UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NCR CORPORATION,<br><br>                          Plaintiff,<br><br>vs.<br><br>B.A.T INDUSTRIES p.l.c.,<br><br>                          Defendant. | Case No. 1:23-cv-1172 |

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff NCR Corporation ("NCR") seeks a declaratory judgment against Defendant B.A.T Industries p.l.c. ("BAT"), and in support thereof, states as follows:

**INTRODUCTION**

1. This case is about one party's unjustified refusal to honor its clear and unambiguous contractual obligation to pay its fair share to clean up a federal Superfund Site, despite promising to do so and despite an arbitration panel's binding decision assigning the exact percentage of the cost to be paid.

2. Between 1954 and 1971, two mills situated on the Fox River in Appleton, Wisconsin produced a revolutionary product: a carbonless copy paper used to easily create duplicate forms used by businesses across the country. During the manufacturing process, those two mills, which eventually formed the Appleton Papers Division of NCR, also generated scrap paper and other waste, known as "broke," which they sold to other mills on the Fox River and elsewhere. Those mills then recycled the waste into other paper products. Unfortunately, and unbeknownst to NCR at the time, the Appleton Papers Division manufacturing processes and the recycling processes used

1

on the broke caused environmental contamination in the Fox River, as well as other waterways in the region.

3. In 1978, BAT purchased the entire Appleton Papers Division, including the two Appleton mills that had manufactured carbonless copy paper, and all of its other assets and liabilities. BAT formed a subsidiary to receive those assets and liabilities, which then changed its name to Appleton Papers Inc. ("API").

4. When the contamination of the Fox River was discovered and environmental cleanup began in the 1990s, federal and state environmental regulators identified both NCR and API as potentially responsible for investigation and cleanup of the contaminated areas of the Fox River. NCR and BAT/API each claimed that, as between them, the other party was responsible for all such costs under the terms of the asset purchase agreement.

5. Following litigation and mediation, on February 12, 1998, NCR, BAT, and API entered into a binding "Confidential Settlement Agreement" (or "CSA") to allocate each party's respective share of any environmental costs relating to the Fox River or other sites that might in the future be alleged to be contaminated by the activities of the Appleton Papers Division. The Confidential Settlement Agreement labeled these other sites "Future Sites." As relevant to the present dispute, BAT and API (which is now bankrupt) agreed to joint and several liability for 55 percent of costs relating to the Fox River or Future Sites, and NCR agreed to liability for the remaining 45 percent, for the first $75 million in costs. The parties also agreed to arbitrate the allocation of costs beyond that threshold, and an arbitration panel issued a ruling that increased BAT and API's joint and several liability to 60 percent and decreased NCR's liability to 40 percent for all future costs.

6. For years following the parties' Confidential Settlement Agreement, NCR and BAT adhered to its terms. They shared the costs of investigation and cleanup of the Fox River in Wisconsin for more than a decade, with cleanup of that site successfully completed in 2020.

7. When similar environmental claims arose at one of the Future Sites—the Kalamazoo River—in 2010, NCR and BAT continued to coordinate for almost a decade as NCR determined the scope of potential liability and defended against environmental claims relating to contaminated areas at this site. It was only after NCR finished negotiating a consent decree with the government that fixed its obligations to clean up a portion of the river that BAT reversed course and contended for the first time that the Kalamazoo River was not a Future Site. In doing so, it renounced its obligations under the Confidential Settlement Agreement to pay its fair, agreed, and ordered share of the investigation and cleanup of the Kalamazoo River.

8. NCR brings this lawsuit to compel BAT to live up to its end of the bargain. This complaint asks this Court to enforce the clear and plain terms of the Confidential Settlement Agreement and issue a declaration that the Kalamazoo River is a "Future Site" covered by the Confidential Settlement Agreement, for which BAT is obligated to pay its share of the potentially hundreds of millions of dollars of investigation and cleanup costs. The declaratory relief sought here will satisfy the core purpose of the Declaratory Judgment Act: to clarify and settle the legal relations and obligations between the parties before significant and potentially avoidable damages have accrued, and resolve the uncertainty concerning which party must bear environmental costs running into the hundreds of millions of dollars that will be incurred in the coming years.

