UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                       :

NCR CORPORATION,                           :

                                :

                Plaintiff,             :

                                :                    23 Civ. 1172 (JPC)

            -v-                       :

                                :                  OPINION AND ORDER

B.A.T. INDUSTRIES P.L.C.,               :

                                :

                Defendant.            :

                                :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff NCR Corporation ("NCR") brings this action against Defendant B.A.T. Industries p.l.c. ("BAT"), seeking a declaratory judgment that, under the terms of a 1998 Confidential Settlement Agreement ("CSA"), BAT is obligated to compensate NCR for sixty percent of any costs NCR incurs in certain environmental cleanup efforts in the Kalamazoo River. BAT has asserted five counterclaims, all of which seek declaratory judgments that either the CSA is void or BAT has no liability to NCR for various reasons, and eight affirmative defenses. Before the Court are NCR's motions for judgment on the pleadings as to its Complaint, to dismiss BAT's counterclaims, and to strike BAT's affirmative defenses. Because BAT has raised a question as to the enforceability of the CSA, as reflected in the allegations supporting certain counterclaims, NCR's motion for judgment on the pleadings is denied. The Court dismisses BAT's third, fourth, and fifth counterclaims, but otherwise denies NCR's motion to dismiss. The Court also strikes BAT's eighth affirmative defense, but otherwise denies NCR's motion to strike.

# I. Background[1]

## A.    Factual Background

Between 1954 and 1971, NCR manufactured and sold carbonless copy paper ("CCP"). Counterclaims ¶ 25. CCP, which was used to create exact copies of documents without the need for carbon paper, worked by coating one piece of paper in a special substance that contained a solvent, colorless ink capsules, and other chemicals. *Id.* ¶¶ 5, 25. Another piece of paper was coated in a different substance that, when pressed to the first piece and placed under pressure from an instrument like a pen, would interact with the coating on the first piece of paper and cause the second piece of paper to turn blue from the ink capsules. *Id.* ¶ 25.

NCR manufactured CCP at two mills located on the Fox River in Appleton, Wisconsin; these two mills formed the company's Appleton Papers Division ("APD"). Compl. ¶ 2; Counterclaims ¶ 29. In 1978, NCR sold the assets and liabilities of APD to a BAT subsidiary, Lentheric Inc., which "assumed certain liabilities of the APD" and subsequently changed its name to Appleton Papers Inc. ("API"). Counterclaims ¶ 8. Over a decade later, BAT spun off its ownership of API. Compl. ¶ 16; Ans. ¶ 16.

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from BAT's Counterclaims, Dkt. 21 at 16-40 ("Counterclaims"), as well as documents incorporated by reference in or integral to the counterclaims, most notably the parties' CSA, Dkt. 31 ("Kuster Decl."), Exh. A. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010); *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 90 (S.D.N.Y. 2020); *see also Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); Dkt. 21 at 1-16 ("Ans.") ¶ 22 ("BAT further states that the terms of the CSA speak for themselves, and denies any characterization of the CSA by NCR."). The Court also relies on those facts alleged in the Complaint, Dkt. 1 ("Compl."), that BAT has admitted in its Answer. Where the Court cites to NCR's allegations in the Complaint that have not been admitted, it is solely to provide narrative context for NCR's position in the litigation and the nature of the present dispute.

In 1994, the State of Wisconsin notified NCR and API that they were potentially responsible parties for cleanup costs and natural resource damage to the Fox River under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), popularly known as the "Superfund." Compl. ¶ 18; Ans. ¶ 18. As it turned out, the special coating which enabled CCP to produce copies contained polychlorinated biphenyls ("PCBs"), highly toxic pollutants which can cause serious health problems in humans, including liver damage and skin burning and irritation. Counterclaims ¶ 27. Wisconsin alleged that APD directly discharged PCBs into the Fox River during the manufacturing process and sold scrap paper produced as a byproduct of the manufacturing, referred to as "broke," to brokers and paper recycling mills who also discharged PCBs into the Fox River. Compl. ¶ 18; Ans. ¶ 18. This was particularly problematic as PCBs do not dissolve or dissipate in water and instead remain present for decades. Counterclaims ¶ 27. Around this time, the United States Environmental Protection Agency ("EPA") also alleged that NCR and BAT/API were responsible for CERCLA costs at an industrial site in Marina Cliffs, Wisconsin. CSA at 2; *see also* Counterclaims ¶¶ 10, 50.

A dispute quickly arose between NCR and BAT/API about which should bear responsibility for the CERCLA costs. Compl. ¶¶ 19-20; Ans. ¶¶ 19-20. After engaging in mediation, the parties entered into the CSA in July 1999, which was effective as of February 12, 1998. Counterclaims ¶¶ 10, 55; CSA at 1, 25 (three signature pages). Under the CSA, NCR and BAT/API determined that they would "allocate as between themselves all Claims, Damages, and Defense Costs . . . relating to the Fox River sites, to the Marina Cliffs sites . . . and to Future Sites, as defined herein, up to a total of $75 million" (the "Initial Allocation"). CSA at 4. In this Initial Allocation, costs were allocated so that fifty-five percent were borne by BAT/API and forty-five percent were borne by NCR. *Id.* ¶ 3; Counterclaims ¶ 53. If the CERCLA costs relating to the

Fox River sites, the Marina Cliffs sites, or Future Sites exceeded $75 million, the parties agreed in the CSA to arbitrate how the additional costs would be split (the "Subsequent Allocation"), and agreed the outcome of that arbitration would be "final, compulsory, and binding." CSA at 4-5, ¶ 4. An arbitration panel later concluded that the Subsequent Allocation would entail BAT/API bearing sixty percent and NCR bearing forty percent of these costs. Compl. ¶ 23; Ans. ¶ 23.

NCR alleges that after the CSA was signed, "[f]or many years, NCR shared costs with one or both of BAT and API relating to the Fox River Site," Compl. ¶ 29, and the parties agree that NCR "played the lead role in the cleanup work at the Fox River Site," Compl. ¶ 31; Ans. ¶ 31. The parties also agree that Fox River "has now been fully remediated at a total cost of nearly $1 billion." Compl. ¶ 31; Ans. ¶ 31. NCR also alleges that it spent "hundreds of millions of dollars" during the Fox River cleanup, splitting this cost with API according to the terms of the CSA. Compl. ¶ 32. In 2012, NCR, BAT, and API entered into a "funding agreement" for the Fox River Site. Compl. ¶ 34; Ans. ¶ 34. NCR alleges that this was an agreement "to amend the cost sharing allocations with respect to the Fox River Site only," and that the cost allocations of the CSA, including the Subsequent Allocation, remain in effect otherwise. Compl. ¶ 34. BAT avers that under the funding agreement, BAT "advanced monies to NCR in what were effectively loans with express rights of recourse relating to the Fox River environmental cleanup." Ans. ¶ 29.

## B.    The Kalamazoo River Site

In 1990, the Kalamazoo River was added as a site (the "Kalamazoo River Site") to the National Priorities List as a result of the discharge of PCBs from CCP. Ans. ¶ 35; *see* 42 U.S.C. § 9605(a)(8)(B) (requiring that based on provided criteria "the President shall list . . . national priorities among the known releases or threatened releases [of hazardous substances] throughout the United States"). In 2003, the EPA notified NCR that it was investigating whether NCR's broke

4

paper material may have contaminated the Kalamazoo River.  Ans. ¶ 37 (answering that, in 2003, NCR received a notice from the EPA "stating that the EPA was investigating 'to what extent NCR Corporation may have sold, either directly or indirectly through waste paper brokers, NCR paper broke to any of the secondary fiber pulp and paper mills located within the Kalamazoo Rivera area of Michigan'"); *see* Compl. ¶ 37 (alleging that, in November 2010, the EPA notified NCR that it may be liable for cleanup relating to Kalamazoo River because the EPA believed that NCR "arranged for the transportation and disposal of paper material containing PCBs to the site").

At this time, NCR was sued by a group of related paper companies ("Georgia-Pacific") in the United Stated District Court for the Western District of Michigan.  Kuster Decl., Exhibit B ("Georgia-Pacific Compl.").  In its complaint,[2] Georgia-Pacific claimed that NCR broke was the source of PCB contamination in the Kalamazoo River, and that NCR arranged for the PCB-contaminated broke to be disposed by facilities near the Kalamazoo River.  *Id.* ¶¶ 5, 13.  Georgia-Pacific alleged that this contamination was arranged by two coating companies, Appleton Coated Paper Company ("ACPC") and Combined Paper Mills, Inc. ("Combined Locks Mill").  *Id.* ¶¶ 13, 54, 76.  The parties agree that ACPC and Combined Locks Mill were the two paper mills previously owned by NCR which formed APD (and thus were subsequently sold to BAT/API) and which generated broke that was sold to brokers and recycling mills.  Compl. ¶ 2; Ans. ¶ 2.

