# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NCR CORPORATION, | |
| Plaintiff, | Case No.: 1:23-cv-1172-JPC-SDA |
| v. | |
| B.A.T INDUSTRIES p.l.c., | |
| Defendant. | |

## PLAINTIFF NCR VOYIX CORPORATION'S ANSWER TO COUNTERCLAIMS OF B.A.T INDUSTRIES P.L.C.

Pursuant to Federal Rule of Civil Procedure 15(a)(3), Plaintiff NCR Voyix Corporation ("NCR") hereby answers the Counterclaims (Dkt. 21) of B.A.T Industries p.l.c., ("BAT") as follows.

The Counterclaims section headings are carried over for reference only, and NCR denies any allegations contained in the section headings. By submitting this Answer, NCR expressly reserves and does not waive any applicable rights, defenses, or objections. NCR also reserves the right to amend this Answer and its affirmative defenses based on, *inter alia*, facts learned during discovery and NCR's ongoing investigation of BAT's counterclaims. Unless expressly stated herein, nothing in this Answer should be construed as an admission by NCR of any facts set forth in the Counterclaims. NCR makes no representations, concessions, or admissions regarding the relevance or appropriateness of any facts set forth in the Counterclaims.

## INTRODUCTION

1.      This case arises from NCR's egregious and intentional pollution of American waterways with toxic compounds from the 1950s through the 1970s and its fraudulent and wrongful attempt to foist liability for its conduct on a party that played no role in contributing to that conduct.

**RESPONSE:** Denied.

2.     As a series of federal court decisions in *Georgia-Pacific Consumer Products. LP v. NCR Corp* (the "*Georgia-Pacific*" case) has found, NCR knew for years that its products were "hazardous" and that by-products of its manufacturing were "worthless waste . . . at best." Yet, even after learning that its product was poisoning people and the environment, NCR did not cease production. Instead, it increased it. As a federal court has already found, NCR "deliberately attempted to conceal . . . the toxic nature of" its broke as part of a scheme to mislead the public and the government, pass NCR's broke off as "useful," and generate billions of dollars in revenues while "getting rid of a substance it knew to be hazardous."

**RESPONSE:** NCR refers the Court to the referenced documents for their true and complete contents and denies the remaining allegations in this Paragraph, including any legal conclusions and any characterization of the events at issue.

3.     As a result of NCR's wrongful behavior, it has been ordered to pay hundreds of millions of dollars in damages and penalties to punish it for its actions. But instead of facing the court-ordered consequences of its egregious misconduct, NCR is attempting to transfer those consequences to BAT – a party that had no role in NCR's actions and that (unlike NCR) did not benefit in any way from NCR's intentional misconduct.

**RESPONSE:** NCR admits that the Western District of Michigan entered judgment against NCR for a share of Georgia-Pacific Consumer Products LP's past response costs, but denies that the judgment involved damages or penalties, was the result of wrongful behavior, or was intended to punish NCR. NCR further states that NCR and other parties appealed the judgment in the Western District of Michigan and that NCR ultimately entered into a consent decree to settle its liability by agreeing to perform specific work. Ultimately, while NCR dismissed its appeal, the Sixth Circuit reversed the Western District of Michigan on statute of limitations grounds. *See Georgia-Pac. Consumer Prod. LP v. NCR Corp.*, 40 F.4th 481 (6th Cir. 2022). NCR denies the remaining allegations in this Paragraph, including any legal conclusions and any characterization of the events at issue.

4.     NCR's deceitful manufacturing, marketing, and sale of PCB-tainted broke was only the beginning of its fraud. As set forth in detail below, NCR was fully aware that it had produced toxins and that the arrangements it made for their disposal resulted in those toxins being dumped in the Kalamazoo River. NCR was, therefore, fully aware of the likelihood that it

would face liability for environmental cleanup at that site. NCR intentionally concealed its knowing and wrongful pollution of the Kalamazoo River from BAT in order to avoid financial responsibility for its actions and fraudulently induce BAT to enter into the CSA at the center of this case. As a result, NCR is barred from enforcing the CSA, and BAT is entitled to a declaratory judgment, including under principles of equitable recoupment, that the CSA is void and unenforceable.

**RESPONSE:** Denied.

5.      At issue in this case is a product NCR began producing in the 1950s known as carbonless copy paper ("CCP"). CCP used a special coating to make exact copies of a document without the need for carbon paper. However, the coating was made using a product that contained PCBs, toxic chemicals that cause serious health issues in humans and animals. NCR learned of the toxic nature of the PCBs it used to make CCP by no later than the mid-1960s (and possibly much earlier), but continued making CCP anyway, resulting in large quantities of PCBs being dumped into several American rivers, either by NCR-contracted manufacturers and paper coaters, by NCR itself, or by recyclers to which NCR sold broke (i.e. paper that does not meet finished product specifications, is damaged in the manufacturing process, or consists of trim or cuttings produced during manufacture and conversion). NCR knew that its products were toxic, but concealed that information from the rest of the world. In fact, rather than winding down its production of CCP (which contained PCBs), NCR instead ramped up its production, dumping ever higher levels of a chemical it knew was toxic into American rivers. NCR wanted to generate as much profit as possible off CCP before the public learned that product was toxic and its massive revenues (amounting to over $2 billion in 1970-72 alone) and profit-taking came to an end.

**RESPONSE:** NCR denies the allegations in this Paragraph, except admits that NCR began

producing CCP in the 1950s, that CCP used a special coating to make exact copies of a

document without the need for carbon paper, which coating contained PCBs from 1954 to April

1971, and states that the Western District of Michigan determined that "by at least March of

1969, NCR knew CCP broke generated a toxic, hazardous by-product in normal recycling," and

that NCR had arranged for disposal of CCP broke at the Kalamazoo River site, but that NCR

contested this point at trial through 2016.

6.      NCR went to great lengths to keep the world in the dark about the dangers of its product, showing no regard whatsoever for the health and safety of the public. For instance, when its PCB supplier, Monsanto, became aware of evidence of the product's toxicity, NCR asked Monsanto to cover up the fact that NCR was one of the biggest receivers of Monsanto's PCB products, so that no one would know CCP contained PCBs. NCR's deceptions allowed it to continue to produce toxic CCP even after regulators and the public learned that PCBs were toxic, and to sell that CCP in ever larger quantities. NCR also sold increasing amounts of CCP broke to

recyclers.  NCR never told these recyclers that what they were buying was toxic and worthless. Instead, NCR deliberately concealed that information so that NCR could continue to sell CCP broke.

**RESPONSE:** Denied. As set forth in NCR's response to Paragraphs 32 and 33, NCR refers the

Court to the referenced opinion in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-

C-16 (E.D. Wis.), the apparent basis for these allegations, for its true and complete contents and

denies the remaining allegations in this Paragraph including any legal conclusions and any

characterization of the events at issue except states that NCR acted promptly to find an

alternative and stopped using PCBs by April 1971.

7.      But, as NCR knew, it was only a matter of time before the public and regulatory authorities discovered that CCP was a poison and that NCR's dumping was a massive environmental disaster.  Despite its efforts to mislead regulators and the public, information began to come to light showing that PCBs were toxic and that they remained in water for decades without dissipating.  NCR knew that it would eventually be forced to pay for the damage it had done to American rivers.  But rather than accept this liability, NCR started looking for ways it could shift the consequences of its own intentional wrongdoing to someone else.

