# Exhibit A

Jonathan Hoak                                                            NCR Corp. vs. Appleton Papers, Inc.

Page 153

1  Q. Was there anybody else that you knew of
2  that attended on behalf of Appleton?
3  A. I don't believe so.
4  Q. On behalf of Appleton, when you were having
5  discussions in the course of the mediation, is there
6  someone you would have characterized for their side
7  as being the lead negotiator, your counterpart?
8  A. I think that Dan and Paul had basically the
9  same relationship that John Giering and I -- that I
10 did. They were -- again, had worked together for
11 some period of time and were very closely aligned.
12 I don't remember one sort of having more authority
13 than the other.
14 Q. And fair to say that Dan McIntosh was the
15 businessperson at API and Paul was the internal API
16 lawyer?
17 A. That's correct.
18 Q. And then the only other person who would
19 have been involved in the mediation would have been
20 Judge Phillips; is that fair?
21 A. Yes.
22 Q. So besides the people that we've listed, is
23 there anybody else that you can remember that was
24 involved in the actual mediation itself, not
25 necessarily the drafting of papers?

Page 154

1  A. Right. There were a lot of people involved
2  in the drafting of papers. I don't believe anybody
3  else was there.
4  Q. Now, at the conclusion of that session, did
5  the parties reach an agreement?
6  A. Yes.
7  Q. And what was the -- if you could paint for
8  me the broad strokes of the scope of liability that
9  you believed NCR was settling with API.
10 A. Yeah. What I can say is the concept, Mike.
11 It's hard for me to go back -- I did some of the --
12 documents I reviewed were, you know, the settlement
13 agreement itself and the -- and the exchange on the
14 recording that Layn Phillips did. And I can say I
15 thought those were accurate reflections of what we
16 agreed to.
17      Again, hard for me, even at this time, to
18 go parse individual language. What I can say is
19 that as part of the mediation, we came to the
20 agreement that we wanted to settle as broadly as
21 possible, that we wanted to get -- you know, so we
22 wouldn't be continuing to have other disputes, that
23 we -- you know, we wanted it to broadly include any
24 of the liabilities that could come up in terms of
25 anything that could come up as part of the Fox

Page 155

1  River.
2       And we wanted it to include other sites as
3  well. I remember discussions specifically on that.
4  It was at a time when the Kalamazoo was at least
5  lurking out there. Nothing -- as I recall, nothing
6  specific happened, but we knew that was another
7  potential location, and so we wanted to include it
8  as broadly geographically as we could.
9  Q. Just give me a second --
10 A. Sure.
11 Q. -- to look at my notes here.
12      MR. HUTTENLOCHER: Can we go off the
13 record?
14      MR. McATEE: Yeah.
15      THE VIDEOGRAPHER: This marks the end of
16 Video Recording 2 in the deposition of Jonathan
17 Hoak. 12:18, going off the record.
18      (Recess taken)
19      THE VIDEOGRAPHER: On record at 12:24.
20 This marks the beginning of Video Recording 3 in the
21 deposition of Jonathan Hoak.
22      (Deposition Exhibit 15 was marked for
23      identification)
24 BY MR. HUTTENLOCHER:
25 Q. Mr. Hoak, I've handed you an exhibit we've

Page 156

1  marked as Hoak 15, a document that was filed in Case
2  Number 2:08-cv-00016-WCG, which is one of the
3  Wisconsin litigations. And it's a two-page
4  document. And the second page is entitled "New
5  Scientist," December 15, 1966, and the title of the
6  document is "Report of a New Chemical Hazard."
7       I believe this is the document that you
8  were referring to earlier from Mr. Jensen, a Swedish
9  scientist.
10      Do you recall ever seeing this document?
11 A. I'm not sure if I did or not. I know that
12 the concepts were -- were something I knew of, you
13 know, that this -- that NCR knew the potential
14 hazardous consequences of PCBs prior to stopping
15 production in 1971.
16      I just don't remember, you know, the --
17 again, maybe if you show me enough, I might remember
18 some, but I just don't remember specific documents.
19 But I do know as I look at -- you gave me the first
20 page -- the concept that was being discussed.
21      One thing that's giving me pause is that I
22 don't remember anything as early as '66. I thought
23 it was more in the '69 to '71 time frame.
24 Q. Do you recall ever giving a copy or a
25 synopsis of anything from Mr. Jensen to API during

Page 153..156

CONFIDENTIAL                                                                      NCRV_00022233
                                                                                   NCRV_00022194

