# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NCR CORPORATION,

Plaintiff,

v.

B.A.T INDUSTRIES p.l.c.,

Defendant.

Case No.: 1:23-cv-1172-JPC-SDA

**DEFENDANT B.A.T. INDUSTRIES P.L.C. NOTICE OF 30(B)(6) DEPOSITION**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant B.A.T Industries p.l.c. ("BAT") will take the oral deposition of Plaintiff NCR Voyix Corporation ("NCR"). The deposition will commence on a date and time to be agreed upon by the parties, and will continue from day to day until completed. The deposition will be held at the offices of Hogan Lovells US LLP, 390 Madison Avenue, New York, NY 10019, or at such place as may be agreed upon by counsel for the parties.

The deposition shall be taken before a duly authorized officer certified to administer oaths and take depositions, and shall be recorded by stenographic and audiovisual means. The deposition will be taken for the purpose of discovery, for use as evidence at any hearing or trial, and for any other purposes authorized by law.

NCR is requested to designate, pursuant to Rule 30(b)(6), person(s) to testify about information known or reasonably available to NCR regarding the subject matters listed in Schedule A, attached hereto.

NCR is requested to provide BAT's counsel, as soon as reasonably possible, a written designation of the name(s) and position(s) of the person(s) who will testify on behalf of NCR and,

for each person so designated, the matters set forth in the attached Schedule A as to which each person will testify.

Dated: January 16, 2026
New York, New York

Respectfully submitted,

/s/ Dennis H. Tracey, III

Dennis H. Tracey, III
David R. Michaeli
Benjamin H. Diamond
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
dennis.tracey@hoganlovells.com
david.michaeli@hoganlovells.com
benjamin.diamond@hoganlovells.com

**SCHEDULE A**

I. **DEFINITIONS**

1. Any reference to a person or entity, including each of the parties in this proceeding, includes any director, officer, partner, managing member, employee, corporate parent, subsidiary, or affiliate acting on behalf of the person or entity. Any reference to a person or entity, including each of the parties in this proceeding, does not include outside counsel or litigation consultants of the person or entity.

2. "ACPC" means Appleton Coated Paper Company.

3. "API" mean Appleton Papers, Inc.

4. "Communication" shall be construed in the broadest sense possible and includes but is not limited to any conversation, correspondence, discussion, email, facsimile, letter, meeting, memorandum, negotiation, telephone conversation, text message (or similar chat message on any platform), or any other occurrence whereby thoughts, opinions, social media, or data is transmitted between two or more persons in any manner. For the avoidance of doubt, the term communication includes both internal and external communications involving NCR.

5. "CPM" means Combined Paper Mills.

6. "Regarding" and "in connection with" mean regarding, relating to, concerning, describing, pertaining to, evidencing, reflecting, regarding, constituting, involving, in connection with, or touching upon in any way. Each of these terms may be used interchangeably herein and shall be treated as encompassing all these meanings.

7. "Including" means "including but not limited to."

8. "NCR" means NCR Voyix Corporation, the plaintiff in this action, formerly known as NCR Corporation and as AT&T Global Information Solutions Company, including any and all of its subsidiaries and divisions (for the avoidance of doubt, this includes NCR's Systemedia division, ACPC, and CPM).

9. "BAT" means B.A.T Industries p.l.c., the defendant in this action.

10. "CSA" means the Confidential Settlement Agreement between NCR, BAT, and API that was fully executed on July 26, 1999.

11. "A1242" means Aroclor 1242, a specific type of polychlorinated biphenyl.

12. "CCP" means carbonless copy paper manufactured by NCR.

13. "PCBs" means polychlorinated biphenyls.

14. "The Georgia Pacific Litigation" means *Georgia-Pac. Consumer Prods. LP v. NCR* Corp., 980 F. Supp. 2d 821 (W.D. Mich. 2013).

15. "Kalamazoo River Site" means the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site in Michigan, defined by the U.S. Environmental Protection Agency. (*See* BAT.00317812).

## II. DEPOSITION TOPICS

1. NCR's knowledge of A1242's and/or CCP's toxicity, including: experiments or other investigations into potential or known A1242/CCP toxicity of which NCR was aware, the times such experiments or other investigations occurred, the conclusions reached, and any related communications.
2. NCR's knowledge of general PCB toxicity, including: experiments or other investigations into potential or known PCB toxicity of which NCR was aware, the times such experiments or other investigations occurred, the conclusions reached, and any related communications.
3. NCR's knowledge that A1242 does not degrade, including: experiments or other investigations into potential or known A1242 degradation of which NCR was aware, the times such experiments or other investigations occurred, the conclusions reached, and any related communications.

