# Exhibit E

AMERICAN ARBITRATION ASSOCIATION

------------------------------x

NCR CORPORATION,

Claimants,

v. AAA No.

13-489-Y-00691-13

APPLETON PAPERS, INC.,

Respondents.

------------------------------x

DEPOSITION OF J. ANDREW SCHLICKMAN

New York, New York

January 10, 2014

Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 69388

January 10, 2014

8:25 a.m.

Deposition of J. ANDREW SCHLICKMAN, held at the offices of Cravath, Swaine & Moore, LLP, 825 Eighth Avenue, New York, New York, before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New Jersey.

APPEARANCES:

CRAVATH SWAINE & MOORE
Attorneys for Plaintiff
825 Eighth Avenue
New York, New York 10019
BY: DARIN McATEE, ESQ.
DAVID LISNER, ESQ.

McDERMOTT WILL & EMERY
Attorneys for Defendant
340 Madison Avenue
New York, New York 10173
BY: MICHAEL HUTTENLOCHER, ESQ.
ALLISON FLEISCHER, ESQ.

Also Present:
Edward Gallagher, NCR Corporation
Jim Roberts, Videographer

Schlickman

THE VIDEOGRAPHER: Good morning. We are now on the record. This is the start of tape labeled number one of the videotape deposition of Andrew Schlickman in the matter of NCR Corporation versus Appleton Papers Incorporated under the jurisdiction of the American Arbitration Association 13-489-Y-00691-13.

The deposition is being held at Cravath, Swaine & Moore located at 825 Eighth Avenue, New York City, New York on January 10,2014 at approximately 8:25 a.m.

My name is Jim Roberts from TSG Reporting Incorporated. I am the legal video specialist. The court reporter is Mary Bowman, in association with TSG Reporting.

Counsel please state their appearances for the record.

(Whereupon, attorneys placed their appearances on the audio record)

THE VIDEOGRAPHER: The court reporter will please swear in the

witness.

J. ANDREW SCHLICKMAN,

called as a witness by the plaintiff, having been duly sworn, testified as follows:

EXAMINATION BY

MR. HUTTENLOCHER:

Q. Good morning, Mr. Schlickman.

A. Good morning.

Q. As I said previously, my name is Michael Huttenlocher from McDermott, Will & Emery, just here to take your deposition today in the matter between NCR Corporation and Appleton Papers under the American Arbitration Association.

To start off, have you ever been deposed before?

A. Yes, I have.

Q. And how many times?

A. Approximately three or four times.

Q. And were you previously deposed in a matter regarding the Fox River liabilities?

A. Yes.

Q. Do you recall when that was?

Schlickman

A. The last two or three years.

Q. Just one time? Or -- of the three or four times you have been deposed, how many times was it related to the Fox River?

A. Twice.

Q. What were the other two matters that you were deposed in?

A. I believe one was in the Whiting case. The other one was in connection with an insurance dispute that -- I don't recall if it was in litigation or arbitration, but it was an insurance dispute.

Q. When you refer to the Whiting action, can you explain what you mean by that? I think everyone around the table knows, but just to make the record clear.

A. The Whiting litigation was a lawsuit that Appleton and NCR filed against a number of other parties who were responsible, potentially responsible and responsible parties for the contamination along the Fox River.

Q. And the purpose for that litigation was what?

A. To make sure that all the responsible parties were paying their share of the costs.

Q. Was part of that action NCR and API seeking contribution from those other potentially responsible parties?

A. That was part of the case, yes.

Q. Were there other aspects of the case other than the seeking of contribution?

A. I think there were, but I don't recall right now.

Q. Now, I understand that you have been deposed before, you have been through the process. I'm sure you have been, given your career, on my side of the questioning as well.

But let me go over some quick ground rules today so we are all on the same page. Is that OK?

A. OK.

Q. As you know, the court reporter is here today taking everything down. If you would please make sure that your answers are audible and no head nods, OK?

Schlickman

A. OK.

Q. In addition, please allow me to finish my question before you begin your answer so that the court reporter can take everything down. Is that all right?

A. That's fine.

Q. If you don't understand any of the questions that I have, please just ask me to rephrase. But if you answer a question that I have, we are all going to assume that you understood the question and answered in response to that question, OK?

A. I understand.

Q. If at any time during the course of the deposition you need to take a break, please just let me know, but the one thing I would ask is that you don't request to take a break during a pending question. Is that all right?

A. OK.

Q. And do you understand that you are giving testimony here today under oath just as if you were before the arbitral panel?

A. Yes, I do.

Schlickman

Q. Are you taking any medication today that would impair your ability to recollect facts or testify truthfully today?

A. No.

Q. What did you do to prepare for today's deposition?

A. I met with, on two occasions, with the lawyers from Cravath and I briefly reviewed some documents.

Q. When did those meetings with lawyers from Cravath take place?

A. One took place just before Thanksgiving. One took place yesterday.

Q. For approximately how long did you meet?

A. I don't think either meeting exceeded three hours.

Q. Was anyone else other than Cravath lawyers in attendance at those meetings?

A. At the first meeting, I believe Ed Gallagher was there for part of the meeting and John Hartje was there for part of the meeting.

Q. Who is John Hartje?

Schlickman

A. John Hartje works in the law department for NCR.

Q. You mentioned you reviewed documents during those meetings. Is that correct?

A. We reviewed some documents at those meetings and I think I reviewed the same -- I briefly reviewed, I think is what I said, but I did look at some documents at those meetings and I looked at the same documents outside of those meetings for a little while.

Excuse me, let me turn -- I think the sound is on on my phone here.

Q. Certainly.

A. Go ahead, I am sorry.

Q. No, that's all right.

Did any of the documents that you reviewed during the course of these prep sessions refresh your recollection at all about the events that you were discussing?

A. That's a tough question to answer because there was a lot of stuff covered in those documents. I would say some things, yes, those documents refreshed my

Schlickman

recollection.

Q. Do you recall which documents refreshed your recollection?

A. For the same reason the last question was tough, that one is tough. I can tell you I spent most of my time looking at the confidential settlement agreement and that did bring back some memories, some recollections, though I didn't spend much time on other documents though I did briefly look at some other things.

Q. Have you spoken to anyone other than representatives of -- representatives of Cravath or NCR concerning today's deposition?

A. No.

Q. No discussions with any attorneys at Sidley Austin about the events of the Fox River in connection with you coming for this deposition?

A. Other than the fact that my deposition was to be taken, no.

Q. Have you ever appeared as a witness in a court proceeding?

A. Yes.

Schlickman

Q. In what proceeding and what was that relating to?

A. I can think of three.

Q. What are those three?

A. Many years ago, I testified in the Northern District of Illinois in a proceeding to award attorneys' fees in a case after a summary judgment had been entered.

In the insurance matter I was referring to before -- and I don't recall exactly the precise procedural posture -- it may have been, it was, it was before a state court judge who was handling some sort of special procedure outside of the court itself, and I testified in that proceeding that was up in Green Bay as I recall.

And I testified at the trial in Whiting.

Q. Was there ever an occasion where you appeared as a witness in an arbitration or are those three instances you recall the sum and substance of your testimonial experience?

A. I think I briefly testified at the

arbitration that was held under the confidential settlement agreement to determine the sharing percentages for amounts in excess of 75 million.

Q. That would be the 2005 subsequent allocation arbitration that you are referring to?

A. I don't recall the year.

Q. OK. Mr. Schlickman, just take some time to review some of your background.

Do I understand correctly you graduated from Georgetown University in 1974?

A. Yes.

Q. And you also graduated from the University of Chicago Law School in 1978?

A. Yes.

Q. Was there a year that you took in between Georgetown and starting at University of Chicago Law?

A. Well, I took a year off from school if that's what you mean.

Q. Yes, that's what I mean.

A. Yes.

Q. What did you do during that year?

Schlickman

A. I traveled. I worked at a record store in San Francisco, spent some time in Washington DC, and eventually found a job in Chicago and worked at that job until I started law school.

Q. What was the job that you mentioned you were in Chicago for?

A. I worked as a law clerk for the Illinois Attorney General's office.

Q. Did you continue that position during the time that you were in law school?

A. Yes, I worked at the Attorney General's office as a law clerk the summer before -- part of the year before my first year of law school and the summer after my first year of law school.

Q. And you clearly graduated from law school. What was your first job after graduating from law school?

A. I became an associate at Sidley & Austin in Chicago.

Q. How long were you at Sidley?

A. Until ten days ago.

Q. Am I correct that you have recently

Schlickman

retired?

A. Yes.

Q. Congratulations.

A. Thank you.

Q. So you started as an associate in 19 -- fall of 1978, is that fair, at Sidley?

A. Actually, I think I started there in the summer. I did some work while I was studying for the bar exam. I wasn't, obviously, licensed to practice law at that point, but I started working for the firm at that time.

Q. And in what states are you barred to practice --

A. Pardon me?

Q. In what states did you pass the bar exam?

A. The only bar exam I took was the state of Illinois and I became a member of the Illinois bar later that year in 1978.

Q. Are you currently or have you ever been licensed to practice in any other states, practice law in any other states other than Illinois?

Schlickman

A. No.

Q. Are you admitted to practice in any federal courts?

A. I was.

Q. During the course of your career, up until about ten days ago, what federal courts were you licensed to practice in?

A. The main ones were all Illinois courts. The Northern District of Illinois, U.S. District Court, United States Court of Appeals for the Seventh Circuit, U.S. Supreme Court. I believe I was admitted to practice in a couple of other Circuit Court of Appeals, and I think I had been admitted pro hac vice to practice in a number of other courts. I don't recall them all now.

Q. When you started at Sidley Austin in 1978, what group did you begin your practice in?

A. A group known as the general litigation group.

Q. Did you remain in the general litigation group for the balance of your career at Sidley?

A. No.

Q. When did that change? With what other groups did you practice?

A. I would say beginning in my seventh or eighth year, I started doing some work in the group we called the environmental law group and that was just part-time. I was sort of strattling both the general litigation group and the environmental law group.

Within two or three years, the work in the environmental law group became full time and I eventually made the transition full time to that group. The lines between groups at Sidley are not really well defined, so.

Q. Understood. Would the, would it be fair to say that the time that you, for lack of a better term, fully transitioned to the environmental law group, would that be 1988, '89, in that time period, or earlier than that?

A. It was around '87 or '88 I believe that I felt I was pretty much working full

Schlickman

time in the environmental group.

Q. Was there a time you were promoted to partner at Sidley & Austin?

A. I was made partner at some point in time, yes.

Q. Do you recall when that was?

A. Around the same time, I think it was 1988.

Q. Did you remain a partner during your entire tenure while you were at Sidley & Austin?

A. I was a partner until April 1, 2009.

Q. Did you assume a different role at Sidley at that time?

A. Well, at that point, I voluntarily withdrew from the partnership and took on a position called senior counsel.

Q. Is it fair to say from April 1, 2009 until approximately ten days ago, you remained senior counsel at Sidley & Austin or did that change at all?

A. No, I was senior counsel from April 1, 2009 until December 31, 2013.

Schlickman

Q. During your time in the environmental group at Sidley, can you give me a description of the type of matters and -- that you were working on?

A. Well, it was a wide range of things. Many of the cases involved various types of matters and claims under the Superfund law and the Resource Conservation and Recovery Law.

Many of the cases involved disputes between private companies as to who would pay for clean-up costs. Some of the cases involved enforcement proceedings brought by various governmental agencies and litigation related to those things.

Q. OK. When you mentioned the Superfund law, is that also known as CERCLA or are you making a distinction between the two?

A. Yeah, the Superfund law is known by the acronym CERCLA, yes.

Q. During your time at Sidley, would you consider yourself to have developed a specialty?

Schlickman

A. I would say I concentrated my practice in environmental litigation, you know, from roughly 1987, 1988 up until the time I withdrew from the partnership.

Q. Can you describe for me or list off some of the clients that you have represented in Superfund litigations over the course of your career?

A. I can't remember all of them.

Q. Is there a -- let me kind of go through a few that I think you have listed previously on your bio while it was still up on the Sidley site.

Do you recall being involved in Superfund litigation with regard to the Penobscot River in Maine?

A. Yes.

Q. Who was your client with regard to that litigation?

A. The client's name changed over the years, but most recently it was known as Mallinckrodt.

Q. And what were the issues that were involved that you represented Mallinckrodt in

Schlickman

with regard to the Penobscot River?

A. There were issues between subsequent owners of the property. There were issues involving the state of Maine and U.S. EPA over the appropriate clean-up of the site. At one point, there were issues relating to a bankruptcy proceeding, and there was also litigation involving a private party who was seeking to have Mallinckrodt and other parties conduct an environmental study of the Penobscot River. And probably some other issues, I can't remember.

Q. Fair to say this representation involved issues concerning the Superfund law?

A. Much more than that.

Q. Would you say that it included that, though there may have been a number of other issues involved?

A. You know, actually, until the private party litigation about cleaning up the river came along, it really was primarily a RCRA case, Resource Conservation and Recovery Act case, and frankly, even that, even the private party action was under RCRA,

Schlickman

Superfund, primarily RCRA matter and state environmental law matter.

Q. Approximately during what time did this representation take place? What was the years that Sidley got started and then when did it resolve itself to the extent it did?

A. It started in 1989 and it is still not yet resolved fully.

Q. Did this involve similar legal issues that arose during the course of your representation of NCR in respect to the Fox River liabilities or different issues?

A. Well, that's a very difficult question to answer. Could you be a little bit more precise.

Q. Sure. In the course of your representation for Mallinckrodt for the Penobscot River, were there any legal issues that were presented during that representation that were similar to the issues that arose with regard to the Fox River liability that NCR was facing?

A. The problem I have with your question is that the Maine matter, Penobscot

River matter primarily involved RCRA, primarily involved Maine state law.

The Fox River matter, for the most part, primarily involved CERCLA and Wisconsin state law.

Q. Another one of your representations was with regard to the Fieldsbrook -- I will pronounce this incorrectly, Ashtabula River in Colorado?

A. Ashtabula. People tell me that is a word out of a Bob Dylan song.

Q. Sounds like it.

MR. McATEE: You are not going to ask him who Bob Dylan is?

MR. HUTTENLOCHER: I am not that young.

A. I thought you were going to test my age.

Q. To run every issue down -- just kidding.

So the Ashtabula River, who is your client that you represented in connection with that environmental issue?

A. It was also Mallinckrodt, but I

Schlickman

think while the Fields Brook Ashtabula matter was active, they were known by a different name.

Q. Do you recall what name they were known by that was different than Mallinckrodt?

A. Either International Minerals & Chemical Corp. or IMCERA, I-M-C-E-R-A, all caps.

Q. Was that a Superfund or CERCLA environmental litigation matter?

A. CERCLA was involved and I believe RCRA was involved.

Q. With respect to the CERCLA issues, were any of the CERCLA issues that were raised in the field Brooks Ashtabula River matter similar to any of those with respect to the Fox River liability?

A. Again, could you be a little more precise? There are a lot of issues about those that are tied into the facts of each case and it is hard to answer a general question like that.

Q. Sure, sure. In the Fields Brook

Schlickman

matter, did you address issues concerning clean-up costs?

A. How so?

Q. For your client, involved in negotiating with other potentially responsible parties, potentially bringing a contribution action, negotiating with U.S. EPA or the Ohio environmental authorities concerning how to conduct a clean up and who is to pay for it?

A. OK, there was a lot in that question.

Q. Understood.

A. Let me try to parse it a little bit.

There was a group called the Fields Brook group. It may have consisted of 15 or 20 parties, including the client I represented. That group, as a group, I believe did have dealings with U.S. EPA and Ohio EPA over the appropriate clean-up approaches for the site which would have a bearing on the cost of the clean-up. And that group, as a group, created a procedure

to address allocation outside of, you know, the court context. It was a -- I don't know how you describe it, but it was a sort of a -- it was just a private agreement that involved presentations to a third-party neutral to try to resolve the allocation issues.

Q. Was that group, with respect to Fields Brook, similar in any way to the Fox River Group that was formed between a number of the potentially responsible parties for that river clean-up?

A. How the groups operated were very different.

Q. Was, with respect to the Fields Brook group, was there a formal agreement put in place among the parties?

A. I believe there was, though I don't recall for sure.

Q. And same question with respect to the Fox River Group, was there ever a written agreement, to your knowledge, that was put in place to govern how they would, the members of the Fox River Group would operate?

Schlickman

A. There was really never a comprehensive written agreement for how the Fox River Group would operate.

Q. Would it be fair to say that the Fox River Group conducted themselves in more of an informal matter or how would you characterize the way that the group operated?

A. I don't think I can answer that question without going year by year and trying to explain how they did things. It's -- I just can't answer that question.

Q. Can you give me a general concept of how things maybe changed over time from when the Fox River Group was first started to later in time when your involvement potentially ceased with it?

A. Let me just put it this way, the primary -- I'll use the word "understandings" that were struck for trying to facilitate the operation of the Fox River Group were funding agreements or funding understandings of which there were two or three. Those changed from year to year.

Q. When the Fox River Group was first

formed, what was the stated purpose of the group among the members?

A. I can't answer that question for two reasons. I'm -- I myself am not sure when the Fox River Group formed, and number two, I don't know if we ever -- I don't recall us ever agreeing on any stated purposes.

Q. What functions did the Fox River Group play during your time -- during your involvement with the Fox River Group?

A. Well, my only involvement was through my representation, the firm's representation of NCR.

Q. Understood. And what role did you play as NCR's counsel?

A. I was one of the primary persons on behalf of NCR who participated in the meetings and activities of the Fox River Group. NCR's involvement, as I recall, started in early 1997.

Q. And in early 1997, what were the types of activities that you were engaged in with the Fox River Group on behalf of NCR?

Schlickman

A. As I recall, the Fox River Group was in the process of hiring outside consultants to help the group evaluate and assess the claims that the trustees and government agencies were making against the various members of the group.

Q. Was part of the, your involvement with the Fox River Group discussing matters in which clean-up costs would be funded by the members of that group?

A. Not at that time.

Q. Did there come a time in which that became part of your activities with the Fox River Group?

A. I don't think the purpose of the Fox River Group was ever to discuss funding of the remedial work at the Fox River site.

Q. Was one of the purposes of the Fox River Group ever to discuss how the members of the Fox River Group would split clean-up costs for the Fox River Group? For the Fox River, excuse me.

A. I don't recall that ever being a purpose or objective of the Fox River Group

Schlickman

as -- as the Fox River Group.

Q. Mr. Schlickman, during your career in the environmental law group with Sidley & Austin, is it fair to say that you represented a number of different clients that found themselves named as potentially responsible parties by U.S. EPA under CERCLA for various clean-ups?

A. I never am quite sure how to respond to a question which starts "is it fair to say." I'm not sure what's fair to say and what's not fair to say, but let me try to answer that question.

During the course of my career, yes, I represented clients who had been identified or who were concerned about being identified as potentially responsible parties under CERCLA and perhaps other analogous environmental laws.

Q. In your practice, was it common for parties that were named as potentially responsible parties under the Superfund law to refuse to fund any clean-up or administrative orders of U.S. EPA and

challenge their liability? Or was it more common, for instance, for the potentially responsible parties to pay costs or pay clean-up costs in response to an administrative order and then seek recovery from the government or from other potentially responsible parties later on?

A. I don't think I can answer that question as a general matter. I think each case was very different and the facts and circumstances and the matters the clients took into account and the courses of action they eventually decided to pursue, you know, just all varied from case to case.

Q. So as you sit here, there is no common or unifying manner in which clients would handle or in which you would advise clients to handle certain -- let me strike that and start over.

Was there not a common manner in which to respond to U.S. EPA with respect to a client of yours being named as a potentially responsible party when it came to funding clean-up costs or choosing otherwise

Schlickman

to challenge liability?

A. Can you read that question back, please.

(Record read)

A. I don't know exactly what you mean by common manner. It differed in each case.

Q. I kind of gloss over this without being more precise. Let me go back and ask a couple more questions.

Is it true that you represented NCR during your -- NCR Corporation during your career at Sidley & Austin?

A. I did.

Q. And when did that representation first begin?

A. Well, first of all, it is the firm that represented NCR. I didn't personally. They personally weren't my client, though I probably filed an appearance in a case on behalf of them.

I personally became involved in work for NCR in early 1996.

Q. And at the time that you personally got involved, was NCR Corporation an existing

Schlickman

client of Sidley & Austin?

A. Yes. Let me just clarify. I believe NCR was known by a different name at that time.

Q. The AT&T GIS?

A. I think that's right, Global Information Systems.

Q. That's right, that's what I meant by GIS. OK.

Do you recall when AT&T GIS was first hired Sidley & Austin to represent them?

A. It was sometime before then. I'm not sure exactly when.

Q. When you first started your own representation of NCR through the firm in early 1996, what project were you working on? Or what matter for NCR were you working on?

A. My first involvement in a matter for NCR was a meeting concerning the Fox River case.

Q. And what was that meeting about?

A. Some -- at least one representative of NCR was in Sidley's offices to meet with

the other attorneys that had been working on the Fox River matter and I was invited to attend that meeting.

Q. At the time that you first got involved with the matter that -- of NCR and the Fox River in early 1996, who were the other attorneys at Sidley & Austin who were working on the matter that you said were at this meeting?

A. I believe Tom McMahon, Katie Moertl and John Heyde were the three that I recall. There may have been others.

Q. At that time, what were the roles and responsibilities of those three individuals at Sidley & Austin that you can recall?

A. I think the only way I can answer that question is Tom McMahon was the senior lawyer at the firm responsible for the Fox River matter, and Katie Moertl and John Heyde were assisting him.

Q. At the time, do you -- do you recall at the time what Ms. Moertl and Mr. Heyde's titles were? Were they

associates or partners at the time?

A. Katie Moertl, M-O-E-R-T-L, was a associate. I believe John Heyde, H-E-Y-D-E was also an associate.

Q. When you were brought into this meeting in early 1996, what was the reason for you being brought on to the -- into the meeting I guess first? I won't say you were assigned to the team just yet. What was your purpose at being at the first meeting?

MR. McATEE: I will let him answer that at high level. Obviously, the contents of the meeting are privileged. But at a high level, I will let him answer it.

A. I think the best way to describe that is Tom McMahon was not a litigator. I was a litigator. And I think Mr. McMahon and perhaps others felt that given the trajectory of the Fox River matter, as best we could predict it, it might involve litigation at some point in time.

