# Exhibit F

**Diamond, Benjamin H**

| | |
|---|---|
| **From:** | Diamond, Benjamin H |
| **Sent:** | Friday, January 23, 2026 6:18 PM |
| **To:** | LaBounty, Emma; Tracey, Dennis H.; Tyne, Patience |
| **Cc:** | Schafer, Chad |
| **Subject:** | RE: Timing for today's meet and confer |

Hi Chad and Emma,

Thank you both for your time on Wednesday.

As discussed, please see below for follow ups from our call.

Regarding NCR's 30(b)(6) Notice and BAT's objections thereto:

- Topics 4, and 16-22, regarding facts known to NCR that were not disclosed.
    - It is our position that these topics would require the witness to testify to facts known by NCR, which is outside of the scope of a 30(b)(6) witness, and is in the nature of a contention interrogatory, which under the local rules cannot be propounded until the end of discovery.
    - As a compromise, we are prepared to agree that our 30(b)(6) witness will be prepared to testify to facts that, at the time of the filing of the counterclaims, BAT believed NCR had failed to disclose and the effect such omissions had on BAT's decision to enter into the CSA.
    - *****Please let us know if this is agreed.**

- Topics 6, 9, 10, 24, and 26, regarding what information STB knew during the CSA negotiations.
    - It is our position that these topics relate to information known to STB, not BAT, and given that NCR will be taking the testimony of STB (and could, if it wished serve a 30(b)(6) notice on STB, it makes no sense to have BAT testify on these topics, particularly before discovery has been taken from STB.
    - We also explained that whatever information STB knew at the time of the CSA negotiations was based on the joint investigation between API and NCR, which information would be in Sidley's documents.
    - *****You stated you would follow up on how you want to proceed on Topics 6, 9, 10, 24, and 26.**

- Topic 29 regarding the K&E binders.
    - *****We stated we would provide information in writing, under oath if you wish, regarding what the K&E binders are.**

- Topics 30 and 31, regarding the harm BAT suffered as a result of NCR bringing this action in 2023 rather than 2019, and any shortcomings in NCR's "litigation and settlement strategy" regarding the Kalamazoo River Site.
    - We stated that BAT's witness would not know this information, but rather that it would be known by Kevin Lloyd and that as such, we are prepared to answer these questions in writing as contention interrogatories.
    - You responded that you would prefer Kevin educate BAT's witness on these issues.
    - *****We stated we would consider your position.**

<u>Regarding BAT's 30(b)(6) Notice and NCR's objections thereto:</u>

- Topics 1-16, which seek information regarding the underlying factual issues in this matter.
  - These include, among other things: NCR's knowledge of the toxicity and environmental risks of CCP, PCBs, and Aroclor 1242; NCR's production of CCP; NCR's efforts to replace Aroclor 1242; NCR's efforts to avoid CCP being linked with PCBs; NCR's recycling of broke during the production period, including efforts to dispose of broke other than by selling it to recyclers; and NCR's communications with regulators, recyclers, and others about the risks associated with CCP and PCBs.
  - In your responses and objections to BAT's 30(b)(6) Notice, you took the position that these topics are irrelevant to claims and defenses at issue in this action. In our meet and confer, you stated that these issues were not pled in the complaint.
  - That is inaccurate and, in fact they are central to the counterclaims. Just by way of example, the counterclaims allege that:
    - "This case arises from NCR's egregious and intentional pollution of American waterways with toxic compounds from the 1950s through the 1970s and its fraudulent and wrongful attempt to foist liability for its conduct on a party that played no role in contributing to that conduct." BAT's Counterclaims at 1.
    - "As a series of federal court decisions in Georgia-Pacific Consumer Products. LP v. NCR Corp (the "Georgia-Pacific" case) has found, NCR knew for years that its products were "hazardous" and that by-products of its manufacturing were "worthless waste . . . at best." Yet, even after learning that its product was poisoning people and the environment, NCR did not cease production. Instead, it increased it. As a federal court has already found, NCR "deliberately attempted to conceal . . . the toxic nature of" its broke as part of a scheme to mislead the public and the government, pass NCR's broke off as "useful," and generate billions of dollars in revenues while "getting rid of a substance it knew to be hazardous." As a result of NCR's wrongful behavior, it has been ordered to pay hundreds of millions of dollars in damages and penalties to punish it for its actions. But instead of facing the court-ordered consequences of its egregious misconduct, NCR is attempting to transfer those consequences to BAT – a party that had no role in NCR's actions and that (unlike NCR) did not benefit in any way from NCR's intentional misconduct." BAT's Counterclaims at 2.
    - "NCR had acted with the specific intent to offload a product it knew was toxic." BAT's Counterclaims at 79.
    - "NCR had knowledge of material facts that BAT was unaware of – namely, that (1) it had sold broke to mills in the Kalamazoo River area; (2) it knew that such broke would create toxic waste in the Kalamazoo River; (3) it had intentionally passed off on Kalamazoo recyclers a product it knew to be toxic as useful in order to earn a profit; and (4) the likelihood that NCR would be held liable for environmental cleanup costs at the Kalamazoo River." BAT's Counterclaims at 90.
  - Additionally, NCR's own 30(b)(6) Notice includes the following Topics on these very subjects:
    - Topics 18/19 - All facts that NCR, Sidley, and/or NCR's CSA negotiating team "knew (or allegedly should have known) in 1998– 99 regarding the NCR Paper Business's knowledge during the Production Period of harmful effects of Aroclor 1242 in the environment that NCR should have disclosed to BAT in connection with negotiating the CSA."
    - Topics 20/21 - All facts that NCR, Sidley, and/or NCR's CSA negotiating team "knew (or allegedly should have known) in 1998– 99 regarding whether the recycling of NCR Paper broke during the Production Period resulted in the discharge of Aroclor 1242 to the environment that NCR should have disclosed to BAT in connection with negotiating the CSA."
    - Topic 22 - Facts supporting BAT's position that NCR possessed knowledge superior to that of BAT and/or API regarding facts relevant to the potential of future liability at locations

