# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NCR CORPORATION,

Plaintiff,

v.

B.A.T. INDUSTRIES p.l.c.

Defendant.

Case No.: 1:23-cv-1172-JPC

# Expert Disclosure Report of Michael D. Goodstein

May 15, 2026

[signature]

*NCR Corporation v. B.A.T. Industries, p.l.c.* (S.D.N.Y.)

Michael D. Goodstein

May 15, 2026

## I. Introduction

Between 1954 and 1971, two mills located on the Fox River in Appleton, Wisconsin were involved in the manufacture of carbonless copy paper ("CCP"), which was used to create copies of documents. Those two mills formed the Appleton Papers division, which was owned by NCR Corporation ("NCR"). In 1978, NCR sold the Appleton Papers business to a B.A.T. Industries, p.l.c. ("BAT") subsidiary, which subsequently changed its name to Appleton Papers Inc. ("API"). In 1990, BAT sold API.[1]

In 1994, NCR and API were notified by the State of Wisconsin that they were potentially responsible for cleanup costs and natural resource damage in the Fox River under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42. U.S.C. § 9600 *et. seq.* ("CERCLA"). CCP produced between the mid-1950s and 1971 contained polychlorinated biphenyls ("PCBs").[2] Wisconsin alleged that NCR/API directly discharged PCBs into the Fox River during the CCP manufacturing process and sold scrap paper ("broke") produced as a byproduct of CCP manufacturing to brokers and paper recycling mills, which themselves discharged PCBs into the Fox River.

At that time, NCR, BAT, and API disputed which company should bear responsibility for releases of PCBs into the Fox River. After a mediation on February 12, 1998, the parties entered into a confidential settlement agreement ("CSA"), which is stated to be effective as of February 12, 1998, and was executed as of July 26, 1999. Under the CSA, the three parties determined that they would "allocate as between themselves all Claims, Damages, and Defense Costs" not just for the Fox River, but also for any "Future Sites."[3]

---

[1] For this report, I refer to NCR to encompass the Appleton Papers Division, which became API. At the relevant times, NCR also owned other facilities involved in the process of manufacturing CCP (NCR's Systemedia business). The Systemedia business was not sold to BAT. This business was retained by NCR. Deposition of Paul Samson 110:16-23; NCRV_13582721.

[2] Roderick A. Carr, Robert L. Durfee & Edward G. McKay, *PCBs Involvement in the Pulp and Paper Industry*, EPA OFFICE OF TOXIC SUBSTANCES (Feb. 25, 1977) at PDF p.3, available at https://semspub.epa.gov/work/05/157339.pdf (last visited May 11, 2026).

[3] *NCR Corporation v. B.A.T. Industries p.l.c.*, No. 1:23-cv-1172 (JPC), 2025 WL 2780066 at *2 (S.D.N.Y. Sept. 30, 2025).

Now, a dispute has arisen between NCR and BAT for liability at the Allied Paper Inc./ Portage Creek/ Kalamazoo River Superfund Site ("Kalamazoo River Superfund Site") in relation to the CSA, including whether the CSA is valid.

BAT asked me to draw on my over forty years of experience with CERCLA to review and summarize the CERCLA caselaw about "arranger" liability in existence at the time of the CSA and describe how that legal framework could have been applied in 1999 to evaluate NCR's potential legal exposure for PCB contamination at the Kalamazoo River Superfund Site. This report summarizes the opinions and underlying rationale that I may provide if asked to testify at trial. This report also includes the underlying facts that I considered in formulating my opinions. Attached to this report are exhibits that I may use in my testimony.

## II. <u>Professional Experience</u>

I have spent over forty years litigating and advising clients on CERCLA and other environmental laws. I graduated from Cornell Law School in 1984, with a focus on environmental law. During law school, I took a number of courses in environmental law, including a course entitled Regulation of Toxic Substances, which covered the major federal statutes. I worked at the National Wildlife Federation in Washington, D.C. as an extern during law school. My summer internship after my second year of law school was with the Miami-Dade County (then called Dade County) Attorney's Office in Miami, Florida.

Upon graduation in 1984, I accepted a position as an Assistant County Attorney and represented Miami-Dade County's environmental department responsible for environmental regulation and enforcement in Dade County, which included the Miami metropolitan area and surrounding communities in South Florida. I worked on CERCLA cases as an Assistant County Attorney.

In 1988, I accepted a position as a Trial Attorney in the Environmental Enforcement Section ("EES") of the U.S. Department of Justice's Environment and Natural Resources Division in Washington, D.C. At that time, EES attorneys served as lead counsel on most of the CERCLA cases brought by the United States developing the case law under CERCLA as methodically and uniformly as possible. CERCLA amendments were passed in 1986, and CERCLA cost recovery actions were a major focus of EES for the entire twelve years I worked there. As a Trial Attorney and later Senior Attorney in EES, I was one of the attorneys developing the case law under CERCLA, and I represented the U.S. Environmental Protection Agency ("EPA") as lead counsel in numerous CERCLA cases.

From 2000 to present, I have continued to handle CERCLA matters in private practice, usually with lead counsel responsibilities. I have taught CERCLA as part of the environmental curriculum at Tulane Law School as a visiting professor, presented at continuing legal education ("CLE") sessions on various related topics, and have continued to periodically attend CLE

training on CERCLA and related topics. A copy of my resume is attached and incorporated herein by reference.

## III. Disclosures

I have not testified as an expert witness in the last four years. I am being compensated at the hourly rate of $1100/hour for my work on this matter.

## IV. Opinions

Overview

First, I will provide some background on CERCLA, the elements of "arranger" liability under CERCLA, and the state of the "arranger" liability case law at the time of execution of the CSA between NCR and BAT. Between 1980 and 1999, courts across the country were imposing CERCLA arranger liability on parties that arranged for "disposal" or "treatment" of hazardous substances, even if the party was allegedly selling the product for a recycling or re-use purpose.

Second, I will explain how the "arranger" liability framework could be applied, and what facts and information would be relevant, in considering NCR's potential liability at the Kalamazoo River Superfund Site.

Finally, I will note some facts that stood out to me in my review of the documents that indicate NCR and its legal counsel did investigate NCR's potential CERCLA liability at the Kalamazoo River Superfund Site prior to execution of the CSA.

### 1. At the Time of Execution of the CSA between NCR and BAT, CERCLA Case Law Had Developed to Impose Arranger Liability on Parties that Arranged for "Disposal" or "Treatment" as part of "Recycling" or "Reuse."

*a. Background on CERCLA and PCBs*

Congress enacted CERCLA in 1980 to respond to the threat posed by hazardous substances to human health and the environment and to provide a comprehensive mechanism for cleaning up the release or threatened release of hazardous substances and for funding the costs of cleanup actions.[4] CERCLA includes a broad definition of "hazardous substance" to include all the known substances that could pose a threat to public health or the environment.[5]

PCBs were specifically identified as hazardous substances under federal environmental laws as early as 1976. That year, the Toxic Substances Control Act ("TSCA")[6] prohibited the manufacture, processing, and distribution in commerce of PCBs except in limited authorized

---

[4] *See* 42 U.S.C. § 9601 *et seq*.

[5] *Id.* § 9601(14).

[6] 15 U.S.C. § 2601 *et seq.*

circumstances.[7] By 1977, PCBs (including Aroclor 1242) were listed under Section 311 of the Clean Water Act,[8] thereby triggering spill-reporting requirements and federal cleanup authority for PCB releases into waterways.

PCBs were included in the comprehensive "list of lists" promulgated by the EPA under CERCLA in 1987.[9] CERCLA gave broad authority to the federal and state governments to pursue liable parties for investigations, cleanups, reimbursement of response costs incurred by the governments, and natural resource damages.

*b. Elements of Potential CERCLA Liability, Including "Arranger" Liability*

Congress established a four-part test to hold a party liable for cleanup costs under CERCLA: (1) the property in question is a "facility" as defined by CERCLA; (2) the defendant falls within one of four categories of "covered persons" pursuant to CERCLA; (3) a release or threatened release of a hazardous substance occurred on the property; and (4) the release or threatened release caused the plaintiff to incur response costs that are not inconsistent with the National Contingency Plan.[10]

As to the second element of the test, CERCLA imposes strict liability for four categories of persons: (1) owners or operators; (2) past owners or operators; (3) transporters; and (4) arrangers.[11]

An arranger is defined as:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances.[12]

The term "potentially responsible party" means "any person who may be liable" under the above test "for response costs incurred and to be incurred by the United States."[13]

---

[7] *See* 15 U.S.C. § 2605(e); 40 C.F.R. Part 761.

[8] 33 U.S.C. § 1251 *et seq.*

[9] *See* 40 C.F.R. § 302.4.

[10] 42 U.S.C. § 9607(a).

[11] 42 U.S.C. §§ 9607(a), 9613(f)(1).

[12] 42 U.S.C. § 9607(a)(3).

[13] 40 C.F.R. § 304.12(m).

*c. Pre-Confidential Settlement Agreement Case Law Established Potential "Arranger" Liability for By-Products Containing Hazardous Substances*

Between the enactment of CERCLA in 1980 and the execution of the CSA between NCR and BAT in 1999, courts across the country developed case law on "arranger" liability under CERCLA. In determining whether parties were liable as "arrangers," the courts considered various factors including whether a party had an intent to dispose, the value of the material that was the subject of the transaction, whether the material required additional treatment before re-use, and whether the material included a known waste portion requiring disposal. The question of a party's "arranger" liability could not be determined solely by reference to the fact that it sold its waste material and received some compensation. The courts' considerations were much more comprehensive. Courts looked at all the circumstances surrounding the transaction to determine whether it was an "arrangement for disposal or treatment" rather than focusing on one factor. Attached at **Appendix A** is a timeline of significant holdings between 1980 and 1999 related to "arranger" liability under CERCLA that inform my analysis here.

**2. The "Arranger" Liability Framework for Determining Whether NCR Could Be Liable at the Kalamazoo River Superfund Site.**

*a. Three of the CERCLA Elements Undisputably Apply*

Starting with the first element of the CERCLA test, there could be no dispute in 1999 that the paper mills located at the Kalamazoo River including the mill known as the Kalamazoo Paper Company, and the Kalamazoo River Superfund Site, was a "facility" as defined by CERCLA.[14] As to the third element of the CERCLA test, there could be no dispute in 1999 that Aroclor 1242—the substance used by NCR in its CCP—was a PCB and hazardous substance as defined by CERCLA.[15] As to the fourth element of the CERCLA test, there could be no dispute in 1999 that the Kalamazoo River Study Group had incurred response costs investigating the Kalamazoo River, including the PCB contamination of the River.[16]

Therefore, the key issue for analysis during the time period leading up to the CSA was whether NCR could be found liable under CERCLA as a "covered person" at the Kalamazoo River Superfund Site.[17]

[14] *See* 42 U.S.C. § 9601(9) (defining "facility" as "any building, structure equipment, pipe or pipeline…including any site or area where a hazardous substance has been deposited, disposed or placed, or otherwise come to be located…"). *See also Kalamazoo River Study Group v. Rockwell International*, 3 F. Supp. 2d 799, 802 (W.D. Mich.).

[15] *See id.*

[16] *See id.*

[17] 42 U.S.C. § 9607(a).

*b. Establishing a Nexus to the Kalamazoo River Superfund Site*

As NCR didn't own or operate facilities at the Kalamazoo River Superfund Site and would not be considered a transporter at that site, the focus of the nexus analysis would be whether NCR could be determined to be an "arranger" at the site. The assessment of "arranger" liability requires evidence that the party's hazardous substance actually went to the relevant "facility." This is usually a key focus of CERCLA cases since the transactions at issue may have occurred many years before the investigation. Evidence is typically in the form of historical business records or factual accounts from witnesses with direct knowledge. In other words, the investigation requires searching through historical records and identifying, locating, and interviewing witnesses with personal knowledge. Potentially responsible parties spend substantial time and effort investigating this type of nexus information.

