UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NCR CORPORATION,<br><br>*Plaintiff*,<br><br>-against-<br><br>B.A.T INDUSTRIES p.l.c.<br><br>*Defendant*. | Case No.: 1:23-cv-1172-JPC |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT B.A.T INDUSTRIES P.L.C.'S MOTION FOR**
**LEAVE TO FILE AN AMENDED ANSWER AND COUNTERCLAIMS**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 2

LEGAL STANDARD .......... 13

ARGUMENT .......... 14

I. BAT HAS ESTABLISHED GOOD CAUSE TO AMEND UNDER RULE 16(B). .......... 14

II. LEAVE TO AMEND IS ALSO WARRANTED UNDER RULE 15(A) BECAUSE NCR CANNOT SHOW THAT IT WOULD BE UNDULY PREJUDICED BY THE PROPOSED AMENDMENTS OR THAT THE PROPOSED AMENDMENTS ARE FUTILE. .......... 19

A. NCR Can Not Show That the Proposed Amendments Would Be Unduly Prejudicial. .......... 19

B. BAT's Proposed Amendments Are Not Futile. .......... 21

1. Proposed Amendments Alleging A Special Relationship Between NCR and BAT Giving Rise to A Duty to Disclose .......... 22

2. Proposed Amendments Alleging NCR Made Partial Disclosures Giving Rise to A Duty to Disclose .......... 23

3. Proposed Amendment to Answer .......... 24

4. Proposed Amendments Seeking to Delete Previously Dismissed Counterclaims and Defenses .......... 25

CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V. by Versace, Inc. v. Gianni Versace S.p.A.*,
87 F. Supp. 2d 281 (S.D.N.Y. 2000)....................20

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010)....................19

*Allgaier v. Peterson*,
No. 13 CV 5112, 2015 WL 5459808 (S.D.N.Y. 2015) ....................19

*Appleton Papers Inc. v. George A. Whiting Paper Co.*,
No. 08-C-16, 2009 WL 5064049 (E.D. Wis. Dec. 16, 2009), *vacated and remanded on other grounds*, 768 F.3d 682 (7th Cir. 2014)....................4

*Avila v. Lease Fin. Grp., LLC*,
No. 11 Civ. 8125, 2012 WL 3165408 (S.D.N.Y. July 31, 2012) ....................21

*Bernheim v. Elia*,
No. 05-CV-118A, 2010 WL 743887 (W.D.N.Y. Feb. 25, 2010) ....................25

*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir. 1993)....................14, 19

*Christians of Cal., Inc. v. Clive Christian N.Y., LLP*,
No. 13 Civ. 0275, 2014 WL 3605526 (S.D.N.Y. July 18, 2014) ....................14

*English v. Sellars*,
No. 07-CV-6611L, 2008 WL 189645 (W.D.N.Y. Jan. 18, 2008) ....................25

*Enzymotec Ltd. v. NBTY, Inc.*,
754 F. Supp. 2d 527 (E.D.N.Y. 2010) ....................18

*Georgia-Pac. Consumer Prods. LP v. NCR Corp.*,
358 F. Supp. 3d 613 (W.D. Mich. 2018) ....................4

*Georgia-Pac. Consumer Prods. LP v. NCR Corp.*,
980 F. Supp. 2d 821 (W.D. Mich. 2013) ....................1, 4

*Hadassah, Women's Zionist Org. of Am., Inc v. Hadassah Acad. Coll.*,
No. 19-CV-8953, 2021 LX 187080 (S.D.N.Y. Sep. 29, 2021)....................17

*Harger v. Price*,
204 F. Supp. 2d 699 (S.D.N.Y. 2002)....................23

*Huber v. Nat'l R.R. Passenger Corp.*,
No. 10 Civ. 9348, 2012 WL 6082385 (S.D.N.Y. Dec. 4, 2012)....................14

*Hughes v. Patrolmen's Benevolent Assoc. of the City of N.Y.*,
850 F.2d 876 (2d Cir. 1988), *cert. denied*, 488 U.S. 967 (1988)....................25

*Ideavillage Prods. Corp. v. Copper Compression Brands LLC*,
No. 20-CV-4604, 2021 WL 5013799 (S.D.N.Y. Oct. 27, 2021)....................14

*J&A Concrete Corp. v. Dobco, Inc.*,
No. 21-CV-11097, 2025 WL 3211743 (S.D.N.Y. Nov. 17, 2025)....................14

*Jackson v. Roslyn Bd. of Educ.*,
596 F. Supp. 2d 581 (E.D.N.Y. 2009) ....................18

*Kalamazoo River Study Grp. v. Menasha Corp.*,
228 F.3d 648 (6th Cir. 2000) ....................5

*Kalamazoo River Study Grp. v. Rockwell Int'l*,
3 F. Supp. 2d 799 (W.D. Mich.) ....................5

*Kassner v. 2nd Ave. Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007)....................14

*Margel v. E.G.L. Gem Lab Ltd.*,
04 Civ. 1514, 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010).................... *passim*

*Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*,
318 F.R.D. 28 (S.D.N.Y. 2016) ....................18

*McGucken v. Content IQ LLC*,
No. 20 Civ. 08114, 2021 WL 5357473 (S.D.N.Y. Nov. 16, 2021) ....................14

*Pagan v. N. Atl. States Reg'l Council of Carpenters*,
No. 24-CV-01535, 2025 WL 2092112 (D. Conn. July 25, 2025) ....................18

*Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*,
No. 18 CIV. 5831, 2020 WL 6690659 (S.D.N.Y. Nov. 13, 2020)....................17

*Perez v. 117 Ave. of the Ams. Food Corp.*,
No. 15 Civ. 8151, 2016 LX 132910, at *2 (S.D.N.Y. Sep. 27, 2016)....................17

*Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*,
889 F. Supp. 2d 453 (S.D.N.Y. 2012)....................15

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
46 F.3d 230 (2d Cir. 1995)....................18

*Radar Sports Mgmt., LLC v. Legacy Lacrosse, LI Inc.*,
No. 21-CV-5749, 2023 WL 7222736 (E.D.N.Y. Nov. 2, 2023) ....................25

*Richardson Greenshields Secs., Inc. v. Lau*,
825 F.2d 647 (2d Cir. 1987)....................18

*Sacerdote v. N.Y. Univ.*,
9 F.4th 95 (2d Cir. 2021) ....................13

*Saray Dokum Ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics Inc.*,
335 F.R.D. 50 (S.D.N.Y. 2020) ....................14

*Scott v. Chipotle Mexican Grill, Inc.*,
300 F.R.D. 193 (S.D.N.Y. 2014) ....................15, 19

*Smith v. P.O. Canine Dog Chas*,
No. 02 6240, 2004 WL 2202564 (S.D.N.Y. Sept. 28, 2004)....................21

*Smith v. Westchester Cnty. Dep't of Corrs.*,
No. 12cv3941, 2014 WL 4384104 (S.D.N.Y. 2014) ....................19

*State Teacher's Ret. Bd. v. Fluor Corp.*,
654 F.2d 843 (2d Cir. 1981)....................20

*U.S. Airways, Inc. v. Sabre Travel Int'l Ltd.*,
No. 11 Civ. 2725, 2015 WL 8335119....................13