## THE PARTIES

9. NCR is the world's leading provider of software, hardware, and services for banks, retailers, restaurants, telecommunications providers, and other industries, powering technology for businesses from the corner coffeeshop to global conglomerates. Over the years, NCR has invented

the electronic cash register, the magnetic credit card strip, and self check-out machines, among other hardware and software business solutions. NCR is incorporated under the laws of Maryland, and its principal place of business is in Atlanta, Georgia.

10. On information and belief, BAT is a British investment holding company for subsidiary undertakings of the British American Tobacco p.l.c. group of companies, which operate in more than 100 countries worldwide. Those subsidiaries are engaged primarily in the manufacture of tobacco and other nicotine products and the provision of financial and insurance services. BAT is organized under the laws of the United Kingdom, and its principal place of business is in London.

## JURISDICTION AND VENUE

11. NCR brings this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b) because BAT is subject to personal jurisdiction in this District, having expressly consented to the jurisdiction of the Southern District of New York in the 1978 Agreement of Purchase and Sale of Assets (the "Asset Purchase Agreement") and the 1998 Confidential Settlement Agreement.

## FACTUAL BACKGROUND

### A. BAT's Acquisition of NCR's Appleton Papers Division

14. In the 1950s, NCR developed and began to manufacture a carbonless copy paper, which it sold under the brand "NCR Paper." From its introduction in 1954 until 1971, NCR Paper contained polychlorinated biphenyls ("PCBs") as an ingredient.

4

15. NCR Paper was manufactured at two mills located on the Fox River in Appleton, Wisconsin. Initially, these mills were operated by separate companies, but in the late 1960s and early 1970s NCR purchased the mills and merged the predecessor entities to form the Appleton Papers Division.

16. In 1978, NCR sold the entire Appleton Papers Division to BAT, which created a new subsidiary to receive the assets. That subsidiary originally was called Lentheric, Inc., but was subsequently renamed Appleton Papers Inc., and later Appvion Inc. (collectively, "API"). In 1989, BAT spun off its ownership of API.

17. The Appleton Papers Division that BAT purchased has been linked to at least two rivers that have become large Superfund cleanup sites: the Fox River and the Kalamazoo River.

B.  **The Fox River Claims and the 1998 Confidential Settlement Agreement**

18. In 1994, the State of Wisconsin notified NCR and API that they were potentially responsible parties under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA" or "Superfund") for cleanup costs and natural resources damages in the Fox River. At that time, numerous federal and state governments and agencies were overseeing investigation and cleanup of PCB-contaminated sediment lying on the bottom of the Fox River in northeastern Wisconsin (the "Fox River Site"). This contamination was alleged to be traceable to the Appleton Papers Division in two ways: First, the Appleton Papers Division mills were located on the Fox River and were alleged to have directly discharged PCBs to the Fox River. Second, the two mills were alleged to have sold paper scrap, known as "broke," to brokers and other mills on the Fox River which recycled the broke into new paper products. During the recycling process, the PCB coating on NCR Paper was stripped off and discharged into the Fox River.

19. NCR and API initially cooperated as part of a defense group with the recycling mills alleged to have purchased Appleton Papers Division broke and to have discharged PCBs into the

Fox River. However, as the full costs relating to the environmental litigation became clear, NCR, on the one hand, and BAT and API, on the other, each argued that the Asset Purchase Agreement had assigned to the other the full burden of any CERCLA costs, damages, or claims.

20. In 1995, NCR filed a suit seeking a declaratory judgment that BAT and API were jointly and severally liable for all costs NCR incurred relating to contamination in the Fox River under the Asset Purchase Agreement.