---

[2] "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).  Thus, the Court does not take the allegations included in Georgia-Pacific's complaint as assumed to be true when deciding the pending motion.  Rather, the Court mentions these allegations as relevant insofar as Georgia-Pacific made them.  *See* Ans. ¶ 39 ("BAT respectfully refers to the filings and findings in that action for Georgia-Pacific's allegations."); *see also infra* II.B.1.

Georgia-Pacific alleged that ACPC and Combined Locks Mill "knew, or reasonably should have known, that the waste would be sold to recyclers and/or de-inkers such as the paper mills on the Kalamazoo River," and that these companies "knew, or should have known, that the reprocessing of waste from the coating process would result in the discharge of wastewater and the disposal of other waste containing PCBs."  Georgia-Pacific Compl. ¶¶ 77-78.

In a 2013 liability-phase trial, NCR was found to be a responsible party under CERCLA and held liable for costs relating to the Kalamazoo River contamination.  Compl. ¶ 40; Ans. ¶ 40.  NCR subsequently entered a consent decree with the United States and Michigan, under which NCR agreed to clean up portions of the Kalamazoo River in return for a release of liability for the entire site.  Compl. ¶ 42; Ans. ¶ 42.  NCR alleges that its costs under the consent decree will exceed $350 million.  Compl. ¶ 43.

Although API went bankrupt in 2017, *id.* ¶ 44; Counterclaims ¶ 72, NCR claims that it "coordinated closely with BAT" about the CERCLA issues on the Kalamazoo River.  Compl. ¶ 44.  BAT admits that "NCR has shared some information with BAT related to the Kalamazoo River subsequent to the execution of the CSA," that the two companies "held meetings in both London and New York related in part to the Kalamazoo River," that "NCR provided BAT with certain documents related to the Georgia-Pacific Litigation . . . and claims by federal and state environmental regulators related to environmental cleanup," and that BAT even engaged an outside lawyer who participated in NCR's response to Georgia-Pacific's lawsuit and subsequent trial.  Ans. ¶¶ 44-45.  BAT further admits that "NCR and BAT had discussions regarding the Kalamazoo Consent Decree and the CSA," but contends that NCR "entered into the Kalamazoo Consent Decree based on its own decision and for its own commercial reasons."  *Id.* ¶ 46.

NCR claims BAT informed NCR in June 2019 that BAT "disclaimed any obligation to pay

for any share of the cleanup costs at the Kalamazoo River Site." Compl. ¶ 48. BAT agrees that, on June 3, 2019, it sent NCR a letter "rejecting NCR's demand for payment by BAT of cleanup costs at the Kalamazoo River." Ans. ¶ 49. NCR claims that in this letter, BAT argued the CSA did not apply to the Kalamazoo River Site because the PCB pollution was caused by a different NCR division than APD and that the CSA's definition of "Future Sites" does not cover the Kalamazoo River Site. Compl. ¶¶ 49-50. NCR also says that BAT claimed it was not bound by the CSA as to the Kalamazoo River Site because NCR materially misrepresented the scope of its liabilities and failed to disclose matters related to these liabilities, and that the costs NCR had incurred related to the Kalamazoo River Site were a result of NCR's own bad conduct. *Id.* ¶ 51.

While NCR's tale is of a corporate contract broken by a company unwilling to pay its fair share, BAT tells the story differently. According to BAT, when the parties negotiated the CSA, NCR hid its involvement in polluting the Kalamazoo River and the scope of its potential liabilities. BAT alleges that it "was unaware of any sites other than the two expressly listed in the CSA," and that any other sites were not mentioned during the parties' mediation. Counterclaims ¶¶ 54-56. But BAT says that when NCR returned the first draft of the CSA, the agreement inserted language relating to "Future Sites." *Id.* ¶ 55. BAT alleges that NCR's counsel said that "NCR was proposing to apportion liability for 'potential future sites' on the basis that 'NCR paper was recycled at mills other than those on the Fox River,' and that the new language would apply to 'Future Sites, if any.'" *Id.*

BAT claims that NCR personnel have since admitted in depositions that the Kalamazoo River Site was "lurking out there" as a liability at the time of the CSA negotiations, and that NCR "was, in fact, fully aware that it had trucked CCP broke to the Kalamazoo River." *Id.* ¶ 57. Yet, NCR's counsel "provided no information about Kalamazoo" and "there was no mention of

Kalamazoo" during the CSA negotiations. *Id.* ¶¶ 55-56. In particular, according to BAT, "NCR never disclosed the fact that it had arranged for the discharge of its broke into the Kalamazoo River, or its expectation that the Kalamazoo River would be a future site or that it was fully aware of the likelihood that NCR would have arranger liability in respect of it," and these were "facts [NCR] intentionally concealed from BAT." *Id.* ¶ 58. As a result, when the CSA was signed "BAT was unaware of any future sites (actual or potential) outside the Fox River and Marina Cliffs sites." *Id.* ¶ 56. Nonetheless, the final version of the CSA was "intentionally drafted [by NCR] . . . to attempt to cover Kalamazoo" through the "Future Sites" language. *Id.* ¶ 59.

## C.    Procedural History

After the parties unsuccessfully engaged in a dispute resolution process outlined in the CSA, Counterclaims ¶ 73, NCR filed its Complaint in this Court on February 10, 2023, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332(a) and asserting a single count under the Declaratory Judgment Act, 28 U.S.C. § 2201. Dkt. 1.[3] NCR seeks a declaratory judgment that Kalamazoo is covered as a "Future Site[]" under the CSA and that BAT is obligated to compensate NCR for sixty percent of any costs it incurs related to the Kalamazoo River Site. Compl. ¶ 65.

On June 23, 2023, BAT filed its answer and counterclaims against NCR. Dkt. 21. In answering the Complaint, BAT pleads eight affirmative defenses: (1) the Complaint fails to state a claim upon which relief can be granted; (2) NCR's claims are barred because NCR has breached

---

[3] NCR pleads that venue is proper in this Court "because BAT is subject to personal jurisdiction in this District, having expressly consented to the jurisdiction of the Southern District of New York in the 1978 Agreement of Purchase and Sale of Assets (the 'Asset Purchase Agreement') and the 1998 Confidential Settlement Agreement." Compl. ¶ 13; *see* 28 U.S.C. § 1391(b)(2) ("A civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.").

the CSA; (3) NCR's claims are barred under the doctrine of equitable recoupment because NCR fraudulently induced BAT to enter into the CSA; (4) NCR's claims are barred by NCR's unclean hands; (5) NCR's claims are barred by the doctrines of waiver, estoppel, and/or laches; (6) NCR's claims are barred by NCR's failure to mitigate its damages; (7) NCR's claims are barred by public policy; and (8) NCR's claims are barred under the doctrine of *in pari delicto*.  Ans. at 15-16.

BAT also asserts five counterclaims, all seeking declaratory judgments.  BAT seeks declarations that (1) "NCR fraudulently induced BAT to enter into the CSA and that, as a result, the CSA is null and void," Counterclaims ¶ 84; (2) "NCR negligently induced BAT to enter into the CSA and that, as a result, the CSA is null and void," *id.* ¶ 94; (3) BAT "has no liability to NCR for any cleanup costs relating to the Kalamazoo River," *id.* ¶ 101; (4) BAT "has no liability to NCR for any cleanup costs relating to the Kalamazoo River under the doctrine of *in pari delicto*," *id.* ¶ 108; and (5) BAT "has no liability to NCR for any cleanup costs relating to the Kalamazoo River, as any requirement to reimburse such damages would violate public policy," *id.* ¶ 120.

On October 2, 2023, NCR moved for judgment on the pleadings, to strike all of BAT's affirmative defenses, and to dismiss all of BAT's counterclaims.  Dkts. 29, 30 ("Motion"), 31. BAT filed its opposition to NCR's motions on November 20, 2023, Dkt. 34 ("Opposition"), and NCR filed its reply on December 22, 2023, Dkt. 37 ("Reply").  The Court addresses NCR's motion for judgment on the pleadings first, then turns to the motion to dismiss BAT's counterclaims, and concludes with NCR's motion to strike BAT's affirmative defenses.