**RESPONSE:** Denied.

8.      In 1978, NCR sold its carbonless paper coating business, the APD, to Lentheric, a BAT subsidiary, which assumed certain liabilities of the APD.  That subsidiary was subsequently renamed Appleton Papers Inc. (as above, "API").

**RESPONSE:** Admitted.

9.      Following the sale in 1978, regulators began to discover that the Fox River was polluted with NCR's chemicals and that a massive environmental cleanup would be needed.  The EPA, relying on the provisions of CERCLA (which was enacted after the sale in 1980), looked to NCR to pay for the damage it had caused.  NCR, in turn, sued BAT and API, claiming that they were responsible for footing the bill for NCR's bad acts under a contractual indemnity provision in the SPA through which Lentheric had acquired API.

**RESPONSE:** NCR admits that regulators began to study the Fox River for PCBs, although they

discovered contamination there before NCR's 1978 sale of APD.  NCR also admits that the U.S.

Environmental Protection Agency ("EPA") sent notice letters to both NCR and API and states

that the Wisconsin Department of Natural Resources ("Wisconsin DNR") also sent notice letters

4

to both NCR and API, having already sent notice letters to several other potentially responsible

parties. NCR does not know what "SPA" stands for, but states that NCR sued API and BAT

under the 1978 Agreement of Purchase and Sale of Assets by and among B.A.T Industries

Limited, Lentheric, Inc., and NCR Corporation. NCR otherwise denies the allegations in the

Paragraph.

10.     The parties engaged in mediation and entered into the CSA in July 1999, by
which time BAT no longer owned API.  Under the CSA, API and BAT agreed to pay a
percentage of NCR's cleanup costs at the Fox River and an industrial site called Marina Cliffs
without admitting liability.

**RESPONSE:** NCR admits that the parties engaged in mediation and entered into the CSA in

July 1999. NCR denies knowledge as to the specific timing of BAT's spin-off of API. NCR

further states that API and BAT agreed to pay a share of costs at the Fox River, Marina Cliffs,

and at Future Sites as defined in the CSA.

11.     NCR never mentioned any other sites at the mediation or that it had or would
have CERCLA liability for such, and the agreement the parties reached in principle at the
mediation did not address any other sites.  But after the mediation concluded, NCR proposed that
the parties also agree to apportion liability for "Future Sites", if any, that may in the future be
identified.

**RESPONSE:** NCR denies having knowledge or information sufficient to form a belief as to the

allegations in this Paragraph regarding what was mentioned at the mediation as to other sites, but

states that at the time during which the CSA was negotiated, it was public knowledge that state

and federal regulators were overseeing an investigation into PCB contamination at the

Kalamazoo River. A group of paper companies was conducting the investigation and had sued

multiple defendants—but not NCR—for contribution. It was public knowledge that the plaintiff

paper companies had recycled CCP. Because all this was public knowledge, BAT and NCR

personnel and representatives were equally positioned to know this. NCR admits that the

agreement the parties reached in principle at the mediation did not address any other sites and

that, after the mediation concluded, NCR conspicuously proposed—and BAT and API agreed—

that the parties also should apportion liability for "Future Sites" that may in the future be

identified, as defined in the CSA.

12.    Unbeknownst to BAT, NCR was pushing to include the "Future Sites" language
in the agreement for a very specific reason that NCR never disclosed to BAT: NCR knew it had
created another looming environmental disaster.  In addition to intentionally destroying the Fox
River in Wisconsin, NCR had also made arrangements which resulted in toxic CCP broke being
dumped into another river, the Kalamazoo River in Michigan.

**RESPONSE:** NCR denies the allegations in this Paragraph except admits that the Western

District of Michigan ultimately found that NCR had arranged for disposal at Kalamazoo, but that

NCR contested this point at trial through 2016. NCR further states that in 1998, NCR personnel

and representatives had no knowledge that CCP broke had been sold to mills on the Kalamazoo

River and that API/BAT personnel and representatives were in an equal position to know what

broke shipments had been made from the APD mills prior to 1978. NCR further states that the

allegation that NCR had made "arrangements" for disposal is a legal conclusion to which no

response is required.

13.    NCR's liability for the Kalamazoo River cleanup is fundamentally different from
its liability for Fox River.  Whereas at the Fox River, the discharge of PCBs was the result of the
operations BAT acquired there, the Kalamazoo liabilities arose from NCR's own intentional and
undisclosed actions leading to the disposal of broke in the Kalamazoo River.  The basis for NCR's
liability for Kalamazoo has been clearly established by the courts in prior decisions that are binding
on NCR.  Specifically, the courts have found that NCR's liability for the cleanup of the Kalamazoo
River is based on its own "arranging" for disposal of toxins in the Kalamazoo River.  And most
relevant to the current dispute, the courts have expressly held that NCR's liability is *not* premised
on any knowledge or intent of ACPC – the business acquired by BAT.

**RESPONSE:** NCR refers the Court to the referenced decisions for their true and complete

contents and denies the remaining allegations in this Paragraph including any legal conclusions

and any characterization of the events at issue.

14.    In the first of those decisions, from 2013, a Michigan federal court found that
NCR was responsible for Kalamazoo River cleanup costs under CERCLA because NCR had
"arranged" for hazardous substances to be disposed of in the river.  In 2018, the same court held

that NCR was liable for 40% of Kalamazoo River cleanup costs. The court explained that, although the evidence in that case, to which BAT was not a party, indicated that NCR had only contributed 1- 2% in volume of the PCBs in the Kalamazoo River, NCR should be held responsible for a much higher percentage of the clean-up costs because NCR's conduct had been egregious.

**RESPONSE:** NCR refers the Court to the referenced decisions for their true and complete

contents and denies that the Court imposed a higher percentage of costs on NCR based on

"egregious" conduct.

15.    NCR intentionally concealed what it knew about its pollution of the Kalamazoo River to attempt to induce BAT to agree to accept significant liability that BAT would not have otherwise had for NCR's contamination of a river hundreds of miles from any of the facilities that BAT purchased. NCR had already concluded that it faced liability exposure for NCR's actions in respect of the Kalamazoo River, and NCR was looking for a way to dump that liability on an unsuspecting party, just as NCR had dumped poisons into the river itself.

**RESPONSE:** Denied.

16.    The evidence of NCR's deceitful intent is clear and overwhelming. Unbeknownst to BAT, NCR had already determined by the time it entered into the CSA that it had produced toxins and that the arrangements it made for their disposal resulted in those toxins being dumped in the Kalamazoo River. NCR was, therefore, fully aware of the likelihood that it would face liability for environmental cleanup at that site. NCR then decided to use the CSA negotiations to attempt to pass this liability off onto BAT.

**RESPONSE:** Denied.

17.    During the CSA negotiations, NCR represented to BAT that it had no reason to think it would face liability at any sites other than Fox River and Marina Cliffs, and failed to disclose what it knew about Kalamazoo. In a letter dated April 23, 1998 to BAT's counsel, NCR's counsel deliberately misrepresented to BAT's counsel the likelihood of any future claims by stating that there was merely a "potential" for claims in respect of future sites. The only basis for such "potential" was represented to be that "NCR paper was recycled at mills other than those on the Fox River," and thus that it "makes sense" to include such sites in the CSA on an "if any" basis.