Jonathan Hoak                                            NCR Corp. vs. Appleton Papers, Inc.

```
                              Page 149                                         Page 150
 1     Q.  But you're not going off of the specific     1      I probably would have said he was our
 2  recollection that that happened; you're just making 2  client representative, so -- so, you know -- I
 3  an assumption?                                      3  probably did more of the negotiating, but maybe the
 4     A.  Yes, I do have a specific recollection that  4  ultimate decision was his.  And we were during that
 5  that -- that production increase was a discussion   5  time in communication with our CEO as well and
 6  with FRG and with the government.  I don't remember 6  briefed him before going out on the mediation about
 7  a specific conversation between myself and somebody 7  what the arguments were on both sides and the
 8  from API talking about that.                        8  parameters and all that kind of stuff.
 9     Q.  With respect to negotiating a settlement in  9      Q.  And what was -- I'm sorry.
10  the 1998 mediation, who was NCR's lead negotiator? 10          Where is -- let me strike that and start
11     A.  Would you ask that question again.         11  over.
12     Q.  Sure.  Sure.                                12          Currently, do you know where John Giering
13         When you had gotten into the 1998          13  is now?
14  mediation, I assume that you -- and you had       14      A.  I do.
15  mentioned before, it wasn't just you, you had gone 15      Q.  Where?
16  with other individuals; right?                    16      A.  He is -- primarily lives in Dayton, Ohio.
17     A.  Mm-hmm.  Yes.                              17  He also has a house in Florida, I believe.
18     Q.  And on the NCR team, who would you have    18      Q.  Have you spoken to him recently?
19  considered to be the lead negotiator for that     19      A.  I have.  He and I are good friends, remain
20  settlement agreement on behalf of NCR?            20  good friends.  I have not spoken to him specifically
21     A.  I'd say it was either John Giering or      21  about this matter.
22  myself.  We were -- again, he was the CFO, I was the 22     Q.  Did you -- when was the last time you spoke
23  general counsel.  He and I had worked very, very  23  to him?
24  closely on a number of issues.  So I really felt we 24     A.  By e-mail, I think as recently as yesterday
25  were joined at the hip on it.                     25  or the day before.  By phone, maybe a month or two

                              Page 151                                         Page 152
 1  ago.                                                1      Q.  This bears the Bates number
 2     Q.  And in your e-mails or your telephone        2  NCR-ARB00007030.
 3  communications, did you discuss that you were going 3          Do you see that?
 4  to be deposed with respect to NCR and the potential 4      A.  I do.
 5  Fox River liabilities?                              5      Q.  As you'll see in the bottom e-mail,
 6     A.  No, I did not.                               6  Mr. Schlickman describes who are the individuals who
 7     Q.  And I assume that you didn't talk to him     7  will be attending the mediation.  And those
 8  about any of the subject matters here to attempt to 8  individuals are -- in addition to himself, there is
 9  refresh your recollection at all?                   9  John Giering, yourself, and Lee Freeman.
10     A.  I did not.                                 10          Does that refresh your recollection of the
11         MR. HUTTENLOCHER:  Let me mark a document, 11  individuals who attended on behalf of NCR?
12  which is Hoak 14.                                 12      A.  I didn't even need this one to refresh.  I
13         (Deposition Exhibit 14 was marked for     13  remember.  I remember it very well.
14         identification)                           14      Q.  Were there any other individuals that were
15  BY MR. HUTTENLOCHER:                              15  representing NCR that attended that mediation?
16     Q.  You'll see that -- let me just read it -- 16      A.  I don't believe so.
17  describe it for the record.                       17      Q.  And the top e-mail, where Mr. Bourque
18         It's an e-mail chain, dated Friday, January 18  replies -- he says the participants for Appleton
19  30th, 1998; subject matter:  Mediation attendees;  19  Papers will be Paul Karch, Dan McIntosh, himself,
20  between Andrew Schlickman and Bob Bourque on the   20  and Bill Russell.
21  bottom e-mail.  And then when Mr. Bourque responds 21         Do you see that?
22  to Mr. Schlickman.  He copies Paul Karch, it looks 22      A.  I do.
23  like, at appletonpapers.com, and Bill Russell, who 23      Q.  And were those the individuals who attended
24  we discussed before was at Simpson at the time.    24  that 1998 mediation?
25     A.  Yes.                                       25      A.  That's correct.
```

CONFIDENTIAL                                                NCRV_00022232
                                                            NCRV_00022194