4. NCR's efforts to identify a replacement for A1242 for use in the manufacture of CCP, its decision as to when to replace A1242, and any communications or documents related to that decision.

5. The increase in production of CCP prior to the replacement of A1242 in the manufacture of CCP, and any communications or documents related to those efforts.

6. NCR relationship to any third-party waste paper brokers and/or recyclers, including any communications or directives made to them.

7. NCR's knowledge of environmental risks of manufacturing and recycling CCP, including any communications and/or documents related to those environmental risks and NCR's knowledge thereof.

8. NCR's efforts to avoid CCP being publicly linked with PCBs, including any communications with government regulators or with other corporate entities in the US or abroad.

9. NCR's knowledge, as found in the Georgia Pacific Litigation, "that waste water treatment in paper recycling operations would do little, if anything, to remove PCBs from" effluent deposited into the environment as part of the CCP, broke, or trim recycling process.

10. NCR's analysis of the possibility of destroying CCP, broke, or trim by other methods, including incineration, and NCR's reasons for pursuing or not pursuing those approaches to disposal.

11. NCR's communications with regulators regarding the toxicity or potential toxicity of CCP, broke, or trim.

12. NCR's sales of CCP broke or trim to recyclers, and/or brokers.

13. Other ways in which NCR disposed of or dealt with broke and trim, other than by selling this to recyclers/brokers (for example, sending broke or trim to landfill and/or to be incinerated).
14. NCR's communications with recyclers about the environmental risks of recycling CCP, broke, or trim.
15. NCR's awareness of and/or involvement in the recyclers' processes for removing PCBs from broke/trim, including deinking, and including any involvement by NCR in assisting the recyclers to develop or adapt their processes (for example, to attempt to resolve the problem of "bluing") and related communications.
16. NCR's knowledge that broke/trim was not a useful product.
17. NCR's knowledge that broke/trim was sent to the Kalamazoo River Site or recycling companies with operations at the Kalamazoo River Site.
18. NCR's shipment of broke to the Kalamazoo River Site or recycling companies with operations at the Kalamazoo River Site.
19. NCR's communications with BAT, API, and/or Simpson Thacher & Bartlett about the CSA.
20. The basis for NCR's belief at the time the CSA was negotiated and executed that the Kalamazoo River Site was "lurking out there."
21. All information NCR provided to BAT about the Kalamazoo River Site prior to BAT executing the CSA.
22. NCR's knowledge of NCR's actual or potential liability at the Kalamazoo River Site prior to execution of the CSA.
23. NCR's reasons for proposing the "Future Sites" language in the CSA.
24. NCR's communications with BAT about any of the above-mentioned knowledge, communications, or actions.

25. Information NCR shared with BAT in connection with or prior to executing the CSA regarding any of the above.

26. NCR's communications with BAT regarding potential liability at the Kalamazoo River Site after the execution of the CSA, including in connection with the following events:

    1. NCR's receipt of a section 104(e) information request, made by the EPA in April 2003;

    2. NCR's receipt of an EPA notice identifying NCR as a PRP as the Kalamazoo River Site;

    3. NCR being sued in the Georgia-Pacific Litigation; and

    4. NCR being found liable in the Georgia-Pacific Litigation, in 2013 and in 2018.

27. NCR's communications with any party to the Georgia Pacific Litigation and/or any state or federal agency regarding the potential settlement of NCR's CERCLA related liabilities in respect of the Kalamazoo River Site.

28. The 1998 Joint Defense and Representation Agreement.

29. Communications and information shared between NCR and Simpson Thacher during the period 1995 to July 1999 regarding potential liability for NCR in respect of the Kalamazoo River or other "Future Sites," as defined in the CSA.

30. Information held by NCR during the period from January 1, 1995 to December 31st, 2000 regarding potential liability for NCR in respect of the Kalamazoo River or other "Future Site," as defined in the CSA.

31. Communications and information provided by NCR directly to BAT during the period from January 1, 1995 to December 31, 2000 regarding potential liability for NCR in respect of the Kalamazoo River or other "Future Site," as defined in the CSA.

32. Communications and information provided by NCR directly to API during the period from January 1, 1995 to December 31, 2000 regarding potential liability for NCR in respect of the Kalamazoo River or other "Future Site," as defined in the CSA.