Q. Was there something that was happening with respect to the Fox River

Schlickman

potential liability for AT&T at that time that necessitated you being a -- bringing a litigator on to the team?

A. The only thing I recall -- and I don't know what was in Mr. McMahon's mind at the time. I believe the trustees for Natural Resource Damages were making demands upon certain parties, I'm not sure who all they were, to undertake some preliminary assessment of the need for a Natural Resource Damages assessment, and something like that can, you know, depending on what the twists and turns are, ultimately lead into litigation.

So that's my best recollection of the context in which I became involved.

Q. And the trustees that you are referring to, is that of the Wisconsin Department of Natural Resources?

A. Well, more than that, I believe. "Trustees" is sort of a defined term under the Natural Resource Damages provisions of Superfund, and trustees are not always the same as the clean-up agencies.

Schlickman

My recollection is that the trustees we were dealing with, at that time, were the state of Wisconsin, NOAA, and the U.S. Fish and Wild Life Service. Let me just say I believe some of the Native American tribes in Wisconsin were contending they were trustees also.

Q. Now, when you first -- would it be fair to say at this early 1996 meeting, that you were joining the AT&T GIS Fox River liability team?

A. I didn't know.

Q. Did there come a time where you did join the team of Sidley lawyers representing AT&T GIS, later NCR?

A. All the lawyers who were on the team at that point were members of the environmental group and I was a member of the environmental group. So it wasn't like joining a team.

I think what happened was, subsequent to the meeting that I recall in early 1996, I became more actively involved in the Fox River matter.

Schlickman

Q. And during what period of time were you actively involved representing AT&T GIS, later NCR, with respect to the Fox River liability?

A. Until -- it is hard to answer when that activity ended. I would say it wound down between 2009 and 2013. There wasn't a definite, I guess -- there wasn't any point in the sense I retired as of December 31, but between -- between April 1 of 2009 and December of last year, it gradually wound down.

Q. I understand it is a long period of time, but could you please describe for me what your role was in representing AT&T GIS, later NCR with respect to the Fox River liability over that period of time?

A. Well, I would say for the first few years, I worked very closely with Mr. McMahon and other members of the team on many aspects of the Fox River matter. And in those early years, I was probably the, along with John Heyde, the lawyer that participated most in the activities of the Fox River Group to --

Schlickman

the work on behalf of NCR, and when Mr. McMahon retired, I took over primary responsibility for the matter at the firm.

Q. And when did that occur?

A. I don't recall the precise date. I think it was in the early 2000s.

Q. You mentioned the confidential settlement agreement previously. Do you recall that was executed sometime in 1998 or 1999?

A. I recall it was executed in 1999.

Q. Did you assume primary responsibility before or after the execution of that agreement?

A. Well, I assumed primary responsibility for the overall matter after that time.

Q. That's what I meant. Thank you.

When you first got involved with the Fox River team in early 1996, what did you understand NCR's legal problems with respect to the NCR -- what were the issues they were coming to Sidley & Austin for?

MR. McATEE: Again, at a high

Schlickman

level, I will let him answer that without revealing any privileges or work product.

A. I think I described that before.

Q. Would you mind describing it again for me just to make sure we are clear.

A. It is my understanding the trustees were asserting that NCR -- is it OK if I use NCR instead of AT&T GIS?

Q. It will save us time --

A. Just not to clutter everything up.

It was my understanding that the trustees were, you know, requesting that NCR Appleton Papers and other of the PRPs undertake this preliminary assessment of Natural Resource Damages and we had to deal with those requests.

Q. During the course of your representation for NCR with respect to the Fox River liability, did there come a time where you interfaced directly with any of the government entities with respect to negotiating clean-up costs?

A. I am sorry, I can't answer that question because it just -- it doesn't make

Schlickman

sense.

Q. OK. Let me see if I can clean it up.

MR. McATEE: Maybe I should have objected then.

Q. There are too many lawyers around the table.

A. I am sorry.

Q. That's all right.

Did there come a time where you negotiated with the government U -- take U.S. EPA, did there come a time where you, on behalf of NCR, assisted in or conducted negotiations with U.S. EPA concerning the scope of administrative orders?

A. Let me try to answer that, just short-circuit this a little bit. EPA takes the position they don't negotiate over remedies. You can try to influence them, but they don't negotiate.

Q. Is it fair to say that you attempted to influence the U.S. EPA's decisions with respect to remediation?

A. I personally had a number of

Schlickman

meetings with representatives of the state of Wisconsin and EPA in which we discussed the remedial planning work and we made suggestions to the agencies as to things they should consider.

Q. For these meetings that you are referring to, and I understand the general sense, was there a representative of Appleton Papers -- and I'll refer to them as API during the course of today's deposition -- was there a representative from Appleton Papers or API at any of these meetings?

A. There were innumerable meetings like that over the course of this matter and, yes, in many cases, it was with representatives of API. There may have been some cases when they weren't there. But for most of the time, we were in regular communication with API over what was going on. And -- but I can't give you the specifics of any of those at this time. There were just too many of them.

Q. Who were the people that you contacted or were in discussions with who

represented API?

A. At what time period? I'm sorry --

Q. So --

A. It was a long time and it changed.

Q. That's understandable. So at the outset of the time that you began the -- your representation, say, from '96 to '98, let's try to isolate that time period first, were there persons that you would be in contact with who represented API's interest with respect to the Fox River liability?

A. OK. The people that I dealt with on behalf of API in that time period were primarily Bob Bourque and Bill Russell of Simpson Thacher, Paul Karch, Dennis Hultgren, and to a more limited extent, Dan McIntosh of Appleton Papers. There may have been others.

Q. The individuals that you named, who were the individuals that you were primarily or most frequently in contact with?

A. Well, that was five. There were three, probably Bob Bourque, Paul Karch, Dennis Hultgren.

Q. With respect to your interaction

Schlickman

with Mr. Bourque, what were the types of matters that you were discussing with him during this '96 to '98 period?

A. Boy, there were a variety of things we were talking about in that time period. I'm not sure I could even attempt to make a list of things we did; in part because it would be pretty long, and in part because I'm not sure I remember it all.

Q. Can you give me a few examples of things the two of you were working on during the '96 and '98 time period?

A. For a period of time, Bob and I together along with Dennis Hultgren and maybe John Heyde attended meetings of the Fox River Group. I recall Bob and I attended meetings with the trustees. They convened some meetings to discuss matters with the various PRPs.

I discussed with Bob conducting interviews of some Appleton Paper employees to try to start to understand some of the facts that might be, you know, pertinent to the matter. To the extent we received

materials from the trustees regarding the work they were asking the PRPs to conduct, I'm sure I spoke to Bob about those and got his views. Things of that nature.

Q. During that same time period, did you have discussions with Mr. Bourque concerning the prospect of the potential mediation between NCR and API?

A. I'm not sure I understand exactly what you are asking. Obviously at some point, I had some conversations with Mr. Bourque about that.

Q. You mentioned conducting interviews or -- that was one of the things you talked about with Mr. Bourque. At the time that you first got involved with the matter, what things did you do to get yourself up to speed on the facts at issue with respect to the Fox River liability?

MR. McATEE: Again, at a high level, I will let him answer that.

A. Some of that work had already been started before I became involved in the matter. My recollection is at a very high

Schlickman

level, an effort was made to assemble documents, identify witnesses who were familiar with certain activities involving the coating of carbonless paper and the handling of broke, and there were some preliminary interviews of some of those people. That's what I recall going on at the time.

Q. Was there, either during the time that you were -- that you had first come on to the team or that had been conducted previously, an effort by Sidley & Austin to collect documents from NCR concerning the potential liability at the Fox River?

A. Well, I don't quite understand the last part, the potential liability at the Fox River. I mean, in the sense that I don't think we really understood at that time the extent of that liability or the ways in which that liability would come up. We knew that the trustees were requesting us to do work and were taking the position that NCR and other parties were potentially responsible parties. We knew that other PRPs had us in

their crosshairs, you know, which made it difficult at times to work with them.

So when you talk about the liability for the Fox River, we didn't really have a full understanding at that time of what we were dealing with, and given the nature of the environmental laws, they could come up a lot of different ways.

So I would say we -- our focus wasn't really on liability issues. Our focus was on trying to understand better how the business was conducted that, according to the trustees, allegedly gave rise to the problems in the Fox River.

Q. As part of this effort to learn more of what -- of what was at issue with respect to NCR's production of carbonless copy paper, what steps did you take in investigation, again, at a high level?

A. Well, the investigation wasn't just related to that issue, the production of carbonless copy paper, but my recollection is we tried to identify where documents relating to the time period, this really lengthy time

period would be; try to get those together; begin reviewing them; and try to get a better understanding of what had happened during that time period.

Q. What was your understanding of the activities of NCR with respect to its paper production or emulsion production that led to it finding itself in this predicament with the U.S. EPA to begin with?

MR. McATEE: Are you asking what the agencies were alleging that NCR had done?

Q. Yeah, the question is a little bit broader. I am not trying to pry into privileged matters. I am trying to get to, what did -- and much more of a general sense, what the government agencies were alleging that NCR did and what were your responses to the government with respect to the potential liabilities that arose?

MR. McATEE: So that question, I'll let him answer.

A. Well, again, you know, a couple things. We were conducting our investigation

of the facts throughout the entire case. I mean, it was -- there was a lot to be learned, and given the time periods we were dealing with and how far back in the past it was, it was hard to find all the information.

I think the best way I can answer your question, again, keeping in mind what I said before, that other than the request at that time to do this preliminary assessment, there may have been a request in this time frame to conduct a remedial investigation feasibility study. I think that was in -- we have been talking about '96 to 98 time period, right?

Q. Um-hm.

A. There may have been a request by U.S. EPA to conduct a RIFS in that time period. But our focus was trying to understand how carbon -- how the carbonless copy paper business worked with the expec -- or anticipation that issues would come up in the future that we just couldn't predict at that time.

But the most focused way that we

responded to the agencies during that time period, I believe we received, over the course of the case, we probably received four or five or more information requests from the agencies under a particular provision of the Superfund statute, and at least one of those was received in that time period.

So we had to do our best to collect information in order to respond to the questions that were contained in that information request.

Q. You have mentioned a few times the scope of time and how far -- the time period that you are dealing with. In your discussions with third parties, what was the position that NCR took about the time period that was at issue here with respect to potential Fox River liability that the various trustees were alleging?

A. What position did we take with third parties? Who are you referring to?

Q. So I'm trying to avoid and skirting the line between what you discussed internally with your client and what was

Schlickman

externally represented about the time period in which NCR, for instance, was manufacturing emulsion that wound up on NCR coated carbonless paper. So my question is, what was the time period that you were investigating here that was disclosed to third parties?

A. I believe the agencies were interested in, among other things -- I don't recall everything they were interested in their requests -- but among other things, information relating to the production of NCR carbonless paper from the early 1950s until the early 1970s, especially up until the time that PCBs were removed from the emulsion formula.

And I believe in the discussions we had with the other companies that ultimately became members of the Fox River Group that we joined, I think one of their interests in discussing with us was, you know, production and discharge information during that same time period.

Q. Now, again, in reference to what

you, in your role as counsel for NCR disclosed to third parties -- and when I say disclose to third parties, I mean, other than privileged conversations that you would have had with your client, discussions with the trustees, with members of the Fox River Group, what exactly was NCR's position with respect to its role in the production of NCR paper?

MR. McATEE: Object to form.

A. Yeah, I am sorry, I don't understand that question.

Q. Am I correct that NCR had involvement with the production of carbonless copy paper which was branded NCR paper?

A. Well, it had some involvement, but that involvement is much more complicated than your question assumed, I think.

Q. So what was NCR's involvement in the production of carbonless copy paper?

A. So you're not asking me what we told third parties anymore? You are just trying to understand what his role was?

Q. Yeah, I'm trying to simplify the

Schlickman

questions, but minding counsel's objection about seeking privileged communications between you and NCR.

A. My problem is we are talking about a very long period of time, much longer period of time if you bring it forward to when we were having meetings and discussions with the Fox River Group, and there were a variety of things that were discussed in the, you know, about both time periods.

You know, it's -- to try to pin it down to a primary thing or something like that is awfully hard to do. There was so much going on.

Q. OK. Do you recall, do you recall discussing a company by the name of Appleton Coating Paper Company or ACPC?

A. I'm familiar with that name. I'm not sure what you mean by did we discuss that with someone.

Q. Yeah. Let me -- you're familiar with the name of the company, ACPC?

A. Which is an acronym for Appleton Coated Paper Company. Is that right?

Schlickman

Q. Yes.

A. We are on the same page.

Q. We are on the same page, yes, correct.

And what was your understanding of -- and -- strike that.

Was there -- are you also familiar with or heard of a company called Combined Paper Mills?

A. Yes.

Q. And was that also referred to as Combined Locks?

A. Combined Locks may have been the name of the plant. Combined Paper Mills may have been the name of the company I think.

Q. Was the plant of Combined Paper Mills colloquially referred to among the Fox River Group as Combined Locks?

A. That's one name that was used.

Q. During the course of your representation of NCR and again, I'm not asking for privileged communications, but did you come to an understanding that carbonless copy paper made with a substance called

Aroclor 1242 was produced from approximately 1954 to 1971?

A. Could you read that back please.

(Record read)

A. I thought there was something in there that was limiting that question to Combined Locks. Are you asking was I aware, did I become aware that carbonless paper was manufactured with Aroclor 1242 sometime between -- roughly 1954 and 1971?

Q. Yes. That's what I am asking.

A. I did come to that understanding.

Q. Was this time period of 1954 to 1971 referred to among the Fox River Group as the production period?

A. I think that's a term that came into use much later.

Q. If I use that term "production period," would it be fair to understand that I -- that's the period from 1954 to 1971 in which NCR carbonless copy paper was manufactured using Aroclor 1242?

A. Again, I don't know if it is fair or not to say that. If you want to refer to

that period, '54 to '71 during which carbonless paper was manufactured with Aroclor 1242, if you want to call that time period, the production period, I'm comfortable with that.

Q. OK. And would that be inconsistent with your recollection at all, using that formulation?

A. Well, I already told you what my understanding was. We were just agreeing that that's the term we are going to use.

Q. OK, fine.

A. I'm not sure I understand your last question.

Q. Did you also come to an understanding that Aroclor 1242 was manufactured by Monsanto?

A. That was my understanding, yes.

Q. And what was your understanding about how Aroclor 1242 made it from Monsanto into NCR carbonless copy paper? What was the process?

A. Sitting here right now, I don't recall the details.

Schlickman

Q. Do you recall that Aroclor 1242 was an ingredient in the emulsion manufactured by NCR during the production period?

A. Yes.

Q. Do you recall that -- or understand that emulsion manufactured by NCR was then sold to certain paper companies along with Fox River, ACPC and Combined Locks included?

A. I understood that NCR produced the emulsion. I understand that until sometime in the late 1960s, they had arrangements with Appleton Coated and Combined Paper Mills, one or the other or both, I don't recall right now, and it may have changed over time, but I believe up until sometime in the late 1960s, they did sell that emulsion to those companies.

Q. After that emulsion was sold to those companies, is it your understanding that ACPC, Combined Locks, either one or both, then coated paper with that emulsion in order to manufacture NCR carbonless coated paper?

A. Can you read that back, please.

Schlickman

Q. And carbonless copy partnership at the end.

(Record read)

A. Well, again, I don't recall the specifics, but my general understanding was that from '54, early '50s, again, either '53, '54, I'm not sure of the precise date it started up, until the 1960s, NCR sold the emulsion that was used to make carbonless copy paper to one or both of those companies, again, I'm not sure if it was to both those companies throughout that entire time period and that one or both of them, in turn, used the emulsion to coat paper that was, became carbonless copy paper.

Q. And is it your further your understanding after that paper was coated with the emulsion by ACPC and Combined Locks, during that time period, then the coated paper was then sold back to NCR?

A. I just don't recall the details of those arrangements.

Q. Do you recall one way or the other whether it was NCR or ACPC or Combined Locks

Schlickman

that sold NCR branded carbonless copy paper to end users?

A. During this time period?

Q. During this time period?

A. Which is what, the early '50s, up, what, the late '60s?

Q. That's right.

A. And the -- could you, I am sorry, I'm trying to keep these facts.

(Record read)

A. Again, I'm not sure what you mean by end users, I believe I'm not entirely sure, but I believe after the paper had been coated by Appleton Coated and/or Combined Locks, there was some relationship by which NCR then in turn took that paper and sold it.

Q. You mentioned "broke" before. Are you familiar with that term?

A. Yes.

Q. And what is broke?

A. Broke is what is sort of generated as a consequence of the paper manufacturing process. It -- not all the paper that is used to make coated paper, including

carbonless copy coated paper, can turn into end product, product that's a line of quality to sell to, you know, customers, whoever is selling it, and the remnants that is not suitable to sell as finished product was generally referred to as broke.

Q. Of the three entities we have been speaking about, NCR, ACPC and Combined Locks, which one of those three companies actually created the broke in the process?

A. Well --

MR. McATEE: In the process of coating the paper?

Q. Yeah, as I have asked it, I understand it is a little imprecise. What I am trying to get at, in reference to sizing the paper from large -- or rolls of coated paper to something that would be a smaller, you know, business form, who is the one who is cutting the paper to size, such that there were scraps from which that -- where broke was created? Do you understand what I am trying to say?

MR. McATEE: Object to form.

Schlickman

A. I don't know. But as we were talking, one thing came back to me I would like to clarify.

Q. Sure.

A. I think for most of this time period, Combined Locks, Combined Paper Mills created, made, manufactured what was known as the base paper and I'm not sure they did coating. I think the coating was primarily done at Appleton Coated Paper Company which is why I was a little uncertain if both of them bought the emulsion.

If my recollection is correct, probably only Appleton bought the emulsion. My recollection, I knew these facts at one point in time, but they are fairly hazy now.

Q. I understand.

A. With a little bit of work, maybe they will come back.

But, you know, broke was generated -- I wouldn't say created. Broke was generated primarily in the paper coating process, the application of the coating to the paper. But it would also be generated at

other points in subsequent steps.

Q. OK. What is your understanding of how -- let me strike that.

The substance Aroclor 1242 that we were referring to earlier, did you understand that that is the substance that had PCBs in it?

A. That is one of the substances that contained PCBs.

Q. Was it your understanding that one of the allegations at least that the various trustees were making was that PCBs got into the Fox River through a number of processes related to the manufacture of NCR carbon coated -- carbonless copy paper?

A. Well, let me just say, I can't recall having an understanding what the trustees' positions were about how PCBs got into the river. I think my understanding at that time -- and now I'm referring to a '96 to '98 time period. I think my understanding was that based on our discussions with them about the preliminary assessments they were interested in conducting, that they

considered PCBs in the river to be one of the primary issues to be assessed.

Q. What were the allegations of how the PCBs got into the Fox River in the first place?

A. You know, there were no pleadings making allegations at that time. There were discussions. There were, you know, draft documents that would set forth, I guess, the parameters for the preliminary assessment. And my recollection was that PCBs were a matter they were concerned about and that the companies they were talking to were in one way or the other, responsible for those PCBs.

Q. Was one of the ways in the course of these discussions with the trustees, one of the ways that PCBs had gotten in the river was due to the recycling of broke by certain recyclers on the Fox River that was then discharged into the Fox River as part of the recycling process?

MR. McATEE: The question is were the trustees alleging that?

MR. HUTTENLOCHER: Yes, that's

Schlickman

right.

A. Well, we understood that the reason other companies were involved in these discussions is because they used -- they either recycled, they repulped, they deinked various types of paper, including carbonless paper, and the trustees believed that that could have been a source of PCBs to the river.

Q. Was there any other allegation made by any of the trustees that you can recall about how the PCBs made their way into the Fox River?

A. I'm just going to say again, allegations is a term of art for litigators and lawyers. There were no pleadings, no complaint filed. There was no administrative complaint filed. These were rather informal, at the time, discussions with the trustees about what might be a first step to start understanding the nature of the PCB problem, if there was one, in the Fox River and I don't recall any allegations or things of that nature being raised. I remember the

general concern about the PCBs in the river.

Q. So with your caveat about the word "allegations," I'll try to stay away from that then, in the course of your discussions with the trustees, what did they say or why did they believe or how did these PCBs make their way into the Fox River?

A. I guess I thought I answered that question already.

There were discussions over a number of years about how PCBs got into the Fox River. And those discussions went well beyond 1998 and all I can tell you is that in 1996, 1997, when we were talking to the trustees, their general position was that the parties that they had invited to these meetings were parties that were responsible for PCBs in the river and I guess NCR and Appleton knew those companies, knew what business they were in, knew they deinked, repulped, recycled, and I'm sure that was mentioned by the trustees. I don't recall the specifics of those discussions.

So nobody was surprised that these

Schlickman

other companies were involved at that point. But in terms of a rather pointed position or allegation, what have you, I don't recall that being the case at the time.

Q. When you were having these discussions with the trustees, did you come away from those meetings with an understanding that it was the trustees' belief that PCBs had gotten into the river, into the Fox River through the process of recycling broke, not limited to a time period, just during your discussions with the trustees during your representations of NCR?

A. Well, look, I am having a difficult time answering this question because it seems to me you don't appreciate or don't understand a lot of the history that occurred before this time. This river had been -- there have been concerns about PCBs in this river that extended back well before the time of these meetings.

MR. McATEE: How long have we been going?

MR. HUTTENLOCHER: A little --

Schlickman

almost an hour and a half now. Why don't yes take a break.

MR. McATEE: This is a probably a good time to take a break and let everybody recharge their batteries.

MR. HUTTENLOCHER: Fine, go off the record.

MR. McATEE: Going off the record, the time is 9:48 a.m.This is the end of disk one in the deposition of Andrew Schlickman.

(Recess)

THE VIDEOGRAPHER: Going back on the record at 10:05 a.m. This is the beginning of disk 2 in the deposition of Andrew Schlickman.

Q. Mr. Schlickman, I am going to hand you a document that has previously been marked as Hoak Exhibit 12. In the course of your representation of NCR, did you come to meet a man by the name of Jonathan Hoak?

A. So you are not asking a question about the document right now?

Q. Just a prelude to the document.

A. I did meet Jonathan Hoak.

Q. How did you meet Jonathan?

A. At the time I became involved in the Fox River matter in early 1996, Jon Hoak was the general counsel of NCR. He may have had other titles besides that, but he was the general counsel.