other than the Fox River Site, including the potential of future liability at the Kalamazoo River Site, prior to BAT's signing of the CSA.

- *****Based on our discussion, we stated that we would provide clarification on the time periods for the information we seek in connection with Topics 1-16.**
  - **For Topics 1-16, we seek information regarding:**
    - **1) NCR's knowledge during the production period (1954-1971);**
    - **2) NCR's knowledge during the CSA period (1994-1999), including relating to the company's knowledge during the production period (1954-1971).**
  - **By way of examples to illustrate:**
    - **For Topics 1 and 2, regarding NCR's knowledge of the toxicity of CCP, PCBs, and Aroclor 1242, we are seeking to understand what NCR knew about the toxicity of such materials during the production period, as well as what NCR knew between 1994-1999 about the company's knowledge of toxicity during the production period.**
    - **For Topic 4, regarding NCR's efforts to identify a replacement for Aroclor 1242, we are seeking to understand NCR's efforts to replace Aroclor 1242 during the production period, as well as NCR's knowledge of such efforts during the CSA period (1994-1999).**
    - **For Topic 12, regarding NCR's sales of CCP broke or trim to recyclers and/or brokers, we are seeking to understand NCR's sales of broke to recyclers and/or brokers during the production period, as well as NCR's knowledge of such sales during the CSA period (1994-1999).**
  - *****Please let us know your position on Topics 1-16 given the above clarifications. If helpful, we are happy to provide clarifications similar to those included above for all Topics 1-16.**

- Topic 26, which addresses NCR's communications with BAT regarding potential liability at the Kalamazoo River after execution of the CSA.
  - We asked that you clarify the meaning of the phrase "pattern and cadence of communications" in your response.
  - *****You stated you would clarify this.**

- Topic 28, regarding the Joint Defense and Representation Agreement ("JDRA").
  - We explained that we appreciate your agreement to designate a witness to testify as to "why the 1998 Joint Defense and Representation Agreement was entered into, what it covered, and its basic structure" but that we would also like to cover the following matters:
    - 1) the negotiations and discussions that led to the agreement,
    - 2) communications between the parties about the agreement (both before it was agreed to, during the negotiations and, any discussions after the agreement was signed), and
    - 3) how the agreement was implemented, generally speaking (in other words, what workstreams were undertaken pursuant to the JDRA and how did those workstreams function).
  - *****You stated you would consider our request.**

Please let us know if you had any other follow ups or if you have any questions.

Thank you,

**Benjamin H. Diamond**
Senior Associate

**Hogan Lovells US LLP**
390 Madison Avenue
New York, NY 10017
Tel: +1 212 918 3000
Direct: +1 212 918 3171
Mobile: +1 646 951 5955
Fax: +1 212 918 3100
Email: benjamin.diamond@hoganlovells.com
www.hoganlovells.com

---

**From:** LaBounty, Emma <elabounty@sidley.com>
**Sent:** Wednesday, January 21, 2026 3:05 PM
**To:** Tracey, Dennis H. <dennis.tracey@hoganlovells.com>; Diamond, Benjamin H <benjamin.diamond@hoganlovells.com>; Tyne, Patience <patience.tyne@hoganlovells.com>
**Cc:** Schafer, Chad <cschafer@sidley.com>
**Subject:** Timing for today's meet and confer

**[EXTERNAL]**
Dennis and team,

I inadvertently sent the calendar invite for today's meet and confer for the wrong time (4 pm CT, instead of 4 pm ET). At this point, would your team prefer 4 pm ET or 4 pm CT (3 pm ET)? Either can work for us.

Thank you,
Emma

**EMMA LABOUNTY**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 7268
elabounty@sidley.com
www.sidley.com

SIDLEY

****************************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.
****************************************************************************************************