In this case, an investigation would have examined how and where NCR paper and NCR's CCP broke was disposed. NCR's CCP broke was produced at the Appleton facilities on the Fox River and at Systemedia's facilities.[18] It would have been important, therefore, to understand whether CCP broke from the Appleton facilities, and/or NCR's own Systemedia's facilities, was sent—either directly from NCR or indirectly through a broker—to any of the paper mills on the Kalamazoo River. If NCR conducted this investigation, I would expect NCR to have searched for records of transactions and to have interviewed relevant employees and brokers with relevant knowledge. If NCR found any evidence to show that any of its CCP broke was sent to any of the paper mills at the Kalamazoo River Superfund Site for de-coating and re-use of the pulp paper, this indicates potential exposure to "arranger" liability. To the extent that such evidence was not rebutted or discredited, that would increase NCR's potential exposure.

*c. Case Law Factors to Consider for Arranger Liability*

As explained above, prior to the CSA, courts across the country weighed in on defining when "arranger" liability may apply. All the courts agreed that the determination requires a factual, case-specific analysis and cannot hinge on merely whether the party labels the transaction as a sale of a useful product.[19] The following are the primary factors that courts considered at that time.

*i. Intent of the generator*

Prior to the CSA, courts differed on whether subjective intent or knowledge was a relevant part of the inquiry into arranger liability.[20] "Objective indications of the purpose of the

[18] NCRV_13582721.

[19] *See, e.g.*, *Cadillac Fairview/ California, Inc. v. United States*, 41 F.3d 562, 566 (9th Cir. 1994); *United States v. Petersen Sand and Gravel, Inc.*, 806 F. Supp. 1346, 1353-55 (N.D. Ill. 1992).

[20] *Compare Prudential Ins. Co. v. U.S. Gypsum*, 711 F. Supp. 1244, 1254 (D.N.J. 1989) (intent and knowledge are irrelevant), *with United States v. Cello-Foil Products, Inc.*, 100 F.3d. 1227, 1231-34 (6th Cir. 1996) (intent is relevant and can be inferred from totality of circumstances).

transaction, however, are certainly relevant – there is no other evidence of whether an act is an arrangement for disposal."[21]

Accordingly, a potentially important factor at the time of the CSA would be whether NCR treated its broke as a waste. A court would be interested to know whether NCR's primary product was broke (i.e., paper trimmings) or, by contrast, if NCR took steps to minimize the generation of broke during the various stages of its manufacturing process.[22] The court would likely consider testimony from fact witnesses and business records showing how NCR viewed its broke—either as a primary product for manufacturing and sale, or a by-product or waste to be disposed of.

*ii. Value of the product*

Some courts looked at evidence of the value of the product sold.[23] If the parties believed the product was valuable, and the transaction occurred for a competitive price, the court considered that fact relevant.[24]

Therefore, another potentially important factor at the time of the CSA would be whether NCR sold its broke for a profit. A court may be interested in the price or level of profitability achieved by the sale of NCR's broke.[25] If broke was merely sold at whatever price could be negotiated and/or a minimal value, that fact could weigh against the material being a valuable product and support the conclusion it was a waste to be disposed of.

*iii. Usefulness of the materials in the condition in which they were sold*

Prior to the CSA, courts applied the "useful product" doctrine, asking whether the party sold a new material that was still fit for its original purpose or whether it was a by-product of the party's operations or used material with only nominal value.[26] For example, one district court found liability under CERCLA where transporters of used oil shipped the used oil to an oil

---

[21] *United States v. Petersen Sand and Gravel, Inc.*, 806 F. Supp. 1346, 1354 (N.D. Ill. 1992).

[22] *See Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1575 (9th Cir. 1994) (determining that sold product (slag) was "at best a by-product" and the "principal business" of the entity selling the slag was "manufacture of aircraft").

[23] *E.g.*, *Pneumo Abex Corp. v. High Point, Thomasville, and Denton Railroad Co.*, 142 F.3d 769, 775 (4th Cir. 1998).

[24] *Id.*

[25] *See United States v. Vertac Chemical Corp.*, 966 F. Supp. 1491, 1508 (E.D. Ark. 1997) (noting as relevant that the sale of a by-product "was conducted at a substantial profit" and the contract contained terms similar to those contained in sales contracts for other products).

[26] *See, e.g.*, *Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1574-75 (9th Cir. 1994); *Chesapeake and Potomac Telephone Co. of Virginia v. Peck Iron & Metal Co.*, 814 F. Supp 1269, 1274-75 (E.D.Va. 1992); *United States v. Maryland Sand, Gravel, and Stone Co.*, Civil No. HAR 89-2869, 1994 WL 541069 at *4-8 (D.Md. 1994).

recycling facility because the used oil was no longer fit for its original purpose.[27] By contrast, another district court found no CERCLA liability where the defendants sold asbestos-containing products as complete, new, useful products.[28]

Thus, another potentially important factor at the time of the CSA would be whether the paper industry, at the time, viewed NCR's broke as useful in its condition when sold. A court might consider whether broke was a primary sale product or an incidental result of the manufacturing process. A court might also consider whether NCR's broke could be re-used in its original form, or whether it had to undergo a treatment process of de-coating before it could be used. If the broke had to undergo a treatment process before re-use, a court would not likely have viewed that broke as a useful product in the condition it was sold by NCR.

*iv. Release of hazardous substance inherent in re-use of product*

Akin to the useful product doctrine, courts considered whether treatment of the material was inherent in the particular arrangement, even if the selling party did not retain control over the treatment leading to the release.[29]

Accordingly, another important factor at the time of the CSA would be whether the sale of NCR's broke inherently contemplated treatment of the broke. A court would likely consider: (i) any treatment process that was required before NCR's broke could be re-used, (ii) if the treatment process led to the discharge of PCBs into the Kalamazoo River, and (iii) if NCR knew that re-use would require such treatment. Each of these factors individually would point towards the conclusion that the release of a hazardous substance was inherent in the re-use of NCR's CCP broke and therefore that NCR could be found liable as an "arranger," and together these factors could make a strong case.

*d. Weighing Knowledge of Hazardousness*

In analyzing CERCLA "arranger" liability, some courts particularly focused on any party who both owned the hazardous substances and made the crucial decision how the hazardous substances would be disposed of or treated, and by whom.[30]

At the time of the CSA, it would have been relevant to know whether NCR was aware of the environmental risks of PCBs in its CCP broke. This evidence could be in the form of internal

---

[27] *Ekotek Site PRP Committee v. Self*, 881 F. Supp. 1516, 1525-28 (D.Utah 1995).

[28] *Prudential Ins. Co. of America v. U.S. Gypsum,* 711 F. Supp. 1244, 1254-55 (D.N.J. 1989).

[29] *Catellus Development Corp. v. United States*, 34 F.3d 748, 752-53 (9th Cir. 1994).

[30] *See, e.g.*, *United States v. Aceto Agric. Chemicals Corp*., 872 F.2d 1373, (8th Cir. 1989); *United States v. A & F Materials Co.*, 582 F. Supp. 842, 844-45 (S.D. Ill. 1984). *But see Fla. Power & Light Co. v. Allis Chalmers Corp*., 893 F.2d 1313, 1318 (11th Cir. 1990) (holding that even though a manufacturer does not make the critical decisions as to how, when, and by whom a hazardous substance is to be disposed, the manufacturer may be liable under CERCLA if there is evidence that the manufacturer is the party responsible for "otherwise arranging" for the disposal of the hazardous substance).

memos or research or documents sent to NCR from third parties about the environmental hazards of PCBs or alternatives to PCBs in paper coating. To the extent such evidence existed, a court may have found this evidence gave rise to "arranger" liability. It may also have been relevant to whether NCR should be allocated a greater share of overall responsibility than other liable parties.

**3. NCR Investigated Its CERCLA Liability at the Kalamazoo River Superfund Site.**

Sidley & Austin ("Sidley"), a law firm acting on behalf of NCR, appears to have been monitoring the CERCLA litigation at the Kalamazoo River Superfund Site. This was reflected in an email dated September 11, 1997, regarding "the Kalamazoo River stuff," that requested a litigation docket print-out for the Kalamazoo River Study group case.[31] Sidley's monitoring included review of a March 6, 1998 court decision about a successful third-party defense used in a CERCLA case on the Kalamazoo River.[32] In that decision, there were findings identifying NCR paper as a major driver of liability for response costs among the facilities on the Kalamazoo River:[33]

> Between 1957 and 1971, a type of carbonless copy paper typically referred to as "NCR" paper, incorporated Aroclor 1242 as a solvent. According to [Michigan Department of Natural Resources], the recycling of carbonless copy paper was a major source of the PCBs at the Site . . . Each of the mills owned by [Kalamazoo River Study Group] members, performed de-inking or used de-inked feedstock at some point in the past. Georgia Pacific and James River, at various times, used feedstock consisting entirely or largely of NCR paper. There are massive quantities of PCBs in the Site. Estimates range between 350,000 pounds to over 4 million pounds.[34]

The decision was sent by consultants from Putnam Hayes and Bartlett to Sidley with a comment that the decision was noteworthy because the decision "repeatedly talks about NCR paper as a source of PCBs."[35]

Sidley appears to have provided advice to NCR regarding the litigation at the Kalamazoo River Superfund Site.[36] I have been unable to review the content of any such advice, however, as I understand it has been withheld on privilege grounds. More redacted communications from Sidley files with the subject "Kalamazoo River Study Group" show numerous communications

---

[31] NCRV_13586011.

[32] NCRV_13609698 (mostly redacted).

[33] *See Kalamazoo River Study Group v. Rockwell International*, 3 F. Supp. 3d 799 (W.D. Mich. 1998).

[34] *Id.* at 802.

[35] NCRV_13606752.

[36] *E.g.,* NCRV_13609698 (mostly redacted).

regarding the same in April 1998.[37] This suggests that there was a very specific focus by NCR and its counsel on NCR's potential liability at the Kalamazoo River Superfund Site in March and April 1998.[38]

On July 12, 1998, PHR Environmental Consultants ("PHR") produced a report to Sidley that contained an analysis of court filings from the Kalamazoo River Superfund Site litigation.[39] In the report, PHR provided detailed citations to the record identifying NCR carbonless copy paper as a significant source of PCB contamination at the Kalamazoo River Superfund Site:

- From 1960 on, the Kalamazoo River water used by Menasha contained elevated levels of PCBs . . . Because certain paper mills used NCR paper as a source of secondary fiber, PCBs eventually became incorporated into other types of paper, which ultimately entered the wastepaper stream.[40]
- Deposition of Ronald Hanson, Georgia Pacific employee "recalled that NCR paper was part of the 'wood free furnish' used in de-inking mill No. 1. NCR paper was approximately 10 percent of the furnish for that mill."[41]
- A Kalamazoo Study Group report excerpt contained "References to carbonless paper as a source of Aroclor 1242 in the paper recycled by Kalamazoo area paper manufacturer."[42]
- Deposition of Robert E. Krell, Lipsner & Krell Iron and Metal Company "recalled that at one time there was a specific category of wastepaper called 'NCR paper' which contained nothing but carbonless paper."[43]
- A Kalamazoo River Study Group memorandum in opposition to Menasha's motion for summary judgment "states that Georgia Pacific purchased bales of NCR paper for recycling from 'companies making NCR paper' and not as post-consumer waste."[44]
- Expert Report by John Schell, Expert Witness for Menasha "reviews the U.S. EPA's reports citing NCR paper as a source of PCBs in the secondary fiber sources used as furnish by certain paper plants."[45]

[37] NCRV_13606751 (redacted).

[38] NCRV_00020488.

[39] *See* NCRV_13609046.

[40] NCRV_13609054.

[41] NCRV_13609065.

[42] *Id.*

[43] NCRV_13609066.