*Yador v. Mowatt*,
No. 19-cv-4128, 2022 WL 4472630 (E.D.N.Y. June 13, 2022)....................20

*Zomba Recording Corp. v. MP3.com, Inc.*,
No. 00-CV-6831, 2001 WL 770926 (S.D.N.Y. July 10, 2001)....................18

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)....................21

Fed. R. Civ. P. 15 .................... *passim*

Fed. R. Civ. P. 16 .................... *passim*

Fed. R. Civ. P. 56....................21, 22

Pursuant to Federal Rules of Civil Procedure 15(a) and 16(b), Defendant B.A.T Industries p.l.c. ("BAT") respectfully submits this Memorandum of Law in support of its Motion for Leave to File the Amended Answer and Counterclaims. The proposed Amended Answer and Counterclaims (also "Proposed Amended Pleading" or "Proposed Amendments") are attached as Exhibit 1 (redline showing changes from the original) and Exhibit 2 (clean copy) to the accompanying Declaration of Dennis H. Tracey III ("Tracey Decl.").

**PRELIMINARY STATEMENT**

This action concerns whether BAT must indemnify Plaintiff NCR Voyix Corporation ("NCR") for a portion of the cost of cleaning up PCBs in the Kalamazoo River in Michigan. NCR sued BAT after a federal court found that NCR had knowingly and intentionally arranged for the disposal of products it knew to be toxic at the Kalamazoo River. BAT played no role in that conduct and was not a party to the underlying litigation.

NCR commenced these proceedings against BAT ten years after NCR was first found liable for its contamination of the Kalamazoo River[1] and three years after the quantum of liability for future clean-up costs was resolved.[2] NCR brought the present action seeking to shift its liability to BAT, even though BAT had nothing to do NCR's pollution of the Kalamazoo River, and was unaware that NCR had ever arranged for disposal of PCBs there. NCR claims that BAT is liable to indemnify it under the Confidential Settlement Agreement ("CSA") that the parties signed in 1999 to resolve the (entirely distinct) environmental liabilities at the Fox River.

BAT filed its original Answer and Counterclaims against NCR in June 2023 based on the information available to BAT at that time. BAT has contended from the outset that the CSA was

[1] *Georgia-Pac. Consumer Prods. LP v. NCR Corp.*, 980 F. Supp. 2d 821 (W.D. Mich. 2013) ("*NCR I*").

[2] Consent Decree with NCR Corporation, *United States v. NCR Corp.*, No. 1:19-CV-01041, (W.D. Mich., Dec. 11, 2019), Dkt. No. 2-1; Order Adopting Consent Decree, *NCR Corp.*, No. 1:19-CV-1041, (W.D. Mich., Dec. 2, 2020), Dkt. No. 36.

unenforceable because BAT had been induced to enter it by NCR's fraudulent[3] misrepresentations and omissions. BAT alleged that, prior to the execution of the CSA, NCR knew that it had arranged for the disposal of its broke at the Kalamazoo River; NCR knew that it was exposed to liability as an "arranger"; and NCR intentionally concealed what it knew about the nature and extent of that liability in order to induce BAT to enter into the CSA and thereby assume that liability.

The parties have conducted extensive discovery, including millions of pages of document productions and more than a dozen depositions. While the essential elements of the fraud alleged by BAT remain the same, what the discovery process has revealed is considerably more serious and sophisticated than BAT could have known prior to discovery.

BAT seeks leave to amend its pleading to conform it to the evidence BAT has adduced through discovery. BAT does not propose to add any new causes of action. It seeks merely to add additional factual information and legal theories to support its existing claims that BAT did not know at the outset of this case but learned through NCR's production of documents and through testimony from NCR's witnesses. NCR will not suffer any prejudice from BAT's Proposed Amendments, which are based on information BAT learned from NCR. Accordingly, and for the reasons described more fully below, good cause for leave to amend exists.

## FACTUAL BACKGROUND

The starting point of BAT's fraud case continues to be the original draft of the CSA containing the "Future Sites" indemnity ("Draft CSA") together with a cover letter dated April 23,

[3] BAT also asserts a claim for negligent misrepresentation. For the avoidance of any doubt, the points made in this Memorandum of Law in relation to BAT's fraud counterclaim also apply to its counterclaim in negligence. BAT also relies on other defenses including public policy.

1998 ("April Letter") which purported to explain its inclusion, both of which had been prepared by NCR's external counsel, J. Andrew Schlickman, of Sidley Austin.[4]

The Draft CSA defined "Future Sites" as "any facility alleged to be contaminated with Hazardous Substances as a result, in whole or in part, of the manufacture, recycling, deinking or repulping of NCR carbonless paper that was manufactured with PCB-containing coatings."[5] The April Letter described Future Sites as merely "potential" and repeatedly stated that the indemnity would apply to Future Sites "if any."[6] In its Answer and Counterclaims, BAT alleged that the representations contained in the April Letter were false and materially misleading, and that NCR had intentionally concealed the fact that it was liable as an arranger at the Kalamazoo River.

Over the course of discovery, NCR has produced approximately 1.35 million documents amounting to 13.7 million pages across 36 production volumes.[7] There have been 17 depositions totaling approximately 81 hours of deposition time and 3,852 pages of transcripts.[8] That extensive discovery has substantiated the allegations of fraud advanced by BAT in its Answer and Counterclaims, while disclosing a course of conduct which was far more extensive, calculated, and complex than the material then-available to BAT could possibly have shown. What has emerged is a deliberate and sophisticated scheme of concealment in which NCR and Sidley Austin actively participated.

That scheme does not come without precedent. In fact, it was effectively a continuation of the strategy that NCR had been pursuing for nearly thirty years prior to the CSA. As two federal judges independently concluded, in damning fashion, NCR spent years deceiving third parties in

---

4 Ex. 2, ¶¶ 17, 61, 64; Ex. 51, NCRV_00020488.
5 Ex. 51, NCRV_00020488 at NCRV_00020500.
6 *Id.* at NCRV_00020489.
7 Tracey Decl. ¶ 4.
8 *Id.* ¶ 14.

order to avoid having to face the consequences of its own wrongdoing in deliberately polluting the Fox and Kalamazoo Rivers.[9] Not only did that strategy continue through the time the parties entered into the CSA, it has continued since, remarkably, even in these proceedings. NCR has attempted to, and still does, conceal critically relevant evidence from BAT and this Court in the hope that it can finally fulfill its plan of seeking to have BAT pay for the environmental disaster that NCR itself intentionally caused.