21. In early 1998, the Parties engaged in mediation to resolve the litigation and settle their respective liabilities for any claims or damages arising out of the Fox River Site and any "Future Sites" that might one day be alleged to have been contaminated by PCBs from the Appleton Papers Division operations. That mediation resulted in the Confidential Settlement Agreement.

22. The Confidential Settlement Agreement explicitly defined the share of costs that each party would bear relating to the Fox River Site and any "Future Sites." The Parties agreed to an "Initial Allocation" of "all Damages or Group Defense Costs allocated or assessed to, imposed upon, or incurred by NCR or API/BAT, either singly or collectively, related to the Fox River sites . . . or Future Sites as follows: 55% will be borne by API/BAT and 45% will be borne by NCR, up to a total of $75,000,000 in the aggregate." CSA ¶ 3.

23. The Confidential Settlement Agreement also provided for a "Subsequent Allocation" to be set through arbitration for any damages or costs in excess of $75 million. CSA ¶ 4. The Parties arbitrated the Subsequent Allocation, and the arbitration panel determined that 60 percent of additional costs would be borne by API/BAT and 40 percent of such costs would be borne by NCR.

24. The "Damages and Group Defense Costs" allocated by the Confidential Settlement Agreement are quite broad.

25. "Damages" include, among other things, "all out-of-pocket study, restoration, acquisition, cleanup, removal, remedial, investigative, oversight or response costs, or penalties

allocated or assessed to, imposed upon, or incurred by NCR or API/BAT in response to Claims . . . ; [and] all damages, including national resource damages, allocated or assessed to, imposed upon, or incurred by NCR or API/BAT in response to Claims."

26. Likewise, "Group Defense Costs" include "all investigation, administrative and defense costs allocable to NCR or API/BAT in connection with . . . the activities of any group of allegedly responsible parties formed by API, NCR, and any other [potentially responsible parties] in connection with the Fox River sites or at any of the Future Sites."

27. The Confidential Settlement Agreement defines "Future Sites" to include "any facility, property, or location, other than the Fox River sites, alleged to be contaminated with Hazardous Substances as a result, in whole or in part, of the manufacture, recycling, deinking, or repulping of any amount of PCB-containing NCR Paper brand carbonless paper that was manufactured utilizing the assets that were the subject of the Purchase Agreement [of the Appleton Papers Division]." CSA ¶ 1.i.

28. Under the express terms of the Confidential Settlement Agreement, BAT and API are jointly and severally liable for their share of damages and costs under both the Initial Allocation and the Subsequent Allocation, arising from either the Fox River or any other Future Site.

29. For many years, NCR shared costs with one or both of BAT and API relating to the Fox River Site. In 2001, NCR and API entered into an interim consent decree to provide funding for a variety of government cleanup and natural resource restoration projects.

30. In the ensuing years, NCR designed a cleanup remedy via an administrative settlement agreement with the U.S. Environmental Protection Agency (the "EPA"), which involved dredging millions of cubic yards of river sediment and placing engineered caps and sand covers in other parts of the river. In 2007, the EPA ordered NCR, API, and six other companies to conduct the cleanup.

31. NCR played the lead role in the cleanup work at the Fox River Site. The physical portion of that work was completed successfully in September 2020, and EPA issued a certificate of completion for that work in October 2022. The Fox River Site has now been fully remediated at a total cost of nearly $1 billion.

32. NCR spent hundreds of millions of dollars during the course of the investigation and cleanup of the Fox River Site. Between 1998 and 2012, API paid 55 percent of those costs until the $75 million threshold was reached, and thereafter paid 60 percent of the costs that NCR incurred.

33. When the Parties jointly contracted for work, they likewise divided the costs according to the percentages set forth in the Initial and Subsequent Allocations section of the Confidential Settlement Agreement.