## II.  Motion for Judgment on the Pleadings

### A.    Standard of Review

"Judgment on the pleadings 'is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings.'"  *VCG*

*Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 339 (S.D.N.Y. 2008) (quoting *Sellers v. M.C. Floor Crafters Inc.*, 842 F.3d 639, 642 (2d Cir. 1988)). "When a plaintiff is the movant [in a motion for judgment on the pleadings under Rule 12(c)], courts must accept all factual allegations in the answer and draw all reasonable inferences in favor of the defendants, who are the non-movants in that scenario." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021). In this procedural context, "the question for determination is whether on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law." *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, No. 22 Civ. 8842 (JLR), 2023 WL 5971144, at *5 (S.D.N.Y. Sept. 14, 2023) (internal quotation marks omitted). "In other words, if a defendant's answer admits, alleges, or fails to deny facts which, taken as true, would entitle a plaintiff to relief on one or more claims supported by the complaint, then the plaintiff's Rule 12(c) motion should be granted." *Allstate Ins. Co. v. Vitality Physicians Grp. Practice P.C.*, 537 F. Supp. 3d 533, 545 (S.D.N.Y. 2021) (internal quotation marks omitted).

**B.    Discussion**

NCR moves for judgment on the pleadings on the grounds that the Subsequent Allocation provision unambiguously applies to the Kalamazoo River Site because that site qualifies as a "Future Site[]" under the CSA. Motion at 7-11. BAT responds that the CSA does not cover the Kalamazoo River Site, Opposition at 8-11, and that the allegations in its counterclaims and affirmative defenses, which challenge the validity and enforceability of the CSA, preclude judgment on the pleadings, *id.* at 11-12. The Court concludes that, although the Kalamazoo River Site qualifies as a "Future Site[]" under the unambiguous language of the CSA, because BAT's affirmative defenses and counterclaims call into question the CSA's enforceability as to BAT's

liability for costs incurred at the Kalamazoo River Site, judgment on the pleadings is not appropriate.

### 1.    Whether the CSA Covers the Kalamazoo River Site

"Judgment pursuant to Rule 12(c) can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties." *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013) (collecting cases). This is because "[t]he initial interpretation of a contract is a question of law for a court." *Id.* "If the contract is unambiguous, the Court may award judgment on the pleadings, assuming no material facts are in dispute." *Neopharm Ltd. v. Wyeth-Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016). But "a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004)). Thus, as an initial matter, judgment on the pleadings is not appropriate if material ambiguity exists in the relevant CSA terms.

The CSA is governed under New York law. CSA ¶ 14. "It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (cleaned up). "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Id.* "The matter of whether the contract is ambiguous is a question of law for the court." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Cervecería Modelo de México, S. de R.L. de C.V. v. CB Brand*

11

*Strategies, LLC*, No. 23-810, 2024 WL 1253593, at *1 (2d Cir. Mar. 25, 2024) (internal quotation marks omitted).  But "[c]ontract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)).

At the heart of this dispute is the meaning of the CSA's term, "Future Sites."  The agreement defines "Future Sites" as

> any facility, property, or location, other than the Fox River sites, alleged to be contaminated with Hazardous Substances as a result, in whole or in part, of the manufacture, recycling, deinking, or repulping of any amount of PCB-containing NCR Paper brand carbonless paper that was manufactured utilizing the assets that were the subject of the Purchase Agreement.[4]

CSA ¶ 1.i.

Before delving into BAT's arguments, it bears noting that BAT's reading of the "Future Sites" language has some degree of tension with its allegations in the counterclaims.  BAT alleges that "at the time of the CSA negotiations, Kalamazoo River was 'lurking out there' as a source of liability for NCR" and as a result, NCR "wanted to include [future sites language] as broadly as geographically as [it] could."  Counterclaims ¶ 57 (alterations in original) (internal quotation marks omitted).  Indeed, according to BAT, "NCR intentionally drafted the provision to attempt to cover Kalamazoo," and inserted the provision's broad language "as a 'sweep up' provision in

---

[4] The "Purchase Agreement" is defined in the CSA as referring to "the 'Agreement of Purchase and Sale of Assets by and among B.A.T Industries Limited, Lentheric, Inc. and NCR Corporation' and the 'Assumption Agreement,' both of which are dated June 30, 1978."  CSA at 2.  Based on the date, these agreements would appear to constitute the contracts which governed NCR's sale of APD to Lentheric.  *See* Counterclaims ¶ 8 (noting that this sale occurred in 1978).

case there was liability at unknown future sites." *Id.* ¶ 59.  NCR would have been quite the bumbling villain if all this subterfuge fell apart because, despite intending for the CSA to cover the exact issue here, its sophisticated counsel erred in drafting the key provision.

Nonetheless, BAT's reading of the "Future Sites" provision as not applying to the Kalamazoo River Site is not persuasive.  BAT presents three arguments in support of its position.  First, BAT points to the term "NCR Paper brand carbonless paper," arguing that this language does not extend to the broke, which was the substance that contaminated the Kalamazoo River.  Opposition at 10.  By BAT's stance, "[p]aper is not branded until it is a finished product ready for sale to consumers," and thus the broke produced in the manufacturing process does not qualify.  *Id.* at 10.  This reading runs afoul of the principle that "[i]n determining the meaning of a contract, th[e] Court will 'look to all corners of the document rather than view sentences or clauses in isolation.'"  *In re Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 172 (S.D.N.Y. 2015); *see Kass v. Kass*, 696 N.E.2d 174, 182 (N.Y. 1998).  By focusing on the "NCR Paper brand carbonless paper" language, BAT ignores that "Future Sites" include those contaminated by "the manufacture, recycling, deinking, or repulping of *any amount*" of such paper, CSA ¶ 1.i (emphasis added), which logically extends to the trimmings and broke produced as a byproduct of manufacturing the finished NCR Paper product.  By BAT's reading, the CSA's "Future Sites" provision would only extend to a scenario where a valuable finished consumer product had been abruptly subjected to "recycling, deinking, or repulping" (and thus contaminating the site with PCBs) instead of sent for sale to consumers.  This understanding further is at odds with the recycling process, which used "paper that does not meet finished product specifications, is damaged in the manufacturing process, or consists of trim or cuttings produced during manufacture and conversion," to "create pulp for recycled paper."  Counterclaims ¶¶ 5, 32.  BAT offers no

13

explanation for why a specialty finished paper product like CCP would be sent for the creation of a presumably less lucrative generic recycled paper product. The Court declines to adopt such an illogical and strained reading of the CSA. *See Western Waterproofing Co., Inc. v. Zurich Am. Ins. Co.*, 685 F. Supp. 3d 157, 162 (S.D.N.Y. 2023).

BAT's reading also runs against "the context of the entire integrated agreement." *Cervecería Modelo de México*, 2024 WL 1253593, at *1. The CSA was primarily drafted in response to the regulatory investigations into the Fox River contamination. Counterclaims ¶¶ 9-10. That contamination was allegedly the result of both APD's "direct[] discharge[]" of PCBs into the Fox River and contamination that occurred because APD had "sold broke to brokers and other mills on the Fox River which recycled the broke into new paper products." Ans. ¶ 18. A cramped reading of the provision to only cover contamination from finished paper and ignoring the allegations about contamination caused by broke improperly detaches the CSA from its historical context and meaning. *See* 11 Williston on Contracts § 32:7 (May 2024) ("[T]he circumstances surrounding the execution of a contract may always be shown and are relevant to a determination of what the parties intended by the words they chose."). The meaning of "Future Sites" is not ambiguous on this basis.

BAT's second and third arguments overlap, so the Court addresses them jointly. BAT argues that "the indemnity only applies to liabilities which are actually attributable to the Acquired Assets," and that "BAT has alleged that NCR's liability is attributable" to other NCR divisions instead of APD. Opposition at 10. BAT also contends that the provision requires establishing causation through a showing that the CCP which contaminated the Kalamazoo River "was manufactured utilizing the assets that were the subject of the Purchase Agreement." *Id.* at 10-11. In BAT's eyes, "[a]llegations of contamination may be sufficient, but allegations of manufacture

are not." *Id.* at 11.

These arguments misread the CSA. To qualify as a "Future Site[]," a location need only be "alleged to be contaminated with Hazardous Substances as a result, in whole or in part, of the manufacture, recycling, deinking, or repulping of any amount of PCB-containing NCR Paper brand carbonless paper that was manufactured utilizing the assets that were the subject of the Purchase Agreement." CSA ¶ 1.i. As NCR persuasively argues, this language requires only an *allegation* that the contamination occurred due to the manufacturing of NCR paper produced by APD. *See* Reply at 4-5.