**RESPONSE:** NCR denies the allegations in this Paragraph. NCR further states that BAT

mischaracterizes the April 23, 1998 letter, in which counsel for NCR wrote to BAT's counsel,

"*As you know*, broke from NCR paper was recycled at recycle mills other than those on the Fox

River, and there is a potential for claims at other river sites."

18.     In fact, NCR knew that it had produced toxins and that the arrangements it made for their disposal resulted in those toxins being dumped in the Kalamazoo River. NCR was, therefore, fully aware of the likelihood that it would face liability for environmental cleanup at that site. NCR's general counsel at the time of the CSA negotiations has already testified that NCR knew Kalamazoo was "lurking out there," and that NCR "knew that was another potential location" at the time it pushed to include Future Sites in the CSA. NCR's outside counsel, J. Andrew Schlickman (of Sidley Austin), similarly confirmed in his own deposition that "[w]e were aware that the issues that were arising at the Fox River Site could arise at other sites. And the particular site I have in mind here was the Kalamazoo River in Michigan."

**RESPONSE:** NCR refers the Court to the referenced testimony for its true and complete

contents. NCR further states that in 1998, NCR personnel and representatives had no knowledge

that CCP broke had been sold to Kalamazoo mills and that API/BAT personnel and

representatives were in an equal position to know what broke shipments had been made from the

APD mills prior to 1978. NCR denies the remaining allegations in this Paragraph.

19.     Not only that, NCR also knew that the risk of liability in respect of the Kalamazoo River did not arise from the mere fact that NCR paper was recycled there, but from its own knowing and intentional conduct in arranging for its broke to be sent there for recycling, with the toxic PCBs to be dumped in the Kalamazoo River during the process. As early as June 1998 (at a time before the CSA was entered into and while NCR's misrepresentations were continuing), NCR was aware that the environmental authorities were pursuing paper mills that reprocessed CCP on the Kalamazoo River, and was also fully aware of the likelihood that those mills would in turn pursue NCR on the basis that NCR's knowing and intentional disposal of broke at the Kalamazoo River made it liable as an arranger under CERCLA. NCR was sufficiently concerned of these risks that its in-house lobbyist Phil Servidea set them out in a memo dated June 10, 1998 to an executive at National Fiber Supply, a paper broker, for lobbying purposes. None of that information was disclosed to BAT.

**RESPONSE:** Denied. NCR states that in 1998, NCR personnel and representatives had no

knowledge that CCP broke had been sold to Kalamazoo mills and that API/BAT personnel and

representatives were in an equal position to know what broke shipments had been made from the

APD mills prior to 1978. NCR contested, until at least 2016, that it had the requisite knowledge

and intent to make any sale of broke an arrangement for disposal under CERCLA. NCR states

further that in June 1998, it was public knowledge that state and federal regulators were

overseeing an investigation into PCB contamination at the Kalamazoo River. A group of paper

companies were conducting the investigation and had sued multiple defendants—but not NCR—for contribution. It was public knowledge that the plaintiff paper companies all had recycled CCP. Because all this was public knowledge, BAT and NCR personnel and representatives were equally positioned to know this.

20.    BAT had no reason to suspect that NCR had arranged for PCBs to be dumped into the Kalamazoo River, as neither NCR nor the APD ever had any operations on the Kalamazoo River.  NCR knew that BAT would not knowingly agree to share liability for NCR's destruction of the Kalamazoo River if NCR disclosed the true facts, so it concealed what it knew and believed about Kalamazoo. NCR exploited its unique knowledge of essential facts to induce BAT to include Future Sites in the CSA.  Having done so, NCR cannot recover from BAT for its wrongful behavior.

**RESPONSE:** Denied. NCR states that in 1998, NCR personnel and representatives had no knowledge that CCP broke had been sold to Kalamazoo mills and that API/BAT personnel and representatives were in an equal position to know what broke shipments had been made from the APD mills prior to 1978. NCR contested, until at least 2016, that it had the requisite knowledge and intent to make any sale of broke an arrangement for disposal under CERCLA. NCR states further that in June 1998, it was public knowledge that state and federal regulators were overseeing an investigation into PCB contamination at the Kalamazoo River. A group of paper companies were conducting the investigation and had sued multiple defendants—but not NCR—for contribution. It was public knowledge that the plaintiff paper companies all had recycled CCP. Because all this was public knowledge, BAT and NCR personnel and representatives were equally positioned to know this.

21.    **First,** NCR is barred from recovery under the CSA as a result of its fraudulent misrepresentations and concealment at the time of the negotiation of the CSA.  Had BAT known the true facts as to NCR's involvement in polluting Kalamazoo, the true degree of likelihood of NCR being liable as an arranger, and/or that NCR intended to transfer liability to BAT for NCR's own misconduct, BAT would not have agreed to execute the CSA.

**RESPONSE:** NCR states that the first sentence of the Paragraph contains a legal conclusion to which no response is required, but otherwise denies the factual predicates therefor. NCR denies

knowledge sufficient to admit or deny BAT's knowledge or what BAT would have done under different circumstances.

22.    **Second,** the CSA relates solely to potential liabilities arising out of the APD business that was acquired by BAT.  The liability NCR faces for the pollution of the Kalamazoo River is a liability which is attributable only to NCR itself, not to the APD business that BAT acquired.

**RESPONSE:** NCR denies the allegations in this Paragraph, which misstate the CSA. The Court here has held that the CSA's Future Sites language applies to any site at which it is alleged that contamination occurred as a result of APD assets and rejected BAT's argument that Kalamazoo River liability is attributable only to NCR and "not the business that BAT acquired." *See* Dkt. 38 at 11-17.

23.    **Third,** even if Kalamazoo were a "Future Site" under the CSA (which it is not), NCR cannot transfer liability for its own misconduct to an innocent party such as BAT.  Any recovery from BAT would be barred by both public policy and the *in pari delicto* doctrine.

**RESPONSE:** NCR denies the allegations in this Paragraph. The Court here has held that the Kalamazoo River is a "Future Site" under the CSA and that recovery from BAT is not barred by public policy or the *in pari delicto* doctrine. *See* Dkt. 38.

24.    For all of these reasons, NCR is barred from trying to make BAT pay for NCR's Kalamazoo cleanup costs.

**RESPONSE:** Denied.

## FACTUAL BACKGROUND

A.    **NCR MANUFACTURES CCP USING A TOXIC CHEMICAL**

25.    From 1954 to 1971, NCR manufactured and sold CCP, which enabled users to make multiple copies of a document without the messy side effects of carbon copy paper.  CCP eliminated the need for a sheet of copy paper by placing a special coating on the back of one piece of paper that contained a solvent, colorless ink capsules, and other chemicals.  A second piece of paper was coated with a different solution, including clay, which, when mixed with the chemical emulsion from the ink microcapsules on the first page, would turn blue.  The microcapsules would rupture under pressure from, *e.g.*, the pressure of a pen, creating an exact duplicate.

**RESPONSE:** NCR admits the allegations in this Paragraph except states that NCR

manufactured CCP from 1954 until it sold the business to BAT in 1978.