Q. Did you know Mr. Hoak while he was an associate at Sidley & Austin?

A. I knew of him. I may have met him a few times. As I recall, he worked in a different office.

Q. Prior to today's deposition, did you review Mr. Hoak's transcript, transcript of his deposition that was taken in this matter?

A. No.

Q. We can turn to the document now and I'm looking at page 3 of the document that's Bates labeled NCR-ARB 00014033. Let me ask you a preliminary question. Do you recognize the document?

A. Just a second, I am looking at it right now.

Schlickman

The question? I'm sorry.

Q. Do you recognize the document?

A. I think today is the first time I have ever seen it.

Q. Could you please turn to page 3 of that document, again, 14033 Bates number. Are you on that page?

A. Yes.

Q. And I am going to refer to this document as a player's list, for lack of a better term. And there is a gentleman -- you are listed as the first person on this list, is that right?

A. On this --

Q. On page 3?

A. Well, I'm -- Sidley, Austin, Brown & Wood is listed first under the name and address. Yes, I am listed.

Q. OK. And you will see a little bit down that page, there is a name Steven M. Bierman, do you see that?

A. I do.

Q. Did Mr. Bierman have a role representing NCR with respect to the Fox

Schlickman

River liability?

A. An aspect of it, yes.

Q. What aspect?

A. He represented NCR -- he and Sidley -- we were known as Sidley Austin was known as Sidley, Austin, Brown & Wood at that time. I will just refer to them as Sidley. But Sidley, through our New York office, represented NCR in some litigation with Appleton Papers, maybe BAT, I can't recall if they were a party, in the Southern District of New York, and Mr. Bierman was one of the attorneys that filed an appearance in that case.

Q. Did you have a role in that case?

A. Minimal.

Q. Do you recall what that, the subject matter of that suit in the Southern District was?

A. Generally.

Q. What's your general recollection?

A. That it was a -- it was litigation that focused on which party was responsible for what you might call the Fox River

Schlickman

problems under the 1978 purchase agreement between NCR and BAT and Lentheric.

Q. Do you recall who initiated that lawsuit, which party?

A. Sitting here now, I don't.

Q. Do you recall what relief, if any, that NCR was seeking through that lawsuit?

A. Only the most general nature. I don't recall the specifics.

Q. What was the general nature of relief they were seeking you can recall?

A. I think I described before, it was litigation over who was responsible under the 1978 agreement, and as I recall, NCR was taking the position that Appleton Papers and BAT were responsible.

Q. Do you recall what position Appleton Papers and/or BAT took in that litigation?

A. Just the other position.

Q. Do you recall whether any of the relief sought by NCR was for declaratory judgment in that matter?

A. I don't recall.

Schlickman

Q. Did Mr. Bierman, other than this litigation in the Southern District of New York have responsibilities with respect to NCR Corporation's, Fox River -- potential Fox River liabilities?

A. Well, as I recall, other than his involvement in the Southern District litigation, he had -- I don't recall him having any involvement in any other aspect of the matter that we handled at Sidley.

Q. The next name down that list is John Kuster, what role and responsibilities did he have with respect to the representation of NCR with respect to the potential Fox River liabilities?

A. He worked with Mr. Bierman.

Q. On the same Southern District litigation?

A. That was my understanding.

Q. There is also a gentleman listed at the bottom here by the name of Lee Freeman. Do you know who Mr. Freeman is?

A. Yes.

Q. And what was his role in the

Schlickman

representation of NCR with respect to potential Fox River liabilities?

A. You keep using this frame with respect to potential or Fox River liabilities. It is the Fox River matter. It was a variety of issues, and as I said before --

Q. Would you be comfortable if I used Fox River matter?

A. I would. Because it was never clear to us that -- the liability issues were complex and wide-ranging and to a certain extent, unpredictable. So I would prefer to use it as the Fox River matter.

Q. Whatever term you're comfortable with, I will use that.

A. I'm more comfortable.

Q. To the extent I don't stick to that, give me a wink.

A. I'm do that.

With respect to the Fox River matter, as I recall, Lee Freeman first became involved after, soon after NCR and Appleton Papers agreed to submit their dispute over

Schlickman

the 1978 agreement to mediation.

Q. What is your recollection about what time period that was, what year?

A. Well, the mediation was held, as I recall, I may be off a little bit, February of 1998. So sometime before then. I don't recall the specific time frame.

Q. And to the best of your recollection, what was Mr. Freeman's involvement with that mediation for NCR?

A. Jon Hoak, the general counsel of NCR retained Lee Freeman to essentially be the lead counsel for NCR in that mediation.

Q. Do you know what, if any, Mr. Freeman's specialty is, legal specialty?

A. I understood it was litigation.

Q. General litigation?

A. That was my understanding, though I never looked into his credentials.

Q. There is also a gentleman -- excuse me, let me take a step back.

Other than the mediation in 1998, do you recall whether Mr. Freeman had any other responsibilities with respect to the

Schlickman

Fox River matter?

A. Yes, he did.

Q. And what were those?

A. Well, as a result of the mediation, there was an agreement to conduct discovery under one of the agreements that was generated as a result of the settlement and Mr. Freeman's firm took the lead on conducting that discovery. I think it was actually an agreement called the discovery procedures agreement or something. I'm not -- I don't recall the exact title of it.

So his firm took the lead on that and there was some activity over the following year, I don't recall exactly how long it was, in which depositions were taken, documents were being produced, and then I think Mr. Freeman's involvement became dormant for a while, Mr. Freeman and his firm, until the time it became apparent that there was going to be a need to conduct an arbitration for the amounts in excess of 75 million dollars under the confidential settlement agreement. So at that point, you

Schlickman

know, when it appeared that we were headed in that direction, he became involved again.

Q. To your knowledge, were any attorneys from Sidley involved in the taking of discovery during the -- pursuant to that discovery agreement that you were referring to?

A. I believe there were.

Q. And who was that?

A. I think Pam Hanebutt worked with the -- let me just give me a second. I take that back.

At some point, Pam Hanebutt was involved in interviewing former and current NCR employees about issues relating to the 1978 agreement. I can't recall right now -- I think it was in an effort to assist Lee Freeman during that period they were conducting the discovery, but I'm not a hundred percent sure about that.

Q. Do you recall whether any Sidley attorneys took any of the depositions during that discovery period?

A. I don't recall.

Schlickman

Q. There is also a name here, John Kenny that's listed below Mr. Freeman. Do you recall working with him at all on the Fox River matter?

A. I recall the name. I probably had some contact with him. I don't recall sitting here, but I understood him to be another attorney at Lee Freeman's firm who was working with Mr. Freeman, whatever Mr. Freeman was doing.

Q. Other than -- we also mentioned that arbitration. Did Mr. Freeman, to your knowledge, have a role in that arbitration?

A. Yes.

Q. What was that role?

A. Similar to his role in the mediation, he was the lead attorney for NCR in the arbitration proceeding.

Q. To your knowledge, were any Sidley attorneys involved in representing NCR in that 2005 arbitration?

A. We were involved, yes.

Q. How were you involved?

A. As I recall, we assisted the

Schlickman

Freeman firm in trying to identify and evaluate potential arbitrators, just give them the resources of a large firm, there is a lot of information available that he may not have had available. I think when Mr. Freeman was preparing briefs for the arbitration, he ran this by us to see if we had any comments. We did not have a principal role in drafting the briefs.

I'm sure we had some phone calls with NCR and the Freeman firm leading up to the arbitration. I don't recall the specifics of any of those calls and I believe I personally attended part of one day of the arbitration.

Q. Did Sidley serve in more of a support role than a lead counsel role with respect to the 2005 arbitration?

A. I described what our role was.

Q. You may, you go ahead.

A. I already did. I described our role, and if you consider that support, we were providing some assistance to the Freeman firm in connection with what they were doing.

Schlickman

Q. Do you recall whether any of the Sidley attorneys handling the Fox River matter entered an appearance in that 2005 arbitration?

A. I don't.

Q. You mentioned Pam Hanebutt?

A. Yes.

Q. What was her role in connection with the responsibilities with respect to the Fox River matter?

A. After I became more actively involved in the Fox River matter, and I don't recall when this was, I realized that we needed to have another experienced litigator as part of the team, just for the purposes of doing all the work that needed to be done and I involved Pam.

I talked to Mr. McMahon about it because when she joined the time, he was still the lead lawyer on the case and we agreed to get Pam involved.

Q. Was Pam also in the environmental litigation group at Sidley?

A. The reason I am pausing, she also

moved from general litigation to the environmental group like I did, but later. And I don't recall if she was part of the general litigation group at that time or part of the environmental group. But it was probably around that time, shortly before, shortly after that she made the move.

Q. Did she, I think you said this, but did she eventually transition full time into Sidley's environmental litigation group?

A. She did. For the most part, she did. I think she continued to handle nonenvironmental matters, but we considered her part of the environmental group, that was sort of her administrative assignment.

Q. You also mentioned several time a gentlemen by the name of John Heyde?

A. Heyde.

Q. And that's H-E-Y-D-E?

A. Correct.

Q. What was Mr. Heyde's roles and responsibilities with respect to the Fox River matter?

A. A little bit of everything.

Schlickman

Q. Was there anything in particular that he had a focus on?

A. I referred to the 1996 to '98 time period when we were dealing with the Fox River Group sort of the very early days. But before we were members of the Fox River Group, but meeting with them and joining the Fox River Group and having meetings to discuss various issues, John was very much involved in that.

John has a, how would you put it, sort of a good scientific technical bent and background. So he would spend a fair amount of time working with many of our technical consultants and scientists.

But I would have to say while that was sort of his focus in that time period, he really was involved in, you know, most aspects of the case going along.

Q. Was he involved in the 1998 mediation?

A. If he was, it was a relatively minor role.

Q. Was he involved in the 2005

Schlickman

arbitration?

A. Same answer, I don't think he was, but if he was, it was a relatively minor role.

Q. Was he involved in negotiations or dealing with some of the technical vendors that assisted in the Fox River clean-up, for instance, Tetra Tech?

A. He was very involved in the meetings and discussions that led up to the selection of contractors to work on the remediation project of the Fox River and now we are jumping ahead in time quite a lot.

Q. I understand that.

A. We are jumping up to 2008, 2009, I think.

Q. Prior to that 2008-2009 period, was there something that you can say Mr. Heyde spent a majority of his time on with respect to the Fox River matter?

A. It is hard for me to say that because he was involved in so many different things, I believe. I believe during that entire time period from '96 to '98 and then

Schlickman

carrying forward to around 2003, 2004, when the Fox River Group sort of lost momentum, I guess you would say, both he and I spent a fair amount of time on Fox River Group matters and related matters. But he was involved in many other aspects of the Fox River matter. It just would be too hard to describe everything that he did.

Q. Obviously there is a large array of activities that needed to be done by you and your firm with respect to the Fox River matter. One of those aspects being the Southern District litigation, for instance; another aspect being Fox River Group activities; another aspect being NCR's interaction with the trustees. Are there any other -- first of all, would you agree at least these three are general categories of types of work that needed to be done for the Fox River matter?

A. Yes. But he -- even those, sort of the last two in overlapped and intermingled.

Q. Are there any other general categories of work that needed to be done for

Schlickman

the Fox River matter that Sidley was involved in?

A. You know, I'm not trying to play games with you here, but there were so many things going on. I am not sure I could list them all or categorize them right now.

Q. Of the range of activities that needed to be done for the Fox River matter, is there anything in particular that Mr. Heyde had to focus on? Like if he -- what was he your go-to person for?

A. I guess I tried to answer that before. You know, clearly he was instrumental in our work with the Fox River Group. But John had his -- John was involved in really almost every aspect of what we were doing.

So I, you know, he was in some respects my right-hand person once I became the lawyer at the firm responsible for the matter. And to a certain extent, he was Tom McMahon's right-hand person. It's hard to say that he had any particular focus. He pretty much was involved in all aspects of

what was going on.

Q. And was he also part of the environmental litigation group at Sidley?

A. The environmental group. It was not an environmental litigation group. It was the environmental group. Yes, he was a member of that group.

Q. Did he have a similar path as you and Ms. Hanebutt of starting in the general litigation group and then moving into the environmental group if you recall?

A. No, my recollection he was a member of the environmental group from the day he started at the firm and he still is a member of the environmental group.

Q. Do you recall approximately when Mr. Heyde started at Sidley Austin?

A. No.

(Exhibit 1, document Bates stamped NCR-ARB 10567 through 78 marked for identification, as of this date.)

Q. Mr. Schlickman, I have handed you a document which is a multipage document with the Bates numbers NCR-ARB 00010567 through

Schlickman

10578 which we have marked as Schlickman 1. Do you recognize this document?

And please take your time to go through it and let me know when you're ready.

A. Yes, I've seen this document before.

Q. Can you generally describe what this document is?

A. Yes. Should I go ahead and do that?

Q. Please do.

A. As I mentioned, there were a series of funding agreements by which the Fox River Group companies agreed to fund the activities of the group. This was the first of those funding agreements.

And there had been a -- this -- there had been some meetings with the trustees over entries for damages assessment work that they were asking the companies to conduct and through discussions with primarily the state of Wisconsin, we reached -- we being the companies that are signatories to this agreement -- reached an

Schlickman

understanding to conduct some limited work with the state of Wisconsin that we hoped would satisfy the trustees' desire for us to do work at that time.

Q. Was this in response to any formal administrative or otherwise order from the trustees?

A. I don't recall there was a formal order. I believe letters had been sent by various trustees to various parties identifying them as responsible parties and requesting, if not demanding, that they do work, Natural Resource Damages Assessment work.

Q. If you look at the first paragraph of the document, a number of companies list Fort Howard Corporation, NCR Corporation, Appleton Papers Inc., P.H. Glatfelter Company, Riverside Paper Corporation, U.S. Paper Mills Corp. and Wisconsin Tissue Mills. Were those the members of the Fox River Group at the time in 1997?

A. Yeah, yeah, as of the date of this agreement, I considered those companies to be

Schlickman

the members of the Fox River Group.

Q. Were there any other companies that were involved in discussions with the Fox River Group that were not a party to this agreement?

A. Just to clarify something, the Fox River Group existed before the date of this agreement. Appleton and NCR were not -- were not considered to be members of the Fox River Group until about this time. So there were five companies before this date, roughly, I think there is seven companies as of this date. Your question then is --

Q. Were there any other companies that, as of this date, part of the Fox River Group or in discussions with the Fox River Group about potentially joining that are not a party to this agreement?

A. There were at some point discussions with Menasha Corporation about joining the Fox River Group. I can't recall if they had been approached at this time or not.

Q. After the date of this agreement,

Schlickman

which is January 31, 1997, or the effective date that's listed in the first paragraph, were there companies other than those listed and Menasha, that were at one point members of the Fox River Group?

A. I don't think Menasha ever became part of the Fox River Group and I think from early 1997 through the time period in the, around 2003 or so, when the group sort of lost its momentum, these were the only seven members. That's what I recall. That's what I recall.

Q. Did you have a specific role or title in the, for lack of a better term, administration of the Fox River Group? Were you a member of any committees or anything like that?

A. Yes.

Q. What committees were you a member of, of the Fox River Group?

A. I think I participated in virtually all the activities, though there was a technical committee that John Heyde focused on. I don't recall the time frames here, but

Schlickman

for some period of time, I was the chair of the legal committee. For some period of time, I was chair of the steering committee. I think those were the only two positions.

Q. Were you chair of those committees concurrently or at some point in time, did your time overlap?

A. I believe they were at separate times, I'm not 100 percent certain about that.

Q. Can you give me a rough time period when you were chair of the steering committee and then chair of the legal committee?

A. No, I can't.

Q. In looking down, there is -- after the third paragraph, there is a colon in that document and then there is a table there. Do you see where I am referring?

A. Yeah, the table with three columns, the acronyms for the companies, first 6 million and then additional costs?

Q. That's right.

A. That's the part --

Q. That's where I am referring, yes.

Schlickman

Why is NCR and API on the same line as opposed to each company having their own separate line?

A. As I recall, early on in our discussions with Appleton, we concluded that it was both in Appleton's interest and NCR's interest to take the position that the two companies together were responsible for only one share.

Q. Why did you come to that decision in your discussions with API?

A. We thought that was one of the best ways of reducing the overall cost that NCR and API would pay to the lowest degree possible.

Q. Was it in part an argument that one source, one share? Or one source of pollution, so the responsibilities would be one share?

MR. McATEE: Object to form.

A. That's not how I describe it.

Q. How would you describe it?

A. Well, I think we were -- how would you put it -- at different times, owners of

Schlickman

the same operations that allegedly were at issue and I think our position was just because there had been a change of ownership should not mean -- as to the rest of the world, that should result in two shares as opposed to one share.

Our concern was if we conceded that we were two shares, that we would -- that that concession would by itself probably increase the overall costs that we would ultimately pay as a group.

Q. Was there --

A. As a group, those two companies as a group.

Q. Not the Fox River Group more broadly? OK. I understand what you are saying.

Was there dissent among the members of the Fox River Group as to the position that NCR and API were taking in that regard?

A. Well, I would put it more this way, I think it took a good amount of my persuasive powers to convince the Fox River Group to go in this direction.

Schlickman

Q. Was there any particular member of the Fox River Group that you needed to put your powers of persuasion to?

A. I don't recall the specifics. I think all of them all of them initially were concerned about just assigning one share to the two companies together. You know, on any issue of this type, allocation, I guess is the word I describe for how you would fund something among the lawyers for Glatfelter always seemed to be the most vocal. A guy like -- I don't know if you met him, a guy named David Mandelbaum, the attorney for Glatfelter.

Q. He is one of the attorneys who took your deposition, correct?

A. No, he may have asked some questions at the deposition. I think he conducted the cross-examination at the Whiting trial.

Q. OK. Now, how was -- I understand this agreement established how some clean-ups were to be funded, correct?

A. Well, I would have to review the

Schlickman

agreement. My recollection is there were some rather discrete projects that we as a group agreed to do with the state of Wisconsin. I don't know if they are reflected in this agreement. I think there was a separate agreement with the state of Wisconsin that was sort of a companion to this.

I don't think -- We never shared this funding interim implementation agreement with the state of Wisconsin, but as I recall internally we executed all of the agreements at the same time.

Q. In terms of -- are let me take a step back.

This funding was to go to pay certain contractors to perform the remediation work that was agreed upon with the trustees, is that right?

A. Well, it was not remediation work because at this point, we were still talking about restoration under the Natural Resource Damages and it was not with the trustees plural, it was with one trustee, the state of

Schlickman

Wisconsin.

Q. OK.

A. And as I mentioned before, there were rather discrete items of work that had been identified and we took the position that I think there were two sediment projects that were covered by this funding agreement and covered by the companion state agreement and those were referred to as pilot projects. They were not referred to as remediation projects.

Q. Were there contractors hired to perform those pilot projects?

A. Ultimately, yes.

Q. What was the process established among these companies for how those contractors were to be paid?

A. How they were to be paid?

Q. Yeah.

A. Could you, I mean what -- what rates we would agree to pay them at or how the group would issue checks? I don't understand the question.

Q. Yeah, my question is to the later

Schlickman

point, how would the group issue their payments and how would they determine what shares would be paid to the contractors?

A. What do you mean by what shares? Are you talking about these shares here?

Q. So would the contractor issue a separate invoice to each company or would they issue one invoice and then you would all together get -- review that invoice and then make a payment as you agreed to?

A. OK. Here is how it worked. Fox River Group had a technical committee. And there was a lawyer in the Fox River Group by the name of Tony Vogel who wasn't necessarily a committee, but took on responsibility for setting up the accounts that the Fox River Group would use to manage their funds and pay their various contractors and third parties.

So what would happen is I believe the technical committee would come to a meeting of the Fox River Group and say we are expecting to spend this amount of money over the next several months to do work. We need to fund that.

Schlickman

During the time that this interim, this funding and interim implementation agreement was in effect, what would happen is that there was a need for funds, each, let's say we needed 2 million dollars -- that's just hypothetical. I don't think we ever called for that much at one time.

But if we ever needed 2 million dollars, NCR and Appleton would be expected to pay 26.97 percent of that funding call, as would Fort Howard and Glatfelter and the other companies in lower percentages as reflected here. The money would be deposited in the Fox River Group account that was set up by Tony Vogel at some point in Milwaukee, and as contractor bills came in, the technical committee would review the bills, review the information that was submitted along with the bills, and periodically make recommendations to the full steering committee as to what should be paid and what should not be paid. And then checks would be cut appropriately on the account that had been set up by Mr. Vogel.

Schlickman

Q. Did all the members of the Fox River Group have access to or the ability to review those invoices as they came in?

A. Yes.

Q. Would any payments go out to any contractors prior to an invoice being received and reviewed by the Fox River Group?

A. I'll be honest with you, I don't recall the specifics any further than what I just described. I mean, that was sort of the general overall approach. I was not a member of the technical committee. I don't know exactly how they operated. I generally recall that they would bring their overall recommendations to the steering committee, but that was more in the nature of not specific contractors, but here is what we owe all of them, here is what we are recommending, you know, and that would be authorized.

Q. Let's switch gears. We discussed previously there was a time at which a complaint was initiated in the Southern District of New York in which at least NCR

Schlickman

and Appleton Papers were a party around the mid 1990s, is that fair?

A. Are you referring to what we were talking about before, the Southern District of New York litigation?

Q. I am, the Southern District litigation, yeah.

A. Concerning the 1978 agreement?

Q. That's what I am referring to, yes.

A. I seem to recall from just the caption that was probably filed in 1995.

Q. And what was the ultimate result -- let me strike that.

Did there come a time when the parties had filed cross motions for summary judgment to your recollection?

A. I generally recall that being the case.

Q. Do you recall the outcome of those motions for summary judgment?

A. I recall they were both denied.

Q. After those motions for summary judgment were both denied, what was the next step in that matter?

Schlickman

A. I'm not sure what the next step was in the case.

Q. After those motions for summary judgment were denied, did there come a time in which the parties discussed mediating their dispute?

A. Yes.

Q. And when did that generally come about?

A. Well, the mediation was, I think we discussed before, correct me if I am wrong, I don't have any dates here in front of me, I think it was in February of 1998. And my recollection is, you know, several months before then, maybe four or five months, I can't give you the precise time frame, but some months before then, an understanding was reached by NCR and Appleton to attempt to reach a mediated resolution of the issues relating to PCB contamination of the Fox River as it impacted on Appleton and NCR.