[44] *Id.*

[45] *Id.*

On July 27, 1998, Ms. Mary Cesar of Jaakko Poyry sent Sidley her comments on a report relating to the contamination of the Fox River.[46] Those comments included the observation that "several interviews dispute [the…] assumption" that "most if not all of the NCR paper broke was deinked and used in the Fox Valley" for the following stated reasons:[47]

- "All broke was sold through brokers, and API had no direct knowledge of who the ultimate consumers were."[48]
- "Two of the largest brokers (Continental Paper Grading and National Fiber Supply) were headquartered in Chicago, and advertised nationally. It is reasonable to assume they could have shipped broke outside the Fox Valley."[49]
- "API has no control of the broke once it was loaded in a railcar and turned over to the railroad."[50]
- "Possible end-users outside the Fox Valley mentioned in interviews included Kalamazoo (Michigan), 'the Northeast,' Consolidated (Wisconsin Rapids), Hennepin (Minnesota), West Carrollton (Ohio)."[51]

From August 1998, NCR's action plan, as set out by Sidley in various planning memos, included development of its potential defense at the Kalamazoo River Superfund Site.[52] One meeting agenda from contained several relevant topics to discuss:

- "Identify potential for exposure at other sites"[53]
- "Where did NCR broke generated at ACPC go? Some may have been shipped out of the Fox River Valley (e.g., east coast)"[54]
- "Other Considerations: NCR's Potential Arranger Liability from Broke Sales and Equitable Factors"[55]
- "Other Sites" – "PHR report on the Kalamazoo River litigation"[56]

---

[46] *See* NCRV_13609189.

[47] NCRV_13609193.

[48] *Id.*

[49] *Id.*

[50] NCRV_13609194.

[51] *Id.*

[52] *See* NCRV_13609235; NCRV_13583249, 50, 54, 57, 58.

[53] *See id.*

[54] *See id.*

[55] *See id.*

[56] *See id.*

In at least September 1998, Sidley obtained supplemental expert reports submitted in the Kalamazoo River CERCLA litigation that further detailed chemical fingerprinting and fate and transport analysis of Kalamazoo River PCB contamination to NCR broke.[57]

An expert report by Robert Barrick of PTI Environmental Services for Defendant Rockwell International identified the Georgia Pacific facility (formerly Kalamazoo Paper) as a source of the PCB contamination in the Kalamazoo River based on the location of the contamination in relation to the Kalamazoo Paper Mill and the composition of the PCB samples.[58] Robert Barrick's report also stated his opinions that "Aroclor 1242 is the dominant PCB mixture detected in surface and subsurface Kalamazoo River sediments"[59] and "[s]ources of PCBs in historical paper recycling operations include Aroclor 1242 from carbonless paper . . . ."[60] For the latter opinion, Robert Barrick explained his rationale as "[t]he use of Aroclor 1242 in the manufacturing of carbonless paper . . . and the subsequent release through wastes created in recycling processes is well known . . . ."[61]

Sidley appears to have been concerned enough about NCR's exposure at the Kalamazoo River Superfund Site to consider NCR's likely involvement in litigation there when reviewing requests by Fox River consultants to clear conflicts for work at the Kalamazoo River. In particular, in November 1998, Ms. Pamela Hanebutt with Sidley sent a memorandum enclosing "a letter documenting how RMT intends to handle the Weyerhauser/Kalamazoo River project so as not to undermine RMT's efforts for NCR/API at the Fox River" and recommending that "RMT refrain from using any personnel from RMT's Appleton office on the Weyerhauser project."[62] Further communications described the internal debate between the ideas of a "soft Chinese wall" versus "clean division" to avoid risk of "cross-contamination."[63] It is not clear to me from the documents I reviewed how this was ultimately resolved.

When considering the potential conflict for RMT, one of the Sidley attorneys on the matter noted, "[A]nother reason is the likely actual conflict, i.e., NCR and API get sued at the Kalamazoo, and they look to RMT to prepare a mass balance estimation."[64] This statement shows that Sidley attorneys working on the matter for NCR at that time had concluded it was likely NCR would be named as a CERCLA "arranger" defendant for contributing to the PCB contamination at the Kalamazoo River Superfund Site.

---

[57] *See* NCRV_13610167.

[58] NCRV_13610169.

[59] NCRV_13610180.

[60] NCRV_13610182.

[61] *Id.*

[62] NCRV_13582739.

[63] NCRV_13609198.

[64] NCRV_13610241.

Sidley was also working with consultant Jaakko Poyry to investigate where broke was sent and proximity to PCB sites, including where broke might have ended up during the relevant time period. In December 1998, Jaakko Poyry produced an analysis for Sidley of "whether there are any paper mills in the vicinity of sites that EPA has identified as being contaminated with PCB."[65] This analysis included consideration of the specific geographical region of the Kalamazoo River.

Sidley's investigation into NCR's exposure at the Kalamazoo River Superfund Site continued through 1998 and into 1999, as evidenced by key quotes from documents during those years. Some of the documents discuss the status of Kalamazoo litigation-related tasks.[66] Other documents describe legal theories to further research in support of NCR's position at the Fox River Superfund Site that held larger implications, such as NCR counsel's focus on rebutting CERCLA arranger liability.[67] One document in particular noted:

> Specifically, we need to develop evidence and legal arguments that demonstrate that the sale of NCR broke was in fact the sale of a 'useful product.' To accomplish this, we need to undertake four tasks:
>
> 1. Update Arranger Liability White Paper . . .
> 2. Prepare an Analysis of Whether NCR Broke Would Constitute a "Solid Waste" Under RCRA . . .
> 3. Synthesize Evidence Showing That Broke Was "Valuable" and Not a "Waste" . . .
> 4. Investigate Whether To Retain an Additional Expert on the Limited Issue of Whether There Was a 'Market" for Broke.[68]

---

[65] NCRV_13601949.

[66] NCRV_13588179 ("Status: [PHR] has completed report on Kalamazoo River research, and submitted proposal for additional work . . . Top Priority Task: Develop list of additional witnesses to be interviewed (S&A)"); NCRV_13610231 ("Review documents obtained by PHR from Kalamazoo River case. S&A performed this work. Identify additional potential waste paper consultants. S&A performed this work. Schedule additional broker interviews. S&A and JPC performed this work."); NCRV_13609207 ("The Kalamazoo issue is stalled as everyone from RMT who was contemplating that work has been out of the office.").

[67] NCRV_13582731 ("Brokers hold the key to many of the gaps in our current information (e.g. where did the ACPC's/ CL's broke go; which recycle mills used post-consumer waste paper that may have contained NCR Paper brand; how much post-consumer NCR Paper brand paper was recycled)"); NCRV_13582735 ("Useful Product Defense: Retain an expert (economist?) to develop the argument that broke was a useful product. Use Jaakko Poyry to collect supporting information (prices; trends; broke as substitute for pulp)."); *id.* ("Legal Research: Whether third-party defense to arranger liability can be asserted"); NCRV_13582719 ("Rebuttal of the claim that the sale of NCR paper broke constituted an 'arrangement for disposal' under CERCLA").

[68] NCRV_13582725-26.

NCR's counsel explained that, while they were focused on Fox River litigation in the immediate-term, they were "closely monitoring NCR/API's potential exposure at other PCB-contaminated sites" including at the Kalamazoo River Superfund Site.[69]

In April 1999, Sidley submitted a response to a CERCLA information request from the U.S. Fish and Wildlife Service which included questions and responses regarding broke sold to paper producers outside the Fox River Valley.[70] In June 1999, Sidley emails cited another potential site (Cumberland Bay on Lake Champlain) which could be the first "emerging" carbonless copy paper site outside of the Fox and Kalamazoo Rivers.[71]

The deposition testimony by NCR's witnesses and by witnesses from Sidley in these proceedings confirms that Sidley and NCR were concerned about NCR's potential liability exposure in relation to the Kalamazoo River Superfund Site.

For example, when asked during his 2026 deposition whether Mr. Westerfield of Sidley "expect[ed] at that point in 1998 [] that NCR and API would be brought into the Kalamazoo", he responded "[e]xpectation's a little strong a word but [] there was a real risk that we would get brought in."[72] Similarly, during a 2026 deposition of Mr. Schlickman of Sidley, the deposing attorney asked "at this time, you were certainly aware that there was potential liability for NCR at the – Kalamazoo Site?" and Mr. Schlickman responded "I'm not sure what you mean by certainly aware, but we understood there was some potential liability at the Kalamazoo Site and possibly other sites."[73] During his 2026 deposition, Mr. Hoak of NCR testified "at some point in time we knew that there was ongoing litigation involving the Kalamazoo that we were not a party to. But we knew that PCBs from carbonless paper were part of the contamination in that river; and, therefore, we were concerned that at some point we might be brought in to the – to the litigation."[74]

---

[69] NCRV_13582728-29 ("[W]e recently retained PHR Environmental to review the Kalamazoo River litigation files, the result of which was the discovery of some very useful information (e.g. the Valley Report) . . . we have reviewed the EPA's report entitled "The Incidence and Severity of Sediment Contamination in Surface Waters of the United States: National Sediment Quality Survey" (EPA 823-R-97-006) to identify those sites identified as being contaminated with PCB. Using that list, we will ask Jaakko Poyry to identify whether there are any paper mills or coaters in the vicinity. This project can be completed by year end.").

[70] NCRV_00094894-95.

[71] NCRV_13609580.

[72] Deposition of Evan B. Westerfield 157:13-18.

[73] Deposition of J. Andrew Schlickman 153: 7-19.

[74] Draft Deposition Transcript of Jonathan S. Hoak 97: 5-11.

## V. Conclusion

The following evidence in particular would have informed NCR's assessment of whether it would be liable as an "arranger" in connection with PCB contamination of the Kalamazoo River Superfund Site:

- Evidence that CCP broke from the Appleton facilities and/or NCR Systemedia facilities was a source of PCB contamination of the Kalamazoo River Superfund Site;
- Evidence of whether NCR's CCP broke was treated as a waste. This would have included (among other factors) whether NCR sold its CCP broke for a profit, whether the paper industry considered NCR CCP broke to be a useful product before treatment, and whether NCR CCP broke had to go through treatment before re-use;
- Evidence of whether NCR was aware of the environmental hazards associated with its CCP broke.

Based on my review of documents and deposition testimony in this case, it appears that NCR and its lawyers were concerned that NCR would be legally pursued for PCB contamination at the Kalamazoo River Superfund Site and formed the view—prior to the execution of the CSA—that it was likely claims would be commenced against NCR regarding the Kalamazoo River Superfund Site.

## VI. References

In coming to my conclusions, I reviewed the documents listed on the attached **Appendix B**. I also reviewed case law and other legal sources as cited herein.

**APPENDIX A**

The following are a list of significant federal cases from 1980 to 1999 that opined on CERCLA arranger liability.

| | | |
|---|---|---|
| March 30, 1984 | *United States v. A & F Materials Co.*, 582 F. Supp. 842, 844-45 (S.D. Ill.) | Held: Denying summary judgment under CERCLA where jet aircraft production company produced aluminum etch caustic solution as byproduct and arranged to sell it for reuse or discarding. "[L]iability for releases under § 107(a)(3) is not endless; it ends with that party who both owned the hazardous waste and made the crucial decision how it would be disposed of or treated, and by whom." |
| June 26, 1984 | *New York v. General Electric Co.*, 592 F. Supp. 291, 295-97 (N.D.N.Y.) | Held: Finding on motion to dismiss that "it appears clear" defendant arranged to dispose of its waste where it sold drums of used transformer oil containing hazardous substances to a company that reused it for drag racing dust control. "[A] waste generator's liability under CERCLA is not to be so facilely circumvented by its characterization of its arrangements as sales." |
| March 28, 1989 | *Prudential Insurance Co. of America v. U.S. Gypsum,* 711 F. Supp. 1244, 1254-55 (D.N.J.) | Held: "Merely characterizing a transaction as a sale is insufficient to avoid CERCLA liability." However, CERCLA may not impose liability where defendants sold asbestos-containing products as part of complete, new, useful products because defendants were not arranging to dispose of the products. |
| April 25, 1989 | *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, (8th Cir.) | Held: On motion to dismiss, Plaintiffs sufficiently stated a claim upon which relief could be granted under CERCLA where Plaintiffs alleged that Defendants were arrangers because they contracted with a third party to take Defendants' technical grade pesticide (over which they retained ownership) and reformulate it into commercial grade pesticide, resulting in some hazardous waste. |