NCR's scheming with respect to Kalamazoo began in 1997 when, at the same time that NCR was supposed to be working together with API and BAT, NCR was secretly undertaking separate investigations about its CCP-related liability. In particular, from no later than July 1997, Sidley Austin had been investigating PCB contamination of the Kalamazoo River.[10] Sidley Austin continued investigating the Kalamazoo River over the remainder of 1997 and through the date that the CSA was finally signed in July 1999.[11]

Neither the existence of those investigations, nor their results, were ever shared with BAT or its counsel, Simpson Thacher & Bartlett ("STB"). The very fact that NCR continues to assert privilege over documents prepared in the course of those investigations is proof of this in itself.[12] As a result of those investigations, well before the date of the April Letter, NCR's witnesses have

[9] *See NCR I*, 980 F. Supp. 2d at 834 ("NCR actively attempted to conceal the hazards associated with CCP broke—from recyclers, the public, and even governmental entities."); *Georgia-Pac. Consumer Prods. LP v. NCR Corp.*, 358 F. Supp. 3d 613, 649 (W.D. Mich. 2018); *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 5064049, at *20 (E.D. Wis. Dec. 16, 2009), *vacated and remanded on other grounds*, 768 F.3d 682, 699–703 (7th Cir. 2014).

[10] Deposition of J. Andrew Schlickman (Volume III) on April 15, 2026, Ex. 48, at 421:12–422:2 ("Q. And the litigation that was being anticipated there would have been, based on your prior testimony, litigation relating to liability for PCB contamination in the Kalamazoo River, correct? . . . A. Yeah, well, I -- I described what our concerns were just a minute ago, but the -- there would be some connection between the operations of the Appleton Combined Locks plants and the PCBs that were found in the Kalamazoo River; and then, secondly, you know, the -- whether or not there might be claims asserted. That's -- that's where our concerns were.").

[11] *E.g.*, Ex. 50, NCRPRIV_00153, NCRPRIV_00263, NCRPRIV_00264.

[12] *See* Ex. 3, at 5 (the "Privilege Letter") and especially Heading "NCR's selective deployment and/or disclosure of documents" thereof; *see also* Ex. 50, NCRPRIV_000098, NCRPRIV_00263.

testified that they considered the Kalamazoo River to "potentially be a future site"[13] and were concerned about PCB contamination there.[14]

Among other active workstreams, Sidley Austin was closely monitoring a federal case in Michigan, *Kalamazoo River Study Group v. Rockwell International*, involving PCB contamination of the Kalamazoo River. 3 F. Supp. 2d 799 (W.D. Mich.) ("*Rockwell*"). On March 6, 1998, Judge Robert Holmes Bell issued a decision in *Rockwell* that indicated that NCR Paper was the source of the contamination in the Kalamazoo River.[15] This set off a striking sequence of events, culminating in the drafting of the Future Sites indemnity.

On the same date as the *Rockwell* decision, Sidley Austin undertook an analysis of arranger liability.[16] Within a week, Sidley Austin had drafted the CSA together with a memorandum of advice concerning its terms.[17] Then, on March 25, 1998, Sidley Austin prepared a memorandum of advice specifically concerned with the *Rockwell* decision.[18] Less than a week thereafter, on April 1, 1998, Sidley Austin prepared a revised draft of the CSA together with the April Letter and a further memorandum of advice.[19]

Viewed as a whole, that chronology indicates that the Future Sites provision was deliberately introduced, in major part, in response to NCR's understanding of the implications of the *Rockwell* decision. That conclusion is supported by NCR's deposition testimony.[20] In

13 Deposition of J. Andrew Schlickman (Volume III), Ex. 48, at 484:4–7.

14 Deposition of Evan Westerfield, Ex. 49, at 152:16–24 ("Q. . . there was a concern about being sued there? A. Yes. Q. . . in 1997? A. Yes, that we could be brought into -- and by suit, I mean . . . the government might bring you in.[.]").

15 *Rockwell*, 3 F. Supp. 2d 799, 802 (W.D. Mich. Mar. 6, 1998), *rev'd sub nom.*, *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648 (6th Cir. 2000).

16 Ex. 50, NCRPRIV_00238.

17 *Id.*, NCRPRIV_00245, NCRVPRIV_00246.

18 *Id.*, NCRPRIV_00263, NCRVPRIV_00264.

19 *Id.*, NCRPRIV_00269, NCRPRIV_00270.

20 *See* Deposition of Pamela Hanebutt, Ex. 44, at 132:18–133:1 ("A. . . . So I haven't read this whole opinion, but it looks like it was being alleged that NCR was a source of PCB in the Kalamazoo River, and so I can imagine that would be of interest to NCR. Q Right. And that would be of interest to NCR because of the potential liability that that would bring? A. Of course."); Deposition of Jonathan S. Hoak, Ex. 46, at 101:23–102:4 ("A. . . . [A]t some point

particular, Mr. Schlickman testified that he considered that the effect of the *Rockwell* decision was that "NCR carbonless paper . . . had been . . . implicated."[21] Accordingly, when the April Letter was sent to STB together with the Draft CSA, NCR knew that the Kalamazoo River was already alleged to have been contaminated as a result of the recycling of NCR carbonless paper and thus constituted a Future Site. Indeed, Mr. Schlickman confirmed that the Kalamazoo River was a site he had "in mind" when he drafted the Future Sites indemnity.[22]

The *Rockwell* decision made no reference to arranger liability, nor did it state that NCR's broke had been sent to the Kalamazoo River for recycling—the factual predicate upon which such liability could arise. Its significance was not, therefore, apparent on its face. But NCR understood its meaning as a result of its secret investigations, which, as NCR's Privilege Log reveals, included detailed analyses of the flow of NCR paper prepared by RMT Inc., a paper industry expert whose role, according to Mr. Schlickman's deposition testimony, was to "look at what information we had about the flow of NCR paper."[23] RMT had been jointly retained by NCR, API, Sidley Austin, and STB to render services in connection with the Fox River matter.[24] However, NCR's Privilege Log records privileged communications in relation to paper flow consultants generally[25] and in

in time we knew that there was ongoing litigation involving the Kalamazoo that we were not a party to. But we knew that PCBs from carbonless paper were part of the contamination in that river; and, therefore, we were concerned that at some point we might be brought into to the -- to the litigation.").

21 Deposition of J. Andrew Schlickman (Volume III), Ex. 48, at 481:4–8 ("Clearly NCR, the name NCR carbonless paper, had been, you know, implicated in the Kalamazoo case. I can't remember if they used the words you just used, but we knew that -- we knew that.").

22 Deposition of J. Andrew Schlickman (Volume II), Ex. 47, at 266:12–18 ("We didn't know what was going to happen in Kalamazoo. We thought based on the information available that was a site that we should keep our eyes on. That was a site we had in mind when we worked on the future sites provision of the confidential settlement agreement. I think that was the concern.").

23 *Id.* at 338:3–338:13 ("A. . . . RMT, the consultant we discussed earlier, had an individual working on the case for us by the name of Paul Knopp. . . . Paul was a sort of paper industry expert. He was very familiar with the ins and outs of the paper industry, and we -- we asked him to look at what information we had about the flow of NCR paper.").

24 Ex. 5.

25 Ex. 50, NCRPRIV_00118.

connection with RMT specifically.[26] The precise basis upon which RMT came to participate in those separate, privileged investigations remains unclear, as NCR continues to withhold such privileged material from BAT.