34. After a dispute arose in 2012, NCR, BAT, and API agreed to amend the cost sharing allocations with respect to the Fox River Site only; however, the cost allocations agreed upon in the Confidential Settlement Agreement —and as determined by the arbitration of the Subsequent Allocation—remained in effect for all other sites, including all Future Sites.

    **C.**    **The Kalamazoo River Claims**

35. In 1990, the EPA and the State of Michigan began a CERCLA investigation of the Kalamazoo River Superfund site in southwestern Michigan, where PCB-contaminated sediment alleged to have come from carbonless copy paper has accumulated (the "Kalamazoo River Site").

36. As a result, during the 1990s, a number of paper companies performed a multi-million dollar investigation of the Kalamazoo River Site under an agreement with the State of Michigan. Those companies filed a lawsuit seeking contribution from several additional companies for the investigation and cleanup costs. Neither NCR nor BAT was involved in that lawsuit in any capacity.

37. More than a decade later, in November 2010, the EPA notified NCR that it may be liable for cleanup relating to the Kalamazoo River site because "EPA has reason to believe that NCR arranged for the transportation and disposal of paper material containing PCBs to the site."

38. At around the same time, Georgia-Pacific Consumer Products LP ("Georgia-Pacific"), which had purchased one of the companies involved in performing the investigation of the Kalamazoo River Site, sued NCR and two other companies for cost recovery and contribution under CERCLA (the "Georgia-Pacific Litigation"). Georgia-Pacific alleged that (a) the broke generated by the Appleton Papers Division mills was sold either directly or through third-party waste paper brokers to paper companies for recycling and de-inking, (b) NCR, its subsidiaries and its various contract coaters—including the Appleton Papers Division mills—shipped (or arranged to ship) this PCB-containing broke, and (c) the recycling of this broke was "the Principal Source" of contamination at the Kalamazoo River Site.

39. Georgia-Pacific therefore alleged that NCR was liable for cleanup at the Kalamazoo River Site, at least in part, because the Appleton Papers Division mills sold substantial quantities of PCB-containing waste to brokers and dealers that ended up getting recycled or deinked at paper mills on the Kalamazoo River.

40. After a 2013 liability-phase trial, NCR and another defendant were found to be responsible parties under CERCLA and were held liable for costs incurred by Georgia-Pacific relating to contamination at the Kalamazoo River Site. Following a subsequent share-allocation trial in 2018, NCR was assigned a 40 percent share of Georgia-Pacific's past costs. The court did not allocate the shares of any future costs incurred by Georgia-Pacific attributable to NCR.

41. While litigation among the private parties unfolded, investigation and cleanup of the Kalamazoo River Site continued. The EPA has issued cleanup decisions for several sections of the Kalamazoo River and several upland areas, and cleanup work in several areas has begun.

42. In December 2020, after consultation with BAT, NCR entered a consent decree with the United States and the State of Michigan, under which NCR agreed to clean up certain portions of the Kalamazoo River in return for a release of liability for the entire site (the "Kalamazoo Consent Decree"). The consent decree also satisfies NCR's entire Kalamazoo liability to the federal and state governments for any future costs that Georgia-Pacific or any other private party might incur.

43. NCR estimates its costs under the consent decree to be in excess of $350 million, including direct cleanup costs and payments to the EPA, the State of Michigan, and the Kalamazoo River natural resource trustees.

**D.     The Present Dispute**

44. For many years, NCR has coordinated closely with BAT (and, until its bankruptcy in 2017, API) and kept it fully apprised concerning the developments on the Kalamazoo River. NCR and BAT held numerous in-person meetings in both London and New York, and shared between themselves drafts of pleadings, consent decrees, and other related documents regarding the Georgia-Pacific Litigation and claims by federal and state environmental regulators. NCR invited BAT to provide input into these issues, and to voice any objections regarding its defense strategy.