While BAT's proposed reading is not entirely clear, it seems to suggest that the phrase "as a result . . . of the manufacture . . ." should modify "alleged." But the only natural reading of the CSA is that "as a result . . . of the manufacture . . ." modifies "contaminated." This is because the phrase, "manufacture, recycling, deinking, or repulping of any amount of PCB-containing NCR Paper brand carbonless paper," refers to the accepted method of PCB contamination which occurred. *See* Counterclaims ¶¶ 32-33. BAT cannot manufacture ambiguity in this provision where it is reasonably read to contain none. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."); *see also Neopharm Ltd.*, 170 F. Supp. 3d at 615 ("[T]he Court may not find the contract ambiguous merely because the parties present alternative interpretations.").

BAT's reading also would seem to qualify a location as a "Future Site[]" only where the allegation itself was triggered solely by the fact that the manufacturing process occurred at the location. But that puts the parties in the position of having to ascertain *why* an allegation was made, which would not always be easy to ascertain. NCR's understanding of the provision, on the

15

other hand, solely directs the parties to look to the *kinds* of allegations advanced, which would be obvious from the face of the complaint or request.  It would seem highly unlikely that the parties would have adopted an agreement that focuses their attention on murky issues of motive instead of the relatively clear text of the allegation itself, particularly in the context of CERCLA liability where allegations play a central role in cost due to investigation and response.  *See* Motion at 10 n.4.  This plain reading of the agreement further undercuts BAT's appeal to ambiguity.  *Cf. JA Apparel Corp.*, 568 F.3d at 396-97 ("Ambiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (cleaned up)).

Because of this, the question of liability turns on the nature of the allegations that have been made concerning contamination of the Kalamazoo River.  Under the plain terms of the CSA, if the contamination is alleged to be "as a result, in whole or in part, of the manufacture, recycling, deinking, or repulping of any amount of PCB-containing NCR Paper brand carbonless paper" and further it is alleged that the CCP in question was manufactured "utilizing the assets that were the subject of the Purchase Agreement," the location qualifies as a "Future Site[]."  For the Kalamazoo River Site, Georgia-Pacific has advanced both of these allegations.  *See supra* I.B; *see also* Georgia-Pacific Compl. ¶¶ 5, 13, 54, 76-78; Compl. ¶ 2; Ans. ¶ 2.  Georgia-Pacific (1) alleged that NCR broke was the source of PCB contamination in the Kalamazoo River, and that NCR arranged for the PCB-contaminated broke to be disposed by facilities near the Kalamazoo River, Georgia-Pacific Compl. ¶¶ 5, 13; and (2) alleged that this contamination was arranged by ACPC and Combined Locks Mill, *id.* ¶¶ 13, 54, 76.  Given these allegations, the Kalamazoo River Site qualifies as a "Future Site[]" for purposes of triggering contribution from BAT under the

Subsequent Allocation.

At its core, BAT's attempt to navigate around the CSA fails because "the agreement on its face is reasonably susceptible of only one meaning," *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002), and that meaning covers the Kalamazoo River Site as a "Future Site[]." The Court therefore turns to the question of the enforceability of this contractual provision to determine whether NCR is entitled to judgment at this stage.

### 2.    BAT's Counterclaims and Defenses

BAT alternatively argues that judgment on the pleadings is inappropriate because BAT's allegations in its counterclaims and defenses preclude relief. Opposition at 11-12. Broadly speaking, BAT's counterclaims and defenses challenge the enforceability of the CSA. *See* Ans. at 15-16; Counterclaims ¶¶ 84, 94, 101, 108, 120. Because NCR seeks a declaratory judgment that BAT is "obligated to compensate NCR for 60 percent of any costs it incurs relating to the Kalamazoo River Site," Compl. ¶ 65, relief turns on whether the relevant terms of the agreement are binding. If BAT has pleaded a plausible counterclaim or a valid affirmative defense, judgment on the pleadings in favor of NCR is precluded. As NCR appears to recognize, *see* Reply at 5-6, this implicates the merits of its accompanying motion to dismiss the counterclaims and motion to strike BAT's affirmative defenses. Because for reasons that follow, certain counterclaims and affirmative defenses that challenge the CSA's enforceability survive, the Court concludes that judgment on the pleadings in favor of NCR is not warranted.

### III.  Motion to Dismiss Counterclaims

### A.    Standard of Review

NCR moves to dismiss each of BAT's five counterclaims. "In evaluating a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6), courts apply the same

standard as a motion to dismiss a complaint." *Wells Fargo Bank, Nat'l Ass'n v. GC SHL, LLC*, No. 21 Civ. 8940 (JPO), 2022 WL 3599131, at *2 (S.D.N.Y. Aug. 23, 2022) (internal quotation marks omitted).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a counterclaim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the [counterclaimant] pleads factual content that allows the court to draw the reasonable inference that the [counterdefendant] is liable for the misconduct alleged." *Id.*  A counterclaim's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the [counterclaim] and draw[] all inferences in the [counterclaimant]'s favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## B.    Discussion

### 1.    Fraudulent Inducement

BAT's first counterclaim seeks a declaratory judgment that "NCR fraudulently induced BAT to enter into the CSA and that, as a result, the CSA is null and void."  Counterclaims ¶ 84. "[T]o establish a fraudulent inducement claim, a plaintiff must prove '(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.'" *Wild Bunch, SA v. Vendian Ent., LLC*, No. 17 Civ. 1383 (JSR), 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam)).  A claim for fraud is also subject to the heightened

pleading standards of Federal Rule of Civil Procedure 9(b), which requires parties to "state with particularity the circumstances constituting fraud or mistake." "To meet Rule 9(b)'s pleading standard, a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *President Container Grp. II, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 164 (S.D.N.Y. 2020) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

BAT's counterclaim asserts that "[i]n order to induce BAT to enter into the CSA, and to agree to the 'Future Sites' language proposed by NCR, NCR represented to BAT that it had no reason to think it would face liability at any site other than Fox River and Marina Cliffs, that such liability, 'if any,' was only 'potential' and would arise, if at all, on the basis that 'NCR paper was recycled at mills other than those on the Fox River.'" Counterclaims ¶ 77. BAT also contends that "NCR concealed the fact that it had intentionally arranged for discharges of PCBs into the Kalamazoo River and that it was fully aware of the likelihood of it being found liable as an arranger." *Id.* ¶ 77. To support these assertions, BAT claims that "NCR's representatives have admitted in sworn testimony that they were aware of the likelihood of Kalamazoo liability at the time that the CSA was being negotiated, and these matters are also apparent from NCR's lobbying at the same time, and yet NCR failed to disclose that fact to BAT and instead misrepresented that liability to BAT to induce BAT to enter into the CSA." *Id.* ¶ 78.

NCR argues that BAT's fraudulent inducement claim must be dismissed because the representation BAT alleges was fraudulent—that "NCR represented to BAT that it had no reason to think it would face liability at any site other than Fox River and Marina Cliffs"—relates only to a possibility of a future event, instead of a present fact that can give rise to a misrepresentation necessary to support a fraud claim. Motion at 15-16. "In general, an actionable misrepresentation

during a contractual negotiation 'must be factual in nature and not promissory or relating to future events that might never come to fruition.'" *President Container Grp. II*, 467 F. Supp. 3d at 166 (quoting in turn *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000)).

BAT avers that NCR knew that it had contaminated other sites, yet only told BAT that it "had no reason to think it would face liability at any sites other than Fox River and Marina Cliffs," and that "there was merely a 'potential' for claims in respect of future sites." Counterclaims ¶ 17. But BAT does not allege that NCR had knowledge of any existing *liability*, rather BAT's allegations are that NCR knew that it had contaminated other sites. BAT does not allege that NCR misrepresented the extent of possible contamination; BAT alleges that instead, NCR "represented . . . that 'NCR paper was recycled at mills other than those on the Fox River,' and thus that it 'makes sense' to include such sites in the CSA on an 'if any' basis." *Id.* ¶ 17.

BAT's material misrepresentations position is caught in a bind between the requirement that it plead facts that NCR made false statements and the present facts requirement necessary for fraudulent inducement. NCR's statements throughout the complaint walk a fine line between NCR's knowledge of the extent of contamination and its knowledge of future liability. Yet as NCR argues, BAT's counterclaims do not allege that NCR was aware of any allegation that it was liable for contaminating the Kalamazoo River, even if BAT has pleaded sufficient facts that NCR itself knew such liability was a strong future possibility. *See* Reply at 6-7. "[A]n allegedly fraudulent statement must be a misrepresentation of present fact and not an 'opinion[] or prediction[] of something which is hoped or expected to occur in the future.'" *Dale v. L'Oreal USA, Inc.*, No. 22 Civ. 427 (HG), 2023 WL 3984345, at *7 (E.D.N.Y. June 13, 2023) (quoting *Cantor v. Villucci*, 181 N.Y.S.3d 644, 646 (2d Dep't 2023)). Because those statements of present fact were accurate and any future predictions of possibility cannot support a fraud claim, BAT has

not pleaded sufficient facts to show a material misrepresentation.