26.    But as the Seventh Circuit found in 2014, "[t]he invention of [CCP] by NCR . . . in the mid-1950s solved a small problem and created a large one."

**RESPONSE:** NCR refers the Court to the referenced Seventh Circuit opinion for its true and

complete contents.

27.    That is because until the early 1970s, the substance NCR used to coat CCP contained PCBs, highly toxic pollutants.  Since the invention of PCBs, they have been shown to cause serious health problems in humans.  Courts have found that PCBs can cause damage to human livers, can burn and irritate human skin, and do not dissolve or dissipate in water, instead attaching to solids in the water and remaining present for decades.

**RESPONSE:** NCR admits that PCBs were used as an ingredient in CCP emulsion until 1971,

admits that PCBs were banned for most uses in 1978, and that PCBs were designated a

hazardous substance when CERCLA was enacted in 1980, and otherwise denies the allegations

in this Paragraph.

28.    NCR used a two-step process to produce CCP.  First, the CCP was coated with NCR's emulsion (the chemical treatment that caused CCP to function and which contained the harmful PCBs); second, the coated paper was turned into an end product through a process called "converting" – that is, turned into actual, branded CCP via cutting, printing, and collating the coated paper rolls.

**RESPONSE:** NCR denies that there are two steps in manufacturing CCP and states that CCP is

any paper, including "coated back" (the type of sheet that contained PCBs from 1954 to April

1971) and "coated front," and including paper rolls, sheets, and business forms. Although CCP

generally was converted into business forms for further use, such conversion was not necessary

for it to be "CCP."

29.    NCR prepared the special emulsions used for the first step in the CCP manufacturing process using a product called Aroclor 1242, which was manufactured by Monsanto.  NCR provided the emulsion to three mills with which NCR had contracted to coat its paper: ACPC, CPM, and Mead Corporation ("Mead").  ACPC and CPM were both located along the Fox River in Wisconsin.  Mead (which was not acquired by BAT) was located in Chillicothe, Ohio.

**RESPONSE:** NCR admits the allegations in this Paragraph except denies the characterization of

CCP manufacture as the "first step." NCR further states that Aroclor 1242 was used in CCP

manufacture from 1954 to April 1971.

30.    The coaters would coat rolls of paper with emulsion provided by NCR and then sell the coated paper back to NCR.  In 1969 and 1970, NCR acquired CPM and ACPC, respectively, eliminating this step as to those two coaters, though NCR still used Mead as a contractor to coat CCP as well.

**RESPONSE:** Admitted.

31.    For the second step in the manufacturing process, the coated rolls of CCP would be "converted" into usable paper products.  This process occurred in one of two ways.  First, NCR sold coated paper rolls to customers who performed their own conversion.  Alternatively, NCR converted the rolls itself into NCR branded CCP through NCR's Systemedia subsidiary. Systemedia had conversion facilities at three locations: Portage, Wisconsin; Washington Court House, Ohio; and Dayton, Ohio.

**RESPONSE:** NCR admits the allegations in this Paragraph except denies that there are two

steps in manufacturing CCP. Coated paper rolls were sold to customers as NCR-branded CCP.

32.    Both the coating process and the converting of CCP created broke.  Broke is generally used through a recycling process to create pulp for recycled paper.

**RESPONSE:** NCR admits the allegations in this Paragraph except states that the byproduct of

converting CCP into business forms is often called "trim," instead of "broke" and that mills that

use recycled paper as a feedstock may purchase CCP in the form of broke, trim, or post-

consumer business forms or office waste.

33.    The paper recycling process involves adding a watery slurry to paper scraps and/or broke and extracting fibers for use in recycled paper.  The watery slurry, which contains various chemicals, ink, clay, and other byproducts besides paper fibers, is then dumped back into a water source.  In the case of CCP, the watery slurry contained PCBs, which were dumped into rivers next to paper recycling mills.

**RESPONSE:** NCR states that the chemicals, ink, clay, byproducts, and PCBs could be captured

in part by wastewater treatment systems, which existed during the period in which CCP

contained PCBs and otherwise admits the allegations in this Paragraph.

**B.**    **NCR KNOWINGLY POLLUTES AMERICAN RIVERS**

34.    As a result of the manufacturing and recycling of NCR CCP, PCBs were discharged into rivers by NCR itself, as well as by the "coaters" and the recycling mills.  Not all dischargers in the 1950s to 1970s had knowledge of the toxicity of the PCBs used in CCP – or even that PCBs were present in CCP.  As a federal district court in Wisconsin found, "the toxic nature of the discharged product was not appreciated by most of the dischargers until almost all of the environmental damage had already occurred."  Most dischargers, that is, except NCR.

**RESPONSE:** NCR admits that the manufacturing and recycling of CCP during the referenced time period resulted in the discharge of PCBs. NCR refers the Court to the referenced opinion in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16 (E.D. Wis.), for its true and complete contents and denies the remaining allegations in this Paragraph including any legal conclusions and any characterization of the events at issue.

35.    By 1965, NCR scientists were conducting experiments on the toxicity of the PCBs used in CCP and finding harmful effects on animals exposed to the product as well as caustic effects on human skin.

**RESPONSE:** NCR refers the Court to *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 5064049, at *5 (E.D. Wis. Dec. 16, 2009), ), the apparent basis for this allegation, for its true and complete contents.

36.    In 1967, Monsanto, the manufacturer of the PCBs used by NCR in NCR's coating, sent NCR a study which validated peer reviewed scientific studies and found that PCBs were "related to and as poisonous as DDT."

**RESPONSE:** NCR refers the Court to *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 5064049, at *6 (E.D. Wis. Dec. 16, 2009), for its true and complete contents.

37.    As found by the Wisconsin federal district court, over the course of 1967 to 1971, Monsanto, NCR, and several other entities discussed the toxicity of the PCBs used in NCR's CCP manufacturing process. NCR realized at that time that it would have to stop using PCBs, but did not want to do so until it developed an alternative.

**RESPONSE:** NCR refers the Court to the referenced opinion in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16 (E.D. Wis.), for its true and complete contents and denies the

remaining allegations in this Paragraph including any legal conclusions and any characterization of the events at issue except states that NCR acted promptly to find an alternative and stopped using PCBs by April 1971. NCR further states that, to the extent the phrase "several other entities" includes Wiggins Teape, Wiggins Teape became a wholly-owned subsidiary of BAT in 1970.

38.     Rather than reducing or halting production while searching for an alternative, NCR, upon learning that the PCBs were toxic and harmful to humans on the level of DDT, ramped up its production of CCP, leading to what the Wisconsin federal court described as a "precipitous increase" in production during the late 1960s and early 1970s.

**RESPONSE:** NCR admits that demand for CCP increased in the late 1960s, refers the Court to the referenced opinion in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16 (E.D. Wis.), for its true and complete contents, and otherwise denies the allegations in this Paragraph including any suggestion that NCR's knowledge of the toxicity of PCBs and its "ramped up production" of CCP were related.

39.     The Wisconsin federal district court found that "the strategy of waiting was a deliberate acceptance of a large amount of risk to the environment and public health."

**RESPONSE:** NCR refers the Court to the referenced opinion in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16 (E.D. Wis.), for its true and complete contents and denies the remaining allegations in this Paragraph.