Q. Do you recall which of the parties initially suggested the prospect of mediation?

Schlickman

A. I don't.

(Exhibit 2, document Bates stamped NCR-ARB 00008543 through 8545 through marked for identification, as of this date.)

Q. We are going to mark an document to you and the court reporter will hand it to you as soon as she has had the opportunity to mark it.

A. Are we done with this one?

Q. We are, you may set it aside.

We have handed the witness a document marked Schlickman 2 with Bates numbers NCR-ARB 00008543 through 8545.

Mr. Schlickman, if you could please review that document and please let me know if you recognize it.

A. I have reviewed the document. The question is --

Q. Do you recognize the document?

A. I recall it.

Q. Can I draw your attention to the first sentence of the second paragraph in which this letter is drafted from

Schlickman

Mr. Bourque. You would agree with that, right?

A. The letter is from Robert Bourque, that's correct.

Q. And it is addressed to you?

A. Yes.

Q. And the first sentence of the second paragraph says, "I do wish to insure that it be understood that Appleton Papers has not agreed to conduct a mediation that is different from the one we discussed and agreed upon during the meeting in Chicago attended by you, Jon Hoak, Paul Karch and me."

Did I read that sentence correctly?

A. That's what it says.

Q. Do you recall this meeting in Chicago attended by you, Mr. Hoak, Mr. Karch and Mr. Bourque?

A. I do.

Q. Do you recall when that was?

A. Sometime before the date of this letter. That's all I can say. This is sort of the general time frame as I described

before. Sometime before the mediation in February 1998.

Q. What was discussed during that meeting in Chicago prior to the August 5 letter?

A. Here is what I recall about that meeting. I recall that Jon Hoak and Paul Karch, I think directly, had had some discussions, at least one call, about how nice it would be to be able to resolve all the issues between NCR and Appleton and be able to work together to try to defend these claims and assertions that were being made by the governments and the other PRPs. And I think the focal point of this meeting was, is there a path forward by which we could do it.

And I don't recall the specifics of the discussion, but I recall that at that meeting, we did agree to pursue a mediation and to do it on a somewhat expedited basis.

I have some recollection that there was discussion about what information would be shared before the mediation and I think the upshot of it was that NCR was interested

Schlickman

in some -- what you would call discovery before the mediation. Appleton was reluctant to do that. I don't think we really decided the issue. I think the way it was left was that Appleton said, well, put something together and let us take a look at it and we will consider it. I think that's what ultimately generated this letter.

We put together an request, information we would like to review before the mediation.

But I don't think that was a big issue is my recollection. I think the big issue was the parties had agreed to try to seek a mediated resolution that the parties, especially Paul Karch and Jon Hoak, recognized that more could be done with the two companies working together to manage the whole array of Fox River liabilities than fighting among themselves, and that if there was a way to do that, we should try to pursue it and try to do it as soon as possible.

And my recollection is subsequent to that meeting, yeah, we had this exchange

Schlickman

of letters, we sent a request and Bourque responded to it. But I seem to recall the biggest focus was trying to find the right mediator and do it quickly and get the things set up.

Q. During the course of this meeting in Chicago, were the merits of the dispute discussed between the parties?

MR. McATEE: Which dispute, the contract dispute of the '78 agreement?

MR. HUTTENLOCHER: Yes.

A. You know, my recollection, a little hazy, but my recollection is the focus was more on not the specific issues or allegations at issue in the Southern District litigation over the 1978 agreement but more on the problem the two companies were facing in trying to find a way we could work together going forward to effectively address all the problems we were facing, some of which we knew and some of which we didn't.

Q. What do you mean by that last piece there?

A. What I meant by that is that it

Schlickman

was -- so we were meeting in 1997, probably in the summer, looking at this correspondence here. You know, at that point, I think it was unclear we were dealing with the trustees. I think it was unclear exactly what role EPA was going to play in this matter, if any. It was unclear how long the Fox River Group was going to be able to work together.

It was unclear, you know -- well, we knew for sure that at some point if this all wasn't settled, we would be facing a variety of claims from the other PRPs. And you know, we knew those were all issues that we were going to have to deal with going forward. That's why I said some known, some unknown.

And I think, my recollection is Jon Hoak and Paul Karch shall felt very strongly if we could put the issues between us to rest and focus on what the companies needed to do to address and manage the whole panoply of Fox River-related issues, at the end of the day, the companies would pay less money than

Schlickman

if they didn't do that.

Q. You mentioned the potential for claims from other PRPs. What did the companies have in mind with respect to the types of claims that they could be facing from other PRPs regarding the Fox River matter?

A. At the time of this meeting?

Q. At the time of this meeting and if you could you include in your answer leading up through the 1998 mediation.

A. We had a series of meetings with the other five companies before we joined the Fox River Group January of 1997. And as you can see from the prior exhibit, in January of 1997, we agreed on percentages. That was not easy to do because the other companies, you know, came to the table with preconceptions of what NCR and Appleton should be contributing and it was a lot more than 28 percent, a lot more than 28 percent.

Our effort, our effort being NCR and Appleton's together, we were working closely with the Appleton team at this point,

Schlickman

was to try to get the focus of the other fox -- of the other companies, I'm not going to say Fox River Group companies because I didn't consider the Fox River Group, us to be a part of that yet, our effort was to try to get the focus on discharge, what the volumes of PCBs were that were discharged from Appleton Coated Paper facility, the Combined Locks facility and the facilities that were owned by the other parties. And we thought, based our preliminary work, we thought we had a pretty good story to tell there.

And I recall we had a series of meetings to discuss views on allocation with the other Fox River -- with the other five companies, I will refer to them as the other five companies, and the parties that -- from the NCR or Appleton side that played the most role in that were me, John Heyde and Dennis Hultgren. Bob Bourque may have had some involvement, I don't recall it being extensive. But he was involved in the discussions leading up to this.

In the course of that, I can't

Schlickman

recall the details, but there were a series of meetings leading up to this agreement and in those meetings, as best we could, we shared information about the respective parties' positions, and it became very clear in those discussions that discharge wasn't the only thing on the other company's minds.

As I recall, David Mandelbaum for Glatfelter was particularly dismissive of our efforts to focus on discharge and, you know, would make comments this is a much bigger case than just discharge. There are many other issues going on. You know, Appleton and NCR knew a lot more about the problems with PCBs in the past than any of the other -- any of those five companies.

They made it very clear that they thought there were significant other factors other than just discharge that should play into even a preliminary allocation to try to get a Fox River Group up and running.

So that's why I said before, it took quite a lot of persuasive powers to get our percentage at 28 percent. And it really

Schlickman

wasn't 28 will percent because if you recall, we had to make an up-front payment. Sort of what we call a catch-up payment.

But going forward, we felt very good that we were paying the same percentages as Fort Howard and Glatfelter. Given what we heard from them, I think from our discharge information, we thought they were large parties, we were a relatively small party, but like I said, we heard in our discussions that the other five companies were prepared to assert a variety of other claims against us and take positions on matters just other than discharge to try to increase our share.

Q. What positions, other than discharge, were they discussing or thinking about bringing?

A. Well, you know, I think they were telling us that they felt that they had -- I don't know how familiar you are with the Superfund statute, but contribution litigation, there are a series of equitable factors that a court can take into account.

I think the other companies felt

Schlickman

that they had been cooperating with the government agencies and Appleton and NCR had not. I think that was one.

I think they were taking the position that we, we, Appleton and NCR had knowledge of the problems with PCBs, if you want to use that term, and the evolution of those, that was better than what knowledge the other five companies had. And I think there were discussions about the financial aspects of it. I think the other -- we understood the other companies were prepared to argue that since NCR and Appleton had made a lot of money on the carbonless paper business over the years, that that was a factor that should play into whatever share we ultimately paid, and there were, I'm sure, there were other factors that were laid out in these meetings, maybe not as much detail but clearly laid out to us and expressed as reason why we should be paying a share much larger than 50 percent.

Q. In the course of these meetings, you have mentioned that some of these other

Schlickman

companies were making the accusation, if you want to call it that -- if you want to use a different term, that's fine too -- that API and NCR had at least a different level of knowledge with respect to the dangers of PCBs potentially getting into the Fox River. Who was primarily making those claims?

A. You know, I would think they primarily came from the Glatfelter side of the table with all the other companies sort of nodding their heads.

Q. What was Glatfelter's evidence or basis for the arguments they were making?

A. They didn't share that with us.

Q. Did they ever provide you with any documents that would have backed up their claims?

A. Well, that wasn't what we were trying to do at that point. We weren't sharing documents. We weren't sharing information. We were having discussions and the discussions were in an effort to try to reach some sort of interim funding arrangement that could get this group up and

Schlickman

running. That was really the focus of the discussions. It wasn't a proceeding of sorts, just a series of meetings focused on can we reach some sort of an understanding.

I don't think -- and again, we also tried to keep the focus off that. Our job in these discussions, I felt, were to keep things focused on discharge share and not other factors for a couple of reasons. One is if we start to focus on the factors, we'd never reach an interim agreement.

Number two, we knew what the other companies' positions were on these other factors. These other factors, in their view, who only increase our share.

So we, the NCR/Appleton team, knowing where the other companies were coming from tried to stay focus on the discharge numbers, and we try to keep the door as tightly closed as we could, and not entirely successful, but closed as much as possible so that we wouldn't get into protected discussions about that.

Q. During these discussions that

Schlickman

Mr. Mandelbaum seemed to be leading, did NCR and API deny those allegations, accusations?

A. We told -- again, there were not specific allegations in the terms of factual statements or what have you. They were positions that were asserted and we told them we disagreed with their positions.

It wasn't -- we just didn't engage them on those issues. We tried avoid engaging them on those issues so we could keep it focused on matters we felt were more likely to get us to a lower number in the context of, you know, very difficult negotiation with these companies.

Q. OK. In the course of trying to steer the conversation back, did you, you know, mention to Mr. Glatfelter or provide him with any documents or information that would have disproven their position?

A. Referring to Mr. Mandelbaum on behalf of Glatfelter?

Q. Yes, did I misspeak? I said Mr. Glatfelter. Mr. Mandelbaum?

A. No, as I mentioned before, we did

Schlickman

not exchange documents or materials. There was no such exchange like that. I'm sure if we had done that, we would have probably never reached an agreement. That there just wasn't.

Q. Was it -- it sounds to me, and disagree with me if you do disagree, that the strategy in that negotiation was to deny the allegation or deny the position, but quickly steer it back as best you could to the discharge issue where you thought you were on good footing?

A. Let me just rephrase that. I think the strategy in these meetings was, number one, to try to reach an agreement with the other companies on funding so that we could work with them and keep an eye on them, keep control on them, and at the same time, try to get a better understanding of what their positions would be down the road.

I mean, this was an unusual situation. We were basically trying hard to join forces with a group of companies that we knew were our adversary and would likely be

Schlickman

our adversary in the future. That was a dance we played with the Fox River Group the entire time. It was a difficult dance at times.

So we -- the reason we wanted to insert Appleton and NCR in the Fox River Group is we wanted to keep control of these people as much as we can, learn what they were doing, and of course, join forces with them to try to reduce the overall cost of the remedy or any other restoration actions or whatever the trustees or agencies might ultimately require the parties to do.

Q. I believe you mentioned that both you and API or NCR and API felt that they had a good story to tell with respect to discharge. What was the good story that those parties had to tell with respect to discharge?

A. The --

Q. Were the -- I think you mentioned API and NCR jointly believed they had a good story to tell with respect to allocation based on discharge or levels of discharge or

Schlickman

potential discharge of PCBs into the Fox River. I wanted to see if you could expand, explain to me what the good story was?

MR. McATEE: I will let him answer that if you are asking him what the NCR/API said to the five other companies at these meetings on that issue.

MR. HUTTENLOCHER: Yeah, that's my question. Thank you, Darin.

A. The position we took with the other five companies, based on the work we were able to do up until that point, was that the NCR/API share, based on discharge from the operations of the Appleton business, I'll use that term, was below 20 percent, I think it was closer to 10 percent, and we felt that as a group, the other five companies were responsible for the balance and that Fort Howard and Glatfelter were probably responsible for the larger shares.

Q. Was there a specific facility from the -- I think you just mentioned, called it the Appleton business of NCR/API, that you were tying those discharges to?

Schlickman

A. Well, we were looking specifically at Appleton Coated Paper and Combined Locks and discharges that ultimately went into the river from those two facilities.

Q. Those two companies, Appleton Coated and Combined Locks, do you recall whether those companies were acquired by NCR at some period of time?

A. In a sense, yes.

Q. In a sense, yes, they were acquired?

A. Yeah, I don't recall the specifics of how they became part of NCR, but at some point, they did become part of NCR. Which -- yeah.

Q. And did they eventually become part of NCR and a division called the Appleton Papers Division?

A. That's my recollection.

Q. And that went by the acronym of APD?

A. It may have. I'm not sure.

Q. Do you recall whether the Appleton Papers Division was the subject of the 1978

purchase agreement?

A. As I recall, under the 1978 purchase agreement, basically NCR was selling its entire carbonless paper business to BAT and actually being purchased by an entity called Lentheric, L-E-N-T-H-E-R-I-C, I think that's a French pronunciation.

And it -- as I recall, NCR wanted to get out of the business of making carbonless paper and basically wanted to sell their ongoing business operation related to carbonless paper to BAT and I can't tell you right now what constituted the Appleton Papers Division, if there was such a thing, but I do have a recollection of at least some of the major things that were sold under the 1978 agreement. I think it was outlined in there somewhere.

Q. What's your recollection of some of the major things sold as part of the 1978 purchase agreement?

A. The portage facility where emulsion was manufactured, the Appleton plant, whatever it was named, the Appleton Coating

Schlickman

plant, the Combined Locks mill.

There were a couple facilities in Pennsylvania, I think one was referred to as Roaring Springs. I can't remember the other one. And I believe there was some assets, equipment something like that associated with the business that were located in Dayton, where NCR was located. They were also sold.

There may have been other things but I remember -- that's what I remember.

Q. Do you recall whether NCR retained any piece of that business, whether it's the form of employees, facilities, office space, anything like that?

A. I wasn't aware that they retained anything. The reason I say that is we seem to have to go to Appleton to get documents and we seem to have to go to Appleton to talk to employees and it didn't seem to me like NCR had retained anything at all. So that's the basis for my answer. But I'm not sure.

Q. OK. For what was technically transferred between two parties, would it be fair to say that you just referred to the

Schlickman

1978 purchase agreement itself?

A. That's a starting place.

Q. OK.

A. I, you know, I just don't know.

Q. Now, after -- at this, the meeting in Chicago in August of 1997 which you're talking about, the mediation, or the potential for mediation, was there an agreement reached between the parties when you left that meeting?

A. Well, we had one session with Layn Phillips out in California, February of 1998, and when we left that session, we had an understanding as to -- we -- let me put it to you -- we had, I think, the essentials of what we thought were an understanding to resolve the matter. It was still subject to further documentation, but we thought, you know, the building blocks of the settlement had been agreed to.

Q. And that's in reference to the mediation that was conducted in February of '98 with Judge Phillips?

A. Yes.

Schlickman

Q. Maybe I wasn't precise enough. My question is when you left the meeting in Chicago in the summer of 1997 between yourself, Mr. Hoak, Mr. Karch and Mr. Bourque, was there an understanding reached about whether or when or how you would conduct a mediation of the dispute from the Southern District litigation?

A. We touched upon that before and I think I answered that before, but I think the understanding we reached is we wanted to have a mediation, we wanted to do it as soon as possible, we didn't want to spend a lot of time conducting discovery beforehand and we talked about that already and how that came out.

And I think we had also agreed one mediator, we would find one good mediator out there and try to do it as soon as we can.

Q. And you also, I think, mentioned that there is a lot of discussion over who the mediator would be?

A. Not at that meeting, but subsequent to that time, there was a lot of effort put

Schlickman

into trying to identify potential mediators and discuss that information with the Appleton team and see if we could agree on one.

Q. Do you recall who proposed Judge Phillips?

A. I don't. I remember we knew of him. He is one of these guys that's really big in the mediation field and anybody who has an environmental practice is familiar with Judge Phillips. But I can't recall if we proposed him or if Appleton did, I just don't remember sitting here now.

Q. Do you remember any of the other mediators that were proposed by the other side or potential mediators?

A. No, I don't.

Q. Turning now to that mediation session that you mentioned in February of '98, --

A. Can I just interrupt you. I don't know how long we have been going this water has been going through --

Q. Happy to take a break. We will

take a short one. Absolutely.

THE VIDEOGRAPHER: Going off the record, 11:15 a.m. This is the end of tape 2 in the deposition of Andrew Schlickman.

(Recess)

THE VIDEOGRAPHER: Going back on the record, 11:26 a.m. This is the beginning of disk 3 in the deposition of Andrew Schlickman.

Q. Mr. Schlickman, before the break, we were about to discuss the February 1998 mediation session that you had referred to and we were also discussing that there was some discussion about who the mediator would be.

Just so the record is clear, who was the mediator selected by the parties for the mediation?

A. A former judge by the name of Layn Phillips. I think lane was spelled L-A-Y-N.

Q. And am I correct that he was the sole mediator for the mediation?

A. Yes, he was the only mediator.

Schlickman

Q. And who attended the mediation on behalf of NCR?

A. My recollection there were four people there; Jon Hoak, the general counsel, John Gearing, the CFO, and Lee Freeman and myself.

Q. And who was there on behalf of API?

A. Paul Karch, maybe Dan McIntosh, I'm not 100 percent sure about that. Bob Bourque, maybe Bill Russell. I'm not sure about that either. I think we had about equal numbers on both sides of the table, so.

Q. And where did that mediation take place?

A. Southern California.

Q. How many days was the mediation?

A. One day.

Q. Can you explain for me the process or the events of that mediation? How exactly did it work?

A. That day?

Q. That day.

A. As I recall, we had a brief meeting with Judge -- we called him Judge Phillips,

Schlickman

since he had formerly been a judge. We had a brief meeting with Layn Phillips. I think he just outlined procedural, how he saw the day going.

Early on, he invited us up and sent us to separate rooms. There was an NCR room, there was an API room. My recollection is he -- we did not see the Appleton team until the mediation, as far as Layn Phillips was concerned, was at an end. And he ran shuttle diplomacy. He ran between the two rooms and as I recall, after the initial meetings, he had sort of a preliminary meeting with each side. I'm assuming he had a meeting similar to the preliminary meeting he had with NCR, also with API, and my recollection is after that, he didn't spend -- he didn't have to go back and forth a lot. I think he might have gone back and forth a lot a couple times and returned to the NCR room and told us he thought we had an understanding.

And at some point shortly after that, he brought us back together in the large conference room. He had outlined the

basic terms of what he thought was the understanding.

I think Layn Phillips had written on a legal pad rather detailed provisions of the discovery procedures agreement, if I am using the right name. It wasn't even considered a separate part at that point in time. But it was an agreement for conducting discovery in the future. And then I think there was some discussion about the basic terms of the settlement.

At some point, after some discussion, either things were reduced to writing or what had been in writing before was tinkered with in view of the discussions, and then the Judge Phillips asked one of the parties, I think on the Appleton side, to read something that reflected sort of the basic building blocks of the settlement. And then, as I recall, Judge Phillips himself then read the various items that would be covered in the future discovery and what the terms of that would be, and then I think he asked everybody to acknowledge whether or not

Schlickman

what had been, you know, stated and read was accurate.

And I, you know, there was a discussion that as soon as possible, this would all be reduced to writing; that this was a, I don't know what the term was, preliminary understanding, an agreement in principle, I can't remember the terms that were used. But it was clearly understood this would have to be put into writing and I think both the general counsel said, "And we want that done as soon as possible."

That's what I recall.

Q. During the initial joint session between the parties that started the day, about how long did that last if you recall?

A. I recall that being relatively short. I think Judge Phillips, I have a hazy recollection here, so don't -- but I do have some recollection that Judge Phillips invited each side to make a brief sort of opening statement. And my recollection is Bob Bourque did that and Lee Freeman did that and soon after that, we were sent to separate

Schlickman

rooms.

Q. What were the topics discussed in these opening statements from the parties when they were in the room at the start of the joint session?

A. I don't recall the specifics. To the extent I have a recollection, it was that it was very brief, the comments, and I think they were briefly summarizing the key points of the briefs that had been submitted to Judge Phillips.

Q. And prior to the mediation taking place, do you recall that there was briefing submitted to Judge Phillips in advance?

A. Yes, I recall that.

Q. Do you recall from that joint session any of the discussions or these opening statements covering topics that were outside of those initial briefs?

A. I'm not sure I understand that.

Q. Yeah, sorry. Were these opening statements essentially summary positions of what had already been stated in the briefs or a more wide ranging opening statement?

Schlickman

A. I've told you all I really recall. I can't add anything more than that.

Q. And then after this joint session concluded, would you say more or less than a half hour?

A. I don't recall. It was qualitatively a short session. I can't remember how many minutes it was.

Q. How long did the -- did the session go all day, from some early morning time until the latest afternoon?

A. No, it did not go the whole day.

Q. Do you recall when it started and when it ended approximately?

A. It started first time -- first thing in the morning, business time, I would say 8:30, 9 o'clock, and frankly, I think we were done by 3. I recall because after we were done, at least the NCR people went across the street to get a late lunch, digest what happened, and so it did not take the whole day.

Q. During the shuttle diplomacy sessions that NCR had with Judge Phillips,

Schlickman

what were the topics discussed between NCR and Judge Phillips? What were you guys talking about?

A. Here is what I recall, and it's not much, I recall that at one point, Judge Phillips came to the NCR team and sort of outlined an approach he had in mind and he may have even outlined some percentages he had in mind.

And I think he asked the NCR team, is this the right direction, in so many words. I don't recall the precise words. And I think we signaled that that seemed to be heading in the right direction. And then he said OK, I've got some work to do. And he left.

He spent quite a bit of time with the Appleton team. He may have come back a couple of times for fairly short sessions. My recollection is he spent a good amount of time with the Appleton team and then came back and said he thinks we had a deal and we got back together shortly after in full session.

Schlickman

Q. Do you recall the percentages that Judge Phillips had presented to NCR during this first session you seem to recollect?

MR. McATEE: The first set of percentages that Phillips came to us with?