| | | |
|---|---|---|
| Feb. 9, 1990 | *Florida Power & Light Co. v. Allis Chalmers Corp*., 893 F.2d 1313, 1318 (11th Cir.) | Held: In light of the broad remedial nature of CERCLA, even though a manufacturer does not make the critical decisions as to how, when, and by whom a hazardous substance is to be disposed, the manufacturer may be liable under CERCLA if there is evidence that the manufacturer is the party responsible for "otherwise arranging" for the disposal of the hazardous substance. |
| March 30, 1992 | *United States v. Pesses*, 794 F. Supp. 151, 156 (W.D. Penn.) | Held: "CERCLA liability may be found in the following circumstances: where a defendant sells its hazardous waste substances and makes the crucial decision on how its substances are disposed of or treated, where a defendant retains ownership of its substances and has authority to control the way its substances are treated and/or disposed of, and where a defendant sells its hazardous substances to a facility with knowledge that the substances will be disposed of there."<br><br>In this case, Court held CERCLA liability applied even when defendants insisted their primary purpose in selling scrap material was to make a profit—not dispose and/or treat hazardous substances. |
| Aug. 24, 1992 | *Jones-Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 694-95 (9th Cir.) | Held: CERCLA imposes liability where chemical treatment company retained ownership of all materials it supplied to chemical formulating company, and the agreement between the companies contemplated some spillage of materials containing substances ultimately classified as hazardous. |
| Oct. 8, 1992 | *United States v. Petersen Sand and Gravel, Inc.*, 806 F. Supp. 1346, 1353-55 (N.D. Ill.) | Held: There is no bright line rule between a sale and a disposal under CERCLA. Court must conduct a fact-specific inquiry into nature of the transaction. Where seller arranged for disposal of its by-product fly ash for use as a raw material for manufacturing road base but did not arrange for disposal at the specific Superfund Site, CERCLA liability did not apply. "Certainly, seller liability for the later misuse by the buyer of useful but |

| | | |
|---|---|---|
| | | hazardous ingredients in a manufacturing process was not intended by CERCLA's authors; such liability would chill permissible manufacturing." |
| Dec. 24, 1992 | *Chesapeake and Potomac Telephone Co. of Virginia v. Peck Iron & Metal Co.*, 814 F.Supp 1269, 1274-75 (E.D.Va.) | Held: CERCLA imposes liability where defendant sold spent lead acid batteries to a battery breaking and lead reclamation facility because the spent batteries were no longer new useful products that could be used for their intended purposes. |
| April 28, 1994 | *Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1574-75 (9th Cir.) | Held: CERCLA imposes liability where defendant sold a spent caustic solution (slag) to logyards that was a by-product of its principal business with nominal commercial value, and it had previously dumped the solution or paid to have the solution hauled away. |
| July 19, 1994 | *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1143 (N.D.Fla.) | Held: Finding most defendants liable under § 107(a)(3) of CERCLA where defendants sold spent lead acid batteries to a battery salvage service because they exercised discretion in how, when, and where the batteries were to be treated and disposed of, and proof of specific intent or knowledge is not necessary. |
| Aug. 10, 1994 | *Catellus Development Corp. v. United States*, 34 F.3d 748, 750-53 (9th Cir.) | Held: Finding an "arrangement" occurred under CERCLA where a party sells a substance that has the characteristic of waste at the point at which it is delivered to the buying party, and the treatment was inherent in the particular arrangement, even if the selling party does not retain control over the details leading to the release. |
| Aug. 12, 1994 | *United States v. Maryland Sand, Gravel, and Stone Co.*, Civil No. HAR 89-2869, 1994 WL 541069 at *4-8 (D.Md.) | Held: CERCLA imposes liability where defendants transferred materials containing hazardous substances generated as by-products in their operations, and for which they had no further use, even when the recipients placed some residual value on the waste. "In delineating the scope of CERCLA's 'arranger' liability in the context of assessing a generator's obligation to clean-up hazardous waste sites, the 'useful |

| | | |
|---|---|---|
| | | products' doctrine, not the 'crucial decision' test, is more loyal to Congress' broad environmental objectives." |
| Dec. 6, 1994 | *Cadillac Fairview/ California, Inc. v. United States*, 41 F.3d 562, 566 (9th Cir.) | Held: A transaction is not beyond the reach of CERCLA arranger liability simply because it is cast in the form of a sale. The question is whether, in light of all the circumstances, the transaction involved an arrangement for disposal or treatment of a hazardous waste. A genuine issue of material fact remains whether rubber companies who transferred contaminated styrene to the producer for redistillation sold a useful product or are subject to arranger liability. |
| March 24, 1995 | *Ekotek Site PRP Committee v. Self*, 881 F. Supp. 1516, 1525-28 (D.Utah) | Held: The "useful products" defense to CERCLA is focused only on whether the product is still fit for its original purpose. Where transporters of used oil shipped the used oil to an oil recycling facility, the used oil was no longer fit for its original purpose. The characterization of the transfer as a "sale" does not provide protection from CERCLA liability. |
| Nov. 22, 1996 | *United States v. Cello-Foil Products, Inc.*, 100 F.3d. 1227, 1231-34 (6th Cir.) | Held: Intent is relevant to determining arranger liability under CERCLA. Where defendants bought drums of chemical solvents from a solvent company, then returned the used drums in various states of cleanliness to the solvent company for credit, an issue of fact existed as to the defendants' intent to arrange for disposal of hazardous substances. |
| Jan. 29, 1997 | *Gould, Inc. v. A & M Battery and Tire Service*, 954 F. Supp. 1014, 1018-19 (M.D. Penn.) | Held: CERCLA imposes liability on defendants who sell spent batteries for reclamation of lead, even through a middleman or broker. |
| May 21, 1997 | *United States v. Vertac Chemical Corp.*, 966 F. | Held: CERCLA did not impose liability on chemical manufacturer who sold to Defendant, in a legitimate business transaction for profit, a |

| | | |
|---|---|---|
| | Supp. 1491, 1504-08 (E.D. Ark.) | useful, technical grade chemical product for use as a raw material. |
| April 29, 1998 | *Pneumo Abex Corp. v. High Point, Thomasville, and Denton Railroad Co.*, 142 F.3d 769, 775-76 (4th Cir.) | Held: "In determining whether a transaction was for the discard of hazardous substances or for the sale of valuable materials, courts focus on several factors: the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, the value of the materials sold, the usefulness of the materials in the condition in which they were sold, and the state of the product at the time of transferral (was the hazardous material contained or leaking/ loose)." Where the intent of both parties to the transaction is that the product is valuable and would be reused in its entirety, CERCLA liability does not apply. |
| July 9, 1999 | *RSR Corp v. Avanti Development, Inc.*, 69 F. Supp. 2d 1119, 1126- (S.D. Ind.) | Held: In the Seventh Circuit, intent and the useful product doctrine are relevant to an analysis of arranger liability. Where a defendant broke used batteries and salvaged the lead plates inside, then sold the lead plates for a profit as a useful product to a lead smelter in a bona fide business transaction, CERCLA liability does not apply. |

## APPENDIX B

The following are a list of documents I reviewed in coming to my conclusions.

| Tab | Document Description | Exhibit Ref. | Bates Stamp | Date |
|---|---|---|---|---|
| **Exhibits** | | | | |
| 1. | Memorandum regarding a NCR-Monsanto meeting RE: Plasticizer Sales Call Report | DEFT 0111 | NCRV_00137028 | 03/27/1969 |
| 2. | Letter from Bennett to Laing | DEFT 0004 | NCRV_12910830 | 02/03/1970 |
| 3. | Call Report of Meeting between NCR and Monsanto on September 25, 1970 | DEFT 0112 | NCRV_00112846 | 09/28/1970 |
| 4. | Letter from Eggleson (State of Wisconsin Department of Justice) to Kowal | DEFT 0170 | NCRV_12971212 | 09/09/1994 |
| 5. | Letter from Bush to Hoak | DEFT 0156 | NCRV_00953159 | 07/08/1995 |
| 6. | Letter from Bush to Hoak | DEFT 0157 | NCRV_13583227 | 07/21/1995 |
| 7. | Interview Summary of Gaylon Jay "Bill" Wilson (Redacted) | DEFT 0164 | NCRV_13608733 | 07/21/1995 |
| 8. | Letter from Bush to Hoak | DEFT 0171 | NCRV_13583227 | 07/21/1995 |
| 9. | Interview Summary of Barrett Green (Redacted) | DEFT 0159 | NCRV_13608182 | 07/24/1995 |
| 10. | Interview Summary of Jim Herbig (Redacted) | DEFT 0161 | NCRV_13608207 | 07/24/1995 |
| 11. | Letter from Bush to Hoak | DEFT 0165 | NCRV_13583229 | 07/24/1995 |
| 12. | Interview Summary of J. J. Hangen (Redacted) | DEFT 0162 | NCRV_13608198 | 07/27/1995 |
| 13. | Interview Summary of William Talmage (Redacted) | DEFT 0163 | NCRV_13608626 | 07/28/1995 |
| 14. | Letter from Hoak to Bush, cc Bourque, Chema, Konicki RE: AT&T GIS v API & BAT | DEFT 0133; PLTF 0145 | NCRV_12971224; BAT.00678251 | 09/05/1995 |
| 15. | Letter from Chema to Bourque RE: AT&T GIS v Appleton Papers Inc. and BAT, 95 Civ. 4620 (KTD) | PLTF 0146 | NCRV_00534010 | 09/14/1995 |
| 16. | Revised Joint Defense Agreement | PLTF 0147 | NCRV_00492640 | 09/14/1995 |
| 17. | Letter from Hoak to Bush | DEFT 0166 | NCRV_00022668 | 09/25/1995 |
| 18. | Letter from Bierman to Bourque | DEFT 0056 | NCRV_00019087 | 11/22/1995 |
| 19. | Letter from Russell to Bierman | DEFT 0005 | NCRV_00492701 | 12/19/1995 |
| 20. | Letter from Russell to Bierman RE: AT&T GIS v. API & BAT | DEFT 0037 | NCRV_00492701 | 12/19/1995 |

| | | | | |
|---|---|---|---|---|
| 21. | Joint Defense Agreement | PLTF 0003 | BAT.00733631 | 12/19/1995 |
| 22. | Memorandum from Ballard Spahr Andrews & Ingersoll to Fox River Seven RE: Allocation between the Fox River Group Mills and NCR/Appleton Papers | DEFT 0169<br>DEFT 0172 | BAT.00729600 | 01/08/1996 |
| 23. | Memorandum from Schlickman to File RE: Interviews of Appleton Paper Employees | DEFT 0059 | NCRV_13608081 | 02/26/1996 |
| 24. | Memorandum from Schlickman to File RE: NCR/Fox River - - Interviews of Appleton Paper Employees | DEFT 0168 | NCRV_13609160 | 02/26/1996 |
| 25. | Letter from Mandelbaum to McMahon, Schlickman, Moertl and Bourque RE: Fox River | DEFT 0102 | NCRV_00028794 | 03/06/1996 |
| 26. | Confidentiality Agreement | DEFT 0057 | NCRV_02650337 | 03/15/1996 |
| 27. | Memorandum from Moertl to File RE: Interview with Appleton Paper Employees on March 13, 1996 | DEFT 0002 | NCRV_13608054 | 04/02/1996 |
| 28. | Memorandum from Moertl to File RE: Interview with Appleton Paper Employees on March 13, 1996 | PLTF 0016 | BAT.00729612 | 04/02/1996 |
| 29. | Memorandum from Moertl to File RE: Interview with Appleton Paper Employees | DEFT 0060 | NCRV_13608241 | 04/02/1996 |
| 30. | Draft Memorandum from Macaulay to Schlickman RE: Meeting at API, NCR/API Issues at Fox River | DEFT 0058 | NCRV_13582379 | 04/22/1996 |
| 31. | Letter from Moertl to Samson and Bewer RE: PCBS and broke | DEFT 0062 | NCRV_13609069 | 04/22/1996 |
| 32. | Memorandum from Moertl to Samson, Brewer, McMahon, Schlickman, Chutkow and Heyde RE: NCR – PCBs on NCR Paper and "Broke" | DEFT 0115 | NCRV_13609069 | 04/22/1996 |
| 33. | Fax from Macaulay to Schlickman RE: April 19th Meeting at API attaching Memo RE: Meeting at API, 4/19/96 re: NCR/API issues | DEFT 0129 | NCRV_00028145 | 04/23/1996 |
| 34. | Memorandum from Moertl to File RE: Interview of Floyd Strelow | DEFT 0042 | NCRV_13602890 | 07/16/1996 |
| 35. | Fax from Moertl to Hultgren | DEFT 0049 | APPVIONLLC_0000 0127 | 07/16/1996 |
| 36. | Memorandum from Moertl to File RE: Interview of Dr. William Becker, Former API and NCR Employee | DEFT 0003 | BAT.00729631 | 07/17/1996 |
| 37. | Letter from Moertl to Bourque, Hultgren and Samson re: Interview Notes for Leo Golper, Floyd Strelow and Becker | PLTF 0037;<br>PLTF 0061 | APPVIONLLC_0000 0239 | 07/17/1996 |
| 38. | Memorandum from Moertl to File RE: Interview with Leo Golper on June 26, 1996 | PLTF 0018 | BAT.00729660 | 08/02/1996 |