Most significantly, on March 11, 1998, only five days after the *Rockwell* decision, NCR's Privilege Log records a privileged conference call with "RMT, API, JAS [Mr. Schlickman] PRH [Pamela Hanebutt of Sidley Austin] and JFW [James Warchall of Sidley Austin]" and *without* BAT and STB.[27] BAT does not know precisely what was discussed on that call because NCR continues to assert privilege over the contemporaneous note of it. Its timing, however, and the participation of RMT, strongly supports the conclusion that the call concerned the factual implications of the *Rockwell* decision for NCR's potential liability—most obviously, what the evidence revealed as to whether NCR broke had in fact been recycled at the Kalamazoo River.

NCR was therefore uniquely placed—by reason of investigations conducted in the absence of BAT and STB—to understand the significance of the *Rockwell* decision for its potential liability at the Kalamazoo River. NCR inserted the Future Sites indemnity in the Draft CSA precisely because of that understanding; but concealed it from BAT and STB.

NCR's concealment is all the more remarkable given that Sidley Austin included a provision in the Draft CSA that specifically provided that NCR and API/BAT would "continue to cooperate, coordinate, and assist one another in the defense of the Sovereigns' and potential third-party claims relating to . . . Future Sites, . . . implement a coordinated and efficient joint defense effort among themselves," and "share documents, factual material, mental impressions,

---

[26] *See* Ex. 18 ("As you know, we met with individuals at RMT on Monday to discuss the status of their projects and review some of their work product."); Ex. 50, NCRPRIV_00148, "RMT Meeting," "Memorandum providing legal advice from Pamela Hanebutt and Evan Westerfield regarding factual investigation."

[27] Ex. 50, NCRPRIV_00244.

memoranda, interview reports and other information in any form, whether written, oral, computerized or otherwise, relating to . . . Future Sites" ("Draft Cooperation Clause").[28]

What discovery has revealed, however, bears no resemblance to the cooperation and information-sharing contemplated by that provision. To the contrary, discovery has revealed that at the time of its separate Kalamazoo investigation, NCR entered into a new joint defense agreement that *excluded* BAT. Effective July 1, 1998—approximately three months after the April Letter and a year before the CSA was executed—NCR, API and Sidley Austin entered into the Joint Defense and Representation Agreement ("JDRA").[29] That entry into the JDRA is of critical significance because the JDRA imposed confidentiality obligations that prohibited information exchanged or prepared pursuant to the JDRA from being disclosed to non-parties.[30] Accordingly, BAT and STB were not merely non-parties to the joint defense arrangements, they were prohibited by the JDRA from receiving information exchanged or prepared pursuant to those arrangements.

After the JDRA took effect, NCR and API embarked upon a detailed series of investigations into the nature and extent of their exposure at the Kalamazoo River. In particular, NCR and API:

a. commissioned expert reports concerning PCB contamination at sites other than the Fox River, including the Kalamazoo River;[31]

---

28 Ex. 51, NCRV_00020488 at NCRV_00020509.

29 Ex. 8, NCRV_13585579 at NCRV_13585581.

30 *Id.*, at NCRV_13585584, NCRV_13585587–89.

31 Ex. 9, NCRV_13601949 ("At API's/NCR's joint request, we asked Jaakko Poyry to analyze whether there are any paper mills in the vicinity of sites that EPA has identified as being contaminated with PCB in its report entitled, 'The Incidence and Severity of Sediment Contamination in Surface Waters of the United States; National Sediment Quality Survey, EPA 823-96-006.' Jaakko Poyry's analysis is enclosed, and should be treated as *extremely confidential*. In light of the document's sensitivity, we should discuss the extent to which it should be distributed." (emphasis in original)).

b. closely monitored and assessed NCR's and API's exposure at the Kalamazoo River;[32]

c. obtained, reviewed and analyzed expert evidence and other materials generated in the *Rockwell* litigation;[33]

d. actively investigated a separate potential source of liability at the Kalamazoo River[34] which had nothing whatsoever to do with BAT: arranger liability arising from broke generated by NCR's Systemedia division, which was specifically carved out of the assets that BAT purchased from NCR in 1978 and which remains a division of NCR to this day.

As a result of those investigations, by no later than October 15, 1998, Sidley Austin considered it likely that NCR and API would "get sued at the Kalamazoo" and "be named" at all PCB-contaminated river sites.[35] NCR also appreciated that PCB contamination at the Kalamazoo River resulted in part from the recycling of broke and trim generated by its own Systemedia operations.

Those investigations continued over the course of a year before the CSA was executed in July 1999. During that time, NCR acquired an increasingly detailed understanding of the nature and extent of its exposure at the Kalamazoo River.

---

32 Ex. 6, NCRV_13582717 at NCRV_13582728 ("Although the focus of our efforts is obviously the Fox River, we are closely monitoring NCR/API's potential exposure at other PCB-contaminated sites. Thus, for example, we recently retained PHR Environmental to review the Kalamazoo River litigation files, the result of which was the discovery of some very useful information (e.g. the Valley report).").

33 *Id.*; *see also* Ex. 16, NCRV_13610166–202.

34 From no later than July 14, 1998, the following was recorded as a "Top-Priority Task[]" in NCR's and API's fact investigation: "Confer w/[Paul] Samson [of NCR] to develop list of Systemedia employees to be interviewed (7/14/98)." Ex. 10, NCRV_13602178 at NCRV_13602180. Further, a Memorandum dated December 8, 1998, from Sidley Austin to API copying NCR stated, "Systemedia purchased about 8-9% of NCR Paper brand carbonless that was manufactured during the relevant time period and I would like to start interviewing Systemedia employees who might have information about where its converter scrap went." Ex. 7, at NCRV_13582784.

35 Ex. 17, NCRV_13610241.

Once again, NCR did not disclose any of the information or findings generated by those investigations with BAT or STB. The JDRA therefore operated precisely as it was intended: throughout the final year of negotiations of the CSA, NCR and Sidley Austin continued to investigate the Kalamazoo River and develop their understanding of NCR's exposure while using the confidentiality afforded by the JDRA to conceal from BAT and STB what those investigations had revealed.

During depositions, NCR has attempted to deny that it hid the Kalamazoo information from BAT by falsely maintaining that information generated and exchanged pursuant to the JDRA was available to BAT and STB at the time. Indeed, NCR's witnesses have gone as far as to maintain that BAT knew everything that NCR knew about the Kalamazoo River:

- Mr. Schlickman insisted time and time again that all of the information that NCR had gathered in relation to potential liability for the Kalamazoo River was shared with STB and/or that API was responsible for sharing information with BAT.[36]
- Ms. Hanebutt testified that NCR, API and BAT "were . . . one team working towards a common goal, which was to minimize the exposure for both NCR and Appleton."[37]
- Sidley Austin lawyer Evan Westerfield testified that Sidley Austin, NCR, API, and STB "all worked side by side and each had . . . hands on the oars."[38]

Given NCR's position that "all information" was shared, BAT has been forced to undertake a painstaking forensic analysis of the documents produced in the case to determine the truth. That analysis has shown the above evidence from NCR's witnesses is untrue, in particular because:

36 Deposition of J. Andrew Schlickman (Volume III), Ex. 48, at 422:4–15, 474:1–12.
37 Deposition of Pamela Hanebutt, Ex. 44, at 189:20–190:6.
38 Deposition of Evan Westerfield, Ex. 49, at 307:21–24.