45. During the liability and share allocation phases of the Georgia-Pacific Litigation, BAT embedded its outside environmental lawyer in the NCR trial team. That lawyer attended the trial and participated with the NCR trial team in strategy meetings, witness preparation sessions, and sidebars.

46. As NCR negotiated the Kalamazoo Consent Decree, NCR conferred with BAT to ensure it had no objection to NCR's entering the consent decree. NCR also notified BAT that, pursuant to the Confidential Settlement Agreement, BAT would be required to pay for 60 percent of the resulting cost under the Consent Decree.

47. In January 2019, the Parties met in London for what BAT described as a commercial discussion regarding defense strategy and how much might be owed under the Kalamazoo Consent Decree. At that meeting, BAT asserted that NCR did not have much choice but to settle the Kalamazoo River liability.

48. Five months later, on June 3, 2019, BAT changed its tune and for the first time disclaimed any obligation to pay for *any* share of the cleanup costs at the Kalamazoo River Site.

49. BAT took the untenable position that the Confidential Settlement Agreement did not "apply at all to the liabilities now faced by NCR" because, among other things, the "only connection in fact between the Kalamazoo River and NCR" was through facilities in a different NCR division, Systemedia, and not the Appleton Papers Division assets sold to BAT.

50. BAT asserted, for the first time, that the Kalamazoo River is not a "Future Site" within the meaning of the Confidential Settlement Agreement.

51. BAT also asserted two additional, unsupportable bases for its newly-minted position that the Confidential Settlement Agreement did not apply to the Kalamazoo River Site. First, BAT claimed that the Confidential Settlement Agreement was "vitiated by material misrepresentation and failure to disclose matters known to NCR and relevant to the liabilities now faced by NCR," and that BAT was therefore "not bound" by the Confidential Settlement Agreement "in respect of the Kalamazoo River." Second, it asserted that NCR had incurred costs relating to the Kalamazoo River "as a result of its own bad conduct," and that BAT was "not obliged to pay for the consequences of that conduct." BAT never specified which statements were purported "material misrepresentations," which matters "known to NCR" were not disclosed, or which acts amounted to "bad conduct." But, in any event, BAT's desperate arguments do not support its efforts to avoid its obligations under the Confidential Settlement Agreement.

52. BAT has renounced its obligations under the Confidential Settlement Agreement. BAT's refusal to honor its obligations, unless remedied, will impose on NCR the burden of shouldering the full cost of cleaning up sections of the Kalamazoo River Site, the majority of which is BAT's responsibility to bear.

### E. Dispute Resolution Procedures Under the Confidential Settlement Agreement

53. The Confidential Settlement Agreement requires that, "[i]n the event of any disputes under this Agreement," the Parties will follow a specific dispute resolution procedure, beginning with a three-step inter-company dispute escalation procedure. Under step one of that procedure, "the parties shall submit the issue for resolution to their respective General Counsel, who shall attempt in good faith to resolve the dispute." If the General Counsel cannot resolve the dispute, then the parties proceed to step two, under which they "submit the issue for resolution to their respective Chief Financial Officers who shall also negotiate in good faith to resolve the matter." If the Chief Financial Officers are unsuccessful, the parties move to the final step in the inter-company dispute escalation procedure, and "participate in non-binding mediation before a mediator jointly agreed upon [by] the parties."

54. If the dispute escalation procedure is ineffective, the Confidential Settlement Agreement allows the parties to proceed to litigation, with one exception. The Parties are required to arbitrate "Funding Disputes," defined as "disputes over payment of any Damages or Group Defense costs allocated to or assessed upon NCR or API/BAT." All other disputes—including the present dispute regarding the status of the Kalamazoo River Site as a "Future Site" within the meaning of the Confidential Settlement Agreement—may be litigated in any court having jurisdiction over the dispute.

55. During the second half of 2019, the Parties completed the inter-company dispute escalation procedure, culminating with a mediation in December 2019. The Parties were unable to

resolve their dispute over cost-sharing related to the Kalamazoo River Site. Accordingly, NCR now seeks a declaratory judgment to resolve the Parties' rights and obligations under the Confidential Settlement Agreement.