BAT's stronger argument lies in omissions. Under New York law, a false representation to support a fraudulent inducement claim "can be either a misrepresentation or the material omission of a fact." *Robinson v. Deutsche Bank Tr. Co. Ams.*, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) (internal quotation marks omitted). But "[n]ondisclosure only becomes actionable . . . where a defendant has a duty to disclose" the information. *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 671 (S.D.N.Y. 2009) (citing *E.B. v. Liberation Publ'ns., Inc.*, 777 N.Y.S.2d 133, 134 (2d Dep't 2004)). BAT maintains that such a duty exists through the special facts doctrine. Opposition at 15-17.

It is a general rule that "[w]hen parties deal at arm['[]s length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002); *see* Motion at 23-24 (arguing that it had no duty to BAT on this basis). But under New York law, "there may be a relationship of trust and confidence sufficient to give rise to a duty to disclose under the 'special facts doctrine.' 'Under that doctrine, a duty to disclose arises where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.'" *Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 499 (S.D.N.Y. 2004) (quoting *P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 252 (1st Dep't 2003)). To demonstrate that a duty arises under the special facts doctrine, BAT would need to "prove that '(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge.'" *Id.* (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995)).

BAT has alleged sufficient facts to plausibly plead that the special facts doctrine applies in this case.  Regarding the first and third prongs, BAT's counterclaims allege that at the time the CSA was negotiated, "NCR was, in fact, fully aware" of the extent of potential liability at the Kalamazoo River Site and that it framed the definition of "Future Sites" to protect itself from the full extent of that liability, while BAT "was unaware" that NCR's liability could extend beyond the Fox River and Marina Cliffs sites.  Counterclaims ¶¶ 56-57.  BAT claims that "NCR never disclosed the fact that it had arranged for the discharge of its broke into the Kalamazoo River, or its expectation that the Kalamazoo River would be a future site or that it was fully aware of the likelihood that NCR would have arranger liability in respect of it," and that these were "facts it intentionally concealed from BAT." *Id.* ¶ 58.  These allegations allow for, at a minimum, the plausible inferences that NCR had "superior knowledge of certain information," namely the extent of its liability, and that NCR knew that BAT was "acting on the basis of mistaken knowledge" when it signed the CSA.  *Travelers Indem. Co. of Ill.*, 322 F. Supp. 2d at 499; *see Aquino by Convergent Distribs. of Tex., LLC v. Alexander Cap., LP*, 632 B.R. 7, 33 (S.D.N.Y. 2021) (explaining that the special facts doctrine has been adequately pleaded where a defendant "knew about [a] conflict of interest and, further, knew that [individuals] were acting on the basis of mistaken knowledge"); *Senior Health Ins. Co. of Penn. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 526-27 (S.D.N.Y. 2018) (holding that allegations of "[t]he creation of . . . a deceptive scheme [to lure investors] clearly satisfies the requirements of the special facts doctrine, and thereby imposes a duty to disclose"); *cf. Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 291-92 (S.D.N.Y. 2023) (dismissing a claim where the special facts doctrine was not plausibly pleaded because the claim "lack[ed] nonconclusory allegations" and the allegations which were made did not permit a "plausibl[e] infer[ence]" of mistaken knowledge).

The second prong of the special facts doctrine, that the "information is not readily available to the other party," *Travelers Indem. Co. of Ill.*, 322 F. Supp. 2d at 499, is primarily where the parties disagree. *Compare* Opposition at 17 (arguing that "BAT could not have reasonably discovered information in diligence that it took a government regulator years to uncover"), *with* Reply at 8-9 (arguing that BAT's failure to conduct diligence is fatal to its appeal to the special facts doctrine). The Court concludes that this dispute cannot be resolved on a motion to dismiss. BAT has pleaded, for example, that NCR "asked Monsanto [the manufacturer of the PCBs used by NCR in its CCP coating, *see* Counterclaims ¶ 36] to conceal the fact that NCR was a major recipient of Monsanto products containing PCBs," that a Michigan federal court found that NCR "deliberately attempted to conceal" its activities at the Kalamazoo River Site,[5] that this site was never discussed in the parties' 1998 mediation, and that this issue was "intentionally concealed from BAT" during the CSA negotiations. *Id.* ¶¶ 45, 47, 52, 55, 58. More generally, BAT claims that it could not "have known [of NCR's involvement in the Kalamazoo River pollution] as such information was known only to NCR" and that at the time of the CSA negotiations, "the public evidence to date did not indicate that NCR had committed acts that would lead to liability for the Kalamazoo cleanup." *Id.* ¶ 79. Although NCR may have a point that the extent of these allegations is thin and that the "Future Sites" language could be a warning flag affecting BAT's responsibility to inquire, Motion at 19; Reply at 9-10, the resolution of this issue is more appropriate at summary judgment after factual development during discovery. *See ADL, LLC v. Tirakian*, No. 06 Civ. 5076 (SJF) (MDG), 2010 WL 3925131, at *16 (E.D.N.Y. Aug. 26, 2010) (declining to dismiss a

---

[5] BAT alludes to the preclusive effect of the *Georgia-Pacific* litigation on NCR. *See* Opposition at 2. The Court need not decide whether the *Georgia-Pacific* litigation affects the Court's analysis and, without the benefit of full briefing on that issue, declines to resolve it at this juncture.

fraudulent omission claim where "whether [a party] had 'superior knowledge' and whether the facts necessary to discover the fraud were 'not readily available' are disputed issues of fact"). At this stage, BAT's allegations sufficiently plead that information regarding the extent of liability was not readily available to it during the CSA negotiations.

BAT's counterclaims also satisfy the particularity pleading requirement of Rule 9(b). *See President Container Grp. II*, 467 F. Supp. 3d at 164. "In cases where the alleged fraud consists of an omission and the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000). The "adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015).

BAT's complaint contains several allegations which satisfy Rule 9(b). These include that "NCR's representatives have admitted in sworn testimony that they were aware of the likelihood of Kalamazoo liability at the time that the CSA was being negotiated . . . and yet NCR failed to disclose that fact to BAT," Counterclaims ¶ 78, citations to particular depositions, *id.* ¶ 57, and representations by named individuals, *id.* ¶ 55. Moreover, the counterclaims allege with particularity what the omissions were, NCR's responsibility for the failed disclosure, the context of the omissions, and how they impacted BAT's decision to enter into the CSA. *Id.* ¶¶ 57-59, 76-81; *see also Remcoda, LLC v. Ridge Hill Trading (PTY) LTD*, No. 21 Civ. 979 (ER), 2022 WL 603998, at *10 (S.D.N.Y. Mar. 1, 2022) ("A successful fraudulent inducement claim should be 'premised on misrepresentations [of material fact] that were made before the formation of the

contract and that induced the plaintiff to enter the contract.'" (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)).  The Court thus concludes that BAT's allegations pass muster under the more exacting Rule 9(b) pleading standard.

NCR further argues that BAT failed to plausibly plead reasonable reliance.  Motion at 25. "[W]hether or not a plaintiff reasonably relied upon a defendant's statements is generally a factual inquiry that cannot be resolved on a motion to dismiss." *President Container Grp. II*, 467 F. Supp. 3d at 168; *accord ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1324 (S.D.N.Y. 1997) ("Courts applying New York law generally have found that the question of a plaintiff's reasonable reliance raises issues of fact that should not be resolved on a motion to dismiss." (collecting cases)).  BAT alleges that "[b]ased on NCR's failure to disclose these material facts, BAT was unaware of them, and was thus fraudulently induced to enter into the CSA." Counterclaims ¶ 81.  Given the totality of BAT's allegations regarding the CSA negotiations and purported omissions of material fact, the counterclaims plausibly plead reasonable reliance at the motion to dismiss stage.  It may be that NCR will have compelling arguments at summary judgment after factual development that the CSA's inclusion of liability for "Future Sites" affects, if not precludes, BAT's ability to establish reasonable reliance, but BAT's allegations speak to its belief in the scope of the liability it assumed that term covers and its resulting willingness to agree to its inclusion in the CSA.  *See Pentacon BV v. Vanderhaegen*, No. 23 Civ. 2172 (KPF), 2024 WL 1255992, at *17 (S.D.N.Y. Mar. 25, 2024) ("[I]n the same way that the alleged information imbalance between Plaintiffs and [Defendant] supports Plaintiffs' claim of actual reliance, it also supports Plaintiffs' claim that their reliance was reasonable."); *Epiphany Cmty. Nursery Sch. v. Levey*, 94 N.Y.S.3d 1, 9-10 (1st Dep't 2019) (holding that "the superior knowledge or means of knowledge on the part of the person making the representation" is a relevant circumstance "[i]n

determining whether justifiable reliance is sufficiently alleged"). This is not a case where any "alleged misrepresentation is explicitly contradicted by the written agreement," Reply at 8 (quoting *Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 595 (S.D.N.Y. 2021)), but is based on omissions regarding the true extent of liabilities that the language's agreement covers and BAT's subsequent willingness to enter into the agreement. Thus, the inclusion of the "Future Sites" language itself does not fully resolve the issue of reasonable reliance, at least as a matter of law at the motion to dismiss stage.