40.     As a result of NCR's egregious conduct the Wisconsin federal district court barred NCR from seeking *any* contribution from recyclers in CERCLA litigation over the cleanup of the Fox River in Wisconsin – even though the recyclers were the parties that had actually dumped the PCBs into the river.

**RESPONSE:** NCR refers the Court to the referenced opinion in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16 (E.D. Wis.), for its true and complete contents and denies the remaining allegations in this Paragraph, including any legal conclusions and any characterization of the events at issue.

## C.    NCR Misleads Recyclers into Polluting the Kalamazoo River

41.    As discussed above, the federal courts have already determined that by March 1969 (at the latest), NCR knew that PCBs disposed of during the manufacturing process were toxic, and that the PCBs in broke were also toxic and would introduce toxins into waterways where the broke was recycled.

**RESPONSE:** Denied.

42.    Indeed, the Michigan federal court found that "[n]one of the evidence . . . suggests that NCR genuinely believed that treating the effluent from recycled CCP broke would keep PCBs from flooding into the environment through the recycling process."

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph.

43.    Rather, the evidence showed that NCR concluded by 1970 that there was "no effective method for controlling [PCBs from] the disposal of used paper."

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph, including any legal conclusions and any characterization of the events at issue.

44.    For instance, "NCR proposed incinerating CCP broke," – clear evidence that NCR knew the broke to be worthless at best – "but the cost of doing so, coupled with the fact that the PCBs in CCP paper underwent little decomposition when burnt, derailed that option."

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph, including any legal conclusions and any characterization of the events at issue.

45.    Rather than ordering the cessation of CCP broke sales, NCR instead asked Monsanto to conceal the fact that NCR was a major recipient of Monsanto products containing PCBs.

**RESPONSE:** Denied.

46.    NCR then *ramped up* production, which created even more toxic broke, and then "arranged for disposal of CCP broke that it knew to be an environmental and economic liability." NCR intentionally exploited the fact that, normally, broke is considered such an important product for paper recyclers that they compete to acquire it from paper mills.  NCR concealed that its broke was not normal but highly toxic, and moved to "divest itself of a product that it knew to be

hazardous and a legal liability," all the while profiting from its deception by selling worthless and toxic scrap to brokers and recycling plants.

**RESPONSE:** NCR admits that demand for CCP increased in the late 1960s, refers the

Court to the referenced Western District of Michigan opinion for its true and complete contents,

and denies the remaining allegations in this Paragraph, including any legal conclusions and any

characterization of the events at issue including any suggestion that NCR's knowledge of the

toxicity of PCBs and its "ramped up production" of CCP were related.

47.     The Michigan federal court found that "NCR had deliberately attempted to conceal from [recyclers]—and everyone else—the toxic nature of CCP broke."  Following a bench trial, the Michigan district court found in 2013 that NCR had caused CCP broke to be sent to recyclers on the Kalamazoo river, which resulted in pollution of the Kalamazoo River with PCBs.

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan

opinion for its true and complete contents and denies the remaining allegations in this Paragraph,

including any legal conclusions and any characterization of the events at issue.

48.     Following additional proceedings, the Michigan federal court issued a further ruling in 2018 allocating liability for Kalamazoo cleanup costs among NCR and other polluters. The court held that, despite evidence that NCR had only contributed 1-2% by way of volume of the PCBs in the Kalamazoo River, NCR was liable for 40% of the cleanup costs. The court explained that this high percentage was appropriate because, among other things, "NCR dragged its feet on sharing knowledge about PCBs with the paper mills" and "greatly benefitted from the sale of its CCP broke and trim." Indeed, the Michigan district court found that NCR had made profit margins of 20% and brought in over $2.1 billion in revenue from the production of CCP in 1970 to 1972 alone.

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan

opinion for its true and complete contents and denies the remaining allegations in this Paragraph,

including any legal conclusions and any characterization of the events at issue.

49.     In sum, the court found that: "NCR had a hand in all of the carbonless copy paper that was responsible for the PCB contamination and . . . knew that there were environmental and human dangers to releasing the wastewater from recycling CCP, even as it encouraged the de-inking mills to continue to recycle its product."

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan

opinion for its true and complete contents and denies the remaining allegations in this Paragraph,

including any legal conclusions and any characterization of the events at issue.

**D.    NCR HIDES ITS INVOLVEMENT AT KALAMAZOO TO FRAUDULENTLY PROCURE A SETTLEMENT WITH BAT**

50.    In the 1990s, the EPA targeted the Fox River Site and another site called Marina Cliffs for CERCLA remediation.  It issued notices to NCR and API indicating that they were Potentially Responsible Parties for the Fox River and Marina Cliffs sites.

**RESPONSE:** NCR admits that in the 1990s the EPA and Wisconsin DNR sent notice letters to

NCR and API indicating that they were potentially responsible parties for the Fox River and

Marina Cliffs sites.

51.    In 1995, NCR filed a declaratory judgment action in this District (No. 95-cv-4620) seeking a declaration that API and BAT were required to defend and indemnify NCR against claims arising out of or relating to the Fox River and Marina Cliffs sites pursuant to the SPA.  API and BAT filed counterclaims seeking declarations that NCR was required to defend and indemnify them against claims arising out of or relating to the Fox River and Marina Cliffs sites.

**RESPONSE:** NCR does not know what "SPA" stands for, but states that NCR sued API and

BAT under the 1978 Agreement of Purchase and Sale of Assets by and among B.A.T Industries

Limited, Lentheric, Inc. and NCR Corporation and otherwise admits the allegations in this

Paragraph.

52.    In February 1998, NCR and API took part in a mediation in order to resolve their disputes.  The mediation was in respect of potential liability for Fox River and Marina Cliffs and focused exclusively on this.  There was no discussion of Kalamazoo.

**RESPONSE:** NCR admits that it participated in a mediation with API in February 1998 in order

to resolve their disputes. NCR denies having knowledge or information sufficient to form a

belief as to the allegations in this Paragraph relating to everything discussed at that mediation.

53.    As a result of this mediation, the parties agreed in principle to the terms of a settlement. The parties agreed, without accepting liability, that API and BAT would be jointly and severally responsible for 55% of the liability for the Fox River and Marina Cliffs, and NCR would be responsible for 45% of costs, up to a combined total of $75 million. If costs exceeded

$75 million, the parties would enter into an arbitration to determine the percentages for which each party was liable beyond $75 million.

**RESPONSE:** Admitted.

54.     The original terms of the settlement the parties reached at the mediation that led to the CSA did not include any reference to "future sites." BAT was unaware of any sites other than the two listed expressly in the CSA – the Fox River and Marina Cliffs sites in Wisconsin – where NCR had directly or indirectly disposed of NCR broke.

**RESPONSE:** NCR admits that the agreement in principle the parties reached at the mediation

that led to the CSA did not include any reference to "future sites," but notes the reference to

"Future Sites" was conspicuously added to, defined in, and agreed to by the parties in the final

CSA. NCR is without knowledge or information sufficient to admit or deny what BAT was

"unaware of," and otherwise denies the allegations in this Paragraph.