Q. Exactly.

A. I don't right now recall them being any different than what we ended up with. Again, this very -- it's not -- I'm not entirely certain.

Q. Of the shuttle diplomacy period, book-ended by the relatively short joint sessions, can you put a percentage on time spent with API versus sometime spent with NCR?

A. I can't. I can say more time was spent with API in the individual sessions and I think the joint session at the end was longer than the initial session at the beginning.

Q. Closer to 60/40 or 80/20 between the parties?

A. I am sorry, I can't say.

Schlickman

Q. But not 50/50?

A. My recollection is Judge Phillips spent more time with the Appleton team than he did with the NCR team during the shuttle diplomacy part of the meeting.

Q. Mr. Schlickman, I am going to hand you a document that has been previously marked as Hoak Exhibit 18, and why don't you take a moment to review that.

Just to identify it for the record, it is Hoak Exhibit 18 bearing Bates numbers NCR-ARB00014469 through 14474.

A. OK.

Q. Now, do you recognize this document?

A. I do.

Q. And what do you recognize it to be?

A. This is a transcribed version of the sort of concluding comments that were made at the end of the mediation and that that I described before that Bob Bourque read something, Judge Phillips read something.

What I didn't add, he had a little tape recorder, when all this was going on,

Schlickman

and when he asked everybody to acknowledge their concurrence, he passed the tape recorder around the table. So this was a subsequent transcription of what was dictated into that Dictaphone machine.

Q. Were you provided a copy of the recording?

A. I don't recall ever getting a copy of the recording.

Q. Do you recall who did the transcription?

A. The Simpson Thacher people. Bob Bourque said I'll take this back and we will take care of it is what I recall.

Q. If you look at the, for lack of a better term, second paragraph, names identified there, does this document refresh your recollection that Bill Russell attended on behalf -- or from Simpson Thacher on behalf of BAT and Appleton Papers attended the mediation?

A. Yeah, I think this list is consistent that I said before and sort of confirms what I suspected.

Schlickman

Q. And confirms as well that Dan McIntosh attended?

A. Yes.

Q. And all the other names are the ones that you had previously recollected, is that right?

A. There are, four on each side.

Q. If you go to the bottom, there is an indented paragraph there.

A. Um-hm. I see that.

Q. Which starts, "The parties agree..." And at the end of that sentence, there is percentages listed, Appleton Papers Inc. and BAT Industries, 55 percent, and NCR corporation, 45 percent.

Is that, does that refresh your recollection as to what the initial percentages that Judge Phillips had presented in that first break-out session?

A. Well, I think what I said was that at some point, Judge Phillips came into the NCR room and said how does this sound, is this the right direction. And I'm not sure that was the first break-out session or

second break-out session. I just don't recall. But one of the early ones and there weren't that many.

So it may have been the first one. But -- in, I think what I said before was that I think, my recollection was that what he shared with us, the first set of percentages that he shared with us was pretty close, if not the same, as to where it ultimately came out, and by that, I was referring to the 55/45.

Q. Just so I understand you correctly, is it your testimony that you believe those initial set of percentages that Judge Phillips presented was 55/45 or something close to that?

A. I don't recall exactly. I recall that they were close. I just don't recall how close or that they were the same.

Q. Understood. We are on the same page now. I just wanted to double-check.

Now, if you look at the first paragraph that follows the listing of names there, it states, "The settlement that I am

Schlickman

about to announce in this case has three components. The first component is a 75 million dollar fund component for the Fox River PCB contamination. The second component is a confidential allocation component for the 75 million dollar fund. And the third component is an ADR or deposition procedure, as we have called it, which will govern the arbitration of any allocation for funds expended beyond 75 million dollars."

Do you see that paragraph there?

A. I do.

Q. Did I read that correctly?

A. I wasn't following it word by word when you said it, but I think you came pretty darn close.

Q. OK, I'll take pretty darn close.

A. It says what it says. We all have it here in front of us.

Q. Is this consistent with your recollection of the general terms of the settlement of those three components?

A. Yeah, he uses the word

Schlickman

"components." I used the word before building blocks. But, yeah, this plus -- some of the major things that followed were what I referred to before when I said building blocks.

Q. Going back down to the indented paragraph there, it says that the parties agree that they will share out-of-pocket remedial and response costs and Natural Resource Damages and other mutually agreed defense costs relating to PCB contamination in the Fox River and the Marina Cliffs Superfund site up to total of 75 million dollars as follows," and then it provides that 55/45 percentage we discussed.

Do you recall there being any discussion during the mediation of the use of the term "out-of-pocket"?

A. I recall very little discussion about out-of-pocket, if any. It is a pretty obvious term to me, I think, to the people in the room. I recall at some point -- and I can't remember if it was in one of the preliminary sessions we had with -- during

Schlickman

the shuttle diplomacy or it was at this concluding session, somebody, I'm not sure whose side it was on, somebody expressed some concern about, you know, the internal costs of each company or one company.

For example, NCR had a number of people in-house working on the Fox River matter and I think there was concern expressed that those type of costs, internal company costs, not be swept up into the sharing arrangement. We are really talking about payments, cash outlays to other parties.

Q. During the discussions either at the mediation or leading up to the mediation, had the -- had NCR and Appleton exchanged information concerning their respective insurance coverage for the Fox River matter?

A. Well, let me -- there had been some exchange of information before the mediation, and in fact, I think some progress had been made on an agreement to more formally work together on insurance matters.

Q. At the time of the mediation, had

NCR disclosed to API it's potential insurance coverage for matters relating to the Fox River?

A. I just don't recall. Like I said, there had been discussions going on, I think well before the mediation, about how Appleton and NCR could work together to pursue insurance, and as I recall, there were some issues that came up about whose insurance was whose and we were trying -- we were in the process of working through those issues before the mediation, as I recall sitting here right now.

Q. And sitting here right now, to your recollection, was that agreement more of a process-oriented agreement in which there is a, quote/unquote, insurance coverage out there, we will pursue it in the following manner, or was it more of we have these policies, these policies may go to either party, NCR has these policies, and we will pursue those specific policies for whatever amount of coverage is available under them?

MR. McATEE: Object to form.

Schlickman

A. Here is what I recall, ultimately, there was a document signed, called, I think, the joint insurance recovery agreement.

My recollection is that there were discussions, perhaps even drafts of that document, before the mediation. There must have been some information about insurance policies exchanged because, as I recall, there were some categories of policies that were identified that were in dispute for lack of a better term. Appleton thought they should be able to take the benefit of those policies and NCR thought they should be able to.

And one of the reasons there had been discussions over insurance was to see if there was a way, again, that NCR and Appleton could work together pursuing those, maximize the size of the recovery without fighting among each other.

The precise timing of all that is unclear to me. I'm sure the record would flesh that out, but I'm pretty certain that those discussions had started well before

Schlickman

February 12, 1998, I guess the date of the mediation.

And the other thing I recall is, there was a lawyer in Minneapolis who was handling the insurance work for Appleton Papers at the time and he was working with the woman at our office who was working on insurance. Her name was Maripat Flood, and as I recall, and again, I think this happened before the date of the mediation, Maripat learned from talking to the Appleton outside lawyer that Appleton didn't really have a good handle on its coverage, didn't have really good coverage charts, and I remember she encouraged Appleton to hire one of these insurance archeologists to try to work their magic. They have access to a lot of information that most of us wouldn't understand and they can go back and reconstruct policy history and coverage history, and I know that there had been some discussions between Maripat and this lawyer, I can't remember -- he was a firm up in Minneapolis, about those issues.

Schlickman

Q. I think I probably dreamed at some point of being an archeologist, I don't know about insurance archeologist. It is new to me.

When the business -- when APD was sold as part of the 1978 purchase agreement, and those assets were transferred to Lentheric, what -- to the best of your recollection, what type of insurance coverage did NCR retain, for what types of occurrences?

A. Well, first of all, I mean, I would say -- I always sort of considered the business being sold not APD, it was the carbonless paper business that was sold to BAT and went into Lentheric which eventually became Appleton Papers Inc. without a comma.

Q. Without a comma.

A. I didn't understand the second part of your question.

Q. I guess my question is, the, the -- as you say, the business is being sold as part of that 1978 purchase agreement, and my question is, if NCR was selling that business

Schlickman

to a third party, do you recall what type of insurance coverage NCR retained that could pertain to those potential liabilities that could be associated with those assets?

A. Well, first of all, I'm still not sure I understand your question. Second of all, I don't think I really ever had the knowledge specifically that would allow me to answer a question along those lines. I didn't get into that deeply.

I knew from talking to Maripat Flood, who was our insurance person, what issues they were looking at, what she was working on, but I never delved too deeply into that.

Q. Was the extent of NCR's insurance coverage with respect to Fox River matters, that primarily handled by Maripat Flood?

A. Well, --

Q. On behalf of NCR?

A. Initially, Maripat Flood -- and she worked closely with somebody at NCR who's -- I think it was a Hoak, but not spelled the same way as Jon Hoak, and I'm not sure if he

Schlickman

goes back to the very early stages, '97 to '98, but suffice it to say Maripat Flood, in this time period, was the Sidley lawyer overseeing the insurance issues relating to the Fox River matter.

She worked very closely with an in-house person at NCR, and then when Maripat Flood left the firm, a woman by the name of Maureen Crough took over her responsibilities.

Q. And is that C-R-O-U-G-H, Crough?

A. Yes, that's right.

Q. And I guess my question was -- and maybe you just don't have the background to answer it, but I'm just curious, if APD was being sold by NCR to a third party, and NCR takes the position that any and all liabilities associated with those assets are transferred to API, why NCR would need further insurance coverage?

MR. McATEE: Object to form.

A. I can't answer that question.

Q. OK. In looking at the term "out-of-pocket" that's used on that paragraph

Schlickman

on the bottom of page 14470, was there discussion about that out-of-pocket term meaning net of insurance proceeds?

A. That term never came up during the mediation -- I never heard that term in connection with this until just recently.

Q. There was no discussion of, you know, there being -- certain costs wouldn't be subjected to this particular agreement until the parties had gone or exhausted their insurance coverage?

A. Absolutely not. I mean, I just -- we just went through all the stuff that was going on about insurance in this time period, both before, during and after this agreement.

The parties were very focused on insurance, but on a different track. I mean -- and I take it you have seen the joint insurance recovery agreement, but insurance had no play in this agreement.

Q. And it wasn't discussed during the course of the mediation session either at the beginning or the end of these joint sessions?

A. Not at all.

Schlickman

Q. And not discussed during the break-out sessions that you had with Judge Phillips?

A. Not that I recall.

Q. And if you just turn to the last page of this document.

A. Very last page?

Q. Yes, the very last page. There is the another listing of the names of the individuals who were there. Is that the passing of the tape recorder around that you were referring to previously?

A. Yeah, I think that went around the table at that point.

Q. And I note that your name is second from the bottom and you're expressing your concurrence in the agreement as it was, in principle, as it was read?

A. I agreed to what was been stated previously as reflected in this document. As I said before, this understanding reflected the components of our agreement and I concurred in those components and we had our work cut out to try to flesh this all out and

Schlickman

put it in writing.

Q. You mentioned that there would be further documentation. Who was the party of the eight that were there that took responsibility for putting together the first draft?

A. I'm not sure it was decided that day. I guess I'm just not certain. I don't recall it being discussed that day.

Q. Was there a point in time where it came to be that someone decided to raise their hand and do the first draft?

A. I don't know if we raised our hands but ultimately, Sidley took primarily responsibility for introducing the first draft of the document.

Q. Did you have a role in drafting the first draft of the document?

A. I did.

Q. What was that role?

A. I worked closely with Pam Hanebutt. The two of us together I guess you would call principal draftpersons of the document.

Q. When you were putting together the

Schlickman

first draft of the agreement, did you have any discussions with Simpson Thacher during the first drafting process.

A. The reason I am hesitating here is I need to explain something. Before this document -- before what's reflected in this document was read by Bob Bourque and Judge Phillips we had had a discussion about hazardous substances and PCBs and the extent to which they should be included in this and as I recall, this initial formulation was that this agreement would cover hazardous substances generally, that -- and there was some discussions maybe it should just focus on PCBs, and that's how it turned out. This is an agreement focused on PCBs.

At some point subsequent to this mediation, I believe, my vague recollection is there were some discussions about how to fine-tune that. And I think that's reflected in the final agreement.

My best recollection, I'm not 100 percent certain about this, is that subsequent to the mediation, we did have some

Schlickman

further discussions with the Appleton people about that issue, and perhaps about other issues. I just don't recall right now, but -- and had those discussions before we produced a first draft. That's the best of my recollection right now.

Q. When you use the term "hazardous substances," are you ascribing a particular meaning to that? For instance, how hazardous substances is defined under CERCLA?

A. That's ultimately how we defined it, I think, in the confidential settlement agreement, and I think when we were referring to hazardous substances at the time, I don't think we got everybody around the table to agree that that's the definition, but I think that's generally what we had in mind.

Q. Mr. Schlickman, I am going to hand you a document that has been previously marked as Hoak Exhibit 19. And to identify for the record, Bates number NCR-ARB 00007879 through 7924. Do you recognize this document?

A. It is a long one, give me a second.

Schlickman

Q. Sure, take your time.

A. I have taken a look at this. I do remember this. The one thing I noticed is one of the things that is referenced in the letter is not attached.

Q. And what is not attached?

A. A copy of the parties' joint defense agreement dated December 19, 1995. I don't think that was in this package here.

The other three drafts are in here, but I don't see the -- I didn't go through it page by page, but flipping through it, I don't see that in there.

Q. Did you have the chance to review the cover letter that was sent along with this dated April 23, 1998 from you to Mr. Bourque?

A. I just read most of it.

Q. Does this refresh your recollection of some of the open issues that were left at the end of the mediation session?

A. It does.

Q. And the first one that is mentioned there, under number 1, scope of the

Schlickman

agreement, contamination other than PCBs, is this what you were referring to with respect to whether it is to cover hazardous substances or PCBs?

A. Yeah, that's what I was referring to.

Q. Prior to providing this draft, does this refresh your recollection about whether or not you had discussions with any members of API or Simpson concerning the scope of the agreement prior to providing them the draft?

A. You know, it doesn't say there were, but I still believe -- I have some recollection that maybe just after or -- at some point between the mediation and the time we sent over the first draft, we had some discussion about these issues. It may not have been extensive.

Q. Do you recall who you would have spoken to?

A. Well, I assume -- my guess would be Bob Bourque, but I'm not certain. Most likely Bob Bourque.

Q. Do you recall at the end of any of

Schlickman

those discussions, what the approach would be in trying to come up with a resolution to these outstanding items?

A. Yeah, all I recall is to the extent there were such discussions, there was no negative reaction.

Q. Was there any reaction along the lines of put it in a draft and we'll take a look?

A. That was basically it. Maybe more than we will take a look. Put it in a draft and let's see how it turns out.

Q. If you look to the second page of the cover letter that you have there, there is a -- it's the second numbered paragraph 2 there concerning dispute resolution. Do you recall having any discussions about what the dispute resolution procedures would be prior to delivering this draft?

A. We may have, but I don't recall specifically.

Q. Would this have been discussed with Mr. Bourque from Simpson Thacher to the best of your recollection?

Schlickman

A. Most likely if this had been discussions, most likely with him.

Q. If not with Mr. Bourque, would it have been with Bill Russell at Simpson?

A. Possibly. I just don't recall.

Q. Were you the only Sidley lawyer interfacing with the counsel for API during this initial drafting phase?

A. Pam Hanebutt may have had some contact too, but I can't recall who was taking the lead in the discussions. I probably would have taken the lead in any discussions between the time of the mediation and the time of the first draft because I was at the mediation and Pam wasn't.

Once we got into the drafting process, Pam could well have been taking the lead on some of the discussions.

Q. Do you recall, after this draft was provided, there being a number of other drafts exchanged between the parties?

A. There were more drafts exchanged. I can't quantify that any more.

Q. Do you recall what the sticking

Schlickman

points in drafting, to the extent there were, do you recall what they were in the course of the exchanging of drafts back and forth?

A. My recollection is that there were very few sticking points. My recollection is that it is a first draft, got generally positive comments from the Appleton side, that there was some fine-tuning that needed to be done.

I believe the escrow account proposal that we had included in the first draft seemed too bureaucratic to the Appleton side. They wanted something less formal. The one thing that really sticks out is -- so as to the real substance of the agreement, I don't recall any concerns raised at all. I think we got some handwritten comments and some nits and nats here.

The thing that I recall being a big issue was the extent -- there was a provision in the agreement that tried to preserve a provision in the 1978 purchase agreement by which BAT agreed to submit to the jurisdiction of the U.S. courts with respect

Schlickman

to issues relating to the '78 agreement and we wanted to preserve that concept in the settlement agreement. Something I didn't think would be that controversial. But it ended up being hugely controversial, and at one point, I think almost submarined the whole effort.

Q. What do you recall the controversy being over that clause? What was API's position or BAT's position in response?

A. Let me tell you, we never dealt with anybody from BAT through entire process. Simpson Thacher took the position they were representing BAT. As you know from the listing, nobody from BAT attended the mediation. But we were told that Simpson Thacher had the authority to speak on their behalf.

What we learned from Simpson Thacher, what they told us was BAT was very concerned about anything that could be construed on its part to submit to the jurisdiction of U.S. courts, and it was concerned that this provision, even though it

Schlickman

really just tried to mirror and extend what was already in the '78 purchase agreement, even doing that was causing a lot of problems with BAT.

Q. Did they give you a reason for their problems?

A. They may have.

Q. Do you recall what they may have said?

A. They may have said that, you know, you have got to understand, BAT has got a lot of exposure in the United States for cigarette liability and BAT had a U.S. subsidiary, but I -- BAT did not want to expose any of its other assets to the liability for, you know, cigarette smoking liability. That's what I understood was the genesis of their concerns.

I think that was alluded to in the conversations I had with the Simpson Thacher people.

Q. You also mentioned that this could have potentially submarined the deal. What was the submarining aspect I guess for lack

Schlickman

of a better term?

A. Well, if BAT wasn't going to sign the agreement, we weren't going to have a deal.

Q. Why?

A. Because we were looking to both the assets of Appleton Papers and the assets of BAT to back up this agreement and the obligation was a joint and several obligation. Appleton was an ongoing concern. Frankly, we felt BAT was a larger, more financially viable company, and given the uncertainties at the time over where the Fox River matter would eventually go, what the liabilities would be that we would be facing and how much it would cost, I recall NCR was not prepared to sign a settlement unless BAT was a party to it.

And if NCR had succeeded, you know, in the Southern District litigation, BAT would have been a party to it.

Q. Was there any discussion about which of the parties, API or BAT, would have primary responsibility for costs to be shared

Schlickman

under the settlement agreement?

MR. McATEE: Discussion with API or BAT?

Q. Yeah, between NCR's representatives and API/BAT's representatives, any discussion about that?

A. I don't recall discussion along the lines. I do recall Jon Hoak indicating to probably the mediator how important it was that both Appleton and BAT be jointly and severally liable under whatever settlement we reach. I'm sure he reiterated that many times, the preference.

Q. Were there discussions between NCR and API/BAT --

A. Pardon me.

Q. I am sorry, I'm pausing trying to phrase the question appropriately.

Were there discussions between NCR and, on one hand, and Appleton and BAT on the other hand about pursuing one of them for liabilities that would be covered under the confidential settlement agreement to the exclusion of the other?

Schlickman

A. Could you read that back, please.

(Record read)

A. I don't recall any such discussions.

Q. Were there discussions between NCR and BAT/API about the need for API and BAT's responsibilities under the confidential settlement agreement to be joint and several?

A. Could you read that back again. I am sorry. Must be getting close to lunchtime.

(Record read)

A. I think I just said before I thought that was made clear at the mediation. Obviously it was made clear in all subsequent drafts that we put together and nobody ever questioned that.

Q. OK. There was no other discussion about the manner in which that API/BAT liability was to be shared, no other discussion other than joint and several liability?

A. From NCR's perspective and the position that NCR took throughout this, it

Schlickman

was that; that Appleton and BAT should be jointly and several liable. That was a key component of what we understood the settlement to be. And I don't recall any discussions about any other approach.

MR. McATEE: Maybe we can do one more document and then break for lunch.

Is that OK with you, Andy?

THE WITNESS: That's OK with me.

Q. Let the record reflect I am handing the witness a copy of Hoak Exhibit 28.

MR. LISNER: This is 26.

MR. HUTTENLOCHER: Did I say 28?

A. You did. What you handed me was 26.

Q. Excuse me, 26.

MR. HUTTENLOCHER: Just, Darin, it's the getting into now the '98 settlement agreement. It might be better taking the lunch break now because we are going to spend a significant amount of time on the document.

MR. McATEE: What time is it?

MR. HUTTENLOCHER: 12:20.

MR. McATEE: Fine, and we will start again at 1.

THE VIDEOGRAPHER: Going off the record 12:17 p.m. This is the end of disk three in the deposition of Andrew Schlickman.

(Luncheon recess)

(Continued on next page)

Schlickman

AFTERNOON SESSION

1:01 p.m.

THE VIDEOGRAPHER: Going back on the record, 1:01 p.m. This is the beginning of disk 4 in the deposition of Andrew Schlickman.

BY MR. HUTTENLOCHER:

Q. Mr. Schlickman, you have a document before you marked as Hoak Exhibit 26. Have you had the opportunity to review or at least flip through that document?

A. I flipped through it.

Q. Do you recognize the document?

A. I recognize the documents.

Q. What do you recognize the documents to be?

A. I haven't gone through them page by page, but they appear to be the final versions of the three agreements we had been working on.

Q. And if you turn to page Bates number page 9344, and the following --

A. These are page 25 of the agreement --

Schlickman

Q. That's correct. Is that the signature page for this agreement?

A. It looks like it. There are a series of signature pages, yeah, all 25.

Q. That's correct. And the three parties here, NCR, BAT Industries PLC and Appleton Papers Inc., NCR Corporation, have all executed this agreement, correct?

A. Yes.

Q. And is that what indicates to you this is the final confidential settlement agreement between the parties?

A. That in addition to the cover letter.

Q. If you could turn to the first page of the confidential settlement agreement with the Bates number NCR-ARB9320.

A. 9320.

Q. OK. And focusing your attention first on the first whereas clause. At the conclusion of the whereas clause, the last clause of that says, "Allegedly, as a result of the manufacture and recycling of carbonless paper." Do you see that?