| | | | | |
|---|---|---|---|---|
| 39. | Memorandum from Moertl to File RE: Interview at Appleton Paper, Inc. on June 25, 1996 of Floyd Strelow | DEFT 0113 | NCRV_13606744 | 08/02/1996 |
| 40. | Memorandum from McMahon to Bourque and Hultgren RE: Mill Group "Arranged for Disposal" Theories | DEFT 0011 | NCRV_13601543 | 08/08/1996 |
| 41. | Interview from Moertl to: Brewer, Samson, Bourque, Hultgren, Macaulay and Barats RE: Interviews with API/NCR Employees | PLTF 0036 | APPVIONLLC_0000 0223 | 08/21/1996 |
| 42. | Memorandum from Moertl to NCR Fact File RE: Knowledge of Others in Paper Industry regarding contents of NCR Paper Emulsion | DEFT 0063 | NCRV_13609959 | 09/10/1996 |
| 43. | Fax from Adams to Bourque and Russell RE: NCR/API RFP Analysis | PLTF 0004 | BAT.00718920 | 09/13/1996 |
| 44. | Memorandum from Moertl to File RE: Interviewing Gordon Taylor | DEFT 0061 | NCRV_13609970 | 10/15/1996 |
| 45. | Memorandum from Moertl to File RE: Potential Witnesses to Interview | DEFT 0064 | NCRV_13609964-66 | 10/15/1996 |
| 46. | Memorandum from Moertl to File RE: Miscellaneous Facts About Broke | DEFT 0065<br>DEFT 0114 | NCRV_13609967-69 | 10/15/1996 |
| 47. | Fax from Pisciotto to Schlickman and Bourque RE: Weekly Report for Week Ending 1/2/97 | PLTF 0005 | BAT.00718152 | 01/06/1997 |
| 48. | Memorandum from Heyde to File RE: NCR/Fox River – Telephone Interview of Jerry Goodman | DEFT 0043 | NCRV_13608172 | 01/10/1997 |
| 49. | Memorandum from Heyde to File RE: NCR/Fox River – Telephone Interview of Jerry Goodman | PLTF 0066 | NCRV_13607978 (pages 195 – 198) | 01/10/1997 |
| 50. | Fax from Pisciotto to Bourque and Schlickman RE: Weekly Report for week ending 1/9/1997, attaching Draft Technical Strategy Document | PLTF 0064 | BAT.00718943 | 01/13/1997 |
| 51. | KRSG v. Rockwell Summary Judgment Opinion | DEFT 0086 | NCRV_13586015 | 02/21/1997 |
| 52. | Memorandum from Westerfield to Mieliulis and Gochman RE: Fox River | DEFT 0090 | BAT.00730719 | 03/05/1997 |
| 53. | Email from Adams to Russell RE: Work Product | DEFT 0040 | BAT.00713520 | 03/07/1997 |
| 54. | Fax from Warchall to Russell containing memorandum from Warchall to Samson, Brewer, Russell, Hultgren RE: PTI Agreement, attaching draft agreement with PTI | DEFT 0134 | BAT.00719072 | 03/18/1997 |
| 55. | EPA National Priorities List - Allied Paper, Inc./Portage Creek/Kalamazoo River | DEFT 0089 | NCRV_13586012 | 03/26/1997 |
| 56. | Engagement letter from Sidley to Barrick and Bourque RE: Agreement to Provide Consulting Services | DEFT 0087 | NCRV_08283480 | 04/10/1997 |

| | | | | |
|---|---|---|---|---|
| 57. | Letter from Warchall to Wible and Bourque RE: Agreement to Provide Consulting Services | DEFT 0007 | NCRV_02650313 | 04/22/1997 |
| 58. | Engagement letter from Sidley to Wible and Bourque | PLTF 0006 | NCRV_02650313 | 04/22/1997 |
| 59. | Email from McMahon to Hartwig RE: FW: Follow up to John Gierig's Discussion with Rep. Hobson | PLTF 0152 | NCRV_13583293 | 06/11/1997 |
| 60. | Fax from Servidea to Samson, Schlickman, McMahon, cc Hoak, Gierig, RE: Rep. Hobson Correspondence to Rep. Oxley | PLTF 0153 | NCRV_13582390 | 06/20/1997 |
| 61. | Fax from Servidea to Samson, Schlickman and McMahon copying Hoak and Giering | DEFT 0184 | NCRV_13582390 | 06/20/1997 |
| 62. | Memorandum from Westerfield to Russell and Gochman RE: Fox River/Factual Investigation | PLTF 0017 | BAT.00730054 | 06/23/1997 |
| 63. | Fax from Heyde to Adams, Samson, Barrett and Russell RE: Project 2000: New Items | DEFT 0041 | NCRV_00494548 | 07/17/1997 |
| 64. | Fox River Group steering committee "Revised Messages" | PLTF 0020 | BAT.00720265 | 07/22/1997 |
| 65. | Memorandum from Westerfield to McMahon, Schlickman, Hanebutt and Dickett RE: Fox River/Factual Investigation: PCBs into the Mills | DEFT 0088 | NCRV_13608882 | 08/01/1997 |
| 66. | Email from Heyde to St. Jean, RE: Kalamazoo River | DEFT 0044 | NCRV_13585969 | 09/11/1997 |
| 67. | Letter from Hoak, Samson, Servidea to Nellen, cc Wilson RE: Superfund Reform: Recyclable Material Exemption | PLTF 0154 | NCRV_13606695 | 09/11/1997 |
| 68. | Memorandum from Schlickman, Hanebutt, Westerfield to Bourque, Russell, Gochman RE: Fix River: Retention of Experts/Jaakkoo Poyry and PHR Environmental | DEFT 0120 | NCRV_13612932 | 09/17/1997 |
| 69. | Memorandum from Hanebutt and Westerfield to Samon RE: Fox River: Meeting with RMT | DEFT 0173 | NCRV_13610987 | 09/17/1997 |
| 70. | Fax from Westerfield to Gochman RE: Fox River | DEFT 0091 | BAT.00730713 | 09/24/1997 |
| 71. | Letter from Gravel to Hanebutt containing signed PHR Agreement, dated 24/10/1997 | DEFT 0135<br>PLTF 0148 | NCRV_13611938 | 10/27/1997 |
| 72. | Email from Servidea to Hoak, Nyquist, cc Samson, Schlickman, McMahon RE: Superfund – Light at the End ?? | PLTF 0155 | NCRV_13582451 | 10/30/1997 |
| 73. | Email from Bourque to Schlickman RE: Privileged & Confidential - Mediation | PLTF 0043<br>DEFT 0116 | BAT.00713588 | 11/12/1997 |
| 74. | Letter from Gravel to Westerfield | DEFT 0167<br>DEFT 0174 | NCRV_13612957 | 11/13/1997 |
| 75. | Memorandum from Westerfield to Brewer and others RE: Progress Meeting with RMT | DEFT 0008 | BAT.00729596 | 11/21/1997 |

| | | | | |
|---|---|---|---|---|
| 76. | Fax from Westerfield to Gochman forwarding engagement letter with Jaakko Poyry | PLTF 0007 | BAT.00721810 | 12/04/1997 |
| 77. | Fax from Westerfield to Gochman RE: Fox River Matter | DEFT 0009 | BAT.00721856 | 12/09/1997 |
| 78. | Fax from Russell to Martone, forwarding fax from Westerfield to Gochman | DEFT 0136 | BAT.00721856 | 12/10/1997 |
| 79. | Letter from Hanebutt to Russell RE: NCR v, API and BAT/Mediation | DEFT 0032 | BAT.00729226 | 01/21/1998 |
| 80. | Mediation Brief of Defendants, Appleton Papers Inc. and BAT Industries | PLTF 0044 | BAT.00004482 | 01/28/1998 |
| 81. | Letter from Jaakko Poyry to Westerfield RE: Executed consulting services agreement for the Fox River Matter | DEFT 0121 | NCRV_13612079 | 02/03/1998 |
| 82. | Layn Phillips - Memorandum of Settlement – NCR v Appleton Papers Inc. | DEFT 0117<br>DEFT 0175 | NCRV_00496724<br><br>NCRV_00022838 | 02/12/1998 |
| 83. | Letter from Bourque to Freeman attaching draft Mediation Transcript | PLTF 0025<br>PLTF 0045 | BAT.00729191 | 02/17/1998 |
| 84. | Opinion of Hon. Robert Holmes Bell in Kalamazoo River Study Group v Rockwell International, et al. | DEFT 0140 | NCRV_13585969 | 03/06/1998 |
| 85. | Memorandum from Heyde to McMahon, Schlickman and others, attaching BNA Daily article and Kalamazoo River court decision | DEFT 0016 | NCRV_13609698 | 03/25/1998 |
| 86. | Article from Bureau of National Affairs "Court Dismisses Contribution Actions in Kalamazoo River PCB Contamination Suit" | PLTF 0021 | BAT.00685641 | 03/27/1998 |
| 87. | Letter from Schlickman to Bourque RE: Draft settlement agreement | PLTF 0150 | NCRV_13606338 | 04/01/1998 |
| 88. | Memorandum from Hanebutt to File RE: Interviews of ACPC Purchasing Personnel (Strelow, Christiansen, Hietpas) | DEFT 0118 | NCRV_13609859 | 04/02/1998 |
| 89. | Email from PHB to McMahon and Schlickman, later forwarded to others | DEFT 0017 | NCRV_13606750 | 04/20/1998 |
| 90. | Fax from Hanebutt to Kingseed, Samson, Freeman and C. Gair | DEFT 0033 | NCRV_13607121 | 04/21/1998 |
| 91. | Letter from Schlickman to Bourque RE: Draft settlement agreement | DEFT 0034 | NCRV_00020488 | 04/23/1998 |
| 92. | Letter from Schlickman to Bourque RE: Draft Settlement agreement | PLTF 0026<br>PLTF 0046 | NCRV_00019098 | 04/23/1998 |