- Documents created or exchanged pursuant to the JDRA were not shared with STB. In fact, after the JDRA took effect, Sidley Austin was retained to represent API as well as NCR, and STB played no role in the joint defense work. That is why, among approximately 8000 narrative time entries contained in the JDRA billing records, not one records any written communications, discussions, calls or meetings with BAT or STB concerning joint defense activities.[39]
- NCR continues to withhold hundreds of documents generated or exchanged pursuant to the JDRA on the grounds that they are allegedly privileged, despite NCR's contradictory position that all of the information was made available to BAT and STB at the time.[40]
- Among the most significant materials that were never contemporaneously shared with BAT or STB are a series of documents maintained by Sidley Austin referred to as "Fact Books." These documents were comprehensive records in which Sidley Austin assembled and synthesized the information developed through their investigations and appended key documents. The Fact Books contain multiple entries concerning the Kalamazoo River and Systemedia[41] and NCR's witnesses have consistently emphasized their importance.[42] Despite this, they were never provided to BAT or STB.

---

[39] *See* Exs. 19–43, NCRV_13610988, NCRV_13611024, NCRV_13611059, NCRV_13611096, NCRV_1361132, NCRV_13611171, NCRV_13611362, NCRV_13611396, NCRV_13611443, NCRV_13611486, NCRV_13611524, NCRV_13611563, NCRV_13611603, NCRV_13611645, NCRV_13611685, NCRV_13611719, NCRV_13611748, NCRV_13611783, NCRV_13613275, NCRV_13613301, NCRV_13613326, NCRV_13613350, NCRV_13613374, NCRV_13613399, and NCRV_13613425.

[40] Ex. 3, at Heading "NCR's selective deployment and/or disclosure of documents" ("Disclosure of Sidley's contemporaneous Joint Defense billing records") and Appendix B thereof.

[41] *E.g.*, Ex. 15, NCRV_13609262 at NCRV_13609280, NCRV_13609289; Ex. 11, NCRV_13608897 at NCRV_13608918–19, NCRV_13608924–26,13608934-35, NCRV_13608943; Ex. 14, NCRV_13609231 at NCRV_13609237, NCRV_13609261; Ex. 13, NCRV_13609074 at NCRV_13609092.

[42] Deposition of Pamela Hanebutt, Ex. 44, at 48:2–49.3 and 97:10–102.3; Deposition of John Heyde, Ex. 45, at 36:4–40:9.

BAT has necessarily been required to undertake substantial and meticulous forensic analysis to unpick this complex web of deception. Throughout the discovery process, NCR has maintained that BAT and STB participated in the joint defense arrangements established by the JDRA and had access to the information shared pursuant to them. That account has now been shown not merely to be manufactured, but to have obscured the true operation of the JDRA and the full extent of NCR's fraud. Only through the combination of NCR's deposition testimony and a detailed analysis of the contemporaneous documentary record has BAT been able to establish the true position.

These revelations cast the April Letter in a far more serious light. Read against what discovery has now established concerning NCR's contemporaneous investigations, the presentation of NCR's liability at the Kalamazoo River as merely "potential" and hypothetical was fundamentally false. NCR not only knew that the Kalamazoo River was already an "actual" Future Site; NCR had drafted the Future Sites indemnity specifically to capture liability arising from the Kalamazoo River.

The motive for that deception has also been revealed in discovery. NCR's witnesses have testified that, while NCR was learning the above information through its investigations, NCR was struggling to get BAT to agree to sign the CSA.[43] NCR considered BAT's signature to be "an absolute deal-breaker"[44] because BAT was considered "the deep pocket":[45] "if something happened to API . . . we had to have them there to pay the share of API."[46]

In those circumstances, NCR had every incentive to conceal the Kalamazoo River's status as a Future Site, the role of Systemedia in the contamination of the Kalamazoo, and facts bearing

43 Deposition of Jonathan Hoak, Ex. 46, at 144:25–145:1.
44 *Id.*
45 *Id.* at 145:3–4.
46 *Id* at 145.4–5.

upon the true nature and extent of NCR's liability exposure. Plainly, disclosure of any of these matters would have made it even less likely that BAT would sign the CSA. Accordingly, NCR deliberately deceived BAT to induce it to assume NCR's liability.

BAT now seeks to amend its pleading in light of the significant facts revealed through discovery summarized above. However, the core of BAT's case has not changed. BAT has always alleged that NCR procured the CSA by fraud. What discovery has now revealed, in extraordinary detail, are the inner workings of that fraud.

**LEGAL STANDARD**

A party's ability to amend "is governed by Rules 15 and 16 of the Federal Rules of Civil Procedure which, when read together, set forth three standards for amending pleadings that depend on when the amendment is sought." *Sacerdote v. N.Y. Univ*., 9 F.4th 95, 115 (2d Cir. 2021).

> At the outset of the litigation, a plaintiff may freely amend her pleadings pursuant to Rule 15(a)(1) as of right without court permission. After that period ends—either upon expiration of a specified period in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)(A)—the plaintiff must move the court for leave to amend, but the court should grant such leave 'freely . . . when justice so requires' pursuant to Rule 15(a)(2). This is a 'liberal' and 'permissive' standard, and the only 'grounds on which denial of leave to amend has long been held proper' are upon a showing of 'undue delay, bad faith, dilatory motive, [or] futility.'

*Id.* (citations omitted).

Once the district court issues a scheduling order setting a date after which no amendment will be permitted, as is the case here, a party may still amend their claims upon a showing of "good cause" under Rule 16(b)(4). *Id.* (citation omitted); *U.S. Airways, Inc. v. Sabre Travel Int'l Ltd.*, No. 11 Civ. 2725, 2015 WL 8335119, at *2 (finding that plaintiff acted diligently to amend their complaint and therefore demonstrated "good cause" under Fed. R. Civ. P. 16(b)).

Good cause to amend exists under Rule 16(b)(4) when "'despite having exercised diligence' in its efforts to adhere to the court's scheduling order, 'the applicable deadline [to

amend] could not reasonably have been met."' *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, No. 13 Civ. 0275, 2014 WL 3605526, at *4 (S.D.N.Y. July 18, 2014) (alteration in original) (quoting *Huber v. Nat'l R.R. Passenger Corp.*, No. 10 Civ. 9348, 2012 WL 6082385, at *3 (S.D.N.Y. Dec. 4, 2012)). The "primary consideration" in the Rule 16 good-cause inquiry "is whether the moving party can demonstrate diligence." *J&A Concrete Corp. v. Dobco, Inc.*, No. 21-CV-11097, 2025 WL 3211743, at *3 (S.D.N.Y. Nov. 17, 2025) (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007)). However, "[i]f the Court determines there is good cause for the amendment, it must still determine whether leave to amend is appropriate under Rule 15." *Id.* (citation omitted). "Although the movant bears the burden of demonstrating good cause, the non-movant must show why the Court should deny leave to amend on [the Rule 15] grounds of futility, bad faith, or undue prejudice." *Id.* (citation omitted); *see also Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." (citation omitted)).