## COUNT I
### Declaratory Judgment Against BAT
### Pursuant to 28 U.S.C. § 2201

56. NCR incorporates by reference the allegations set forth in paragraphs 1-55 above as if fully set forth herein.

57. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

58. An actual controversy has arisen between NCR and BAT because BAT has refused to fulfill its obligations under the Confidential Settlement Agreement to bear 60 percent of costs incurred by NCR relating to the Kalamazoo River Site.

59. The Kalamazoo River Site is a "Future Site" under the express terms of the Confidential Settlement Agreement. Among other reasons, during the Georgia-Pacific Litigation, it was alleged to be contaminated, at least in part, from the manufacture, recycling, or deinking of PCB-containing NCR paper manufactured by the Appleton Papers Division mills acquired by BAT in the Asset Purchase Agreement.

60. Because the damages and costs incurred by NCR relating to the Fox River Site and other Future Sites have exceeded the $75 million reallocation threshold, BAT is obligated to compensate NCR for 60 percent of any costs relating to the Kalamazoo River Site.

61. BAT claims that it has no obligation to pay for any portion of the investigation and cleanup costs relating to the Kalamazoo River because "BAT does not consider that the Agreements

apply at all to the liabilities now faced by NCR" or, alternatively, the Confidential Settlement Agreement has been "vitiated" by NCR's purported misrepresentations or bad conduct, which BAT's vague accusations fail to specify.

62. BAT is incorrect in this assertion. BAT has not identified any legitimate basis to excuse it from its obligation under the Confidential Settlement Agreement to pay its share of costs relating to Future Sites, including the Kalamazoo River Site.

63. The facts giving rise to the actual controversy between the Parties and establishing the right to declaratory relief—including the discharge of PCBs into the Kalamazoo River, the execution of the Confidential Settlement Agreement between the Parties, the allegations against NCR made in the Georgia-Pacific Litigation, the notice provided by the United States and the State of Michigan to NCR, the entry of a consent decree to satisfy NCR's obligations relating to the Kalamazoo River Site, and BAT's refusal to comply with its contractual obligations—already have occurred.

64. Declaratory relief is necessary to resolve the effect of those facts on the legal rights and obligations of the Parties and to lift the cloud of uncertainty shadowing the allocation of costs relating to the Kalamazoo River, before NCR takes further action with respect to cleanup at the Kalamazoo River Site and accrues significant damages in the coming years.

65. Accordingly, NCR is entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring that the Kalamazoo River Site is a "Future Site" under the terms of the Confidential Settlement Agreement, and that BAT is therefore obligated to compensate NCR for 60 percent of any costs it incurs relating to the Kalamazoo River Site.

## PRAYER FOR RELIEF

WHEREFORE, NCR respectfully prays that this Court award relief and judgment including:

a) a declaration that the Kalamazoo River Site is a "Future Site" under the Confidential Settlement Agreement and that BAT must therefore compensate NCR for 60 percent of any costs it incurs relating to the Kalamazoo River Site;

b) reimbursement of NCR's costs and expenses incurred in this action, including reasonable attorneys' fees; and

c) such other and further relief as this Court deems just and proper.

Dated: February 10, 2023
New York, New York

Respectfully submitted,

**SIDLEY AUSTIN LLP**

/s/ John J. Kuster
John J. Kuster
Zachary Payne
787 7th Avenue
New York, NY 10019
(212) 839-5300
jkuster@sidley.com
zpayne@sidley.com

Bruce R. Braun (*pro hac vice* application forthcoming)
Charles K. Schafer (*pro hac vice* application forthcoming)
One South Dearborn
Chicago, IL 60603
(312) 853-7000
bbraun@sidley.com
cschafer@sidley.com

*Attorneys for Plaintiff NCR Corporation*