### 2. Negligent Misrepresentation

BAT also brings a counterclaim seeking a declaratory judgment that "NCR negligently induced BAT to enter into the CSA and that, as a result, the CSA is null and void." Counterclaims ¶ 94. "To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'" *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012). As explained above, the counterclaims do not advance a plausible case of falsity necessary to satisfy the second prong of a negligent misrepresentation claim. While BAT argues that "NCR made affirmative statements that [F]uture [S]ites, 'if any,' were merely 'potential,'" Opposition at 21, the allegation BAT points to in the counterclaims contains statements that relate to predictions of future liability, Counterclaims ¶ 17, which are not actionable false representations to maintain a negligent misrepresentation claim. *See Eternity Glob. Master Fund Ltd.*, 375 F.3d at 188 (holding that representations "cannot support a

claim for negligent misrepresentation [if] they are promissory representations about future events").

Nonetheless, "because a negligent misrepresentation claim may be based on the breach of a duty to provide accurate information, it may be premised on an omission." *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 547 (S.D.N.Y. 2012). While NCR claims that omissions "cannot form the basis of a negligent misrepresentation claim because they are premised on the precise type of future contingency that is not actionable under New York law," Motion at 24, that is not the case. BAT's negligent misrepresentation claim instead is based in nondisclosure of key facts related to NCR's past actions. *See* Counterclaims ¶ 90 (explaining that NCR had knowledge that "it had sold broke to mills in the Kalamazoo River area" and that NCR "had intentionally passed off on Kalamazoo recyclers a product it knew to be toxic as useful in order to earn a profit"). BAT's theory is because NCR failed to disclose these facts, BAT was unaware of possible future liability and "was thus induced to enter into the CSA." *Id.* ¶ 91. Thus, BAT's inability to show falsity and its inclusion of statements regarding future liability are not necessarily fatal to its negligent misrepresentation claim.

The issue of duty remains.[6] "In the commercial context, a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals

---

[6] While NCR argues that BAT insufficiently pleaded reasonable reliance for purposes of its negligent misrepresentation counterclaim, Motion at 3, that issue is improper for resolution on a motion to dismiss given the allegations in the counterclaims, for the reasons discussed above at *supra* III.B.1. *See Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 355-56 (S.D.N.Y. 2017) (explaining that the issues involved with determining reasonable reliance for a negligent misrepresentation claim are "a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss" even though "whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss in certain circumstances").

and good conscience the one has the right to rely upon the other for information.'" *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996). "In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.* "[O]nce the nature of the duty has been determined as a matter of law, whether a particular defendant owes a duty to a particular plaintiff is a question of fact." *Id.* at 453.

Regarding specialized expertise, BAT points to NCR's internal knowledge of its PCB-related activities. Opposition at 19-20. But these allegations are not sufficient to undergird the specialized knowledge necessary to maintain a duty for the purposes of negligent misrepresentation. New York courts "have not found specialized knowledge where the alleged area of expertise involves the particulars of the defendant's business." *MBIA Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604, 611 (N.Y. Sup. Ct. 2010) (collecting cases); *see also Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011) ("[T]he mere fact that a defendant possesses certain documentation relating to a transaction is not enough to meet the 'special expertise' element."). BAT's allegations relate solely to "the true situation underlying the misrepresentations pertaining to [NCR's] business" which "does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 402 (S.D.N.Y. 2004).[7]

---

[7] New York law appears to treat differently the special facts doctrine applicable to a fraud claim and the duty required as an element for negligent misrepresentation, likely because "'casual statements and contacts' are prevalent in business," and thus a comparatively stricter duty limitation must be imposed to avoid expanding negligence liability. *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187; *Kimmell*, 675 N.E.2d at 263 (noting that because "a vast majority of

Turning to the special relationship, "[w]hile the existence of a special relationship is a fact-intensive, case-by-case inquiry, courts have dismissed pleadings that contain insufficient allegations on this point." *Amusement Indus.*, 786 F. Supp 2d at 778 (internal quotation marks and citations omitted). NCR argues that this transaction was an arm's length business transaction between sophisticated parties, Motion at 23-24, which is "a circumstance insufficient to create a 'special relationship.'" *Amusement Indus.*, 786 F. Supp 2d at 779 (citing *Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC*, 905 N.Y.S.2d 152 (1st Dep't 2010)); *see also id.* at 779-80 (collecting cases); *Advanced Knowledge Tech, LLC v. Fleitas*, No. 21 Civ. 992 (PKC), 2021 WL 6126966, at *4 (S.D.N.Y. Dec. 28, 2021). And "where, as here, a 'special relationship' is nowhere pled, and the allegations with respect to the other *Kimmell* factors are soft, a claim for negligent misrepresentation is dismissible under Rule 12(b)(6)." *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 188.

Despite these issues, at least one of the *Kimmell* factors could support a duty based on the pleading here: "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell*, 675 N.E.2d at 454. BAT has amply alleged that NCR concealed this information in an attempt to induce BAT to sign the CSA.[8] Counterclaims ¶¶ 55-

---

commercial transactions are comprised of such 'casual' statements and contacts, we have recognized that not all representations made by a seller of goods or provider of services will give rise to a duty to speak with care"). In contrast, the special facts doctrine operates under the relatively more exacting elements, like intent, required to prove fraudulent inducement.

[8] While the parties appear to assume that the heightened pleading requirements of Rule 9(b) apply only to BAT's fraudulent inducement counterclaim, Motion at 21-22; Opposition at 13; Reply at 10, whether the heightened pleading requirements also apply to BAT's negligent misrepresentation counterclaim is a matter of dispute within this Circuit and "the Second Circuit has not provided a clear answer" to that issue. *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 141-42 (S.D.N.Y. 2019). The Court concludes that BAT's claim for negligent misrepresentation would qualify even under the heightened pleading requirements of Rule 9(b) and thus does not reach this issue.

59, 91.  As other courts have noted, not all *Kimmell* factors need be adequately pleaded to support

a claim for negligent misrepresentation.  *Advanced Knowledge Tech*, 2021 WL 6126966, at *5;

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103-04 (2d Cir. 2001); *see also*

*E\*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 290-91 (S.D.N.Y. 2006).  Given

that factual development will bear heavily on the strength of this *Kimmell* factor, and thus inform

the Court's ultimate determination of whether a duty exists, the Court will allow BAT's negligent

misrepresentation counterclaim to proceed past the pleading stage.

### 3.    CSA Liability

NCR moves to dismiss BAT's third counterclaim, which seeks a declaratory judgment that

BAT "has no liability to NCR for any cleanup costs relating to the Kalamazoo River."

Counterclaims ¶ 101.  NCR is correct that this counterclaim is dismissible under the mirror image

rule given the lone count in the Complaint.  *See Orientview Techs. LLC v. Seven For All Mankind,*

*LLC*, No. 13 Civ 538 (PAE), 2013 WL 4016302, at *1 (S.D.N.Y. Aug. 7, 2013) ("A redundant

counterclaim may be dismissed when a counterclaim is merely the mirror image of an opposing

party's claim and the counterclaim serves no independent purpose." (cleaned up)).  BAT does not

respond to this argument, and thus the Court deems this counterclaim abandoned.  *See Fantozzi v.*

*City of New York*, 343 F.R.D. 19, 32 (S.D.N.Y. 2022) ("Courts may, and generally will, deem a

claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should

be dismissed." (internal quotation marks omitted)).   BAT's third counterclaim is therefore

dismissed.

### 4.    *In Pari Delicto*

BAT's fourth counterclaim asserts that BAT "has no liability to NCR for any cleanup costs

relating to the Kalamazoo River under the doctrine of *in pari delicto*."  Counterclaims ¶ 108.  BAT

argues that *in pari delicto* applies based on NCR's "long history of fraudulent activity" and concealment of CCP's toxicity. *Id.* ¶¶ 103-106.