55.     However, in the first draft of the CSA, which was prepared by NCR's counsel, Sidley Austin, NCR inserted language providing that the CSA would apply to "Future Sites" as well. The Sidley Austin partner representing NCR, J. Andrew Schlickman, stated in an April 23, 1998 cover letter proposing the change that NCR was proposing to apportion liability for "potential future sites" on the basis that "NCR paper was recycled at mills other than those on the Fox River," and that the new language would apply to "Future Sites, if any." He provided no information about Kalamazoo. Indeed, as in the mediation, there was *no mention* of Kalamazoo.

**RESPONSE:** NCR admits that its counsel conspicuously added language to the first draft of the

CSA addressing "Future Sites," and highlighted that language in its cover letter transmitting the

draft. NCR further admits that the quoted language is contained in the letter in question, and that

the letter did not list the Kalamazoo River by name, but states that the full excerpt of the letter

from NCR's counsel reads:

> As you know, broke from NCR paper was recycled at recycle mills other than those on the Fox River, and there is a potential for claims at other river sites. In this draft, NCR proposes that the allocation of responsibility for any additional sites, if any, be resolved in the same fashion as liability for the Fox River sites, i.e. all costs relating to the Fox River site and Future Sites, if any, split 55/45 up to $75 million and beyond that, in accordance with the Subsequent Allocation Arbitration. This approach makes sense given that liability as between NCR and AP I/BAT for any future sites would also be governed by the 1978 Purchase Agreement. Again, this would allow the parties to work as closely as possible to defend claims relating to Future Sites, if any.

18

56.    At the time, BAT was unaware of any future sites (actual or potential) outside the Fox River and Marina Cliffs sites.

**RESPONSE:** NCR denies having knowledge or information sufficient to form a belief as to the allegations in this Paragraph.

57.    But unbeknownst to BAT, NCR was, in fact, fully aware that it had trucked CCP broke to the Kalamazoo River for recycling knowing that broke was a worthless toxin, knowing of the likelihood that claims would accordingly be made against it and that it would be found liable, and knowing that such liability would arise not from the mere fact of its broke having been recycled, but from the fact that NCR's knowledge and intentions regarding the disposal of its broke rendered it liable as an "arranger" for the purposes of CERCLA liability. As NCR personnel admitted in later depositions, at the time of the CSA negotiations, Kalamazoo River was "lurking out there" as a source of liability for NCR. NCR "knew that there was another potential location, so [it] wanted to include [future sites language] as broadly as geographically as [it] could."

**RESPONSE:** NCR denies the allegations in this Paragraph and states that in 1998, NCR personnel and representatives had no knowledge that CCP broke had been sold to Kalamazoo mills and that API/BAT personnel and representatives were in an equal position to know what broke shipments had been made from the APD mills prior to 1978. The concern expressed about the Kalamazoo River by NCR representatives was based on public information, and API/BAT personnel and representatives had access to that same information.

58.    Despite this knowledge, NCR never disclosed the fact that it had arranged for the discharge of its broke into the Kalamazoo River, or its expectation that the Kalamazoo River would be a future site or that it was fully aware of the likelihood that NCR would have arranger liability in respect of it – facts it intentionally concealed from BAT.

**RESPONSE:** NCR denies the factual predicates for these allegations embedded in the phrasing "[d]espite this knowledge"—apparently referring to "knowledge" alleged in prior paragraphs that NCR has denied. NCR further states that in 1998, NCR personnel and representatives had no knowledge that CCP broke had been sold to Kalamazoo mills and that API/BAT personnel and representatives were in an equal position to know what broke shipments had been made from the APD mills prior to 1978. NCR further states that the concern about the Kalamazoo River

expressed by its representatives was based on public information, and that API and BAT

representatives had access to that same information.

59.    In the executed version of the CSA executed on July 26, 1999, a definition of "Future Sites" was included at NCR's request effectively as a "sweep up" provision in case there was liability at unknown future sites.  NCR intentionally drafted the provision to attempt to cover Kalamazoo by including "any facility, property, or location, other than the Fox River sites, alleged to be contaminated with Hazardous Substances as a result, in whole or in part, of the manufacture, recycling, deinking, or repulping of any amount of PCB-containing NCR Paper brand carbonless paper that was manufactured utilizing the assets that were the subject of the Purchase Agreement."

**RESPONSE:** NCR admits that the CSA was executed in July 1999, that the executed version of

the CSA contained the quoted definition of "Future Sites"—which the Court here has held covers

liability at the Kalamazoo River—and that the parties agreed to apply the cost-sharing provisions

of the CSA to "Future Sites." NCR denies the remaining allegations in this Paragraph.

### E.    NCR'S ROLE AT KALAMAZOO IS EXPOSED, LEADING TO LIABILITY FOR CLEAN UP COSTS

60.    In April 2003, NCR received an Information Request from the EPA seeking information about NCR's role at the Kalamazoo River site.

**RESPONSE:** NCR admits that, in April 2003, NCR and API received information requests from

the EPA seeking information about possible releases of hazardous substances to the Kalamazoo

River site.

61.    After conducting a search of its documents, NCR represented to the EPA that it had no documents showing sales to mills in the Kalamazoo River area because it had not made any, and that all of its broke was sold to mills in the Fox River area.

**RESPONSE:** NCR refers the Court to its June 10, 2003 response to the EPA, for the true and

correct contents thereof, including its representations that it produced information "concerning

the amount of PCB-containing CCP and PCB-containing CCP broke manufactured at the

Appleton Paper Plant and the Combined Locks mill" and that it "conducted a diligent search to

try to locate records or other documentation evidencing sales of PCB-containing broke from the

Appleton Plant or the Combined Locks mill specifically to secondary fiber mills in the Kalamazoo, Michigan area. None were found."

62.    In 2009 litigation relating to the Fox River Site, a Kalamazoo-based recycling mill obtained documents from the 1960s which suggested that NCR had arranged for CCP broke to be sent to mills in the Kalamazoo River area.

 **RESPONSE:** NCR admits that in or about 2009 or 2010, Georgia-Pacific Consumer Products LP, a party to the Fox River litigation, produced documents that it had obtained from one or more subpoenas to third parties, including former BAT subsidiary Wiggins-Teape, that suggested that CCP broke from Appleton Paper mills had been shipped to Kalamazoo River mills. NCR otherwise denies the allegations in this Paragraph.

63.    In 2010, the EPA sent a further Information Request to NCR asking it to "revisit" its previous response in 2003.  NCR responded that its 2003 response was still accurate.

**RESPONSE:** NCR admits that in February 2010, following Wiggins-Teape's production of a letter suggesting that CCP broke from Appleton Coated Paper Co. had been shipped to the Kalamazoo River, the EPA sent an information request to NCR in part requesting that NCR "revisit" its earlier response. NCR responded, in part, that it "has not located any additional information or records responsive to the April 3, 2003 Information Request, and hereby incorporates by reference its June 10, 2003 responses and objections thereto."

64.    Following this refusal to change positions, the EPA sent NCR a notice that it was a Potentially Responsible Party for the Kalamazoo River site.

**RESPONSE:** Admitted except NCR states that in November 2010, the EPA sent NCR a notice stating that NCR "may" be a responsible party for the Kalamazoo River site.