Schlickman

A. I see that. Can I read the -- are you going to ask me a question about it?

Q. You can read the whole.

A. Read the entire clause?

Q. Go ahead.

A. OK. Did that.

Q. Do you recall whether there was discussion over why the terms "manufacturer" and "recycling of carbonless paper" were used in this first whereas clause of the agreement?

A. I don't recall any such discussion.

Q. At the outset of this agreement, what was your understanding of the general intent between the parties as to what this confidential settlement agreement was to cover between NCR Corporation on the one hand and BAT/API on the other?

A. It really goes back to some of the things we discussed this morning. I think when we talked about the lead up to the first -- the meeting at which we agreed to have the mediation and also the lead up to the mediation itself, we talked about -- and

Schlickman

in other contexts, we talked about the significant liabilities it appears Appleton and NCR were facing for the Fox River matter and also the uncertainties associated with that. It was unclear even in July of 1999 exactly how the liabilities and issues would manifest themselves.

So what I think was initially discussed at the first meeting, we had to talk about the mediation and what was discussed leading into the mediation was trying to find a way in which NCR, Appleton and BAT really could resolve any and all liabilities that they might confront in connection with the Fox River matter, and as between themselves, put those issues behind them. And that was what we were trying to accomplish with this agreement that I have in front of me.

The one thing that I will add to that is that once we achieved the result we did at the mediation, once we got the building blocks in place for dealing with the Fox River matter and I think as reflected in

Schlickman

that correspondence you showed me before and my prior testimony, you know, we discussed expanding the scope of the agreement to include some additional hazardous substances, even though we had agreed on PCBs as sort of the focal point of the components at the mediation.

And knowing that there was a possibility that we could get involved in other sites like the Kalamazoo site, we expanded the agreement to address not only any and all possible issues that could come up in connection with the Fox River matter, but really any and all possible issues that could come up at any site that may have been contaminated by somebody's use of carbonless paper.

Q. And when you put the phrase "allegedly as a result of the manufacture and recycling of carbonless paper," was that the way of expressing that broad potential for liability that the parties were facing at the time?

MR. McATEE: Object to form.

Schlickman

A. Well, you know, this is a recital. This is a series of paragraphs that's just trying to set the context of what is agreed to later in the document. And with that, I mean, if you are trying to -- I'm not following your question, I guess. This is a recital. This is not the -- this is not a, what -- substantive terms of the actual agreement. What are you getting at?

Q. What I am getting at, in terms of setting that context and the parties reciting and forming what they thought they were there for in the first place, that in phrasing what the, in the broadest terms possible, what the sovereigns were accusing, what their position was with respect to NCR and API/BAT, is that term "allegedly as a result of the manufacture and recycling of carbonless paper," the broadest formulation that the parties could agree on with respect to the liabilities they would be facing?

MR. McATEE: Object to form.

A. That was not the intention there. The intention was simply sort of set the

Schlickman

stage for the nature of the problems we were dealing with and the language that really addressed the really broad scope of the settlement we had in mind and which I think we reflect in this agreement comes later in the document.

Q. If you could -- if you could please try to explain for all of us what you understand the mechanics of the confidential settlement agreement to be?

So for instance, if you had a first year associate just joining with the team, how would you explain this is the confidential settlement agreement and this is what we intended when we were drafting the agreement as discussed between the parties?

A. I just answered that a few minutes ago.

Q. Well, looking -- so what I am trying to get a little bit more of an explanation on is how mechanically it was to work, what would qualify, what allegations, what potential claims, what potential damages would fall under the agreement, how would it

Schlickman

be administered, that type of response.

A. Well, I don't mean to quibble with you, if a first year associate came to me and asked me that question, I would hand him the agreement and say go read the agreement, come back, let's talk and see what questions you have.

I mean, we spent a lot of time in this agreement, we tried to be very careful and I think this agreement, the controlling terms of the agreement indeed effectuate what I just described before. It was an attempt -- it was an agreement that encompasses and addresses any and all possible liabilities that Appleton, BAT and NCR might face concerning the Fox River site and other sites and indicated that the extent those liabilities did occur and manifested themselves, they would be covered by the sharing provisions in this agreement.

Q. With respect to NCR, what was the potential NCR conduct that was being settled among the parties as they discussed and reached this confidential settlement

Schlickman

agreement?

A. I don't understand that question.

Q. What activities in the paper-making, carbonless paper-making process that NCR was a part of, what was the conduct that NCR had done that had gotten them to the point where they needed a settlement agreement like this?

A. I am sorry, I still don't understand the question.

Q. Sure. Let me try again. In the manufacturing of NCR carbonless paper, NCR played a role in the sequence of the paper being manufactured, correct?

A. Could you read that back.

(Record read)

A. Well, let me turn that around. I mean, during the time periods we were talking about before, early 1950s until the late 1960s, as we discussed this morning, NCR provided the emulsion.

Q. OK. So -- and NCR manufactured that emulsion, right?

A. Yes.

Schlickman

Q. Now, under the Superfund law, is it your understanding that liability attaches to the manufacturers of hazardous substances?

A. It depends. I mean -- it depends.

Q. In this instance, Monsanto was the manufacturer of Aroclor 1242, correct?

A. Yes.

Q. It was the Aroclor 1242 that contain the PCBs that ultimately made its way into the Fox River, correct?

A. I think that's right.

Q. In this particular situation, during your involvement with the Fox River matters, was Monsanto held liable under CERCLA for its manufacture of Aroclor 1242 to your knowledge?

A. You are asking questions about a body of law that is very complex, evolving, was evolving throughout the time period of this case, and you know, the liability issues, under the Superfund law, under the state statutes, I think principally the Wisconsin Spill Statute, the Natural Resource Damages provisions of Superfund were being

Schlickman

litigated, were evolving and, again, were just very complex.

I -- you need to have a very concrete situation and set of facts before you -- and an understanding of where the law was at that time in order to answer a question you are posing. I can't answer these questions.

Q. I think my second question as a little more specific. So let me try to state it again. During your involvement with the Fox River matters, was Monsanto ever held liable for its manufacture of Aroclor 1242 under CERCLA?

A. I don't know. I mean, I haven't gone back and researched that issue. I don't know.

Q. Well, not --

A. You are talking about the Fox River or just generally?

Q. Talking about the Fox River. I'm talking about the Fox River.

A. I don't believe there has been a court decision holding Monsanto responsible

Schlickman

for PCBs in the Fox River that I'm aware of.

Q. Let's turn to the second page of the confidential settlement agreement. And I'm looking at the first full paragraph on that, in that recital sixth line down. And you will see the term "arising out of or relating to" is used. Do you see that?

A. Yes.

Q. And if you look down to the next paragraph, second line and continuing on to the third line, it also says, "arising out of or relating to." Do you see that?

A. I do see the language.

Q. If you go to internal page 4 of the agreement.

A. Can I just stop -- are you going to ask me some questions about this such that I am going to have to read these entire paragraphs?

Q. No.

A. You are just focusing on some words and moving on?

Q. I am going to ask you about the words I'm focusing on.

Schlickman

A. But the words are in the context of the paragraphs.

Why don't you go ahead and I will listen to the question and see what we need to do.

Q. Page 4, the first whereas clause there, fourth line down, again uses the terms "arising out of or relating to," do you see that?

A. Um-hm. I do.

Q. And then next paragraph, the sixth line down, it -- instead of "arising out of or relating to," it just says "relating to." Do you see that?

A. Where is that, sixth line?

Q. Sixth line down in the second full whereas clause on page 4.

A. OK, I see that.

Q. And then on page 5, paragraph 1, subsection D, the final line on that page says "and relating to" and continues on the top of page 6, but does not appear to say "arising out of or relating to," and my question is, in the course of drafting the

Schlickman

agreement, is there a reason that the parties used "arising out of or relating to" in one instance and just "relating to" in other instances?

A. I don't think so you understand -- I understand your question correctly. I don't think you understand what we were trying to do with the provisions that begin at page 5, beginning with the "now therefore" clause.

Q. OK.

A. Everything preceding the "now therefore" clause was in the nature of descriptive background information that you typically do in recitals.

We intended this agreement to be as broad as possible in terms of the liabilities and issues that would be picked up, both known and unknown, expected, not expected, relating to the sites that were identified in here, the Fox River site and the other sites, and I know that Marina Cliffs is related hereto. But we can set that aside for the minute.

Schlickman

The "relating to" language, I don't know how many places you pointed me out to that, that's descriptive in the sense we were trying to set the context for what's going to be addressed in more specific detail with more precise language and more defined terms which is what we did.

And you focused on the definition of claims and asked me why that language you were quoting was not contained there and, you know, my answer is, the breadth of this agreement is contained in all the provisions that begin at page 5, but in particular, the definition of the Fox River site and other sites, the definition of damages and the definition of claims all read together.

Q. If you go to page 9 of the agreement under subsection F, of paragraph 1, there is "accepted matters," do you see that?

A. Yes.

Q. And then on the second line of that, it uses the phrase "relating to or arising from the release or disposal of hazardous substances."

Schlickman

So if the substantive clauses of this agreement which you have identified as starting at these definitions here, starting on page 5, I'm just wondering why it is inconsistent with the use of the terms "relating to or arising from"? Is there some intent there?

A. Let me read this, excuse me.

Could you repeat your question, I'm not sure how I follow you.

Q. Sure. In just comparing the language, "relating to or arising from" on page 9 in paragraph 1, subsection F, and then it continues, "from the release or disposal of hazardous substances," and there is similar language on the bottom of page 5 and top of page 6, "and relating to the release or disposal of hazardous substances to or at the Fox River sites," I'm asking you whether it was intentional to be inconsistent with the language?

A. No. There was no intention to be -- first of all, I'm not sure I still understand the question. But there was no

Schlickman

intent to put language in this agreement that was inconsistent with other language in this agreement. The intent of this agreement was to very carefully identify the sites, the claims, and the damages or cost in damages that would be covered by this agreement and covered by this sharing arrangement. And we carved out excepted matters and language that I think was appropriate for carving them out.

I guess when you are carving something out, and then -- I'm just confused by why you see any inconsistency here, because first of all, I think you are focusing too much on just individual clauses without looking at their context and I think you're ignoring the overall approach we took in this document in what we were trying to do to effectuate the parties' intention to cover any and all possible claims, known or unknown concerning the Fox River site and other sites.

Q. The reason I'm focused particularly on those two clauses is that, the first part of 1, subsection D, it says, "With the

Schlickman

exception of excepted matters as defined herein, 'claim' or 'claims' mean any and all liabilities, suits, claims, including specifically claims for indemnification arising under the purchase agreement, causes of action or demands of any kind or nature asserted against NCR or API/BAT and relating to the release or disposal of hazardous substances to or at the Fox River sites or future sites," and continues "whether incurred or yet to be incurred, whether presently known or presently unknown, whether developed in the future or now in the existence and based on," and continues from there.

The reason I am focusing on "excepted matters," if excepted matters doesn't fall under claim or claims, I am curious if there was any intent as to why there wasn't parallelism in drafting the "relating to" or "relating to or arising from" language in those two agreements? If it is intentionally and carefully drafted, I am curious why, if there was an intent for

difference?

MR. McATEE: Object to form.

A. Well, I am sorry, I think the document speaks for itself. I can tell you there was no intent to create any inconsistencies in this document and I think the excepted matters provision is fairly clear in what it carves out from claims, damages or group defense costs. I don't know what more I can say.

Q. Would you consider, when using the full "relating to or arising from" as a broader set of language as opposed to simply "relating to"?

A. Is relating to different from "arising from or relating to"? Is that the question?

Q. That's my question, yeah.

A. I'm not sure what the difference is. And as a practical matter, I'm not sure there is a difference.

Q. Could there potentially be a difference?

A. Not that I can think of.

Schlickman

Q. You wouldn't consider, as the drafter of this agreement, that that would -- that the use of the terms "relating to or arising from" as being broader than simply using the term "relating to"?

A. Not really. I mean the only -- I don't see a problem with that. No, I don't see a problem with it.

Q. Turning back to now on page 5, the language "for claims." You may just want to -- it may be easier if you set 5 and 6 next to each other just to read that whole clause.

It says, "Relating to the release or disposal of hazardous substances to or at the Fox River site." Do you see that?

A. So you're actually beginning on the bottom line of page 5?

Q. Correct.

A. "Relating to," the last two words, and switching to the top of page 6, "the release or disposal of hazardous substances to or at future to the Fox River site"?

Q. Yes, "or future sites," that whole

clause there.

A. OK.

Q. Why use the terms just "release or disposal"?

A. Well, you know, consistent with what I have described as the intent of the parties, we were looking for the broadest possible language to cover the claims that NCR, API and BAT may confront in the future concerning the site and the terms "release and disposal," the terms "release" and the term "disposal" are defined extremely broadly in CERCLA, and RCRA. They are defined terms in those two environmental statutes.

And we wanted the concept of claims to be as broad as possible. That's why we used those two words.

Q. Is there a reason why the term "manufacture" was not included in those terms in this clause?

A. Why would we have wanted to include the term "manufacture" in this clause?

Q. That's my question. If there was -- the whereas clauses in the beginning,

setting the context, talk about liability being faced due to the manufacture, and I'm curious why the term "manufacture" wasn't put into this definition of claims?

A. Well, two things. I don't think we ever considered putting the term "manufacture" in here because it wouldn't have made sense, and you're disregarding once again how all the provisions of the settlement agreement hang together, how they're intended to interconnect. You're just taking something out of context here and suggesting something that, in my view, wouldn't have made any sense.

Q. Why wouldn't it have made any sense?

A. Maybe you could tell me why you think it would make sense. I'm just saying, if you look at the way this settlement agreement is structured, if you look at the definition of sites, both the Fox River site and the future sites, if you look at the definition of claims as it's written and if you look at the definition of damages, which

Schlickman

includes costs and damages and the things described there, our view was that those -- especially those three provisions, but that in conjunction with all the other provisions, implemented what the intention of the parties was; to have an agreement that covered any and all possible claims that might come down the road at the Fox River site, including those we didn't know about.

I spent a lot of time describing for you our concerns, that we really didn't understand how the claims would come up and what the nature of those claims would be. So we wanted something that was as expansive as possible. And I think we did that. And we did that in a, I think, a very careful, thorough way.

Having approached it that way, it doesn't make any sense to put the word "manufacture" in the definition of claims.

Q. Part of my question comes from the use of the phrase that we were focused on earlier in the first whereas clause, which we can refer back to, but, to me, the first

Schlickman

recital as we were talking about before, is setting the context, right? And what the parties were facing when they were making this confidential settlement agreement. And that there was potential liability that being -- that was being put forth by the sovereigns as it is defined in the agreement, and that that liability was, as it says in the agreement, allegedly as a result of the manufacture and recycle of carbonless paper. And I'm curious why that same clause doesn't carried through the agreement when it comes to claims?

MR. McATEE: Object to form. I think it has been asked and answered.

A. I don't know if I can -- I am sorry did you --

MR. McATEE: I think I said it has been asked and answered.

A. I was just going to say, I think we have been through this territory couple of times already. Recitals are just background. They set the context. The real operative language begins at page 5. And I tried to

Schlickman

describe to you just a minute ago how we constructed the settlement agreement to be as broad and inclusive as possible of potential liabilities that could come up in connection with the Fox River site or other sites. And how we did it, and how we did it, it just wouldn't make sense to include the word "manufacture" in the definition of claims, and frankly, I don't see any inconsistency with how we did it and just sort of, you know, what we recited as background in the background recitals. It is descriptive language.

Q. With respect to the "release or disposals," you mentioned those are defined terms under CERCLA?

A. Yes. My recollection is --

Q. Release is its own defined term?

A. Release is defined in CERCLA very broadly. CERCLA refers you to RCRA for the definition of disposal, and there, it is defined very broadly.

Q. I believe you're correct. Thank you for adding the precision.

Schlickman

Was there any discussion about including the term "owner/operator" in this clause that I understand is also a defined term under CERCLA?

A. No.

Q. No discussion about that?

A. No.

Q. Any discussion about using some terms to capture a potential arranger liability under CERCLA if -- in addition to the words "release or disposal"?

A. I think arranger liability was captured in this and I think owner and operator -- to the extent you are suggesting that those categories were not captured in the settlement agreement, I disagree with you.

Q. Can you describe for me the basis of your disagreement?

A. Yeah, the three -- the things I have described over the last 15 or 20 minutes were easily broad enough to encompass all those. Liability as an owner, liability as an operator, liability as an arranger.

Schlickman

Q. Rather than leaving it up as a matter of interpretation, why would you just not include those additional terms of owner operator or arranger liability in the term? Was there any discussion about that?

A. It is not a matter of interpretation. The language, as we drafted it, as I have described, clearly encompasses those liabilities. That is not an interpretative question. It is within the four corners of the language of this, of the operative terms of the agreement as I have described it.

Q. Though it doesn't say explicitly "arranger liability," correct? Those terms aren't used, right?

A. I don't recall the word "arranger" being used in this agreement, but it didn't need to be to accomplish what we were trying to do.

Q. And the term "owner/operator" is not included in this section of the agreement either, is it?

A. I don't recall. I haven't done a

Schlickman

word check of this to see if those may be in there somewhere. I don't recall them being the case, but I'm also very comfortable about that they didn't need to be in there to accomplish what you are suggesting.

Q. In this definition of claims as well, was there specific language that was intended to cover NCR's manufacture of the emulsion that was used in the carbonless copy paper?

A. You know I hate to say this, you keep asking questions that disregard my answers before, which is that you have to look at the entire structure of this agreement to understand and appreciate how it worked and how it captured this broad array of known and unknown liabilities out there.

Some of these questions, I am sorry, just don't make sense to me because they're being asked out of context and in disregard of the other important features of this agreement.

Q. One of the things that you had mentioned in our discussion earlier was the

Schlickman

focus on discharge and was the use of the terms "release or disposal" that the parties were -- had agreed upon here tied in any way to that focus on discharge?

MR. McATEE: Are you talking about raising in the concept of discharge with the FRG group? Is that what you are referring to?

MR. HUTTENLOCHER: That's right.

A. I'm not sure that helps me at all, that clarification. Could you ask the question again? Maybe incorporating his clarification and see if that --

Q. Sure, so we had spoken earlier that during discussions with the FRG group, that API and NCR were concentrating on, focusing that discussion on discharge when trying to come to the interim funding agreement, right? We had that discussion earlier?

A. Yes.

Q. And I am phrasing it accurately, right?

A. You are paraphrasing it in a matter that I think is fairly consistent with what

Schlickman

we discussed before. We spent a lot more time talking about it before.

Q. And my question is, did that, those discussions with the FRG inform the choice of using the words "release or disposal" which would cover, it appears, discharges?

A. Well, you know, all I can say is -- you asked did they inform. I'm not sure what you mean by that. I know what that concept generally means.

I think the only way I can answer your question is that there were a number of ways in which liability could arise. There were a number of factors that could be taken into account in determining liabilities and shares in litigation. And we structured this agreement, all the various provisions, to try to encompass all of those possible avenues of liability and allocation.

And in the context of the definition of claim, which is only one part of a number of parts that make this agreement work, we wanted to use the broadest possible concepts possible. That was release and

Schlickman

discharge or disposal, I'm sorry. I think the definitions of release or disposal would encompass a discharge. If by discharge, you mean a PCB being released from a pipe somewhere, that is probably, I'm certain, a discharge or disposal under any one of these definitions.

But did our discussion with the FRG inform or have some bearing on our decision to use these two? That was not the case. That -- our objective was to try to encompass, through all of this language, not just this definition, but the way it all hangs together, all possible liabilities and issues relating to allocation.

Q. Could you turn to page 7 of the document in front of you, with particular attention to E, subsection 1 of that agreement.

A. Yes.

Q. And do you see that on that, there is that term "out-of-pocket" used?

A. Yes.

Q. Was the use of the term

Schlickman

"out-of-pocket" consistent with the use of out-of-pocket that we talked about earlier in summing up the mediation session?

A. If you mean by that, the term out-of-pocket was in the transcript --

Q. That's exactly what I mean, yes.

A. -- of the narrative and I think that was intended to serve a similar if not the same function here at this point of the agreement.

Q. So the term as used here, is it your recollection that the intent was to exclude from damages any internal NCR costs that it could contribute or attempt to claim -- consistent with what was said during the mediation?

A. Well, like I said before, I wasn't sure who raised that issue, but I think the idea was sort of twofold on out-of-pocket and what was discussed was that it shouldn't include internal costs of either company, not just NCR.

A second thing that wasn't discussed but I really think was obvious to

Schlickman

everybody was we were talking about here was a concept that, you know, for lack of a better term involved a cash outlay of money, as opposed to some sort of uncertain obligation that hadn't yet ripened into an obligation to pay money. That's what those words mean. That's pretty common understanding. So that's what we were trying to -- that's how we were trying to use it here.

Q. If you turn to page 14 of the agreement for me, and I just have a question about a difference between paragraph 3 and paragraph 4A. If you want to take a moment to review those paragraphs.

A. OK. You are looking at 3 and 4A?

Q. Yes. Have you read those clauses?

A. I just did.

Q. OK. Great. I'm looking with my attention to the fourth line of paragraph 3, which says, "all damages or group defense costs," and 4A, fourth line down, "between them, all claims damages or defense costs."

I was wondering if you recall

Schlickman

whether there was any discussion about why "claims" is not listed in the initial allocation, paragraph?

A. OK. I see the difference or the see the fact that "claims" does not exist in one but exists in the other, but damages includes, the definition of damages includes claims. So I'm not sure it makes any difference.

Q. So would the use of "claims" in paragraph 4A be superfluous?

A. No, I wouldn't call it superfluous, but maybe not necessary. I'm not sure why that is.

Q. Do you recall any discussion about it?

A. I don't recall anybody raising it.

Q. And sitting here today, do you think it has any significance?

A. No.

Q. Why not?

A. For the reason I just stated before.

Q. OK. And that's because you believe

Schlickman

it is incorporated in the definition of damages?

A. Yes. Among other things. I haven't had a chance to sit through and parse through all the language in this agreement. I read it in advance of the deposition. But I haven't read it with the focus of that particular issue in mind and there may be other reasons I could give you if I did that to explain that, but I think that by itself is probably sufficient.