| | | | | |
|---|---|---|---|---|
| 93. | Letter from Schlickman to Bourque RE: Draft settlement agreement | DEFT 0176 | NCRV_13582456 | 04/23/1998 |
| 94. | Fax from Moody to Russell, Wand, Olson, Geisy, Wilson | PLTF 0067 | BAT.00723487 | 05/04/1998 |
| 95. | Letter from Hanebutt to PHR RE: Kalamazoo | DEFT 0018<br>PLTF 0010 | NCRV_13582476<br><br>NCRV_13585787 | 05/29/1998 |
| 96. | Joint Memorandum by Sidley and Simpson Thacher: Brokers and Other recyclers will be worse off than they are under current law if Congress adopts a recyclable materials exemption with an exclusion for paper with PCBs in excess of 50 PPM | PLTF 0022 | NCRV_13585730 | 06/03/1998 |
| 97. | Letter from Schlickman to Russell RE: Recyclable Materials Exemption | PLTF 0023 | NCRV_13584022 | 06/09/1998 |
| 98. | Email from Heyde to McMahon, Schlickman, Warchall cc. St. Jean RE: WAIS Document Retrieval | DEFT 0123 | NCRV_13607073 | 06/10/1998 |
| 99. | Faxed copy to Schlickman of Letter from Servidea to National Fiber Supply | PLTF 0024; DEFT 0144 | NCRV_13584184 | 06/11/1998 |
| 100. | Fax from Hanebutt to Gochman | DEFT 0010 | BAT.00723916 | 06/15/1998 |
| 101. | Fax from Hanebutt to Russell, attaching Memorandum RE: PHR | DEFT 0019; PLTF 0009 | BAT.00723928 | 06/16/1998 |
| 102. | Fax from Karch to Russell | DEFT 0124 | BAT.00721173 | 06/16/1998 |
| 103. | Fax from Russell to Bourque, cc Martone | PLTF 0151 | BAT.00723986 | 06/22/1998 |
| 104. | Fax from Samon to Hoak, Karch, Mielius, Russell and Schlickman RE: Fox River | DEFT 0177 | BAT.00723986 | 06/22/1998 |
| 105. | Letter from Hanebutt to Russell RE: Settlement Agreement | DEFT 0035<br><br>PLTF 0027 | NCRV_00022844<br><br>BAT.00000667 | 06/29/1998 |
| 106. | Email from Schlickman to Karch copying Mieliulis, Bourque, Russell and Samson RE: Conflicts Check | DEFT 0179 | BAT.00713960 | 07/02/1998 |
| 107. | Email from Hanebutt to Kern, cc Westerfield, RE: Status of various projects | DEFT 0141 | NCRV_13610203 | 07/09/1998 |
| 108. | Review and Summary of 95-CV-838 Kalamazoo River Study Group v. Rockwell International, et al For Sidley & Austin | DEFT 0045<br>DEFT 0020 | NCRV_13609046 | 07/10/1998 |
| 109. | Fox River Status Report | DEFT 0180 | NCRV_13602178 | 07/14/1998 |
| 110. | Email from Stolzenburg to Hanebutt and Russell RE: Potential Conflicts | DEFT 0022 | BAT.00714027 | 07/22/1998 |

| | | | | |
|---|---|---|---|---|
| 111. | Email from Hanebutt to Samson and others forwarding email from Stolzenburg | DEFT 0023 | NCRV_13588046 | 07/22/1998 |
| 112. | Memorandum from Hanebutt to Samson RE: Fact Book | DEFT 0012 | NCRV_13609231 | 07/24/1998 |
| 113. | Fax from Cesar to Hanebutt RE: Patterson Report | DEFT 0122 | NCRV_13609189 | 07/27/1998 |
| 114. | Memorandum from Hanebutt to Samson, Mieliulis, Stolzenburg and Cesar RE: NCR/Fox River Meeting on August 4 and 5 | PLFT 0014 | NCRV_13583248 | 07/28/1998 |
| 115. | Fax from Hanebutt RE: lunch/dinner headcounts for 8/4-8/5/98 Fox River Meeting | PLTF 0015 | NCRV_02577559 | 07/28/1998 |
| 116. | Memorandum from Hanebutt to Samson, Stolzenburg and Cesar RE: NCR/Fox River Meeting on August 4 and 5 | DEFT 0092 | APPVIONLLC_0000 0201 | 07/28/1998 |
| 117. | Letter from Bourque to Kingseed RE: NCR Corp and API/BAT Arbitration | DEFT 0048 | NCRV_00028716 | 08/04/1998 |
| 118. | API/NCR Status Report on the Fox River Factual Investigation | DEFT 0013 | NCRV_13583260 | 08/04/1998 |
| 119. | Fax from Kingseed to Schlickman RE: NCR Corp and API/BAT Arbitration | PLTF 0028 | BAT.00000745 | 08/13/1998 |
| 120. | Memorandum from Westerfield to Mieliulis, Samson and Harrington RE: Fox River/Factual Investigation | DEFT 0181 | NCRV_13582517 | 08/13/1998 |
| 121. | Memorandum from Heyde to Samson and Karch RE: Fox River Status Report | DEFT 0182 | NCRV_13588196 | 08/27/1998 |
| 122. | Email from Russell to Schlickman RE: Settlement/Joint Def Agreements | PLTF 0029; PLTF 0047 | BAT.00714988 | 09/02/1998 |
| 123. | Email from Schlickman to Russell RE: API/BAT/NCR Settlement Agreement – Privileged & Confidential | PLTF 0068 | BAT.00715014 | 09/10/1998 |
| 124. | Fax from Barrick to Warchall RE: Expert Report/Testimony of Rockwell International | DEFT 0021 | NCRV_13610166 | 09/24/1998 |
| 125. | Email from Russell to Schlickman RE: Settlement | PLTF 0069 | BAT.00715182 | 09/30/1998 |
| 126. | Fax from Dungate to Bourque RE: Fox River Settlement Agreement | PLTF 0070 | BAT.00740399 | 09/30/1998 |
| 127. | Memorandum from Heyde to Samson and Karch RE: Fox River Status Report | DEFT 0001 | NCRV_13588177 | 10/02/1998 |
| 128. | Fax from Russell to Dungate RE: NCR v Appleton and BAT Settlement | PLTF 0071 | BAT.00740395 | 10/08/1998 |
| 129. | Email from Bourque to Schlickman RE: JD Agreement | PLTF 0012 | BAT.00715850 | 10/20/1998 |

| | | | | |
|---|---|---|---|---|
| 130. | Draft memorandum from Westerfield to Schlickman RE: Fox River – Fact Investigation Projects | DEFT 0093 | NCRV_13610230 | 10/21/1998 |
| 131. | Email from Stolzenburg to Hanebutt | DEFT 0095; DEFT 0126 | NCRV_13609207 | 10/25/1998 |
| 132. | Memorandum from Hanebutt and Westerfield to Samson and Mieliulis RE: Factual Investigation/Detailed Task List | DEFT 0014 | NCRV_13582730 | 10/27/1998 |
| 133. | Letter from Hanebutt to Samson and Mieliulis RE: Factual Investigation Action Plan | DEFT 0015 | NCRV_13582717 | 10/27/1998 |
| 134. | Email from Schlickman to McMahon, Hanebutt, Westerfield, Heyde, Warchall, Dickett RE: Follow-Up to API/NCR Coordination Meeting | DEFT 0127 | NCRV_13609205 | 11/01/1998 |
| 135. | Memorandum from Hanebutt to Samson and Mieliulis RE: Other PCB contaminated sites | DEFT 0028 | NCRV_13601949 | 11/04/1998 |
| 136. | Letter from Vetter (RMT) to Hanebutt | DEFT 0125 | NCRV_13582742 | 11/05/1998 |
| 137. | Memorandum from Hanebutt to Mieliulis and Samson RE: RMT | DEFT 0025 | NCRV_13582739 | 11/10/1998 |
| 138. | Letter from Hanebutt to Jaakko Poyry RE: Consulting Project for NCR and API | DEFT 0046 | NCRV_13582712 | 11/11/1998 |
| 139. | Fax from Hanebutt to Samson, Mieliulis, Karch, Hoak, Kingseed and Bourque attaching final CSA, SAAA, JIRA and JDRA | PLTF 0011; PLTF 0048 | BAT.00724071 | 11/16/1998 |
| 140. | Memorandum from Hanebutt to Mieliulis, Samson, McMahon, Schlickman, Westerfield and Heyde RE: Broke | DEFT 0183 | NCRV_13602870 | 11/19/1998 |
| 141. | Email from Westerfield to Hanebutt RE: Velleux conversation and status of RMT/ Kalamazoo | DEFT 0026 | NCRV_13609198 | 11/20/1998 |
| 142. | Letter from Schlickman to Samson and Karch RE: Fox River/API/NCR Joint Defense Statement for October, 1998 | DEFT 0027 | NCRV_00982989 | 11/24/1998 |
| 143. | Memo from McMahon and Schlickman to McIntosh, Mieliulis, Samson, Servidea, Hultgren, RE: Fox Strategy | DEFT 0142 | NCRV_13601997 | 12/01/1998 |
| 144. | Opinion of Hon. Robert Holmes Bell in Kalamazoo River Study Group v Rockwell International, et al. | DEFT 0143 | NCRV_00094430 | 12/07/1998 |
| 145. | Memorandum from Hanebutt to Karch and Bourque RE: Signature Pages/ Settlement Agreement | DEFT 0036 | NCRV_13582786 | 12/14/1998 |
| 146. | Joint Defense and Representation Agreement | DEFT 0038 | NCRV_13585579 | 12/23/1998 |
| 147. | Memorandum from Karch to Hanebutt RE: Settlement Documents API Law Department File No. 54,100.51-8 | PLTF 0031 | NCRV_13585601 | 12/23/1998 |

| | | | | |
|---|---|---|---|---|
| 148. | BAT Industries p.l.c. Report and Accounts for the year ended 31 December 1998 | Casey 0008 | | 12/31/1998 |
| 149. | Letter from Simpson Thacher to Radis with Karch in CC | DEFT 0006 | BAT.00693818 | 01/15/1999 |
| 150. | Memorandum from Schlickman and Heyde to Mieliulis and Samson RE: Fox River Budget and Project Management | DEFT 0094 | NCRV_13602175 | 01/25/1999 |
| 151. | Fax from Dungate to Wiliams; Letter from Davies to Porter dated 10 July 1995 | PLTF 0049 | BAT.00710107-08 | 03/02/1999 |
| 152. | Emails from Hanebutt to Schlickman RE: EarthFax Development Corp. 1770 N.Research Park Way, N. Logan, UT 84341 | DEFT 0029 | NCRV_13598214 | 03/09/1999 |
| 153. | Fax from Dungate to Williams | PLTF 0050 | NCRV_01065981 | 03/15/1999 |
| 154. | Letter from Mieliulis to Allen RE: Section 104(e) Information Request Dated March 22, 1999 | DEFT 0104 | NCRV_00048910 | 04/05/1999 |
| 155. | Fax from Kingseed to Russell RE: BAT's Signature of Settlement Agreement | PLTF 0032 | BAT.00732170 | 04/07/1999 |
| 156. | Fax from Williams to Dungate RE: Settlement Agreement signing | PLTF 0033; PLTF 0051 | NCRV_01065982 | 04/12/1999 |
| 157. | Fax from Dungate to Williams and Simpson Thacher RE: Settlement Agreement signing | PLTF 0034; PLTF 0052 | NCRV_01065983 | 04/12/1999 |
| 158. | Fax from Dungate to Wiliams RE: Fox River | PLTF 0053 | NCRV_01065984 | 04/19/1999 |
| 159. | Fax from Dungate to Wiliams RE: NCR Settlement Agreement | PLTF 0054 | NCRV_01065985 | 04/26/1999 |
| 160. | Fax from Wiliams to Dungate RE: Fox River | PLTF 0055 | NCRV_01065986 | 05/20/1999 |
| 161. | Transcript of Deposition of Paul Shrank | PLTF 0063 | NCRV_03393949 | 05/26/1999 |
| 162. | Standing Committee Note (BAT Holdings Limited) RE: Litigation – Fox River | PLTF 0056 | BAT.00699148 | 06/07/1999 |
| 163. | Fax from D. Wiliams to Dungate RE: Fox River | PLTF 0057 | NCRV_01065990 | 06/07/1999 |
| 164. | Letter from Russell to Kingseed RE: NCR/Appleton Papers | PLTF 0035 | BAT.00717301 | 06/18/1999 |
| 165. | Email from Schlickman to Warchall, Hanebutt, Heyde RE: FW: Ft. James – Kalamazoo | DEFT 0128 | NCRV_13583094 | 06/22/1999 |
| 166. | Emails between St. Jean, and Hartwig and Heyde RE: Fox River/Lake Champlain | DEFT 0047 | NCRV_13609579 | 06/23/1999 |
| 167. | Letters from Sidley to NCR, API and Simpson Thacher RE: BAT/API/NCR Settlement, attaching CSA, Subsequent Allocation Arbitration Agreement and JIRA | PLTF 0058; DEFT 0119 | NCRV_13585509<br>(pgs. 4-70) | 07/28/1999 |