## ARGUMENT

### I. BAT HAS ESTABLISHED GOOD CAUSE TO AMEND UNDER RULE 16(B).

"To satisfy the good cause standard 'the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met.'" *Saray Dokum Ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics Inc.*, 335 F.R.D. 50, 52 (S.D.N.Y. 2020) (citation omitted); *see McGucken v. Content IQ LLC*, No. 20 Civ. 08114, 2021 WL 5357473, at *1 (S.D.N.Y. Nov. 16, 2021) (same); *see also Ideavillage Prods. Corp. v. Copper Compression Brands LLC*, No. 20-CV-4604, 2021 WL 5013799, at *2 (S.D.N.Y. Oct. 27, 2021) (finding that plaintiffs acted diligently after discovery to amend their complaint). "A party fails to show good cause when the proposed amendment rests on information 'that the party knew, or should have

known, in advance of the deadline.'" *Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 197 (S.D.N.Y. 2014) (quoting *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012)).

Here, the Proposed Amendments could not have been raised in advance of the applicable deadline for amending the pleadings because the Proposed Amendments rest upon information BAT could not have known prior to the completion of discovery. In its October 30, 2024 Scheduling Order, the Court provided that the applicable deadline for the parties to amend the pleadings was November 29, 2024. (Dkt. No. 47). In November of 2024, NCR had not produced 99 percent of its documents, and no depositions had taken place. Indeed, the key facts underlying BAT's Proposed Amendments, i.e., NCR's undisclosed investigation of its liability at Kalamazoo and the concealment of the results of that investigation, were not available until discovery was substantially complete in the summer of 2026.

The significance of those materials did not become apparent upon the production of any single document. The facts in the Proposed Amended Pleading emerged only through a painstaking analysis of the evidentiary record as a whole, including the successive productions, deposition testimony, and NCR's Privilege Log.

To compound matters, BAT's ability to progress the development of its case has been hampered significantly by the obstructive approach that NCR has taken to discovery. NCR's approach has effectively been an extension of its approach in 1998, namely, to withhold material from BAT and this Court. BAT has had to fight tooth and nail to force NCR to produce documents.[47]

[47] Tracey Decl. ¶¶ 7–21.

The net result of NCR's approach is that some of the most relevant and significant discovery in this case was provided towards or at the very end of discovery, after important depositions had taken place, and only under the threat of further motion practice which NCR realized it had no valid grounds to resist.[48]

The Proposed Amendments are therefore based on information that only NCR possessed until discovery, and that was revealed piecemeal over the course of the discovery process.

In particular, discovery revealed that: (a) NCR's counsel (Sidley Austin) and BAT's counsel (STB) conducted joint Fox River Investigations under the 1995 Joint Defense Agreement ("JDA"), which NCR directed and controlled;[49] (b) NCR simultaneously undertook separate investigations into its liability at Future Sites, including the Kalamazoo River ("NCR-Only Investigations"), without disclosing them to BAT or STB;[50] (c) in July 1998, NCR, API, and Sidley Austin entered into the JDRA—to which neither BAT nor STB was a party—that imposed confidentiality obligations preventing disclosure to BAT of information from Future Sites investigations;[51] and (d) under the JDRA, NCR commissioned expert reports on Kalamazoo, monitored NCR's exposure, and analyzed litigation materials, all without BAT's knowledge.[52] For example, NCR's outside counsel, Mr. Schlickman of Sidley Austin, confirmed during his February 27, 2026 deposition that NCR and Sidley Austin were aware that the issues that were arising at the Fox River Site could arise at other sites and admitted that "[w]e thought based on the information available that [Kalamazoo] was a site that we should keep our eyes on. That was a site

---

48 *Id.* ¶ 13.
49 Ex. 4, NCRV_00492701; Deposition of J. Andrew Schlickman (Volume III), Ex. 48, at 406:10-408:7.
50 *Supra* n. 10, 11 (Ex. 50, NCRPRIV_00153, NCRPRIV_00263, NCRPRIV_00264).
51 Ex. 8, NCRV_13585579 at NCRV_13585581, NCRV_13585584, NCRV_13585587–589.
52 *E.g.*, Ex. 12, NCRV_13609046; Ex. 9, NCRV_13601949; Ex. 17, NCRV_13610241.

we had in mind when we worked on the future sites provision of the confidential settlement agreement. I think that was the concern."[53]

BAT could not have amended its pleadings to allege this information sooner because the factual predicates for the Proposed Amendments were not available to BAT before the close of discovery. After receiving the critical evidence necessitating amendment, BAT moved promptly for leave to amend: the fact discovery deadline was May 2026, but key depositions occurred as late as June 2026. Upon the close of discovery and BAT's review and analysis of the full (and voluminous) evidentiary record—including deposition testimony from NCR's general counsel and NCR's outside counsel at Sidley Austin—BAT promptly filed this motion. Accordingly, BAT has satisfied Rule 16(b)'s good cause standard for permitting amendment after the issuance of a scheduling order. *See Hadassah, Women's Zionist Org. of Am., Inc v. Hadassah Acad. Coll.*, No. 19-CV-8953, 2021 LX 187080, at *8 (S.D.N.Y. Sep. 29, 2021) (noting that good cause is "met where the proposed amendment rests on information that the party did not know (or there is no reason to believe the party should have known) before the deadline." (quoting *Perez v. 117 Ave. of the Ams. Food Corp.*, No. 15 Civ. 8151, 2016 LX 132910, at *2 (S.D.N.Y. Sep. 27, 2016))).

Courts in this district have granted leave to allow amendment after the pleading deadline in cases involving significantly longer intervals between a party's discovery of relevant facts and the filing of an amended pleading. *See, e.g.*, *Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, No. 18 CIV. 5831, 2020 WL 6690659, at *14 (S.D.N.Y. Nov. 13, 2020) (finding existence of good cause and granting motion for leave to amend filed more than 18 months after the deadline for amending pleadings had lapsed because the facts underlying the proposed amendments were learned in discovery and not known to plaintiffs at the time of the original deadline for amending

---

53 Deposition of J. Andrew Schlickman (Volume II), Ex. 47, at 266:13–18.

the pleadings); *Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 38–40 (S.D.N.Y. 2016) (finding good cause to amend to add an additional defendant and claims because plaintiff's additional claims were based centrally in facts learned at a key deposition); *Margel v. E.G.L. Gem Lab Ltd.*, 04 Civ. 1514, 2010 WL 445192, at *13 (S.D.N.Y. Feb. 8, 2010) (granting leave under Rule 16(b) despite delay of at least six months); *Enzymotec Ltd. v. NBTY, Inc*., 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) (noting that delayed discovery and settlement negotiations deferred the plaintiff's ability to discover facts and holding that the plaintiff acted diligently by seeking leave to file an amended complaint only two months after acquiring information); *Zomba Recording Corp. v. MP3.com, Inc.*, No. 00-CV-6831, 2001 WL 770926, at *1 (S.D.N.Y. July 10, 2001) (granting leave to amend despite seven-month delay by plaintiffs given the absence of any material prejudice); *Jackson v. Roslyn Bd. of Educ.*, 596 F. Supp. 2d 581, 586 (E.D.N.Y. 2009) (granting leave under Rule 16(b) after five month delay); *Pagan v. N. Atl. States Reg'l Council of Carpenters*, No. 24-CV-01535, 2025 WL 2092112, at *2 (D. Conn. July 25, 2025) (allowing amendment of pleadings seven months after plaintiff learned relevant supporting facts); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995) (affirming the district court's grant of leave to amend the defendant's answer to include a fraudulent concealment defense despite a four-year delay between when the defendant learned some relevant facts and when it moved to amend); *Richardson Greenshields Secs., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (citing cases where leave to amend was granted after delays ranging from two to five years).