"The doctrine of *in pari delicto* bars a party that has been injured as a result of its own intentional wrongdoing from recovering *for those injuries* from another party whose equal or lesser fault contributed to the loss." *Rosenbach v. Diversified Grp., Inc.*, 926 N.Y.S.2d 49, 51 (1st Dep't 2011) (emphasis added). "In the context of corporate law, the doctrine bars a company that has committed wrongdoing from suing another party who has participated *in the wrongdoing*." *Aviles v. S&P Glob., Inc.*, Nos. 17 Civ. 2987 (JPO), 17 Civ. 6087 (JPO), 17 Civ. 7034 (JPO), 18 Civ. 128 (JPO), 18 Civ. 2416 (JPO), 2020 WL 1689405, at *2 (S.D.N.Y. Apr. 6, 2020) (emphasis added).

As NCR notes, BAT's *in pari delicto* counterclaim is premised on a misunderstanding of the doctrine. *See* Motion at 27; Reply at 11. For *in pari delicto* to bar relief, the wrongdoing BAT points to and the injury NCR asserts in its Complaint must arise from the same conduct. "The *in pari delicto* defense prohibits suits in which the plaintiff is as or more culpable than the defendant *in the conduct forming the basis for the complaint*." *UCAR Int'l Inc. v. Union Carbide Corp.*, 119 Fed. App'x 300, 301-02 (2d Cir. 2004); *see Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010) ("A criminal who is injured committing a crime cannot sue the police officer or security guard who failed to stop him; the arsonist who is singed cannot sue the fire department."). While it is the case that "the law does not require [the parties'] wrongdoing to be of an identical nature for the *in pari delicto* defense to apply," *UCAR Int'l*, 119 Fed. App'x at 302, the Supreme Court's seminal cases concerning the doctrine make clear that the allegation of the plaintiff's wrongdoing must still be tied to "the unlawful activity that is the subject of the suit," *Pinter v. Dahl*, 486 U.S. 622, 636 (1988); *see Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985) (explaining that for *in pari delicto* to apply, the plaintiff must "bear[] at least substantially equal

responsibility *for the violations he seeks to redress*" (emphasis added)).

Here, BAT's *in pari delicto* counterclaim—as well as its affirmative defense, for that matter—is premised on an assertion that NCR's unrelated wrongdoing bars NCR from prevailing in this litigation. Counterclaims ¶¶ 103-08; *see* Opposition at 22-23 (suggesting *in pari delicto* is appropriate here because of the *Georgia-Pacific* court's findings about NCR's involvement in PCB contamination). *In pari delicto* does not apply because, even accepting BAT's assertions about NCR's wrongdoing in PCB contamination, NCR seeks redress for BAT's unwillingness to abide by the terms of the CSA—an entirely different course of supposedly unlawful activity. BAT does not allege that NCR has engaged in any misconduct that relates to NCR's declaratory judgment claim based on BAT's alleged violation of the CSA, and it is not clear how NCR's contract-related "losses result[] from its wrongdoing." Opposition at 22; *see also Reed v. Fortive Corp.*, No. 23-1075, 2024 WL 1756110, at *1 (2d Cir. Apr. 24, 2024) ("[C]onclusory allegations do not satisfy *Iqbal*'s pleading standard.").

BAT cites no cases that adopt its expansive view of the *in pari delicto* doctrine. BAT gestures at *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 987 F. Supp. 2d 311, 321 (S.D.N.Y. 2013), *see* Opposition at 22, a bankruptcy case which discussed the "insider exception" to the doctrine of *in pari delicto*. But this case, like others, simply stands "for the unexceptional proposition that the *in pari delicto* doctrine bars litigation by a corporation against third parties and not against the officers or agents whose wrongdoing has been imputed to the corporation." *Walker, Truesdall, Roth & Assocs., Inc. v. Globeop Fin. Servs. LLC*, 993 N.Y.S.2d 647, 2013 WL 8597474, at *10 (N.Y. Sup. Ct. May 27, 2013). It is unclear how this principle would apply in this case. The other cases BAT highlights tie the application of *in pari delicto* to the same course of wrongdoing that is the subject of the complaint. *See, e.g., MF*

32

*Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 831 (S.D.N.Y. 2016) ("New York courts have long applied the doctrine of *in pari delicto* to bar a debtor from suing third parties for a fraud *in which the debtor participated*." (emphasis added)); *id.* (explaining that "*in pari delicto* bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault *contributed to the loss*" (internal quotation omitted) (emphasis added)); *see also Republic of Iraq v. ABB AG*, 768 F.3d 145, 162-63 (2d Cir. 2014). As BAT has pleaded no facts concerning NCR's wrongdoing regarding BAT's alleged violation of the CSA, which is the subject of this suit, the Court dismisses the fourth counterclaim.

### 5.    Public Policy

Finally, NCR moves to dismiss BAT's fifth counterclaim, which seeks a declaratory judgment that BAT "has no liability to NCR for any cleanup costs relating to the Kalamazoo River, as any requirement to reimburse such damages would violate public policy." Counterclaims ¶ 120. This counterclaim contends that the Kalamazoo River Site costs that NCR must pay are "based on a federal district court in Michigan apportioning 40% of the costs for cleanup at the Kalamazoo River to NCR," and that this number was reached as a result of a conclusion that "NCR must shoulder a share of the cleanup costs far in excess" to its contribution of PCBs. *Id.* ¶¶ 111, 114. BAT alleges that "[s]uch apportionment is a form of punitive damages intended to punish NCR for its bad behavior," and thus any indemnification in the CSA cannot cover such damages because "[i]t is against the public policy of New York to enforce contracts that purport to indemnify a defendant for punitive damages." *Id.* ¶¶ 116-17, 120.

New York law "recognize[s] two situations in which a countervailing public policy will override the freedom to contract, thereby precluding enforcement" of an indemnification

agreement. *J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*, 992 N.E.2d 1076, 1081 (N.Y. 2013). First, "New York prohibits indemnification for punitive damages as against public policy." *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 145 (S.D.N.Y. 2004). "The rationale underlying this public policy exception emphasizes that allowing coverage would defeat the purpose of punitive damages, which is to punish and to deter others from acting similarly." *J.P. Morgan Secs.*, 992 N.E.2d at 1081 (internal quotation marks omitted). Second, under New York law "[i]ndemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury." *Id.* "[T]he public policy exception for intentionally harmful conduct is a narrow one, under which it must be established not only that the insured acted intentionally but, further, that it acted with the intent to harm or injure others." *Id.* (citation omitted).

BAT's fifth counterclaim focuses on the first of these public policy exceptions. Counterclaims ¶ 118 ("NCR is barred from seeking compensation from BAT for such punitive assessments of damages.").[9] NCR argues that the costs allocated in the *Georgia-Pacific* litigation were not punitive damages and thus BAT has not pleaded facts which support application of this exception. Motion at 29; Reply at 12. The Court agrees.

To start, the plaintiff in that litigation sought an equitable apportionment of damages and did not seek the imposition of punitive damages. *See* Georgia-Pacific Compl. at 38. While alone this is not fatal to the claim, it is a relevant factor that at least one judge of this District has

---

[9] While BAT argues that the CSA also is unenforceable on the second ground of intentional harm, Opposition at 24-26, BAT did not plead its public policy counterclaim based on the intentional injury exception, *see generally* Counterclaims ¶¶ 109-120. The Court therefore does not consider that argument. *See Williams v. Rosenblatt Secs. Inc.*, 136 F. Supp. 3d 593, 609 (S.D.N.Y. 2015) ("A plaintiff cannot amend his complaint in [his] response to a motion to dismiss.").

considered in evaluating whether the punitive damages exception to indemnity agreements applies. *See Am. Motorists Ins. Co. v. GTE Corp.*, Nos. 99 Civ. 512 (RCC), 99 Civ. 2214 (RCC), 2000 WL 1459813, at *4 (S.D.N.Y. Sept. 29, 2000) (taking this as one factor into account when considering whether a settlement included payment for punitive damages).

BAT's position is that the *Georgia-Pacific* court "stated expressly that it had enlarged [the damages award] under equitable reasons due to NCR's egregious misconduct." Opposition at 27. Even accepting BAT's argument, it is not clear that the *Georgia-Pacific* court's distribution of damages would qualify as punitive for the purposes of the public policy exception under New York law. Under New York law, "where a sanction has both compensatory and punitive components, it should not be characterized as punitive," and thus public policy does not preclude indemnification in such a case. *J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*, 183 N.E.3d 443, 449 (N.Y. 2021). So long as "under the applicable out-of-state law," these damages could have been awarded "for either deterrence purposes or as additional compensation for the plaintiff's injury . . . the damages award was not solely punitive so as to preclude indemnification." *Id.*; *see also Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994).