65.    Also in 2010, recycling mills on the Kalamazoo River sued NCR seeking contribution for the costs of cleanup on the Kalamazoo River, alleging, among other things, that NCR directly and through Mead had caused CCP broke to be sent to mills along the Kalamazoo River.

**RESPONSE:** NCR admits that, in December 2010, Georgia-Pacific Consumer Products LP, Fort James Corporation, and Georgia-Pacific LLC sued NCR and two other defendants seeking contribution. The complaint alleged, among other things, that "NCR is [] the corporate successor to at least two coaters – the Wisconsin-based Appleton Coated Paper Company ("ACPC") and Combined Paper Mills, Inc. (also known as the Combined Locks Mill") – that arranged for the disposal of PCB-laden broke and trim resulting from the coating of NCR CCP." ACPC and Combined Paper Mills both became part of the business sold to BAT in 1978. The complaint also alleged that broke from Mead Corporation and NCR's internal converting operations were shipped to the Kalamazoo River.

66.    In 2013, the federal district court in Michigan ruled that NCR was an "arranger" that had arranged for its toxic waste to be sent to the Kalamazoo River to be disposed of, making NCR liable for cleanup costs under "arranger" liability provisions of CERCLA.

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph including any legal conclusions and any characterization of the events at issue.

67.    The court found that NCR had concealed the dangers of PCBs from recyclers and brokers so that NCR could keep making profits on the sale of broke while offloading scrap that it viewed as a liability due to the presence of toxic chemicals in the broke.

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph including any legal conclusions and any characterization of the events at issue.

68.    In 2018, the same court apportioned 40% of the past cleanup costs to NCR, despite the fact that NCR claimed that it was responsible for a small fraction of the PCBs in the Kalamazoo River.  The court reasoned that a 40% allocation was equitable because "NCR . . . knew that there were environmental and human dangers to releasing the wastewater from recycling CCP, even as it encouraged the de-inking mills to continue to recycle its product."

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph including any legal conclusions and any characterization of the events at issue.

69.    The court based its conclusions in 2013 and 2018 on NCR's knowing and wrongful actions in delivering toxic broke to the Kalamazoo River:

- "NCR knew at least by the late 1960s that its CCP broke was, at best, not a useful product for a fully informed paper mill and, at worst, a serious environmental hazard."

- "Collectively, the evidence paints a clear and unequivocal picture that, at least by the late 1960s, NCR knew the CCP broke it was facilitating was a hazardous substance, the disposal of which created the possibility of substantial legal liability. Under those circumstances, the Court finds that no one with NCR's knowledge of the situation could have believed that CCP broke was a useful product."

- "NCR created the PCB- containing emulsion, held title to the product as it was converted to usable paper, and then sold that finished product . . . NCR developed a process to enable de-inking mills to use CCP as a feedstock, a process that resulted in most of the PCBs being emitted in waste streams."

- "NCR was not open with the public about its use of PCBs in CCP, but instead tried to keep its use of PCBs out of the press or regulator cross-hairs until a suitable alternative was found."

- "NCR greatly benefitted from the sale of its CCP broke and trim . . . NCR had profit margins of twenty percent and experienced over $2.1 billion in revenues from the production of its CCP in 1970-1972 alone."

- "NCR knew that recycling CCP broke in the paper mills created a hazardous waste stream; that NCR continued to sell CCP broke to brokers and recyclers even though it understood no rational recycler would want the CCP broke anymore if it understood what NCR did; and that CCP broke reached the Kalamazoo River Valley Site."

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph including any legal conclusions and any characterization of the events at issue.

70.    The court also explicitly recognized prior decisions finding that ACPC did not have knowledge sufficient to be liable as an "arranger," and stated that NCR's liability for the Kalamazoo River was not based on any wrongdoing or knowledge of ACPC, but solely *NCR's* wrongful actions:

- "The Court's decision in this case . . . rests not on any findings as to ACPC's culpability or mindset during the production period, but entirely on NCR's knowledge and intent to dispose of what it well understood to be a hazardous, toxic substance."

**RESPONSE:** NCR refers the Court to the referenced Western District of Michigan opinion for its true and complete contents and denies the remaining allegations in this Paragraph including any legal conclusions and any characterization of the events at issue and further states that the Western District of Michigan did not reach the issue of whether ACPC had knowledge sufficient to be an arranger.

71.     Following this ruling, NCR reached a settlement with the EPA, leading to a consent decree being filed in the action requiring NCR to pay past and future costs to the EPA.

**RESPONSE:** NCR admits that in 2019 it reached a settlement of its CERCLA liability for the Kalamazoo River site with the United States and the State of Michigan. The settlement was memorialized in a consent decree that ultimately was approved by the Western District of Michigan.

72.     NCR then turned to BAT, demanding it pay part of the cost of NCR's bad acts.  It also turned to API, but API was in bankruptcy.

**RESPONSE:** NCR admits that it has sought and continues to seek to have BAT meet its obligations under the CSA. NCR denies that it waited until after settling with the United States and State of Michigan to do so. NCR has met and communicated with BAT frequently about Kalamazoo and Fox River matters since the early 2010s. NCR kept BAT updated on its settlement negotiations with the United States and the State of Michigan and sought BAT's input. NCR denies the remainder of the Paragraph.

73.     BAT informed NCR that it is not responsible for payment of Kalamazoo costs under the CSA.  BAT and NCR participated in a dispute resolution procedure, including mediation in December 2019, however the parties were unable to resolve their dispute.

**RESPONSE:** Admitted.

## COUNT I
## <u>DECLARATORY JUDGMENT (FRAUD)</u>

*(These seem repetitive of allegations above, so I have not annotated them.)*

74.    BAT repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**RESPONSE:** NCR repeats and incorporates its responses to the allegations in Paragraphs 1 through 73 as if fully set forth herein..

75.    The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).

**RESPONSE:** NCR refers the Court to 28 U.S.C. § 2201(a) for its true and complete contents.

76.    As set forth in detail above, NCR fraudulently induced BAT to enter into the CSA in an attempt to force BAT to pay for the cleanup costs for NCR's pollution of the Kalamazoo River.

**RESPONSE:** Paragraph 76 states a legal conclusion to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

77.    In order to induce BAT to enter into the CSA, and to agree to the "Future Sites" language proposed by NCR, NCR represented to BAT that it had no reason to think it would face liability at any site other than Fox River and Marina Cliffs, that such liability, "if any," was only "potential" and would arise, if at all, on the basis that "NCR paper was recycled at mills other than those on the Fox River."  NCR concealed the fact that it had intentionally arranged for discharges of PCBs into the Kalamazoo River and that it was fully aware of the likelihood of it being found liable as an arranger.

**RESPONSE**: Paragraph 77 states legal conclusions to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

78.    NCR's representatives have admitted in sworn testimony that they were aware of the likelihood of Kalamazoo liability *at the time that the CSA was being negotiated*, and these matters are also apparent from NCR's lobbying at the same time, and yet NCR failed to disclose that fact to BAT and instead misrepresented that liability to BAT to induce BAT to enter into the CSA.