Q. Maybe we could tag an "among other things" like we would in drafting a brief that would incorporate --

A. I guess I'm not a big fan of that clause.

Q. OK. So now on page 15 of the agreement and with focus on paragraph 5, if you want to take a minute to review the paragraph and then we can talk about it.

A. OK.

Q. Do you recall who had the idea for including this paragraph in the agreement?

A. You know, I don't have a specific

Schlickman

recollection, but I think this was inserted in lieu of the escrow provisions that we had included in the first draft was my understanding and recollection that the Appleton side, the Appleton/BAT side did not like that approach, I think as we talked before, it was viewed as being a little too bureaucratic.

Exactly how we arrived at this approach, I don't recall right now. I suspect some of this came from the Appleton side.

Q. Do you recall any specific discussions with anyone from the Appleton side about this provision?

A. The only thing I recall about this is fairly general, is again, it gets to the idea it was too bureaucratic, they wanted some mechanism that was less formal, you know, we're business people, we can work together, that type of sentiment. And that apparently led to this language.

Q. And what was your understanding of the role of the parties as respective

Schlickman

authorization administrators?

A. I don't understand that question.

Q. Sure. If you look in paragraph 5, it defines the term "authorization administrator"?

A. Yes.

Q. And I'm curious as to whether there was any discussions apart from the language here, about how the authorization administrator process would work between the parties?

A. Well, I mentioned before, the intent was to try to come up with something more informal than the escrow procedure which we had proposed which we thought had a lot of merits to it.

I think -- I don't recall much discussion about this. I think the view was some person at each company that had authority would, you know, review what needed to be reviewed and take it from there.

Q. Was there any discussion about what they would be using as a basis for their review, whether it be invoices or anything of

Schlickman

the like? Do you recall anything like that?

A. There was no discussion I recall of anything like that. I can only say that it was, you know, we had proposed a more formal mechanism, they had rejected it, and this was supposed to be less formal.

Q. Just to make sure I'm clear on your answer, you don't recall there being any discussions whatsoever? Or you don't recall whether or not you spoke about this with somebody from the other side -- from API or BAT?

A. I don't recall any discussions about this whatsoever, about the specific issue you asked of, you know, discussions about payment procedures and level of review and stuff. I recall nothing about that.

Q. OK.

A. I think I'm fairly certain there wasn't.

Q. Is it possible that somebody on your team could have had communications with API/BAT about that same issue?

A. If somebody had felt strongly

Schlickman

enough about that and there had been discussions, I imagine there would have been some language in there. This was intended not to be that formal.

Q. Can you please turn to page 19 of the agreement. This discusses the dispute resolution procedures of the agreement. And it continues on to page 20. You can just take a moment to review that paragraph, both A and B.

A. OK.

Q. Do you recall how -- if any discussions were had concerning this dispute resolution clause that was put in the settlement agreement between NCR on the one hand and API/BAT on the other?

A. Can you read that back.

(Record read)

A. I don't recall any specific discussions about this.

Q. Do you recall which of the two parties put this clause in the agreement or the first draft of this clause in the agreement?

Schlickman

A. Well, I know it is in that pile there. I have some --

Q. You can refer to the pile.

A. I have some recollection it may be in one of the first drafts because I think this was separate from the escrow provision. Can I check that?

Q. Absolutely.

A. Yes. It was in the initial draft. It appears identical except in paragraph B, in the original draft, the one that's in Exhibit 19, there is still a reference to the API/BAT escrow account, and in paragraph B of Exhibit 26, which we are looking at right now, there is not a reference to the escrow account; otherwise, it appears to be same provisions.

I, you know, I don't recall specific discussions about this, other than that -- I seem to think that Hoak and Karch at one point thought this was sort of a good approach. Again, that wasn't too bureaucratic. The one thing I learned about working with Paul Karch and Jon Hoak, they

Schlickman

didn't want to bundle this agreement up with a lot of procedural stuff, that they felt confident as business people and as respectable companies they should be able to work through issues.

And that was sort of the tone of -- that's why I think the escrow came out and that's why we had this form of -- this approach, I guess to dispute resolution.

Q. And I note, just in reviewing the clause, that if there is a dispute concerning something that would be covered under the CSA, that you would have a few different levels of raising the dispute before you get to an arbitration, is that correct?

MR. McATEE: Object to form.

A. Well, I would have to read this again.

I think there were a couple of levels and then you get to mediation. And then if mediation wasn't successful, you took funding issues to an arbitration.

Q. And is it your recollection that the discussions that you had been a party to

Schlickman

between Mr. Hoak and Mr. Karch was that this was to get the parties to work together to resolve their disputes before it escalated to either a mediation or an arbitration?

A. Yeah, generally speaking, that was the intent.

Q. Was it also the intent that prior to any dispute being raised in an arbitration, that all of these steps would be taken to resolve any potential disputes between the parties?

A. I'm not sure I understand that question. What do you mean by a dispute?

Q. Yeah, so for instance, the parties initially may not be able to -- the authorization administrators, for instance, weren't able to come to an agreement on what portion of the particular invoice is covered by the confidential settlement agreement. And they have noticed a dispute between the two of them, and then raise it through these different steps under section 10 of the agreement. Was it -- was there any discussions that you recall emphasizing the

Schlickman

importance of going through these steps in order to resolve the dispute as business folks?

MR. McATEE: Object to form.

A. You know, "dispute" can encompass a number of things. We were trying to use this in a broad sense, not a technical sense. And the objective here was to give the business people an opportunity to address problems before they became big problems.

And it was within that spirit that I believe this was drafted. I don't -- I -- my view as the drafter of the agreement was that it was just to serve as an opportunity for the business people together, get together and talk about these problems, you know. If an issue came up, we would talk about it. And if a, you know, if that issue couldn't get resolved after having gone through this process and if something similar came up soon thereafter, would they have to go through that whole process again? I don't think so. I don't think that was the intent.

I think if a dispute had been

Schlickman

identified, if it had gone through this process, it was ripe for mediation and things related to that that were similar to it. I mean, it is sort of a dispute and sort of a broader sense and a technical sense which I think reflected what the general counsel Paul Karch and Joan Hoak were trying to get at.

My sense was the whole reason they didn't want the escrow provision was because of sort of the level of detail and prescriptive nature of having to do that stuff, you would have to write up an escrow agreement together and write up all the fairly precise procedures and stuff like that and they wanted more casual, informal approach to dealing with issues under this agreement.

Q. Was there any discussion between the parties concerning whether there was a way to kind of short-circuit the various steps before you get to a mediation or an arbitration?

MR. McATEE: Object to form.

A. I don't recall those discussions,

any such discussions. And I don't know what you mean by short-circuit either, by the way.

Q. So for instance, there appears to be in section 10, four different steps that need to be reached or three different steps that need to be reached before you reached an arbitration. There would be the parties submitting the issue for resolution to their respective general counsel; two, the parties submit the issue for resolution to respective chiefs of financial officers who will also negotiate in good faith to resolve the matter. If that doesn't solve the matter, then the parties shall participate in a nonbinding mediation before a mediator jointly agreed upon by the parties, and then should the dispute not be resolved or issued between the parties not be resolved, then they would resort to an arbitration.

My question is whether there was any discussions about including something in the agreement that says you can skip a couple of steps in that process?

A. Well, you know, two things. One of

Schlickman

the problems I have with this whole line of questioning, we talk about dispute in the abstract and disputes usually involve a number of interrelated issues and stuff like that.

So without having a concrete situation in front of me, it is hard to answer these questions.

But as to your second point or as to your point here, I don't think there was anything preventing the parties from agreeing to skip some steps. I don't -- you know, if the general counselors were of the view that it didn't really make sense taking it to their chief financial officers, they had to go right to mediation or skip mediation, go right to arbitration, I don't see anything in here that would prevent them from doing that if they agreed to do that.

Q. If you could please turn to page 22 in the agreement. I'm looking at paragraph 13. Before we were looking at the document itself, we had a discussion about the joint and several liability of API and BAT and I

just want to confirm that this is the paragraph reflecting those discussions that the parties all agreed to?

A. Yeah, the first sentence of that paragraph reflects, yeah, what NCR insisted upon and the parties agreed to.

MR. McATEE: Do you need a break?

THE WITNESS: It probably would be good actually.

MR. HUTTENLOCHER: It works.

THE WITNESS: I don't know how long we have been going.

MR. HUTTENLOCHER: About an hour.

THE VIDEOGRAPHER: Off the record at 2:01 p.m. This is the end of disk 4 in the deposition of Andrew Schlickman.

(Recess)

THE VIDEOGRAPHER: Going back on the record at 2:15 p.m. This is the beginning of disk 5 in the deposition of Andrew Schlickman.

Q. Mr. Schlickman, you have in front of you what has been marked as Hoak Exhibit 26. Correct?

Schlickman

A. I still do, yes.

Q. And that is the final executed copy of, among other things, the confidential settlement agreement from 1998, correct?

A. That's right.

Q. Could you pull the first draft off of your pile for me. I want to compare two clauses from the beginning -- from the first draft to the last draft.

A. So you are referring to Exhibit 19, Hoak Exhibit 19?

Q. Yes, sir.

A. Hold on. OK.

Q. And I'm looking at, in the first draft, which is page 9, continuing on to page 10, the definitions of Fox River sites and future sites.

A. OK.

Q. And in the final draft, I'm looking at pages 10 and 11 of that document which is NCR-ARB 9329 and 9330.

Now, in the final agreement, for the definitions of both Fox River sites and future sites, there is language that says

Schlickman

alleged -- I'm reading now from the final agreement, page 10, at the bottom of that agreement, where it starts, "alleged to be contaminated." Do you see where I am?

A. So this is the final agreement page 10, really fourth line from the bottom?

Q. Yes, sir.

A. The end of that fourth line and continuing on?

Q. That's correct.

A. OK.

Q. And the clause there says, "alleged to be contaminated with hazardous substances as a result, in whole or in part of the manufacture, recycling, deinking or repulping of any amount of PCB-containing NCR paper brand carbonless paper that was manufactured utilizing the assets that were the subject of the purchase agreement."

Do you see that clause?

A. I do.

Q. And could you please turn back to the first draft which is on your left hand, bottom of page 9 of that agreement, which is

Schlickman

NCR-ARB 7890, going to the next page, 7891, and you would agree with me that the language that I have read with respect to Fox River sites does not appear in the first draft, but appears in the final draft?

A. Well, the clause that you read that's in the final draft, which really is the last clause of paragraph H, does not appear in what is paragraph H of Exhibit 19.

Q. OK. I just wanted --

A. Does that answer your question?

Q. I just wanted to confirm that we are on the same page; that the clause appears in the final and doesn't appear in the original? I don't claim to be on the same page with respect to other issues, I'm hoping this one we are.

A. I don't think I need to testify to that. It is apparent from comparing the two drafts.

Q. Now if you look at the comparing of the two drafts of future sites, page 10 in the original and page 11 in the final, and in the final draft, there is a clause starting

on the second line that says, "alleged to be contaminated with hazardous substances as a result, in whole or in part, of the manufacture, recycling, deinking or repulping of any amount of PCB-containing NCR paper brand carbonless paper that was manufactured utilizing the assets that were subject to the purchase agreement."

A. I lost where you are, final draft?

Q. Final draft, page 11.

A. I was on page 12, sorry about that.

Q. Sorry about that.

A. What is it you were referring to?

Q. The clause starting -- looking at subparagraph I, the definition of future sites in the final on page 11 of that agreement?

A. Um-hm.

Q. Do you see where I read, and I won't read it again into the record, but the part of that paragraph starting with "alleged to be"?

A. I see that.

Q. And when you comparing it to the

Schlickman

language in future sites, in the original on page 10, there seems to be some edits to the language between the first draft and the final draft, would you agree with that?

A. Well, there is some differences.

Q. Would you agree for the most part other than some edits maybe on the margins, that the language is substantially similar between the original draft of future sites in the first draft as opposed to the final draft?

A. I -- there are differences and the differences are clearly set forth here. I wouldn't characterize them like that.

Q. Now, the first draft I have handed you, which is, I believe, under your left hand, dated April 23, 1998, correct?

A. That's correct.

Q. I am going to hand you a document that has been previously marked as Hoak Exhibit 20.

MR. McATEE: Are you now comparing three different drafts or are you done --

Q. No. So what we will do is you can

Schlickman

set aside the final draft and look at the first draft. I would like to compare the first draft to this next draft.

A. We are going to be looking at the same general provisions?

Q. Yes.

A. Fox River sites and future sites?

Q. Um-hm.

A. What pages do you want me to look at in Exhibit 20?

Q. In Exhibit 20, if you could please look at page 10 of that agreement which is Bates labeled NCR-ARB -- excuse me, which is Bates labeled NCR 7989 and I -- it does not appear to be an internal pagination on the draft --

A. This is Exhibit 0?

Q. Yes.

A. And what --

Q. I am sorry, I am looking at the black line that's attached to this to hopefully help us along in comparing the language which is NCR-ARB 7989, looking at the Bates numbers.

Schlickman

A. 7989?

Q. Yes, sir. Ready?

A. I'm at page 7989.

Q. Now, if you look at the definition of Fox River sites. Would you agree with me that the language along the lines of "alleged to be contaminated with hazardous substances," and it goes on. We looked at that clause and the final is not included in the definition of "Fox River sites" in subparagraph H there?

A. I am confused here. I thought you said a minute ago we are not looking at the final draft. We are looking at the other two drafts. Are we comparing Exhibit 20 now to the final draft is that what you are asking me?

Q. Let's do it this way, let's do it this way. Would you agree with me that the definition in the first draft for Fox River sites, subparagraph H is the same in the first draft as the following draft that I have handed you?

A. OK, so just to be clear, in Exhibit

Schlickman

19, at page 9 of the draft and it has the Bates number 7890, I just referred the paragraph H that begins at the bottom two lines and continues to the top of the next page. I compared that to paragraph H which is in Exhibit 20 at Bates page 7989, those are the two?

Q. Yes, sir.

A. They appear to be the same.

Q. And can you identify any differences with respect to the subparagraph I of both agreements?

MR. McATEE: The same two drafts that you just asked him about?

MR. HUTTENLOCHER: Yes, sir.

A. OK, I've compared the two. There are some differences.

Q. OK, and what are the differences you have been able to identify?

A. Well, again, I mean, anybody who compares the two paragraphs can tell that there is the, in Exhibit I, there is the underscored language "property or area."

And then, I want to make sure I get

Schlickman

this right, so there is -- language in Exhibit 20 does not appear in Exhibit 19, that begins after the word, second -- let me make sure I have got this right, after the word "repulping," the language "of any amount, of PCB containing," I guess has been added, and then towards the end, after the word "manufactured," the language "utilizing the assets that were the subject of the purchase agreement" has been added in lieu of the three or four words that existed in the prior draft.

Did I get it right?

Q. I think so. So just to confirm between the first draft and the draft that's reflected in Exhibit 20, after the word "repulping," the original draft says "repulping of NCR carbonless paper that was manufactured with PCB-containing coatings" and that same language after "repulping" was rephrased to say "of any amount of PCB-containing NCR carbonless paper that was manufactured utilizing the assets that were the subject of the purchase agreement"?

Schlickman

A. Well, you went too fast for me there.

But I, I don't want to -- I identified what I saw were the differences. They're as clear as black and white here.

Q. OK. Now, with respect to I, so that we can put the future sites part to bed, could you please put the final draft in front of you as well as Exhibit 20.

A. So we are looking at Exhibit 20 and Exhibit 26?

Q. Yes, sir.

A. I am supposed to what, in 26 now, turn back to --

Q. Page 11, please.

A. All right, so we are looking at paragraph I in both cases?

Q. Yes, sir.

When I review the two clauses, it appears that the only other change that was made potentially in subsequent drafts was the insertion of the words "paper brand" between "NCR" and "carbonless" on the third from the bottom line of I in Exhibit 26, and from the

Schlickman

third from the bottom line continuing on to the second from the bottom line in Exhibit 20?

A. Sorry, you lost me there.

Q. OK. Let's look at Exhibit 26?

A. I'm looking. OK. Exhibit 26 is the final draft. So bear with me a second.

Q. Sure.

A. So what were you -- I'm not tracking you here. I've got both paragraphs in front of me. Let's be a little more precise.

Q. So in comparing the two paragraphs, there is the phrase "any amount of PCB containing" --

A. OK, in which draft and in which line?

Q. OK. Let's look at the final draft.

A. So we are focusing on the final draft right now?

Q. Yes, sir. Fifth line of the final draft, the first words to the left of that line begin "any amount of PCB-containing..." Do you see that?

Schlickman

A. I do see that.

Q. And it continues, "NCR paper brand carbonless paper," do you see that?

A. Yes.

Q. Now, looking at the draft, which is Exhibit 20, fourth line down in the definition of future sites.

A. Um-hm.

Q. Beginning again "Any amount"?

A. Yeah.

Q. "Any amount of PCB-containing NCR," and that draft continues, "carbonless paper" while the final draft has the term "paper brand carbonless paper." Do you see that?

A. I do see that.

Q. And other than that change, would you agree with me that the clauses are identical?

A. Paragraphs or the clauses?

Q. The paragraphs.

A. The only other thing I notice is that in the second line of the final -- well, what is this? Is this the final? Second line of Exhibit 26, the word "location" has

Schlickman

been inserted whereas "area" was there before.

Q. OK.

MR. McATEE: And the words "other than the Fox River sites" is also different.

Q. OK.

A. Thanks, yes.

Q. Now, do you recall any discussion between yourself and any individuals from API about the changes that were made from -- in these drafts to phrase it the way that it was ultimately phrased?

A. I don't recall any such discussions.

Q. You don't recall any discussions with Mr. Russell or Mr. Bourque concerning this particular paragraph?

A. I don't.

MR. McATEE: Are you done with these three or are we going to try four at once?

MR. HUTTENLOCHER: I don't think we are going to go for four at once. Just

Schlickman

give me a second.

Q. I am going to hand you a copy of what has been previously marked as Hoak Exhibit 22. Let me -- if you could have the Hoak 22 and the final draft out in front of you.

MR. McATEE: Which is 26?

Q. Which is 26. And just so I can identify it for the record, Hoak 22 is a multipage document bearing Bates numbers API-ARB 6853 through 6879.

Mr. Schlickman, do you recognize Hoak 22?

A. Well, it appears to be a -- first page is a fax sheet on Sidley & Austin letterhead indicating I'm the transmitter, Bill Russell is the recipient, and the second page and remaining pages appear to be a draft of the confidential settlement agreement and there is a handwritten note says it is draft August 26, '98.

Q. Now, I note that there is some, appears to be some highlighting and insertions in the document. Is that what

Schlickman

would be commonly referred to as a black-line or red-line?

A. Hold on a second.

Well, I think I referred to these as a Compare-Write version. But it is a version that's apparently -- electronically shows the differences between this and some other version. I'm not sure which one it is.

Q. Now, if you could compare paragraph H, the definition of "Fox River sites" in Exhibit 26 on page 10 of that agreement with the definition of "Fox River sites," paragraph H in paragraph 11 of Exhibit Hoak 22 on page 11 of that agreement, also Bates numbered 6863?

A. Well, I can tell they're different. I can tell the language in paragraph H of the final version is somewhat longer.

Do you want me to go through and mentally do a comparison of these two? What you do you want me to do?

Q. No, my question is a little bit more specific.

In the draft that is marked Hoak

Schlickman

22, which is the Compare-Write version on the left hand, lacks the language that's included in the final agreement that starts, under your right hand from the fourth line up, "alleged to be contaminated with hazardous substances," and it continues from there?

A. I lost you there. Again, what are you saying there?

Q. Sure. Just want to confirm that the language that is under your left hand in paragraph H, the definition of Fox River sites --

A. So which version, the final version or --

Q. We are looking at the Compare-Write version.

A. OK.

Q. Paragraph H, the definition of "Fox River sites"?

A. Yes.

Q. And we are looking in the final version, page 10, definition of Fox River sites and particularly pointing your attention to the fourth line up from the

Schlickman

bottom where it starts, "alleged to be contaminated."

A. OK, so you're talking about the clause that begins after the semicolon, four lines from the bottom of the page and starts "alleged to be contaminated"?

Q. Yes, sir.

A. And your question is?

Q. That language in the final does not appear in the draft that is Exhibit Hoak 22. You would agree with that, correct?

A. That appears to be the case.

Q. I am going to hand you a document previously marked as Hoak Exhibit 23. If you can keep final draft, Hoak Exhibit 26 in front of you, and set aside the prior draft, Hoak Exhibit 22.

For the record, Hoak 23 is a document bearing Bates numbers API-ARB 9925 through 9991. The cover sheet is a telecopier multiple transition form?

A. The copy I have goes through 9992, not 9991.

Q. Excuse me, it is 9992. Thank you,

Schlickman

sir.

And the front page of Exhibit 23 is a telecopier multiple transition form from Sidley's Pam Hanebutt to Paul Samson of NCR, Ben Mieliulis of Appleton, Paul Karch of Appleton, Jon Hoak of NCR, Mark Kingseed of NCR, and Robert Bourque of Simpson, Thacher & Bartlett.

Sir, do you recognize this document? Or collection of documents?

A. Let me look through it for a minute. I recognize the form of the cover sheet. We used that at that time.

There are a number of -- maybe you can help me short-circuit this. There are a number of documents attached to this faxed sheet and I'm looking through it to see what's in here.

Are we focusing just on the confidential settlement agreement or any other attachments?

Q. Confidential settlement agreement, before you turn to that --

A. There is a lot in here.

Schlickman

Q. Understood. Just looking back at the second page of the multipage document, there is a memorandum there?

A. The one dated November 16.

Q. Dated November 16 from Pamela R. Hanebutt to Jon Hoak, Robert Karch, Robert Bourque and ccs listed at the bottom and you're one of those ccs, correct?

A. Yes, I am.

Q. And the first sentence of the memorandum says, "Enclosed is a final executable copy of the confidential settlement agreement, the subsequent arbitration allocation agreement, and the joint insurance recovery agreement."

Do you see that?

A. That's the first sentence, I see that.

Q. And is that consistent with your recollection that the parties at least believed they had an final, executable copy of the confidential settlement agreement as of November 16, 1998?

A. My recollection -- I don't recall

Schlickman

the specific dates, but I recall at some time, several months after the mediation but in 1998, we thought we had agreed on the language of all the agreements. And then we sent them out requesting signature. This appears to be that, although I don't have any independent recollection that that was the date.