| | | | | |
|---|---|---|---|---|
| 168. | Transcription of voicemail to Pam Hanebutt from Bill Russell | DEFT 0178 | NCRV_13607928 | 08/26/1999 |
| 169. | Invoice from Jaakko Poyry invoice to R. Bourque for period ending 09.30.1999 | PLTF 0008 | BAT.00737565 | 10/07/1999 |
| 170. | Invoice from Jaakko Poyry for the attention of R. Bourque RE: Consulting Services Period Ending October 31, 1999 | PLTF 0065 | BAT.00734094 | 10/31/1999 |
| 171. | Fax from Thimke (Foley Lardner) to Fox River Group Legal Subcommittee | PLTF 0019 | BAT.00726738 | 11/08/1999 |
| 172. | Memorandum from Westfield to Mieliulis and Samson RE: Fox River/Appleton Interviews January 17, 2000 | DEFT 0098 | NCRV_13594848 | 01/21/2000 |
| 173. | Memorandum from Westerfield to File RE: Fox River Interview of Diane Wangeline | DEFT 0099 | NCRV_13608458 (Pgs. 239-248) | 02/24/2000 |
| 174. | Memorandum from Westerfield to File RE: Fox River Interview of Mike Stevens | DEFT 0100 | NCRV_13608458 (Pgs. 95-97) | 02/24/2000 |
| 175. | Memorandum from Westerfield to File RE: Fox River Interview of Jerry Taylor | DEFT 0101 | NCRV_13606792 | 02/24/2000 |
| 176. | Letter from Hanebutt to Russell RE: BAT/Fox River matter | DEFT 0039 | BAT.00734102 | 03/13/2000 |
| 177. | Letter from Hanebutt to Russell RE: BAT/Fox River Matter | PLTF 0013<br>PLTF 0059 | BAT.00738371<br>BAT.00007504 | 03/13/2000 |
| 178. | Letter from PHR to Hanebutt RE: Case Updates, Kalamazoo River, Michigan | DEFT 0030 | NCRV_13610080 | 05/02/2000 |
| 179. | Invoice from PHR to Hanebutt, for the period of 03.01.2000 - 05.02.2000, RE: Fox River PCB Project, Appleton, WI | DEFT 0031; DEFT 0097 | NCRV_00986269 | 06/02/2000 |
| 180. | BAT Industries p.l.c. Directors' Report and Accounts for the year ended 31 December 2000 | Casey 0002 | | 12/31/2000 |
| 181. | Memorandum from Westerfield to File RE: Fox River/Equitable Factors and Discontinuing Use of Aroclor 1242 | DEFT 0050 | NCRV_13606742 | 04/17/2001 |
| 182. | Email from Russell to Westerfield RE: Joint Defense and Representation Agreement.DOC | DEFT 0083 | BAT.00718042 | 09/17/2001 |
| 183. | API-NCR Fox River Strategy Retreat 2001 | DEFT 0051 | BAT.00020703 | 11/28/2001 |
| 184. | Email from Westerfield to Russell RE: Joint Defense and Representation Agreement | PLTF 0073 | BAT.00003294 | 03/05/2002 |

| | | | | |
|---|---|---|---|---|
| 185. | Memorandum from Westerfield to Bates, Chema, Gower and T. Van Straten RE: API/NCR/AWA Joint Defense Agreement | DEFT 0084 | NCRV_13586578 | 04/05/2002 |
| 186. | Email from Schlickman to Bates and others RE: Georgia-Pacific Disclosures - PRIVILEGED | DEFT 0052 | BAT.00432815 | 05/17/2002 |
| 187. | Memorandum from Westerfield to Chema RE: Fox River | DEFT 0085 | NCRV_13599283 | 06/03/2002 |
| 188. | Email from Schlickman to Hoak, Gower, Karch and Bates | DEFT 0053<br>DEFT 0131 | BAT.00025298<br>NCRV_13587140 | 08/16/2002 |
| 189. | Letter from Karch to Gower | PLTF 0060 | BAT.00436964 | 04/14/2003 |
| 190. | Email from Gower to Kratky, Bates with Cooke and Tauscher RE: FW: Kalamazoo River – Possible Shared Tasks | DEFT 0107 | BAT.00028486 | 05/07/2003 |
| 191. | NCR's Response to the Request for Information Concerning the Allied Paper/Portage Creek/Kalamazoo River Superfund Site | DEFT 0105 | NCRV_00036642 | 06/10/2003 |
| 192. | Response of Apple Papers Inc. to the March 18, 2002, US Environmental Protection Agency's Request for Information Regarding Kalamazoo River | DEFT 0106 | NCRV_00044341 | 06/12/2003 |
| 193. | BAT Industries p.l.c. Directors' Report and Accounts for the year ended 31 December 2007 | Casey 0009 | | 12/31/2007 |
| 194. | Letter from Russell to Karl S. Lytz RE: Appleton Papers, Inc. v George A. Whiting Paper Co.: Georgia-Pacific Subpoena to Simpson Thacher | PLTF 0072 | BAT.00006259 | 08/19/2009 |
| 195. | BAT Industries p.l.c. Directors' Report and Financial Statements for the year ended 31 December 2009 | Casey 0010 | | 12/31/2009 |
| 196. | Letter from NCR to BAT Head of Legal | Casey 0015 | BAT.00248650 | 01/26/2010 |
| 197. | Letter from Gallagher to US Environmental Protection Agency RE: NCR's Response to February 9, 2010 Request for Information Concerning the Allied Paper/Portage Creek/Kalamazoo River Superfund Site | DEFT 0108 | NCRV_00092792<br>(Page 32) | 03/12/2010 |
| 198. | Defendant NCR's answer and affirmative defenses in Georgia-Pacific v. NCR and International Paper. | DEFT 0096 | NCRV_09885341 | 02/08/2011 |
| 199. | Emails between NCR and BAT RE: May 11 meeting proposal | DEFT 0109 | BAT.00705922 | 05/06/2011 |
| 200. | Attendance Note RE: Advising regarding clean-up of Fox River in Illinois | DEFT 0054 | BAT.00705940 | 05/11/2011 |
| 201. | BAT Industries p.l.c. Directors' Report and Financial Statements for the year ended 31 December 2011 | Casey 0011 | BAT.00709618 | 12/31/2011 |

| | | | | |
|---|---|---|---|---|
| 202. | Emails between Cravath and BAT RE: Fox River Litigation – Call on Monday, May 28 | Casey 0005 | NCRV_00549102 | 05/28/2012 |
| 203. | Particulars of Claim in the claim no. 2012 Folio No.213 in BAT -v- (i) Windward and (ii) API | PLTF 0042 | NCRV_13604746 | 06/08/2012 |
| 204. | BAT Industries p.l.c. Directors' Report and Financial Statements for the year ended 31 December 2012 | Casey 0012 | BAT.00709635 | 12/31/2012 |
| 205. | First Witness Statement of Kevin Francis Lloyd | PLTF 0074 | | 10/02/2013 |
| 206. | Deposition transcript of J. Hoak | DEFT 0130 | | 12/10/2013 |
| 207. | BAT Industries p.l.c. Directors' Report and Financial Statements for the year ended 31 December 2013 | Casey 0013 | BAT.00709653 | 12/31/2013 |
| 208. | Fourth Witness Statement of Kevin Francis Lloyd | PLTF 0075 | | 09/23/2015 |
| 209. | BAT Industries p.l.c. Annual report and Financial Statements for the year ended 31 December 2018 | Casey 0014 | BAT.00709839 | 12/31/2018 |
| 210. | Letter from Cooper to Murphy | Casey 0016 | BAT.00706743 | 06/03/2019 |
| 211. | BAT's Initial Disclosures, pursuant to Federal Rule of Civil Procedure 26 (A) (1) | PLTF 0039 | | 10/23/2024 |
| 212. | BAT's Responses and Objections to NCR's First Set of Interrogatories | PLTF 0040 | | 12/13/2024 |
| 213. | NCR Privilege Log (Second Revised) | DEFT 0137 | | 02/24/2025 |
| 214. | Letter from Hogan Lovells to Payne (Sidley) | Casey 0003 | | 02/28/2025 |
| 215. | Plaintiff NCR Notice of 30(B)(6) Deposition | Casey 0006 | | 01/06/2026 |
| 216. | Defendant BAT Responses and Objections to Plaintiff's Notice of 30(B0(6) Deposition | Casey 0007 | | 01/15/2026 |
| 217. | BAT Notice of 30(b)(6) Deposition of NCR | DEFT 0103 | | 01/16/2026 |
| 218. | Plaintiff NCR Responses and Objections to Defendant's BAT Notice of 30(b)(6) dated 21 January 2026 | DEFT 0132 | | 01/21/2026 |
| 219. | Draft Memorandum from Westerfield to Hanebutt RE: Fox River - RMT Conflict of Interest | DEFT 0024 | NCRV_13610241 | [unclear] |
| 220. | Excerpts from BAT Privilege Log | PLTF 0002 | | [unclear] |
| 221. | Employment history of K. Moertl | DEFT 0055 | | [unclear] |
| 222. | LinkedIn profile printout of Robert Bourque | PLTF 0001 | | [unclear] |
| 223. | Companies House printout of Robert James Casey | Casey 0001 | | [unclear] |
| 224. | Extracts of BAT Privilege Log (Casey) | Casey 0004 | | [unclear] |
| 225. | NCR Revised Privilege Log | PLTF 0149 | | [unclear] |

| | | | | |
|---|---|---|---|---|
| 226. | LinkedIn profile printout of David Williams | PLTF 0038 | | [unclear] |
| 227. | Extracts of BAT Privilege Log (Williams) | PLTF 0041 | | [unclear] |
| 228. | Extracts of BAT Privilege Log (Russell) | PLTF 0062 | | [unclear] |
| | **Depositions** | | | |
| 229. | Transcript of the Deposition of Pamela Hanebutt | | | 01/29/2026 |
| 230. | Transcript and Video of the Deposition of John Heyde | | | 01/30/2026 |
| 231. | Transcript of the Deposition of Robert Bourque | | | 02/03/2026 |
| 232. | Transcript of the Deposition of Katie Moertl | | | 02/05/2026 |
| 233. | Transcript of the Deposition of John Giering | | | 02/10/2026 |
| 234. | Transcript of the Deposition of David Williams | | | 02/11/2026 |
| 235. | Transcript and Video of the Deposition of Evan Westerfield | | | 02/16/2026 |
| 236. | Transcript and Video of the First Deposition of J.A Schlickman | DEFT 0138 | | 02/17/2026 |
| 237. | Transcript of the Deposition of William Russell | | | 02/19/2026 |
| 238. | Rough Transcript and Video of the Second Deposition of J.A Schlickman (Rough Draft) | DEFT 0139 | | 02/27/2026 |
| 239. | Rough Transcript of the Deposition of Robert Casey | | | 03/13/2026 |
| 240. | Transcript of the Deposition of Kevin Lloyd | | | 04/09/2026 |
| 241. | Transcript of the Third Deposition of of Andrew Schlickman | | | 04/15/2026 |
| 242. | Rough Transcript of the Deposition of Jonathan Hoak | | | 04/21/2026 |
| 243. | Rough Transcript of the Deposition of Susan Chema | | | 04/28/2026 |
| 244. | Rough Transcript of the Deposition of Paul Samson | | | 05/01/2026 |

# ELEMENTS OF CERCLA LIABILITY (42 U.S.C. 9607)

## 1. Release or Threat

*Of Hazardous Substance*

Was there a release or threatened release of a hazardous substance on the property?

+

## 2. Facility

Is the property where the release occurred a "facility" as defined by CERCLA?

"Facility" includes buildings, areas where hazardous substances have been deposited placed or otherwise come to be located.

42 U.S.C. 9601(12)

+

## 3. Incurred Costs

*by Plaintiff*

Did the release or threatened release of the hazardous substance cause the plaintiff to incur costs?

+

## 4. Covered Person

Does the Defendant fall within one of the four categories of covered persons under CERCLA?