As explained above, BAT acted diligently to promptly conform its pleadings to the evidence recently revealed to it in discovery. Seeking leave to amend any earlier would have been premature as any motion to amend brought while discovery remained ongoing risked being

rendered incomplete by subsequent disclosures and likewise risked unnecessarily burdening the Court with duplicative motion practice contrary to the interests of judicial economy. *See Scott v. Chipotle Mexican Grill, Inc*., 300 F.R.D. 193, 198–99 (S.D.N.Y. 2014) (holding that "[p]laintiffs reasonably awaited the close of the opt-in period to file one additional amended complaint. Plaintiffs could have filed for leave each time they identified a state law class action claim and class representative, but that practice would simply burden the Court and the parties with redundant, virtually identical motions, when instead efforts could be focused on discovery and the opt-in period (citing *Ruggles v. Wellpoint, Inc.*, 687 F. Supp. 2d 30, 35 (N.D.N.Y. 2009) ("Plaintiff reasonably waited to file motion to amend until after the close of the opt-in period to avoid being placed in the 'unenviable' position of having to amend again.")).

## II. Leave To Amend Is Also Warranted Under Rule 15(A) Because NCR Cannot Show That It Would Be Unduly Prejudiced By The Proposed Amendments Or That The Proposed Amendments Are Futile.

### A. NCR Can Not Show That the Proposed Amendments Would Be Unduly Prejudicial.

"Although the movant bears the burden of demonstrating good cause, the non-movant must show why the Court should deny leave to amend on grounds of futility, bad faith, or undue prejudice." *Allgaier v. Peterson*, No. 13 CV 5112, 2015 WL 5459808, at *5 (S.D.N.Y. 2015) (citing *Block*, 988 F.2d at 350); *Smith v. Westchester Cnty. Dep't of Corrs.*, No. 12cv3941, 2014 WL 4384104, at *6 (S.D.N.Y. 2014) ("In light of Rule 15's liberal amendment policy, the 'non-movant bears the burden of showing prejudice, bad faith and futility.'" (citation omitted)). "Amendment may be prejudicial when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (citation and internal quotation marks omitted).

Here, there can be no prejudice to NCR because BAT is simply expanding its pleadings to include theories of liability and information that NCR *itself* provided to BAT in discovery. The Proposed Amendments are based on NCR's own testimony and NCR's own documents. NCR already has full knowledge of these facts—they concern NCR's own conduct, NCR's own investigations, and NCR's own internal communications. Moreover, the Proposed Amendments arise from the same underlying transaction already at issue in this case—the negotiation and execution of the CSA. No new claims requiring separate discovery have been introduced. Indeed, most or all of the factual information proposed to be added will be evidence presented at trial in support of BAT's existing claims and thus, there is no prejudice to including it in the pleadings.

NCR does not need additional discovery to respond to the additional factual allegations that are based on its own prior conduct. To the extent NCR may wish to take a limited amount of additional discovery, such discovery would certainly be minimal, would not require expenditure of any significant additional resources, and would not be prejudicial, but rather, would be a consequence of NCR's own unwarranted delay in producing the highly relevant documents at issue here. *See Yador v. Mowatt*, No. 19-cv-4128, 2022 WL 4472630, at *4 (E.D.N.Y. June 13, 2022) ("Given that the new claims arise from the original transaction," any need for new discovery "should be minimal." (citing *State Teacher's Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (leave to amend was not prejudicial because it would "not involve a great deal of additional discovery"))). Moreover, any minimal burden associated with additional discovery sought by NCR would not be a basis for denying leave to amend. *See A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (The adverse party's "burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading. Allegations that amendment will require additional time, effort, or money do not constitute undue

prejudice" where, as here, the new allegations arise from the same events and transactions already at issue. Only *undue* prejudice warrants denial of leave to amend. (citations omitted)). Moreover, given that summary judgment motions have not yet been briefed much less decided and there is no trial date yet set, there is ample time for NCR to defend against the Proposed Amendments, and the Proposed Amendments would not significantly delay the resolution of this dispute.

**B. BAT's Proposed Amendments Are Not Futile.**

Courts evaluate the futility of an amendment under two standards, depending on when amendment is sought. Courts generally examine futility of an amendment under the Rule 12(b)(6) standard under which, leave to amend should be denied as futile only if the proposed amended pleading fails to state a plausible claim for relief and thus, could not withstand a motion to dismiss. As when considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts and draw all reasonable inferences in the moving party's favor. *Avila v. Lease Fin. Grp., LLC*, No. 11 Civ. 8125, 2012 WL 3165408, at *5 n.3 (S.D.N.Y. July 31, 2012).

When, however, a motion to amend is filed after the close of discovery and in response to a motion for summary judgment, the court applies the summary judgment standard of Rule 56 to determine whether the proposed amendments are futile. *See Smith v. P.O. Canine Dog Chas*, No. 02 6240, 2004 WL 2202564, at *12 (S.D.N.Y. Sept. 28, 2004) ("Where, however, a summary judgment motion has been made and evidence outside the pleadings has already been submitted, the court must determine whether the amendment would be futile under the summary judgment standard." (citation omitted)).

Here, the Court should evaluate the futility of BAT's Proposed Amended Pleading using a 12(b)(6) standard because while discovery has closed, no summary judgment motion has been made, and no evidence outside the pleadings has yet been submitted to the Court such that the Court could analyze the claims under a Rule 56 standard. In addition, critical discovery disputes

remain outstanding, including a dispute regarding whether NCR must be compelled to produce additional documents withheld under an assertion of privilege which BAT contests. If and when summary judgment motions are made, and a full record is before the Court, the claims may be appropriately evaluated under the Rule 56 standard. Applying a Rule 56 standard at this juncture, prior to any motion for summary judgment, would be unwarranted and inconsistent with the case law.

*1. Proposed Amendments Alleging A Special Relationship Between NCR and BAT Giving Rise to A Duty to Disclose*

The Proposed Amended Pleading alleges an additional basis for finding that NCR had a duty to disclose its Kalamazoo liability to BAT by virtue of a special relationship. Here, the 1995 JDA established a commitment of close cooperation and information sharing between NCR and BAT. NCR and Sidley Austin directed and controlled the joint Fox River investigations. The commitment to cooperate and NCR's leading role gave rise to a special duty to disclose. The Draft Cooperation Clause in the CSA further represented that cooperation and information-sharing would likewise apply to the investigation of any Future Sites and that NCR would continue to cooperate with BAT and its counsel and share information concerning potential liability. The facts supporting the special relationship were significantly bolstered by NCR witnesses' testimony relating to the joint defense relationship among the parties. While BAT does not accept NCR's characterization of the facts, the testimony strongly supports the existence of a special relationship.