The *Georgia-Pacific* court's apportionment of damages was explicitly based on its findings that "all of the parties before the Court are liable parties under CERCLA," that "[n]o party is uniquely culpable for PCBs in the Kalamazoo River that have required a massive and ongoing cleanup effort," and that there was "no convincing basis for divisibility of harm in the river system." *Georgia-Pacific Consumer Prods. LP v. NCR Corp.*, 358 F. Supp. 3d 613, 635 (W.D. Mich. 2018). Moreover, the court's allocation of forty percent of damages to NCR was based on its determination of NCR's level of involvement in the release of PCBs, *id.* at 648-49, taking into consideration that "NCR had a hand in all of the carbonless copy paper that was responsible for

the PCB contamination and . . . knew that there were environmental and human dangers to releasing the wastewater from recycling CCP, even as it encouraged the de-inking mills to continue to recycle its product," *id.* at 647.

Even accepting BAT's contention that the *Georgia-Pacific* court's motivations were partially punitive, New York law would not preclude indemnification based on the court's mixed motives. *J.P. Morgan Secs.*, 183 N.E.3d at 449. Nor will this Court expand the scope of that exception, in keeping with New York courts' narrow application of the public policy bar. *See Spandex House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 259 n.17 (S.D.N.Y. 2019). The damages award in the *Georgia-Pacific* litigation does not constitute an award of punitive damages as a matter of law, and so BAT has failed to plead sufficient facts to support a plausible claim that the application of the CSA to the Kalamazoo River Site would violate New York's public policy. The Court thus dismisses BAT's fifth counterclaim.

## IV. Motion to Strike Affirmative Defenses

Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "To prevail on a motion to strike, the moving party must satisfy a stringent three-pronged test: (1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *City of N.Y. v. Fedex Ground Package Sys., Inc.*, 314 F.R.D. 348, 355 (S.D.N.Y. 2016) (internal quotation marks omitted); *see also Anhui Konka Green Lighting Co., Ltd. v. Green Logic LED Elec. Supply, Inc.*, 625 F. Supp. 3d 269, 289 (S.D.N.Y. 2022) (recounting these three factors). In the Second Circuit, "the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an

affirmative defense." *GEOMC Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019).[10] But "applying the plausibility standard to any pleading is a 'context-specific' task" and that "the pleader of an affirmative defense has only the 21-day interval to respond to an original complaint" affects the "degree of rigor appropriate for testing the pleading of an affirmative defense." *Id.* "[M]otions to strike under Rule 12(f) are generally 'disfavored and granted only if there is strong reason to do so.'" *Holland v. Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 275 (S.D.N.Y. 2020).

To begin, NCR asks the Court to strike BAT's first affirmative defense for failure to state a claim upon which relief can be granted, because NCR argues the Court can decide its claim on the pleadings. Motion at 12. As the Court denies NCR's motion for judgment on the pleadings, the Court also declines to strike this affirmative defense. NCR further asks the Court to strike BAT's second affirmative defense, asserting that NCR's claims are barred because NCR breached the CSA, and third defense, asserting equitable recoupment based on fraudulent inducement, because they "merely recycle BAT's declaratory judgment counterclaims." *Id.* NCR also moves to strike BAT's fourth affirmative defense for unclean hands for the reasons it argues for dismissal of the fraudulent inducement and *in pari delicto* counterclaims. Motion at 12-13; Reply at 14. Because the Court denies NCR's motion for judgment on the pleadings as well as denies its motion

---

[10] The Court notes that some cases from this District hold that *GEOMC*'s plausibility analysis is dispositive on a motion to strike, notwithstanding the oft-repeated recitation of the standard of review for a motion to strike recounted above which requires a showing of prejudice. *See State St. Glob. Advisors Tr. Co. v. Visbal*, 462 F. Supp. 3d 435, 442 n.7 (S.D.N.Y. 2020) ("Because Visbal's affirmative defense is legally insufficient, the Court need not address whether SSGA would be prejudiced by its inclusion. . . . [T]he only reasonable interpretation of *GEOMC* is that the implausibility of an affirmative defense is itself an adequate basis to grant a motion to strike that defense."); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 14 Civ. 6228 (VSB), 2024 WL 1994205, at *19 n.43 (S.D.N.Y. May 6, 2024) (noting that "[a] number of courts" in this Circuit have adopted this position and collecting cases).

to dismiss the coutnerclaims for fraudulent inducement and negligent misrepresentation, the Court declines to strike these defenses.

NCR also moves to strike BAT's fifth affirmative defense for waiver, estoppel, and/or laches on the grounds that this defense is not pleaded with particularity. Motion at 13. As BAT points out, Opposition at 29-30, it does not have to plead this defense with particularity and must only plead sufficient facts such that its affirmative defense is plausible. *See GEOMC Co.*, 918 F.3d at 98. BAT points to NCR's Complaint, and specifically its allegation that BAT "disclaimed any obligation to pay for any share of the cleanup costs at the Kalamazoo River Site" on June 3, 2019. Compl. ¶ 48 (cited at Opposition at 29). Considering that the "relevant context" to determine the plausibility of this defense is "shaped by the nature of the affirmative defense," *GEOMC Co.*, 918 F.3d at 98, and that NCR's Complaint maintains that BAT disavowed any indemnity obligation for the Kalamazoo River Site under the CSA several years before this action was filed, the Court determines that the "stringent" standard for granting a motion to strike is not met, *Fedex Ground Package Sys.*, 314 F.R.D. at 355.

NCR additionally moves to strike BAT's sixth affirmative defense for failure to mitigate damages. Motion at 13. "Under New York law, the party that is injured by a breach of contract has 'the duty of making reasonable exertions to minimize the injury.'" *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 402 (S.D.N.Y. 2014) (quoting *Holy Props. Ltd., L.P. v. Kenneth Cole Prods., Inc.*, 661 N.E.2d 694, 696 (N.Y. 1995)). BAT argues that this defense is justified because BAT alleges that "NCR massively amplified the amounts it now seeks to recover from BAT by concealing what it knew about its intentional pollution of the Kalamazoo River from the public, the government, and recyclers." Opposition at 30 (citing Counterclaims ¶ 115). This seems to suggest a theory that the damages in this action would have been lower had

NCR not concealed the extent of PCB contamination at the Kalamazoo River Site.  While NCR is correct that BAT's pleadings are thin in this regard, given the short time to plead affirmative defenses, *see GEOMC Co.*, 918 F.3d at 98, and the absence of any argument of specific prejudice from allowing this defense to proceed aside from NCR's general assertion of "having to litigate BAT's factually and legally insufficient affirmative defenses," Motion at 13, the Court declines to strike the sixth affirmative defense.  *See GEOMC Co.*, 918 F.3d at 98 ("A factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by expanding the scope of the litigation.").

NCR further moves the Court to strike BAT's seventh affirmative defense citing public policy.  Motion at 12.  While the Court has dismissed the public policy counterclaim based on pleading deficiencies, *see supra* III.B.5, that was due to BAT's counterclaim explicitly basing itself on the punitive damages exception.  The parties disagree on whether the second public policy exception for intentional harm, *see J.P. Morgan Secs.*, 992 N.E.2d at 1081, applies in this case as a matter of both fact and law.  *Compare* Opposition at 25-26, *with* Reply at 12-13.  At this juncture, the Court cannot say that there is "no question of fact that might allow the defense to succeed," *Fedex Ground Package Sys.*, 314 F.R.D. at 355, particularly where BAT claims that such an argument would be rooted in the "actual, binding findings, rendered after trial, that NCR intentionally arranged for the disposal of toxic broke into the Kalamazoo River with full knowledge that doing so would result in harm," Opposition at 26.  The parties' disagreement as to the public policy defense is better resolved upon summary judgment and so the motion to strike the seventh affirmative defense is denied.

The Court, however, grants BAT's motion to strike the eighth affirmative defense for *in pari delicto*.  Motion at 12.  For reasons discussed above, the pleadings are entirely devoid of

allegations to support an *in pari delicto* defense.  *See supra* III.B.4.

## V.  Conclusion

For the foregoing reasons, the Court denies NCR's motion for judgment on the pleadings; grants NCR's motion to dismiss the third, fourth, and fifth counterclaims and denies it otherwise; and grants NCR's motion to strike the eighth affirmative defense and denies it otherwise.  The Clerk of Court is respectfully directed to close Docket Number 29.

SO ORDERED.

Dated: September 14, 2024
       New York, New York                        _____
                                                        JOHN P. CRONAN
                                                   United States District Judge

40