**RESPONSE**: Paragraph 78 states a legal conclusion to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

79.    NCR was under an affirmative duty to disclose the likely Kalamazoo River liability to BAT during the CSA negotiations.  NCR had unique knowledge of its own role in the discharge of PCBs into the Kalamazoo River – and that NCR had acted with the specific intent to

offload a product it knew was toxic and faced liability for having done so – which it failed to disclose to and instead intentionally concealed from BAT. BAT, on the other hand, had no knowledge of NCR's pollution of the Kalamazoo River, nor could it have known as such information was known only to NCR. Yet NCR negotiated the CSA with BAT, knowing that BAT was unaware that NCR also faced Kalamazoo River cleanup liability because the public evidence to date did not indicate that NCR had committed acts that would lead to liability for the Kalamazoo cleanup.

**RESPONSE**: Paragraph 79 states legal conclusions to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

80.     NCR had knowledge of material facts that BAT was unaware of – namely, that (1) it had sold broke to mills in the Kalamazoo River area; (2) it knew that such broke would create toxic waste in the Kalamazoo River; (3) it had intentionally passed off on Kalamazoo recyclers a product it knew to be toxic as useful in order to earn a profit; and (4) the likelihood that NCR would be held liable for environmental cleanup costs at the Kalamazoo River.

**RESPONSE**: Denied.

81.     Based on NCR's failure to disclose these material facts, BAT was unaware of them, and was thus fraudulently induced to enter into the CSA.

**RESPONSE**: Paragraph 81 states a legal conclusion to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

82.     BAT has been and will be damaged in an amount to be determined at trial, but likely in the hundreds of millions of dollars by NCR's fraudulent inducement.

**RESPONSE**: Denied.

83.     An actual controversy has arisen between NCR and BAT because NCR is seeking to recover from BAT under the CSA.

**RESPONSE**: Admitted.

84.      Accordingly, BAT is entitled to a declaration that NCR fraudulently induced BAT to enter into the CSA and that, as a result, the CSA is null and void.

**RESPONSE**: Paragraph 84 states a legal conclusion to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

85.     NCR's fraudulent procurement of BAT's agreement to enter into the CSA arises out of the same transaction – the CSA – upon which it seeks to recover money from BAT. Accordingly, BAT is entitled to equitably recoup any alleged damages NCR seeks to recover from BAT under the CSA.

**RESPONSE**: Paragraph 85 states a legal conclusion to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

**COUNT II**
**DECLARATORY JUDGMENT  (NEGLIGENT MISREPRESENTATION)**

86.    BAT repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**RESPONSE:** NCR repeats and incorporates its responses to the allegations in Paragraphs 1 through 85 as if fully set forth herein.

87.    In order to induce BAT to enter into the CSA, and to agree to the "Future Sites" language proposed by NCR, NCR misrepresented and concealed the fact that it had engaged in discharges of PCBs into the Kalamazoo River and that such discharges had caused significant environmental damage for which it was facing liability exposure.

**RESPONSE:** Paragraph 87 states legal conclusions to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

88.    NCR's representatives have admitted in sworn testimony that they were aware of the likelihood of Kalamazoo liability *at the time that the CSA was being negotiated*, and yet they failed to disclose that fact to BAT.

**RESPONSE:** Denied.

89.    NCR was under an affirmative duty to disclose the likely Kalamazoo River liability to BAT during the CSA negotiations and not to misrepresent NCR's liability exposure. NCR had unique knowledge of its own role in the discharge of PCBs into the Kalamazoo River and of the likelihood of consequent liability, which it misrepresented and failed to disclose to BAT.  BAT, on the other hand, had no knowledge of NCR's pollution of the Kalamazoo River, nor could it have known as such information was known only to NCR.  Yet NCR negotiated the CSA with BAT, knowing that BAT was acting on the basis of an erroneous belief since the public evidence to date did not indicate that NCR had committed acts that would lead to liability for the Kalamazoo cleanup.

**RESPONSE**: Paragraph 89 states legal conclusions to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

90.    NCR had knowledge of material facts that BAT was unaware of – namely, that (1) it had sold broke to mills in the Kalamazoo River area; (2) it knew that such broke would create toxic waste in the Kalamazoo River; (3) it had intentionally passed off on Kalamazoo recyclers a product it knew to be toxic as useful in order to earn a profit; and (4) the likelihood that NCR would be held liable for environmental cleanup costs at the Kalamazoo River.

**RESPONSE**: Denied.

91.    Based on NCR's failure to disclose these material facts, BAT was unaware of them, and was thus induced to enter into the CSA.

**RESPONSE**: NCR denies knowledge sufficient to admit or deny what BAT was "unaware of," and denies the remainder of this Paragraph.

92.    BAT has been and will be damaged in an amount to be determined at trial, but likely in the hundreds of millions of dollars by NCR's negligent inducement.

**RESPONSE**: Denied.

93.    An actual controversy has arisen between NCR and BAT because NCR is seeking to recover from BAT under the CSA.

**RESPONSE**: Admitted.

94.    Accordingly, BAT is entitled to a declaration that NCR negligently induced BAT to enter into the CSA and that, as a result, the CSA is null and void.

**RESPONSE**: Paragraph 94 states legal conclusions to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

95.    NCR's negligence arises out of the same transaction – the CSA – upon which it seeks to recover money from BAT.  Accordingly, BAT is entitled to equitably recoup any alleged damages NCR seeks to recover from BAT under the CSA.

**RESPONSE**: Paragraph 95 states a legal conclusion to which no response is required. To the extent a response is required, NCR denies the allegations in this Paragraph.

## COUNT III
## DECLARATORY JUDGMENT (CONTRACT)

No response is required, as the Court has dismissed this count.

## COUNT IV
## DECLARATORY JUDGMENT (IN PARI DELICTO)

No response is required, as the Court has dismissed this count.

## COUNT V
## DECLARATORY JUDGMENT (PUBLIC POLICY)

No response is required, as the Court has dismissed this count.

\* \* \*

## NCR'S AFFIRMATIVE DEFENSES

NCR asserts the following defenses without admitting that it bears the burden of

persuasion or presentation of evidence on each or any of these matters. In addition to the

defenses set forth below, NCR expressly reserves the right to assert any and all additional defenses that may develop during the course of investigation, discovery, and litigation of this action.

## FIRST DEFENSE

BAT's counterclaims are barred by res judicata. BAT/API were involved in arbitrations with NCR in 2005 and 2013 that arose under the CSA. At the time of these arbitrations, BAT knew the same facts it now claims amount to fraudulent inducement and/or negligent misrepresentation yet neither API nor BAT raised these defenses to CSA enforceability in the arbitrations or otherwise sought to pursue counterclaims on the basis of these allegations.

## SECOND DEFENSE

BAT's counterclaims are barred because BAT ratified the CSA by signing a Funding Agreement with NCR in 2015. BAT entered into the 2015 Funding Agreement with full knowledge of every fact it now claims NCR withheld before the CSA was signed. The funding agreement repeatedly referenced and incorporated the CSA. By signing the Funding Agreement, BAT ratified the CSA.


Dated: October 18, 2024
New York, New York

Respectfully submitted,

/s/ Zachary Payne
John J. Kuster
Zachary Payne
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
jkuster@sidley.com
zpayne@sidley.com

Bruce R. Braun (admitted *pro hac vice*)
Charles K. Schafer (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
bbraun@sidley.com
cschafer@sidley.com

*Attorneys for Plaintiff NCR Voyix*
*Corporation*