Q. And in that same -- behind that memorandum, if you flip to the next page, it's a draft of the confidential settlement agreement, correct?

A. Well, it nowhere says draft in it, but it is a version of the confidential settlement agreement. It says confidential settlement agreement right at the very top.

Q. Could you please turn to page 10 of that agreement which is the, looking particularly to the Fox River sites definition which is subparagraph H of paragraph 1.

A. At page 9936?

Q. Yes, sir.

A. And continuing over to the next

Schlickman

page.

Q. Yes, sir.

A. So focusing on the Fox River sites now?

Q. Correct. Now, if you review subparagraph H of Exhibit 23, you will see that four lines from the bottom of that agreement, of that clause, of that paragraph, it states, "alleged to be contaminated with hazardous substances as a result, in whole or in part, of the manufacture, recycling, deinking or repulping of any amount of PCB-containing NCR paper brand carbonless paper that was manufactured utilizing the assets that were the subject of the purchase agreement." Do you see that, sir?

A. Yes, I do see that.

Q. Now, from the prior draft that we have been reviewing of paragraph 1, subparagraph H, would you agree with me that this is the first time that that language appears in that definition of the Fox River sites?

A. Well, I don't know if these are all

Schlickman

the drafts that were generated, but -- of what you have shown me today, it seems to me this is a -- and other than the final draft which is Exhibit 26, this does appear to be the first draft we have looked at today that has that language.

Q. Now, do you recall any discussions with API or anyone from BAT, Simpson Thacher, concerning the assertion of that language in definition paragraph 1, subparagraph H, the definition for Fox River sites?

A. That language, "being alleged to"?

Q. That's correct.

A. I don't have any recollection of any discussions about that with one exception and I don't know, you know, the NCR paper brand language that was added in -- I remember at one point and I'm not sure when, but somebody I think at Appleton made the point that that was sort of the official branded name of the paper, and if we are going to refer to NCR carbonless paper, we ought to make sure it is another paper brand carbonless paper, apparently that was a

Schlickman

terminology that was important to somebody and that is all I recall.

Q. Do you have any recollection whatsoever of who asked that that language be inserted in the agreement?

A. Sitting here right now and just looking at that language, I don't have a recollection of how that got in there.

Q. Any -- no recollection of any phone calls between you and Mr. Russell about inserting that language, anything?

A. No, no recollection of any discussions with anybody on the other side concerning that language.

Q. Do you remember remarking at all that this was new language in the agreement at this stage of it being close to final executable?

A. Could you read that back.

(Record read)

A. I'm not sure I quite understand that question.

Q. Just -- in seeing that this language here has made it into the Fox River

Schlickman

sites definition, is there -- do you have any recollection at all of it being something that caught your attention or that you discussed with anybody at API or BAT or anything at all or it just is in the agreement?

A. I've just told you I don't have any recollection of discussing this with anyone or the -- sitting here right now, just focusing on this language and not looking at all the drafting here and trying to peace all this together, which would take a considerable amount of time, I just don't recall, you know, how that got in or why it was added. I suspect there was good reason, but I don't recall here sitting here right now.

Q. And the date of this agreement was -- the date of this draft, excuse me, that was submitted again was November 16, 1998, correct?

A. Well, that is the date of the cover memo and that appears to be the fax -- the date on the fax legend at the top of the

Schlickman

various pages.

Q. And the final draft, Hoak 26, the cover letter there is dated July 28, 1999, correct?

A. That's correct.

Q. Do you have a recollection of why there was a time lag between this draft which Ms. Hanebutt enclosed and stated was a final, executable copy to it not being finally executed until July of 1999?

A. Well, I can't speak with reference to Exhibit 23 precisely. But I do recall that one point, there was a significant amount of time before we finished the document as reflected in Exhibit 26 in which the whole process was held up because of the position Simpson Thacher was taking on behalf of BAT concerning what I will refer to as sort of the consent to jurisdiction provision.

Q. Were there any other reasons for the delay other than the consent to jurisdiction provision that you can recall?

A. I don't recall. The only thing I

Schlickman

recall sitting here right now was that -- what I just mentioned. There may have been others, but I don't recall. It was clearly a very big issue for them.

Q. Understood. Sir, I recall earlier that you had stated that you had attended, at least in part, the 2005 subsequent allocation arbitration between NCR and API. Am I remembering that testimony correctly?

A. Yes.

Q. Do you remember how many days you attended the arbitration?

A. I was there one day, my recollection is I was only there for part of that one day, not the entire day.

Q. Do you recall why you attended that day?

A. I recall an issue had come up in the arbitration that Lee Freeman and his team thought that I might have some input on.

Q. Do you recall what the issue was?

A. No.

Q. No?

A. No. I don't. Let me think here

Schlickman

for a moment. I don't -- I would have to think about it, but sitting here right now, I just don't recall the specifics of it.

Q. Sir, did you have any involvement in the creation of Fox River Remediation LLC?

A. What precisely do you mean in the creation of it? In the drafting of the document? There is a lot of things that went into it.

Q. Were you involved in the negotiations between API and NCR with respect to how the LLC would be formed?

A. Again, I'm not sure exactly what you mean by how the LLC -- I'm not trying to trick you here. I don't understand what you mean how the LLC would be formed.

Q. Were you involved in any discussions between NCR and API to -- in which the discussion was why it was necessary or why it was desirable to form the Fox River Remediation LLC?

A. I was involved in some discussions along those lines.

Q. And what were those discussions?

Schlickman

What was said between the parties that you remember?

A. Well, I don't recall anything about the particulars of the discussions. I don't recall who was involved, when they occurred, where they occurred.

But I do recall, what I do recall is that there was a feeling among the Appleton/NCR team, a belief that -- keep in mind, there was an effort to try to settle the case going on at that point in time with other PRPs and we were hopeful that that settlement would reach fruition and I think the sense was if we created an LLC and structured the agreements of the LLC correctly, we would have a vehicle that would allow NCR and Appleton to undertake the remediation work, we would have a vehicle that would reflect the sharing arrangement, the sharing percentages that were in effect at that time 40/60, and that that vehicle would permit us to add other parties into the remediation effort in a relatively -- what's the right word? Relatively straightforward

way, that we wouldn't have to rework the whole structure to accommodate settling parties.

I do think there was the usual concern about contracting with contractors at a site like this. A LLC would provide a, hopefully some level of liability protection to the companies that were members of the LLC.

Q. In your experience with Superfund clean-ups, is it common for PRPs to develop something like a similar LLC to the Fox River LLC to perform some of the same functions with respect to clean-up?

A. I don't think it's unusual. I think it has been done before and maybe many times before.

Q. Is there anything in forming an LLC like the Fox River Group LLC and performing remediation efforts that should be construed as an admission of CERCLA liability for the clean-up?

A. Could you read that back.

(Record read)

Schlickman

A. I really don't understand that question.

Q. My understanding -- and my please correct me if I am incorrect -- is that a potentially responsible party that participates in and pays for potential clean-up or pays for a clean-up and remediation costs for a Superfund site, that the act of doing that is not an admission of liability by that party, that they are liable under CERCLA?

A. You know, I don't know if I can answer that. I'm sorry. I think the issue of liability turns on a number of factors and I don't think you would necessarily exclude that.

Q. So you would consider the participation in the clean-up efforts as a positive or a negative factor in determining whether a party should be held liable under CERCLA?

A. You know, it -- I don't think I could answer any more than what I just said a minute ago.

Schlickman

MR. HUTTENLOCHER: Do you mind if we take a short break? I think we have one or two documents left. I can organize myself and hopefully get you out of here.

THE WITNESS: That would be great.

THE VIDEOGRAPHER: Off the record, at 3 p.m. This the end of disk 5 in the deposition of Andrew Schlickman.

(Recess)

THE VIDEOGRAPHER: Going back on the record at 3:18 p.m. This is tape 6 in the deposition of Andrew Schlickman.

Q. Mr. Schlickman, I am marking a document with the court reporter here which will be marked as Schlickman 3.

(Exhibit 3, document entitled Decision and Order Dismissing Plaintiff's Claims for Contribution marked for identification, as of this date.)

Q. Schlickman 3 is a document captioned Appleton Papers Inc. and NCR Corp. v. George A. Whiting Paper Company, et al., case number 08C-16, titled "Decision and

Schlickman

Order Dismissing Plaintiff's Claim for Contribution," so ordered December 16, 2009, by William C Griesbach, United States District Judge, United States District Court of the Eastern District of Wisconsin.

Do you recognize the document, sir? Take some time to review it and just let me know when you're ready.

A. Yes, I remember seeing this document before.

Q. What do you remember the document to say, to order, just generally?

A. I remember it was Judge Griesbach's decision and order dismissing plaintiff's claims for contribution. I recall that he entered -- he made such a decision and entered such an order in late 2009. This document reflects it was filed December 16, 2009. That's what I recall.

Q. Did you represent NCR Corporation in filing a notice of appearance to the best of your recollection in this matter?

A. Well, I filed an appearance when the complaint was filed which I believe was

Schlickman

in January of 2008. I think I testified before that I started my transition April 1 of 2009, and there was some internal transitions going on even before that time.

I believe technically, my appearance was still on file as of December 16, 2009, but I was not actively involved in the litigation at that point.

Q. To who, to what counsel was the matter transferred, first internally and then you mentioned another transfer?

A. Well, really it wasn't transferred. Let's see. The team that were working on this matter at the time that it was filed, the principal members of the litigation team were myself, Kathy Roach and Evan Westerfield and some associates in 2008.

And in the latter part of 2008, when I had sort of talked to NCR, talked to people internally about my plans, and my decision to withdraw from the partnership as of April 1, I believe a gentleman by the name of Bill Conlon became involved, filed an appearance and participated in the

Schlickman

litigation.

Q. Earlier in the day, I believe you mentioned that you testified in the Whiting action. Is this the action that you were referring to?

A. Yeah, it was the case of Appleton Papers Inc. versus George Whiting, yes.

Q. And that took place after this decision and order was entered, is that correct?

A. Yes.

Q. Do you recall the procedural posture in which this decision and order was entered; motion dismissed, summary judgment?

A. I'm sure it is reflected in the document here. Let me look. It seems to me it is summarized at bottom of page 47.

Q. And at the bottom of page 47, is it correct it appears there were cross-motions for summary judgment between certain defendants and certain plaintiffs in the action?

A. Well, it says, "Accordingly, the defendant's motions for summary judgment are

Schlickman

granted. The plaintiff's motion for summary judgment is denied." So it appears there had been summary judgment motions filed on both sides.

Q. OK. Now, sir, when this decision and order was entered by Judge Griesbach, do you recall reviewing it at that time?

A. I read it at some point after the decision came down. I don't think I read it right away.

Q. Did you have an opportunity to discuss this decision with anyone at API or BAT?

A. No.

Q. Sir, could you please turn to page 11 of the decision and order. Are you there?

A. I'm there.

Q. And there is the second bit there of block quoted text. It discusses a December 15, 1966 article in New Scientist describing Jensen's findings as follows, and there is a block quote from there.

Do you recall ever seeing a copy of the December 15, 1966 article in the New

Scientist from gentleman by the name of Soren Jensen that's reflected or discussed here in this decision and order.

A. At any time?

Q. At any time.

A. I don't recall seeing it.

Q. Do you recall ever providing a copy of that article to anyone at API or BAT prior to the signing of the 1998 confidential settlement agreement?

MR. McATEE: The Jensen article?

Q. Yes, sir.

A. Well, I don't recall ever having seen the article. I don't know how I could recall giving a copy of the article. I'm not sure what they had at the time.

Q. And it stands to reason you don't recall any discussions with anybody at API or BAT concerning the Jensen article that we were just referencing?

A. I don't recall any such discussions.

Q. Can you turn to page 12 as well, please.

Schlickman

And I'm looking at the second full paragraph that starts "Monsanto's own chemist"? Do you see where I am?

A. Yes, it is the second full paragraph, page 12.

Q. And the second sentence of that paragraph states, "The original of the Jensen report or a copy of a speech based on the report was sent by Monsanto's Dr. Kelly to NCR's Dr. M.J. Thomas in February 1967, roughly two weeks after the Kelly memorandum described above was distributed at Monsanto."

Do you see that sentence?

A. I see it.

Q. And did I read it correctly?

A. It -- I won't make you read it over, but I wasn't tracking word by word as you read it. But it's there. That seems to me it says what you just said.

Q. Do you recall seeing any documents that reflected that the Jensen report was sent by Monsanto to NCR in February of 1967 at any time?

A. Sitting here right now, I don't

Schlickman

recall having seen anything about the Jensen report.

Q. OK. And nothing about this memorandum that concerned the Jensen report, correct?

A. I don't, I don't recall.

Q. And never had any discussions about that memorandum with anybody from BAT or API, correct?

A. Not that I recall.

Q. You know, let me just say something here, there were -- I'm saying I don't recall and I don't recall, but we had numerous discussions over the years with people from Appleton on a variety of topics. I'm thinking right now of Dennis Hultgren who was our in-house technical person and understood their business was involved in many of the investigations.

I can't say, you know, we didn't talk about it in the presence of some of the Appleton people at some point. Dennis himself worked for Appleton. I just don't recall right now.

Schlickman

Q. And that is all I am asking, if you have a recollection about having a discussion about the memo or the Jensen article with anybody at API or BAT prior to the signing of the confidential settlement agreement in 1999? I take it your answer to that is no?

A. My answer is I don't recall that.

Q. And if you could please just turn to page 20 as well. The second full paragraph that includes a block quote starts, "A year later, NCR employee T.E. Hoover prepared an internal memorandum for NCR's vice president of research entitled 'The Status of Polychlorinated Biphenyl Uses at NCR' with a citation to Beaugart declaration Exhibit 7. The memo dated October 13, 1972 was an attempt to summarize NCR's past use of Aroclor, the dangers of such use, and itemize any remaining uses of PCBs within NCR's operations. Among other things, the memo noted that, 'In the late 1960s, a cumulative evidence began to show that PCBs may have adverse effects on certain forms of animal life. The same properties that contributed

Schlickman

to their usefulness were indicted as contributing to the possible hazardous effects, the resistance to breakdown, such as the thermal and biodegradation, was shown to lead to accumulations in the environment.""

Do you see that paragraph there, sir?

A. I do.

Q. Do you recall ever seeing a copy of the memorandum that's referred to in that paragraph?

A. Sitting here right now, I don't recall seeing that.

Q. Is it correct that you also do not recall discussing that memorandum with anybody at API or BAT prior to the signing of the confidential settlement agreement?

A. I presently don't have a recollection of discussing this with anyone at API.

Q. Sir, were you ever present in a discussion in which API or BAT were also present in which a party took the position that NCR knew of the harmful effects of PCBs

Schlickman

on the environment and potentially human health, and in the face of knowledge of those dangers, increased its production of NCR brand carbonless copy paper toward the end of the production period which is the end of the period '68 to '71 approximately?

MR. McATEE: Where that allegation was made you're saying?

MR. HUTTENLOCHER: Yes, sir.

A. Could you read that back.

(Record read)

A. Well, earlier this morning, I testified to the meetings we had with the Fox River Group in the 1996 to 1997, 1998 period. And I mentioned that there had been, maybe not with that level of precision, or those precise words, there had been statements made by at least David Mandelbaum, maybe others in the Fox River Group, that knowledge of the risks of PCBs is an issue that they felt was important to the case, and Dennis Hultgren was at those meetings.

Q. And keeping in mind that that position was taken by at least Mr. Mandelbaum

Schlickman

representing Glatfelter, did you take any steps to capture that potential knowledge issue, as you stated it, in the 1998 confidential settlement agreement?

A. Of course we did.

Q. What did you do to do that?

A. We drafted the agreement we have been looking at for many parts of the deposition today. The final, probably the prior versions, but for sure the final version of the agreement captures that.

Q. Is there a specific clause or piece of language in that agreement that you would point to or are you speaking overall to the intent of the parties as you understood it at the time?

A. No, I'm -- well could you read that back. I want to make sure I understand that.

(Record read)

A. Well, there are two parts of that question. Clearly, it was the intent of the parties to cover that aspect of liability. I mean, we knew it was coming at us from the other PRPs.

Schlickman

I guess as to the second part of your question, yes, I think if you go through the agreement, the confidential settlement agreement in its entirety, follow through all the language that's in the controlling provisions, you will see that that is covered by the settlement agreement, and to the extent that Appleton or NCR incurred response costs that were based on issues of knowledge about PCBs in the '60s or '70s, that that's covered by the agreement. I have no doubt about that.

Q. Do you have a specific recollection of having a conversation with any representative of BAT or API in which you discussed that allegations of heightened knowledge by either one of the parties should that lead to the imposition of liability with respect to the Fox River, would be included in the confidential settlement agreement?

A. Look, I explained to you many times already today that the intent of the parties -- well, going into the mediation, the parties knew that there were a variety of

Schlickman

different ways that these liabilities could arise and that there were ways we probably weren't aware of that these liabilities could arise.

In this particular instance, we knew that the other companies would at some point be trying to take advantage of what you might refer to as the knowledge issue, the knowledge of PCBs and their alleged consequences back in the '60s and '70s, and we -- that's a factor that comes up in contribution litigation. That happens in a number of cases. That's not unique to the Fox River.

And I believe the way we structured the agreement to encompass virtually any type of liability that could arise in connection with the Fox River site includes contribution litigation and includes any other factors that might be asserted in a contribution litigation. I think if you carefully go through the agreement, you will see that.

Q. Do you have a specific recollection of a conversation with someone from API or

Schlickman

BAT discussing the "knowledge issue" as we have referred to it?

A. Well, I think from early on in the case, we knew -- being Appleton and NCR -- that developing an understanding of the knowledge issue was important for preparing our defense of the matter and defense of potential claims in the case. Dennis Hultgren knew that. Paul Karch knew that. Jon Hoak knew that. I knew that.

We knew that in 1997 and that was a long, laborious process to try to develop that information, unearth that information, and while I may not be able to point to a specific conversation with a specific person at Appleton -- and keep in my mind we never spoke to anybody at BAT -- I have no doubt that they were aware that that was an issue that we were all concerned about and that that was the type of cost that was to be shared under this agreement.

Q. Do you recall any specific documents that you had uncovered during the course of your joint work with API that you

would rely on to help back up your remembrance of the development of this knowledge issue?

A. I am sorry?

MR. McATEE: Object to form.

A. I didn't understand the question.

Q. That's fair enough. Let me see if I can rephrase.

You mentioned that there was a process that you were working with people from API, Mr. Karch included, working with Mr. Hoak at NCR, to try and understand this knowledge issue as we have phrased it. I am correct in that, correct?

A. Well, that was part of sort of the ongoing effort that unfolded over a number of years, yes.

Q. Were there any specific documents that you can recall that the parties exchanged that pointed to either NCR or API having knowledge about the harmful effects of PCBs during the production period?

MR. McATEE: You are asking whether he can remember a specific document that

Schlickman

we shared with API or a specific document that API shared with us?

MR. HUTTENLOCHER: Correct.

MR. McATEE: As opposed to a result of some kind of internal investigation?

MR. HUTTENLOCHER: That's absolutely right.

MR. McATEE: I will let you answer that question if you recall any specific documents that were exchanged.

A. Well, you know, we had -- the only way I can answer this is we, together, Appleton and NCR undertook a factual investigation into all the issues that we could think of that related to all the claims we expected to be asserted against the companies including this knowledge issue and that efforts started as back as early as 1996 or 1997.

How it developed, what we learned at what time, what was known specifically to the parties about specific documents, I can't answer for you. I mean, it's something that evolved over time. And frankly, it's -- it

Schlickman

just -- it was a big task that took a lot of work and I'm not sure, you know, we -- why don't I just stop there.

Q. Did the, that big task, the development of that issue, as you say, did that extend beyond the signing of the 1998 settlement agreement? Did you learn more after the agreement was signed?

A. My recollection is it started before, continued after, continued right up through the Whiting litigation itself, and yes, we learned more as time went on.

Q. During that period of time, all the way through the Whiting litigation, is there a time period that you can pinpoint where you said yes, OK, we have our arms wrapped around the issue, we know who knew what and when they knew it?

MR. McATEE: Object to form.

A. Well, the last -- up until the time that I had my last real substantive involvement in the case, which was probably somewhere mid to late 2008, I don't think we had our arms -- I don't think either party

Schlickman

had its arms wrapped around that issue completely and I'm not sure that's the case today.

Q. Give me one second.

THE VIDEOGRAPHER: Do you want to go off?

MR. HUTTENLOCHER: No, we can stay on.

Mr. Schlickman, that is all the questions I have for you today. Thank you very much for your time.

MR. McATEE: I don't have anything. Thanks.

(Continued on next page for jurat.)

Schlickman

THE VIDEOGRAPHER: Going off the record, 3:42 p.m. This is the end of disk 6 and concludes the deposition of Andrew Schlickman.

____________________________

J. ANDREW SCHLICKMAN

Subscribed and sworn to

before me this day

of , 2014.

________________________________

Schlickman

INDEX:


| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| J.A. Schlickman | Mr. Huttenlocher | 5 |


EXHIBIT INDEX:


| NUMBER | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit 1 | document Bates stamped NCR-ARB 10567 through 78 | 86 |
| Exhibit 2 | document Bates stamped NCR-ARB 00008543 through 8545 through | 102 |
| Exhibit 3 | document entitled Decision and Order Dismissing Plaintiff's Claims for Contribution | 241 |

Schlickman

CERTIFICATE

STATE OF NEW JERSEY )
)ss:
COUNTY OF UNION )

I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New Jersey, do hereby certify:

That J. ANDREW SCHLICKMAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 11th day of January, 2014.

______________________________

Schlickman

* * *ERRATA SHEET* * *

NAME OF CASE: NCR v. Appleton

DATE OF DEPOSITION: 1/10/14

NAME OF WITNESS: J. ANDREW SCHLICKMAN

Reason codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ____ Line ____ Reason____
From ________________________ to______________________

Page ____ Line ____ Reason____
From ________________________ to______________________

Page ____ Line ____ Reason____
From ________________________ to______________________

Page ____ Line ____ Reason____
From ________________________ to______________________

Page ____ Line ____ Reason____
From ________________________ to______________________

Page ____ Line ____ Reason____
From ________________________ to______________________

Page ____ Line ____ Reason____
From ________________________ to______________________

_____________________________
J. ANDREW SCHLICKMAN