Van Ness Feldman LLP

# COVERED PERSONS UNDER CERCLA (42 U.S.C. 9607)



*Owners & Operators*

The owner and operator of a facility



*Past Owners & Operators*

Any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of



*Arrangers*

Any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter . . . of hazardous substances owned or possessed by such person, by any other party or entity, at any facility …owned or operated by another party or entity and containing such hazardous substances



*Transporters*

Any person who accepted any hazardous substances for transport to disposal or treatment facilities, or sites selected by such person

Van Ness Feldman LLP



Van Ness Feldman LLP

# Difference between Seller and Arranger

| SELLER | ARRANGER |
|---|---|
| NO CERCLA LIABILITY = mere sale of a useful product without additional evidence that the transaction includes "arrangement" for ultimate disposal of a hazardous substance<br><br>*Characterization of the transaction as a "sale" does not automatically provide protection* | CERCLA LIABILITY = transaction includes an arrangement for disposal or treatment of a hazardous substance<br><br>Courts look at facts:<br>• *Intent of the owner of the product*<br>• *Value of the product*<br>• *Use of the product*<br>• *Release of hazardous substance inherent in reuse* |

Van Ness Feldman LLP

vnf.com

# MICHAEL GOODSTEIN

## PARTNER



**CONTACT**
mgoodstein@vnf.com
202.298.1800

**PRACTICES**

Waste & Hazardous Substances
Litigation & Investigations
Water
Air
Native Affairs

**EDUCATION**

Cornell Law School
Brown University

**BAR AND COURT ADMISSIONS**

District of Columbia Bar
Maryland State Bar Florida State Bar
New York State Bar
U.S. District Court for the District of Columbia
U.S. District Court for the District of Colorado
U.S. District Court for the Southern District of New York
U.S. Court of Appeals for the Federal Circuit
U.S. Court of Appeals for the District of Columbia Circuit
U.S. Court of Appeals for the Fourth Circuit
U.S. Court of Appeals for the Eleventh Circuit
U.S. Court of Federal Claims
U.S. Supreme Court
U.S. District Court for the Eastern District of New York
U.S. District Court for the Southern District of Florida
U.S. District Court for the Middle District of Florida
Supreme Court of Florida
District of Columbia Court of Appeals Maryland Court of Appeals
Hopi Tribal Court

## Professional Background

With over 35 years of environmental law experience, Michael Goodstein's practice includes environmental legal issues arising under federal, state, local, and tribal environmental laws, including lead counsel responsibilities in Superfund claims, regulatory matters, natural resource and property damage claims, and related insurance coverage issues. He helps clients identify and address environmental risks, as well as pursue and defend environmental claims, including investigation, negotiation, mediation, litigation, counseling, and liability structuring. Michael has extensive experience representing private and governmental entities on environmental matters. He uses his 360-degree view of environmental law to strategically advise and work with clients to achieve optimal results. Michael is regularly recognized by his peers as a top environmental lawyer in Washington, DC by such publications as Thompson Reuters Super Lawyers, Best Lawyers, the Washington Post, and Washingtonian magazine. Michael serves on the Leadership Council of the Environmental Law Institute.

Prior to joining Van Ness Feldman, Michael previously headed the Washington, DC office for Hunsucker Goodstein PC, with lead counsel responsibilities in a wide variety of environmental matters for public and private clients, including litigation involving Superfund and other federal and state environmental laws, natural resource and property damage, toxic torts, and insurance coverage.

Michael has represented parties in matters related to some of the Nation's largest and most significant Superfund Sites, including, the Passaic River and Newark Bay, the Hackensack River, the Newtown Creek, the Anniston Alabama PCB and Lead Site, the Bresslube Penn Site in Pennsylvania, and the Tuba City Open Dump Site in Arizona among others.

Michael also served with the United States Department of Justice in the Environmental Enforcement Section for 12 years. He was twice awarded the John Marshall Award, one of the Department of Justice's highest honors, for outstanding legal achievement. He has also received the Gold Medal from the Administrator of the United States Environmental Protection Agency for his contributions to the EPA's enforcement program.

While serving with the Justice Department, Michael represented the United States on a number of landmark cases under the Superfund law, the Resource Conservation and Recovery Act, the Clean Water Act, the Clean Air Act, and the Safe Drinking Water Act. These cases included *United States and Texas v. Koch Industries*, a multi-state Clean Water Act enforcement action which involved over 300 oil spills, and *United States v. Smithfield Foods*, which resulted in the highest Clean Water Act penalty ever assessed after trial at the time.

Prior to joining the Department of Justice, Michael was an Assistant County Attorney in Miami, Florida, representing Metropolitan Dade County in Superfund and other environmental, land-use and labor matters.

Michael previously served as co-coordinator of Van Ness Feldman's Litigation and Investigations Practice.

Van Ness Feldman LLP
vnf.com

## Representative Matters

- Representation of a group performing a remedial investigation at the Proteco Landfill Superfund Site in cost recovery litigation.
- Representation of a party in Passaic River Superfund Site litigation.
- Representation of a party in Hackensack River Superfund Site investigation.
- Representation of a party in Newtown Creek Superfund Site related investigation.
- Representation of an Indian Tribe, in environmental and cultural resource issues, including Superfund matters.
- Representation of an Indian Tribe in various environmental and breach of trust matters.
- Representation of a refining company in indemnification action for contribution of costs to address historical contamination at a refinery site in Virginia.
- Representation of a southern U.S. state in a regional air pollution reduction initiative.
- Representation of leading environmental groups as amicus curiae parties before U.S. Supreme Court in landmark Clean Air Act case (Environmental Defense v. Duke Energy, 2006).

## Representative Experience

- PROTECO Landfill Superfund Generator Parties Group v. Colorcon P.R. LLC et al. (D.P.R.)
- Occidental Chemical v. 21st Century Fox et al. (D.N.J.)
- United States v. Alden Leeds et al. (D.N.J.)
- Cherokee Nation v. Bureau of Indian Affairs et al. (D.DC.)
- Comanche Nation and Kiowa Tribe v. United States et al. (W.D.OK.)
- Artisan Truckers et al. v. Roadside Response et al. (Cuyahoga County, Ohio)
- Phoenix Beverages, Inc. et al. v. Exxon Mobil Corporation et al. (E.D.N.Y.)
- United States v. Middleton (M.D. Ga.)
- Solutia Inc., et al. v. McWane, Inc. et al. (N.D. Ala., 11th Cir.)
- United States v. Circle Environmental, Inc. (S.D. Ga.)
- The Hopi Tribe v. City of Flagstaff (Super. Ct. Ariz., Ariz. Ct. App., and Ariz. Sup. Ct.)
- Wiseman Oil Co. Inc. v. TIG Insurance Co. (W.D. Pa.)
- United States v. Allegheny Ludlum (W.D. Pa.)
- Evansville Greenway and Remediation Trust v. SIGECO (S.D. Ind.)
- Western Refining v. BP (E.D. Va.)
- North Carolina v. Tennessee Valley Authority (W.D.N.C.)
- Environmental Defense v. Duke Energy (U.S. S.Ct.)
- Spillane v. Commonwealth Edison, et al. (N.D. Ill.)
- Marmo et al. v. IBP (D. Neb.)
- DMJ v. Capasso et al. (E.D.N.Y.)
- United States and Texas v. Koch Industries (N.D. Okla. & S.D. Tex.)
- United States v. Smithfield Foods (E.D. Va.)
- United States and Arizona v. ASARCO (D. Ariz.)
- United States v. ASARCO (D. Mont.)
- United States and Texas v. ASARCO and Encycle/Texas (S.D. Tex.)
- United States and Pennsylvania v. ALCOA et al. (Moyer Landfill Litigation) (E.D. Pa.)

Van Ness Feldman LLP
vnf.com

- United States and Pennsylvania v. Cosmo Iacavazzi et al. (Lackawanna Landfill Litigation) (M.D. Pa.)
- United States v. Maryland Sand Gravel and Stone (D. Md.)
- United States v. Shaffer Equipment (S.D. Va.)
- United States v. City of San Diego (S.D. Cal.)
- United States v. Corning Glass (M.D. Pa.)

## Superfund Consent Decrees Negotiated

- *U.S. v. Whitmoyer Laboratories* (M.D.Pa.)
- *U.S. v. Champion International* (D.Mt.)
- *U.S. v. Air Products et al.* (D.Md.)
- *U.S. v. ASARCO* (East Helena) (D.Mt.)
- *U.S. v. Burlington Northern* (D.Mt.)
- *U.S. v Allegheny Ludlum* (W. D.Pa.)

## Select Published Decisions

- *Cherokee Nation v. Department of Interior*, February 10, 2023, 2023 WL 2914173 (D.D.C. 2023)
- *Cherokee Nation v. Department of Interior*, 531 F.Supp.3d 87 (D.D.C. 2021)
- *Wiseman Oil Co., Inc. v. TIG Insurance Co.*, 878 F.Supp.2d 597 (W.D. Pa. 2011).
- *Evansville Greenway and Remediation Trust v. SIGECO*, 661 F.Supp.2d 989 (S.D.Ind. 2009).
- *Western Refining Yorktown Inc. v. BP Corp. North America, Inc.*, 618 F. Supp.2d 513 (E.D. Va. 2009).
- *DMJ Associates, LLC v. Capasso*, 288 F. Supp. 2d 262 (E.D.N.Y., 2003).
- *United States v. Smithfield Foods*, Inc., 972 F. Supp. 338 (E.D.Va. 1997).
- *United States v. Maryland Sand, Gravel and Stone Co.*, 1994 WL 541069 (D. Md. August 12, 1994).

## Government Service

**U.S. Department of Justice**
Senior Attorney and Trial Attorney, Environmental Enforcement Section, February 1988-December 2000

**Dade County, Florida**
Assistant County Attorney, May 1984-February 1988

## Awards and Honors

**Legal 500 - Recommended Attorney**
Native American Law, 2021

**"Best Lawyers in America" by Best Lawyers**
Environmental Law, 2021-2023

**Who's Who Legal, Environment 2020**
Thought Leader

**Super Lawyers - Washington, DC**
2012-2020

**Best Lawyers - Washington, DC**
2023

Van Ness Feldman LLP
vnf.com

**Environmental Excellence Award**
National Association of Environmental Professionals, 2011

**Attorney General's John Marshall Award, United States Department of Justice**
For extraordinary performance in litigation as lead counsel, 2000

**Special Achievement Award, United States Department of Justice**
For outstanding performance of duties, 2000

**Bronze Medal for Commendable Service, United States Environmental Protection Agency**
For outstanding performance in a national RCRA enforcement action, 1999

**Special Achievement Award, United States Department of Justice**
For sustained outstanding performance as a Senior Attorney, 1999

**Gold Medal for Exceptional Service, United States Environmental Protection Agency**
For major contributions to Clean Water Act enforcement, 1998

**Attorney General's John Marshall Award, United States Department of Justice**
For extraordinary performance in litigation as supervisory attorney, 1998

**Special Commendation, United States Department of Justice**
For successful negotiation of an innovative multi-media national enforcement settlement, 1997

**Bronze Medal for Commendable Service, United States Environmental Protection Agency**
For extraordinary achievements on Clean Air Act enforcement actions, 1993

**Bronze Medal for Commendable Service, United States Environmental Protection Agency**
For outstanding performance in the negotiation of a $126 million Superfund cleanup, 1992

**Special Achievement Award, United States Department of Justice**
For sustained outstanding performance as a Trial Attorney, 1990

## Articles and Presentations

- 2023 BSI Connect Summit: Shaping Our Future For Impact, Tempe AZ, 04/11/2023
- Tribal Natural Resource Damage Assessments, Law Seminars International, Seattle WA, 12/16/2019
- Latest Perspectives on Vapor Intrusion Litigation, ABA Section of Litigation Environmental and Energy Litigation Committee, 06/28/2018
- International Municipal Lawyers Association 79th Annual Conference, Baltimore MD, 09/10/2014
- National Association of Environmental Professionals 37th Annual Conference, Portland OR, 05/21/2012
- Pushing the Envelope on Brownfield Remediation: Strategies and Case Studies That Maximize Limited Resources Through Alternative Funding Sources, Environmental Practice, Vol. 13 Issue 2 pp. 130-142, 06/01/2011
- National Association of Environmental Professionals 36th Annual Conference, Denver CO, 04/28/2011

## Alerts

- Business Interruption Insurance Coverage for COVID-19 Losses - Recent Developments, 04/20/2020
- Business Interruption Insurance Coverage: Four States at the Forefront of Responding to COVID-19 Losses, 04/01/2020
- COVID-19 Insurance Impacts, 03/19/2020