These circumstances created a special relationship and a duty to disclose that NCR breached by concealing its separate NCR-Only Investigations, and in particular, NCR's investigations into the Kalamazoo River and awareness of and monitoring of the *Rockwell* case and decision. By virtue of the special relationship created by the Draft CSA, NCR was under an affirmative duty to disclose information to BAT concerning NCR's investigation into the

Kalamazoo River and its monitoring of *Rockwell*. In breach of NCR's duty, NCR failed to disclose that information. While BAT did not previously plead the existence of a special relationship, it now does and such allegations are sufficient to withstand a motion to dismiss.

### *2. Proposed Amendments Alleging NCR Made Partial Disclosures Giving Rise to A Duty to Disclose*

The Proposed Amended Pleading also pleads an additional basis supporting NCR's duty to disclose, namely, that NCR made partial disclosures in the April 23 letter which were false and misleading unless supplemented by the material facts which NCR withheld. The facts developed in discovery demonstrate that NCR made partial and selective disclosures to BAT concerning NCR's potential liability, while withholding the results of its own internal investigations into its exposure at the Kalamazoo River. Under New York law, "a duty to disclose arises in business negotiations where 'one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party.'" *Harger v. Price*, 204 F. Supp. 2d 699 (S.D.N.Y. 2002).

While NCR represented that the Future Sites provision of the CSA was intended to address potential and/or hypothetical liability in relation to sites other than the Fox River, it failed to disclose that: (1) the March 6, 1998 decision in *Rockwell* expressly stated that the Kalamazoo River was contaminated from the recycling of NCR carbonless copy paper, meaning Kalamazoo already met the definition of a "Future Site" when NCR sent its April 23, 1998 letter using the qualifier "if any" language; (2) NCR had already analyzed the *Rockwell* case and obtained legal advice concerning the implications for NCR's liability for PCB contamination of the Kalamazoo River, including a memorandum prepared by Sidley Austin analyzing NCR's arranger liability for Kalamazoo on the same day as the *Rockwell* decision; (3) NCR already knew that it faced a material risk of liability for PCB contamination of the Kalamazoo River; (4) NCR undertook

investigations precisely concerning its liability for PCB contamination of the Kalamazoo River from which BAT and STD were intentionally excluded; (5) a draft of the CSA was prepared within one week of the *Rockwell* decision; (6) NCR had introduced the Future Sites provision precisely because of its analysis of the *Rockwell* decision; and (7) the JDRA was deliberately created to prevent BAT and STB from learning this information.

Those omissions rendered NCR's representation a partial disclosure and a materially misleading statement and placed NCR under a continuing affirmative duty to correct or supplement that representation. Despite obtaining further information through the NCR-API Future Sites investigations pursuant to the JDRA that confirmed NCR's understanding of the risk that it would face liability in respect of PCB contamination of the Kalamazoo River, NCR neither disclosed that information to BAT or STB nor corrected its misleading representation in the April Letter. Rather, NCR deliberately concealed those facts from BAT and STB and used the confidentiality arrangements established by the JDRA to continue that concealment. BAT amends its pleadings to assert that NCR's selective sharing of information constitutes a partial disclosure giving rise to an additional basis for finding that NCR had, and breached, its duty to disclose the full scope of NCR's knowledge regarding the Kalamazoo River contamination and its potential liability there.

*3. Proposed Amendment to Answer*

Finally, BAT seeks to amend its Answer to clarify and preserve its position that the Court lacks jurisdiction to determine and/or declare any specific monetary amount owed under the CSA because any specific monetary determination constitutes a "funding dispute" within the meaning of Clause 10(b) of the CSA. Clause 10(b) provides that funding disputes must be resolved through arbitration, not judicial determination. Accordingly, *if* the CSA *is* ultimately determined to be

enforceable against BAT at all, any monetary amount owed to NCR under the CSA must be submitted to arbitration pursuant to the process prescribed by Clause 10(b).[54]

#### *4. Proposed Amendments Seeking to Delete Previously Dismissed Counterclaims and Defenses*

All other Proposed Amendments are minor "house-keeping" amendments which seek only to delete counterclaims and defenses previously dismissed by this Court.[55] This is routine housekeeping that courts regularly permit. *See Radar Sports Mgmt., LLC v. Legacy Lacrosse, LI Inc.*, No. 21-CV-5749, 2023 WL 7222736, at *1 (E.D.N.Y. Nov. 2, 2023) (directing plaintiff to file an amended complaint removing the causes of action that were previously dismissed).

## CONCLUSION

BAT has demonstrated that, despite having exercised diligence, the applicable November 2024 deadline for amending the pleadings could not have reasonably been met because the Proposed Amended Pleading rests on information obtained piecemeal throughout the years' long course of discovery. BAT's Motion was not delayed unduly, nor was it made with dilatory purposes or in bad faith. The Proposed Amendments would not prejudice NCR—either by requiring it to expend significant additional resources, by delaying resolution of the dispute or by adding unrelated claims or claims that would unfairly surprise NCR. Finally, none of the Proposed Amendments would be futile. Thus, none of the reasons to deny leave to amend are present. For

---

[54] BAT does not understand NCR to dispute this point but to the extent it does, lack of subject matter jurisdiction may be raised at any time by a party and can even be raised by the court sua sponte if the parties have not raised it. *See Bernheim v. Elia*, No. 05-CV-118A, 2010 WL 743887, at *5 (W.D.N.Y. Feb. 25, 2010); *English v. Sellars*, No. 07-CV-6611L, 2008 WL 189645, at *2 (W.D.N.Y. Jan. 18, 2008) ("However, the issue of '[f]ederal subject matter jurisdiction may be raised at anytime during litigation and must be raised *sua sponte* when there is an indication that jurisdiction is lacking.'" (quoting *Hughes v. Patrolmen's Benevolent Assoc. of the City of N.Y.*, 850 F.2d 876, 881 (2d Cir. 1988), *cert. denied*, 488 U.S. 967 (1988))).

[55] BAT's deletion of these claims in its Proposed Amended Pleading is without prejudice to BAT's right to reassert those claims and defenses on appeal.

the foregoing reasons, BAT respectfully requests that this Court grant its Motion for Leave to File an Amended Answer and Counterclaims in its entirety.

Dated: September 10, 2026
New York, NY

Respectfully submitted,

By: */s/ Dennis H. Tracey, III*
Dennis H. Tracey, III
David R. Michaeli
Nathaniel Benfield
HOGAN LOVELLS CADWALADER US LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 918-3000
dennis.tracey@hlc.com
david.michaeli@hlc.com
nate.benfield@hlc.com

*Counsel for Defendant B.A.T Industries p.l.c.*

**WORD COUNT CERTIFICATION**

I hereby certify that this Memorandum of Law complies with Local Rule 7.1(c) of the United States District Courts for the Southern District of New York. This certificate certifies that the document complies with the word count limit. Compliance relied on the word count of the word-processing system used to prepare the document. The total number of the words in this Memorandum, exclusive of the caption, table of contents, table of authorities and signature block is 8,484 words.

Dated: September 10, 2026

By: */s/ Dennis H. Tracey, III*
Dennis H. Tracey, III