# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NCR CORPORATION,

Plaintiff,

-against-

B.A.T. INDUSTRIES p.l.c.

Defendant.

Case No.: 1:23-cv-1172-JPC

**B.A.T INDUSTRIES P.L.C.'S**
**AMENDED ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIMS**

In response to the specific allegations in the separately numbered paragraphs of the Complaint filed by plaintiff NCR Corporation ("NCR"), and in support of its counterclaims against NCR, defendant B.A.T. Industries p.l.c. ("BAT"), by and through its undersigned counsel, states as follows:

**ANSWER TO NCR'S COMPLAINT**

As set forth in detail in BAT's Amended Answer and Counterclaims below, in this litigation, NCR seeks to transfer liability for its own intentional pollution of the Kalamazoo River to BAT, which neither participated in the discharge of pollutants nor ever agreed to pay for NCR's wrongful acts.

This matter arises out of the acquisition by a BAT subsidiary in 1978 of certain of the assets of the Appleton Paper Division of NCR (the "APD"), which produced coated paper for the manufacturing of carbonless copy paper in the 1950s through 1971 in plants located on the Fox River in Wisconsin. Following the Fox River's designation as a Superfund Site due in part to contamination by polychlorinated biphenyls ("PCBs") from APD operations, BAT, without



\\4152-1941-2807 v3

accepting liability to NCR, entered into a confidential settlement agreement pursuant to which it agreed to meet part of the costs of cleaning up the Fox River (the "CSA").

However, BAT never agreed to be responsible for NCR's liability in respect of the Kalamazoo River, which is hundreds of miles from the APD facilities at the Fox River – particularly because NCR's liability for the Kalamazoo River cleanup is entirely attributable to the business NCR retained in 1978 and has nothing to do with the business it sold to BAT. Indeed, it was NCR itself that intentionally arranged to offload toxic scrap paper known as "broke" to unsuspecting mills situated along the Kalamazoo River and, crucially, it was NCR's intentional conduct in doing so that resulted in NCR being found liable, not that of the business acquired by BAT. NCR has no basis to try to force BAT to pay to clean up its mess.

NCR cannot recover any such costs as a result of its own fraudulent conduct. At the time that NCR and BAT entered into the CSA, NCR was fully aware that it had produced toxins and that the arrangements it made for their disposal resulted in those toxins being dumped in the Kalamazoo River. NCR was, therefore, fully aware of the likelihood that it would face liability for environmental cleanup at that site. BAT was entirely unaware of any such liability, and could not have known of NCR's improper and knowing delivery of toxic broke to be recycled at the Kalamazoo River. When entering into the CSA, NCR misled BAT in a deliberate effort to transfer its own liabilities for polluting the Kalamazoo River to BAT, a party that faced no such liability. Due to NCR's fraudulent inducement, its claims are barred.

In its Counterclaims below, BAT seeks a declaration that it is not liable to NCR based on, among other things, NCR's fraud, negligent misrepresentation~~, *in pari delicto*,~~ and violation of public policy.



~~\\4152-1941-2807 v3~~

## INTRODUCTION

1. BAT denies each and every allegation contained in Paragraph 1 of the Complaint.

2. With respect to the allegations contained in Paragraph 2 of the Complaint, BAT admits that Appleton Coated Paper Company ("ACPC") and Consolidated Paper Mills ("CPM"), which were acquired by NCR and formed the APD, generated broke, which they sold via brokers to paper recycling mills and, except as so admitted, BAT denies each and every allegation contained in Paragraph 2 of the Complaint.

3. With respect to the allegations contained in Paragraph 3 of the Complaint, BAT states that its then-subsidiary, Lentheric Inc., which later changed its name to Appleton Papers Inc. ("API"), purchased from NCR certain assets and liabilities of the APD in 1978 pursuant to an agreement dated June 30, 1978 ("the SPA"). BAT was a guarantor of Lentheric's obligations under the SPA. Except as so admitted, BAT denies each and every remaining allegation contained in Paragraph 3 of the Complaint.

4. With respect to the allegations contained in Paragraph 4 of the Complaint, BAT admits, upon information and belief, that environmental cleanup of the Fox River began in the 1990s; admits, upon information and belief, that federal and state environmental regulators identified both NCR and API as potentially responsible for investigation and cleanup of the contaminated area of the Fox River; admits that NCR (on the one hand) and API and BAT (on the other) each claimed that, between them, the other party was responsible for all such costs under the terms of the SPA; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 4 of the Complaint.

5. With respect to the allegations contained in Paragraph 5 of the Complaint, BAT admits that after litigation and mediation NCR, API, and BAT entered into the CSA in July 1999

that was made effective as of February 12, 1998, and respectfully refers the Court to the CSA for the contents thereof; admits that an arbitration panel issued a ruling purporting to adjust the allocation of certain costs under the CSA; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 5 of the Complaint. BAT further states that the terms of the CSA and the referenced arbitral award speak for themselves, and denies any characterization of either by NCR.

6. With respect to the allegations contained in Paragraph 6 of the Complaint, BAT admits that, upon information and belief, the cleanup of the Fox River site was successfully completed in 2020; and otherwise, denies each and every remaining allegation contained in Paragraph 6 of the Complaint.

7. BAT denies each and every allegation contained in Paragraph 7 of the Complaint.

8. BAT denies each and every allegation contained in Paragraph 8 of the Complaint.

**THE PARTIES**

Formatted: Font: Times New Roman

9. BAT admits that NCR is incorporated under the laws of Maryland, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the Complaint.

10. With respect to the allegations contained in Paragraph 10 of the Complaint, BAT admits that BAT is a British investment holding company for the British American Tobacco p.l.c. group of companies, which operate in more than 100 countries worldwide; admits that those subsidiaries are principally engaged in the manufacture of tobacco and other nicotine products; admits that BAT is and at all relevant times was organized under the laws of England and Wales; and admits that BAT's principal place of business is in London.

## JURISDICTION AND VENUE

Formatted: Font: Times New Roman

11. The allegations contained in Paragraph 11 of the Complaint state a legal conclusion as to which no response is required.

12. The allegations contained in Paragraph 12 of the Complaint state legal conclusions as to which no response is required.

13. The allegations contained in Paragraph 13 of the Complaint state legal conclusions as to which no response is required.

## FACTUAL BACKGROUND

Formatted: Font: Times New Roman

### A. BAT'S ACQUISITION OF THE APD

14. With respect to the allegations contained in Paragraph 14 of the Complaint, BAT admits, upon information and belief, that NCR manufactured carbonless copy paper that contained PCBs as an ingredient; and, except as so admitted, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of the Complaint.

15. With respect to the allegations contained in Paragraph 15 of the Complaint, BAT admits, upon information and belief, that NCR paper was coated with an emulsion at, among others, two mills on the Fox River in Appleton Wisconsin; and that those mills were purchased by NCR in 1969 and 1970, after which they became the APD.

16. With respect to the allegations contained in Paragraph 16 of the Complaint, BAT repeats its response to Paragraph 3 above; admits that Appleton Papers Inc. was later renamed Appvion Inc.; admits that in 1990 BAT entered into a demerger agreement the effect of which was to spin off BAT's ownership of API; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 16 of the Complaint.

17. With respect to the allegations contained in Paragraph 17 of the Complaint, BAT states that the term "linked to" is too vague to require a response and therefore denies each and every allegation contained in Paragraph 17 of the Complaint.

**B. THE FOX RIVER CLAIMS AND THE CSA**

Formatted: Font: Times New Roman

18. With respect to the allegations contained in Paragraph 18 of the Complaint, BAT admits that, upon information and belief, the State of Wisconsin notified NCR and API that they were potentially responsible parties under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA" or "Superfund") for cleanup costs and natural resources damages in the Fox River in 1994; admits, upon information and belief, that, at that time, numerous federal and state governments and agencies were overseeing investigation and cleanup of PCB-contaminated sediment lying on the bottom of the Fox River in northeastern Wisconsin (the "Fox River Site"); admits, upon information and belief, that this contamination was alleged to be traceable to the APD, which was alleged to have directly discharged PCBs into the Fox River and was alleged to have sold broke to brokers and other mills on the Fox River which recycled the broke into new paper products; admits, upon information and belief, that, during the recycling process, the PCB coating on NCR paper was stripped off and discharged into the Fox River.

19. With respect to the allegations in Paragraph 19 of the Complaint, BAT admits, upon information and belief, that NCR and API initially cooperated as part of a defense group related to the defense of claims arising from alleged PCB contamination in the Fox River; admits that a dispute arose between NCR, on the one hand, and BAT and API, on the other, regarding liability for CERCLA costs, damages, or claims relating to the Fox River under the SPA; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 19 of the Complaint.

20. BAT admits the allegations in Paragraph 20 of the Complaint.

21. With respect to the allegations in Paragraph 21 of the Complaint, BAT states that the parties executed the CSA in July 1999 and, except as so admitted, denies each and every allegation in Paragraph 21 of the Complaint.

22. BAT denies each and every allegation contained in Paragraph 22 of the Complaint. BAT further states that the terms of the CSA speak for themselves, and denies any characterization of the CSA by NCR.

23. With respect to the allegations contained in Paragraph 23 of the Complaint, BAT admits that NCR, BAT, and API participated in an arbitration regarding the "Subsequent Allocation" terms in the CSA; admits that the arbitration panel purported to assign 60 percent of "Subsequent Allocation" costs to be borne by API/BAT and 40 percent of such costs to be borne by NCR; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 23 of the Complaint.

24. With respect to the allegations contained in Paragraph 24 of the Complaint, BAT states that the term "quite broad" is too vague to require a response, and that BAT therefore denies each and every allegation contained in Paragraph 24 of the Complaint, and respectfully refers the Court to the CSA for the contents thereof.

25. With respect to the allegations contained in Paragraph 25 of the Complaint, BAT respectfully refers the Court to the CSA for the contents thereof.

26. With respect to the allegations contained in Paragraph 26 of the Complaint, BAT respectfully refers the Court to the CSA for the contents thereof.

27. With respect to the allegations contained in Paragraph 27 of the Complaint, BAT respectfully refers the Court to the CSA for the contents thereof and otherwise denies the allegations made in this paragraph.

28. With respect to the allegations contained in Paragraph 28 of the Complaint, BAT respectfully refers the Court to the CSA for the contents thereof and otherwise denies the allegations made in this paragraph.

Formatted: Font: Times New Roman, 12 pt

29. With respect to the allegations contained in Paragraph 29 of the Complaint, BAT admits that from 2014 pursuant to a funding agreement BAT advanced monies to NCR in what were effectively loans with express rights of recourse relating to the Fox River environmental cleanup; and, except as so admitted, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint.

30. BAT admits, upon information and belief, the allegations contained in Paragraph 30 of the Complaint.

31. BAT admits, upon information and belief, the allegations contained in Paragraph 31 of the Complaint.

32. BAT denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint.

33. With respect to the allegations contained in Paragraph 33 of the Complaint, BAT denies that it jointly contracted for work as alleged and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33 of the Complaint.

34. With respect to the allegations contained in Paragraph 34 of the Complaint, BAT states that NCR, BAT, and API entered into a funding agreement with respect to the Fox River environmental cleanup following a dispute between NCR and API in 2012 and that payments by BAT pursuant to that agreement were in the form of advances on terms and in respect of which

BAT has a reserved right of recovery; and otherwise denies each and every remaining allegation contained in Paragraph 34 of the Complaint.

### C. THE KALAMAZOO CLAIMS

Formatted: Font: Times New Roman

35. With respect to the allegations contained in Paragraph 35 of the Complaint, BAT states that, on August 30, 1990, the Kalamazoo River/Portage Creek site was added to the National Priorities List as a result of the discharge of PCBs from carbonless copy paper, and BAT otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 of the Complaint.

36. With respect to the allegations contained in Paragraph 36 of the Complaint, BAT states that, during the 1990s, a number of paper companies filed a lawsuit seeking contribution from several additional companies for the investigation and cleanup of the site, and that BAT was not involved in the litigation, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 of the Complaint.

37. With respect to the allegations contained in Paragraph 37 of the Complaint, BAT states (i) that in 2003 NCR received a notice from the Environmental Protection Agency ("EPA") pursuant to CERCLA Section 104(e) stating that the EPA was investigating "to what extent NCR Corporation may have sold, either directly or indirectly through waste paper brokers, NCR paper broke to any of the secondary fiber pulp and paper mills located within the Kalamazoo River area of Michigan," and (ii) from at least July 1997, NCR was concerned about its potential liability in respect of PCB contamination of the Kalamazoo River and was actively investigating the risk of such liability. BAT otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 of the Complaint.

Formatted: Font color: Auto

38. With respect to the allegations contained in Paragraph 38 of the Complaint, BAT respectfully refers to the filings and findings in that action for the allegations therein, and otherwise denies each and every allegation contained in Paragraph 38 of the Complaint.

39. With respect to the allegations contained in Paragraph 39 of the Complaint, BAT respectfully refers to the filings and findings in that action for Georgia-Pacific's allegations and otherwise denies each and every allegation contained in Paragraph 39 of the Complaint.

40. BAT admits, upon information and belief, the allegations contained in Paragraph 40 of the Complaint.

41. BAT admits, upon information and belief, the allegations contained in Paragraph 41 of the Complaint.

42. With respect to the allegations contained in Paragraph 42 of the Complaint, BAT admits, upon information and belief, that NCR entered a consent decree with the United States and the State of Michigan in December 2020 ("Kalamazoo Consent Decree") and states that NCR did so based on its own decision and for its own commercial reasons after having been found by the courts to have arranger liability for the discharge of PCBs in the Kalamazoo River; BAT specifically reserved its position in respect of NCR's claims that BAT has any liability for Kalamazoo and in respect of NCR's decision to enter the Kalamazoo Consent Decree. BAT relies upon the terms of the Kalamazoo Consent Decree for its true meaning and effect; and, except as so admitted, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42 of the Complaint.

43. BAT denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 of the Complaint.

**D. THE PRESENT DISPUTE**

Formatted: Font: Times New Roman

44. With respect to the allegations contained in Paragraph 44 of the Complaint, BAT states that NCR has shared some information with BAT related to the Kalamazoo River subsequent to the execution of the CSA, but has not been full and frank in its communications with BAT both before and subsequent to the execution of the CSA; admits, upon information and belief, that NCR shared certain information with API related to the Kalamazoo River; admits that NCR and BAT held meetings in both London and New York related in part to the Kalamazoo River; admits that NCR provided BAT with certain documents related to the Georgia-Pacific Litigation (as that term is understood in Paragraph 38 of the Complaint) and claims by federal and state environmental regulators related to environmental cleanup; states that NCR entered into the Kalamazoo Consent Decree based on its own decision and for its own commercial reasons after having been found by the courts to have arranger liability for the discharge of PCBs in the Kalamazoo River; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 44 of the Complaint.

Formatted: Font color: Auto

Formatted: Font color: Auto

45. With respect to the allegations contained in Paragraph 45 of the Complaint, BAT admits that an outside environmental lawyer engaged by BAT monitored certain aspects of the liability and share allocation phases of the Georgia-Pacific Litigation, attended the trial for this purpose, and participated in certain NCR meetings and discussions; states that NCR entered into the Kalamazoo Consent Decree based on its own decision and for its own commercial reasons after having been found by the courts to have arranger liability for the discharge of PCBs in the Kalamazoo River; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 45 of the Complaint.

46. With respect to the allegations contained in Paragraph 46 of the Complaint, BAT admits that NCR and BAT had discussions regarding the Kalamazoo Consent Decree and the CSA;

states that NCR entered into the Kalamazoo Consent Decree based on its own decision and for its own commercial reasons after having been found by the courts to have arranger liability for the discharge of PCBs in the Kalamazoo River; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 46 of the Complaint.

47. With respect to the allegations contained in Paragraph 47 of the Complaint, BAT admits that BAT and NCR met in London in January 2019 at NCR's request; states that part of this meeting was held on a confidential and without prejudice basis; states that BAT did not acknowledge that it had any liability in respect of Kalamazoo River or the Kalamazoo Consent Decree and expressly reserved its rights relating to any such claimed liability; states that NCR entered into the Kalamazoo Consent Decree based on its own decision and for its own commercial reasons after having been found by the courts to have arranger liability for the discharge of PCBs in the Kalamazoo River; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 47 of the Complaint.

48. With respect to the allegations contained in Paragraph 48 of the Complaint, BAT states that it has never accepted that it has any obligations to NCR or otherwise in respect of the Kalamazoo River and that it has sought information from NCR to better understand the basis of the claims made against NCR and the effect of NCR's conduct relating to the pollution of the Kalamazoo River and NCR's liability in respect of such; and otherwise denies each and every allegation contained in Paragraph 48 of the Complaint.

49. With respect to the allegations contained in Paragraph 49 of the Complaint, BAT states that on June 3, 2019, BAT sent a letter to NCR rejecting NCR's demand for payment by BAT of cleanup costs at the Kalamazoo River and respectfully refers the Court to such

correspondence for the contents thereof, and otherwise denies each and every allegation contained in Paragraph 49 of the Complaint.

50. With respect to the allegations contained in Paragraph 50 of the Complaint, BAT states that on June 3, 2019, BAT sent a letter to NCR rejecting NCR's demand for payment by BAT of cleanup costs at the Kalamazoo River and respectfully refers the Court to such correspondence for the contents thereof, and otherwise denies each and every allegation contained in Paragraph 50 of the Complaint.

51. With respect to the allegations contained in Paragraph 51 of the Complaint, BAT states that on June 3, 2019, BAT sent a letter to NCR rejecting NCR's demand for payment by BAT of cleanup costs at the Kalamazoo River and respectfully refers the Court to such correspondence for the contents thereof, and otherwise denies each and every allegation contained in Paragraph 51 of the Complaint.

52. BAT denies each and every allegation contained in Paragraph 52 of the Complaint.

### E. DISPUTE RESOLUTION PROCEDURES UNDER THE CSA

**Formatted:** Font: Times New Roman

53. With respect to the allegations contained in Paragraph 53 of the Complaint, BAT respectfully refers the Court to the CSA for the contents thereof.

54. The allegations contained in Paragraph 54 of the Complaint state a legal conclusion as to which no response is required.

55. With respect to the allegations contained in Paragraph 55 of the Complaint, BAT admits that BAT and NCR participated in a dispute resolution procedure, including mediation in December 2019, and that the Parties to this action were unable to resolve their dispute; and, except as so admitted, denies each and every remaining allegation contained in Paragraph 55 of the Complaint.

**RESPONSE TO**
**COUNT I**
**Declaratory Judgment Against BAT**
**Pursuant to 28 U.S.C. § 2201**

56. In response to Paragraph 56 of the Complaint, BAT repeats and incorporates as if fully set forth herein each and every response to the allegations contained in Paragraphs 1 through 55 of the Complaint.

57. The allegations contained in Paragraph 57 of the Complaint state legal conclusions as to which no response is required.

58. BAT states that there is a dispute between NCR and BAT but otherwise denies each and every allegation contained in Paragraph 58 of the Complaint.

59. BAT denies each and every allegation contained in Paragraph 59 of the Complaint.

Formatted: Font color: Auto

~~60. BAT denies each and every allegation contained in Paragraph 60 of the Complaint.~~

60. Without prejudice to the agreement to arbitrate referred to below, BAT denies each and every allegation contained in Paragraph 60 of the Complaint, and specifically denies that it is liable for payment of any costs incurred by NCR relating to the Kalamazoo River Site. In addition, and without limitation, BAT also denies that the Court has jurisdiction of the allegation that BAT is liable for payment of a portion of any costs relating to the Kalamazoo River Site, as the proper measure of any payment due under the CSA constitutes a "Funding Dispute" within the meaning of Clause 10(b) of the CSA. Accordingly, those matters fall within the parties' agreement to arbitrate and are required to be determined by arbitration. Further, without limitation of the foregoing, should BAT have any liability to NCR (which is denied), pursuant to the terms of the CSA (and, in particular, the definition of "Damages" in Clause 1(e)(1)), any such amount must be assessed on an "out of pocket" basis, net of any relevant insurance recoveries, tax benefits and



~~\\4152-1941-2807 v3~~

indemnities, including recoveries and indemnities available to NCR in respect of costs incurred in relation to the Kalamazoo River Site.

61. With respect to the allegations contained in Paragraph 61 of the Complaint, BAT states that it does not have any obligation to pay for any portion of the investigation and clean-up costs relating to the Kalamazoo River, and otherwise denies each and every allegation contained in Paragraph 61 of the Complaint.

62. With respect to the allegations contained in Paragraph 62 of the Complaint, BAT states that it has no liability to NCR in respect of the clean-up of the Kalamazoo River on the grounds, among others, that the CSA was procured by fraud and that the CSA does not apply to the liabilities of NCR for the clean-up of the Kalamazoo River; and otherwise denies each and every allegation contained in Paragraph 62 of the Complaint.

63. With respect to the allegations contained in Paragraph 63 of the Complaint, BAT states that characterization of the facts and the purported effect of such is inaccurate and misleading, and otherwise denies each and every allegation contained in Paragraph 63 of the Complaint.

Formatted: Font color: Auto

64. BAT denies each and every allegation contained in Paragraph 64 of the Complaint. BAT repeats paragraph 60 above.

Formatted: Font color: Auto

65. BAT denies each and every allegation contained in Paragraph 65 of the Complaint.

**PRAYER FOR RELIEF**

Formatted: Font: Not Bold, Font color: Auto, All caps

BAT denies that NCR is entitled to any of the relief requested. In addition, and without limitation of the foregoing, the declaration sought by NCR that BAT must "compensate NCR for 60 percent of any costs it incurs relating to the Kalamazoo River Site" would exceed the jurisdiction of this Court, as the CSA provides that "Funding Disputes" are to be determined by arbitration.

## BAT'S DEFENSES

BAT asserts the following defenses without admitting that it bears the burden of persuasion or presentation of evidence on each or any of these matters. In addition to the defenses set forth below, BAT expressly reserves the right to assert any and all additional defenses that may develop during the course of investigation, discovery, and litigation of this action.

### FIRST DEFENSE

**Formatted:** Font: Times New Roman

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

**Formatted:** Font: Times New Roman

NCR's claims are barred, in whole or in part, because NCR has breached the CSA (if binding). NCR is accordingly unable, as a breaching party, to establish the required elements of its claims.

### THIRD DEFENSE

**Formatted:** Font: Times New Roman

NCR's claims are barred, in whole or in part, under the doctrine of equitable recoupment because, as set forth more fully below, NCR fraudulently induced BAT to enter into the CSA. NCR is accordingly barred from any recovery from BAT under the CSA.

### FOURTH DEFENSE

**Formatted:** Font: Times New Roman

NCR's claims are barred, in whole or in part, by NCR's unclean hands.

**FIFTH DEFENSE**

Formatted: Font: Times New Roman

NCR's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or laches.

**SIXTH DEFENSE**

Formatted: Font: Times New Roman

NCR's claims are barred, in whole or in part, by NCR's failure to mitigate its damages, if any.

**SEVENTH DEFENSE**

Formatted: Font: Times New Roman

NCR's claims are barred, in whole or in part, by public policy.

~~**EIGHTH DEFENSE**~~

~~NCR's claims are barred, in whole or in part, under the doctrine of *in pari delicto*.~~

Formatted: Font: Bold

Formatted: Centered, Indent: First line: 0.5"

**BAT'S COUNTERCLAIMS**

Formatted: Font: Times New Roman

Defendant and Counterclaim-Plaintiff BAT, by and through its attorneys, Hogan Lovells Cadwalader US LLP, asserts these Counterclaims against Plaintiff and Counterclaim-Defendant NCR, and alleges as follows:

**INTRODUCTION**

1. This case arises from NCR's egregious and intentional pollution of American waterways with toxic compounds from the 1950s through the 1970s and its fraudulent and wrongful attempt to foist liability for its conduct on a party that played no role in contributing to that conduct.

2. As a series of federal court decisions in *Georgia-Pacific Consumer Products. LP v. NCR Corp* (the "*Georgia-Pacific*" case) has found, NCR knew for years that its products were "hazardous" and that by-products of its manufacturing were "worthless waste . . . at best." Yet, even after learning that its product was poisoning people and the environment, NCR did not cease

production. Instead, it increased it. As a federal court has already found, NCR "deliberately attempted to conceal . . . the toxic nature of" its broke as part of a scheme to mislead the public and the government, pass NCR's broke off as "useful," and generate billions of dollars in revenues while "getting rid of a substance it knew to be hazardous."

3. As a result of NCR's wrongful behavior, it has been ordered to pay hundreds of millions of dollars in damages and penalties to punish it for its actions. But instead of facing the court-ordered consequences of its egregious misconduct, NCR is attempting to transfer those consequences to BAT – a party that had no role in NCR's actions and that (unlike NCR) did not benefit in any way from NCR's intentional misconduct.

4. NCR's deceitful manufacturing, marketing, and sale of PCB-tainted broke was only the beginning of its fraud. As set forth in detail below, prior to the execution of the CSA, NCR was fully aware that (1) it had produced toxinstoxic, hazardous products as a result of the manufacturing processes described at paragraphs 28 to 31 below, and that the arrangements it made for their disposal resulted in those toxins being dumped in the Kalamazoo River., and (2) the Kalamazoo River was alleged in a decision of District Judge Robert Holmes Bell dated March 6, 1998 in *Kalamazoo River Study Group v Rockwell International et. al.* ("the Rockwell decision") to have been contaminated with PCBs as a result of the recycling of NCR paper. NCR was, therefore, fully aware that the Kalamazoo River was a Future Site within the meaning of the CSA and of the likelihood that it would face liability for environmental cleanup at that site. NCR was also aware that the effect of the CSA was to allocate to BAT liability for PCB contamination resulting from broke generated by NCR's Systemedia's operations, for which BAT bore no responsibility whatsoever. NCR intentionally concealed these matters and its knowing and wrongful pollution of the Kalamazoo River from BAT in order to avoid financial responsibility

Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font color: Auto

for its actions and fraudulently induce BAT to enter into the CSA at the center of this case. As a result, NCR is barred from enforcing the CSA, and BAT is entitled to a declaratory judgment, including under principles of equitable recoupment, that the CSA is void and unenforceable.

5. At issue in this case is a product NCR began producing in the 1950s known as carbonless copy paper ("CCP"). CCP used a special coating to make exact copies of a document without the need for carbon paper. However, the coating was made using a product that contained PCBs, toxic chemicals that cause serious health issues in humans and animals. NCR learned of the toxic nature of the PCBs it used to make CCP by no later than the mid-1960s (and possibly much earlier), but continued making CCP anyway, resulting in large quantities of PCBs being dumped into several American rivers, either by NCR-contracted manufacturers and paper coaters, by NCR itself, or by recyclers to which NCR sold broke (i.e. paper that does not meet finished product specifications, is damaged in the manufacturing process, or consists of trim or cuttings produced during manufacture and conversion). NCR knew that its products were toxic, but concealed that information from the rest of the world. In fact, rather than winding down its production of CCP (which contained PCBs), NCR instead ramped up its production, dumping ever higher levels of a chemical it knew was toxic into American rivers. NCR wanted to generate as much profit as possible off of CCP before the public learned that product was toxic and its massive revenues (amounting to over $2 billion in 1970-72 alone) and profit-taking came to an end.

6. NCR went to great lengths to keep the world in the dark about the dangers of its product, showing no regard whatsoever for the health and safety of the public. For instance, when its PCB supplier, Monsanto, became aware of evidence of the product's toxicity, NCR asked Monsanto to cover up the fact that NCR was one of the biggest receivers of Monsanto's PCB products, so that no one would know CCP contained PCBs. NCR's deceptions allowed it to

continue to produce toxic CCP even after regulators and the public learned that PCBs were toxic, and to sell that CCP in ever larger quantities. NCR also sold increasing amounts of CCP broke to recyclers. NCR never told these recyclers that what they were buying was toxic and worthless. Instead, NCR deliberately concealed that information so that NCR could continue to sell CCP broke.

7. But, as NCR knew, it was only a matter of time before the public and regulatory authorities discovered that CCP was a poison and that NCR's dumping was a massive environmental disaster. Despite its efforts to mislead regulators and the public, information began to come to light showing that PCBs were toxic and that they remained in water for decades without dissipating. NCR knew that it would eventually be forced to pay for the damage it had done to American rivers. But rather than accept this liability, NCR started looking for ways it could shift the consequences of its own intentional wrongdoing to someone else.

8. In 1978, NCR sold its carbonless paper coating business, the APD, to Lentheric, a BAT subsidiary, which assumed certain liabilities of the APD. That subsidiary was subsequently renamed Appleton Papers Inc. (as above, "API").

9. Following the sale in 1978, regulators began to discover that the Fox River was polluted with NCR's chemicals and that a massive environmental cleanup would be needed. The EPA, relying on the provisions of CERCLA (which was enacted after the sale in 1980), looked to NCR to pay for the damage it had caused. NCR, in turn, sued BAT and API, claiming that they were responsible for footing the bill for NCR's bad acts under a contractual indemnity provision in the SPA through which Lentheric had acquired API.

10. The parties engaged in mediation and entered into the CSA in July 1999, by which time BAT no longer owned API. Under the CSA, API and BAT agreed to pay a percentage of

NCR's cleanup costs at the Fox River and an industrial site called Marina Cliffs without admitting liability.

11. NCR never mentioned any other sites at the mediation or that it had or would have CERCLA liability for such, and the agreement the parties reached in principle at the mediation did not address any other sites. But after the mediation concluded, NCR proposed that the parties also agree to apportion liability for "Future Sites", if any, that may in the future be identified.

12. Unbeknownst to BAT, NCR was pushing to include the "Future Sites" language in the agreement for a very specific reason that NCR never disclosed to BAT: NCR knew it had created another looming environmental disaster. In addition to intentionally destroying the Fox River in Wisconsin, NCR had also made arrangements which resulted in toxic CCP broke being dumped into another river, the Kalamazoo River in Michigan.

13. NCR's liability for the Kalamazoo River cleanup is fundamentally different from its liability for Fox River. Whereas at the Fox River, the discharge of PCBs was the result of the operations BAT acquired there, the Kalamazoo liabilities arose from NCR's own intentional and undisclosed actions leading to the disposal of broke in the Kalamazoo River. The basis for NCR's liability for Kalamazoo has been clearly established by the courts in prior decisions that are binding on NCR. Specifically, the courts have found that NCR's liability for the cleanup of the Kalamazoo River is based on its own "arranging" for disposal of toxins in the Kalamazoo River. And most relevant to the current dispute, the courts have expressly held that NCR's liability is *not* premised on any knowledge or intent of ACPC – the business acquired by BAT.

14. In the first of those decisions, from 2013, a Michigan federal court found that NCR was responsible for Kalamazoo River cleanup costs under CERCLA because NCR had "arranged" for hazardous substances to be disposed of in the river. In 2018, the same court held that NCR

was liable for 40% of Kalamazoo River cleanup costs. The court explained that, although the evidence in that case, to which BAT was not a party, indicated that NCR had only contributed 1-2% in volume of the PCBs in the Kalamazoo River, NCR should be held responsible for a much higher percentage of the clean-up costs because NCR's conduct had been egregious.

15. NCR intentionally concealed what it knew about its pollution of the Kalamazoo River to attempt to induce BAT to agree to accept significant liability that BAT would not have otherwise had for NCR's contamination of a river hundreds of miles from any of the facilities that BAT purchased. NCRNCR already knew that the Kalamazoo River was alleged to have been contaminated with PCBs as a result of the recycling of NCR paper and was thus a "Future Site," and had already concluded that it faced liability exposure for NCR's actions in respect of the Kalamazoo River, and NCR was looking for a way to dump that liability on an unsuspecting party, just as NCR had dumped poisons into the river itself.

Formatted: Font color: Auto

16. The evidence of NCR's deceitful intent is clear and overwhelming. Unbeknownst to BAT, NCR had already determined by the time it entered into the CSA that it had produced toxins and that the arrangements it made for their disposal resulted in those toxins being dumped in the Kalamazoo River. NCR was, therefore, fully aware of the likelihood that it would face liability for environmental cleanup at that site. NCR then decided to use the CSA negotiations to attempt to pass this liability off onto BAT.

Formatted: Font color: Black, English (United Kingdom)

17. During the CSA negotiations, NCR represented to BAT that it had no reason to think it would face liability at any sites other than Fox River and Marina Cliffs, and failed to disclose what it knew about Kalamazoo. In a letter dated April 23, 1998 to BAT's counsel, NCR's counsel deliberately misrepresented to BAT's counsel the likelihood of any future claims by stating that there was merely a "potential" for claims in respect of future sites. The only basis for such

"potential" was represented to be that "NCR paper was recycled at mills other than those on the Fox River," and thus that it "makes sense" to include such sites in the CSA on an "if any" basis.

18. In fact, NCR knew that it had produced toxins and that the arrangements it made for their disposal resulted in those toxins being dumped in the Kalamazoo River., and that the Kalamazoo River was alleged in the Rockwell decision to have been contaminated with PCBs as a result of the recycling of NCR paper. NCR was, therefore, fully aware of the likelihood that it would face liability for environmental cleanup at that site. and that the Kalamazoo River was already a "Future Site". NCR's general counsel at the time of the CSA negotiations has already testified that NCR knew Kalamazoo was "lurking out there," and that NCR "knew that was another potential location" at the time it pushed to include Future Sites in the CSA. NCR's outside counsel, J. Andrew Schlickman (of Sidley Austin), similarly confirmed in his own deposition that "[w]e were aware that the issues that were arising at the Fox River Site could arise at other sites. And the particular site I have in mind here was the Kalamazoo River in Michigan."

Formatted: Font color: Auto

Formatted: Font color: Auto

19. Not only that, NCR also knew that the risk of liability in respect of the Kalamazoo River did not arise from the mere fact that NCR paper was recycled there, but from its own knowing and intentional conduct in arranging for its broke to be sent there for recycling, with the toxic PCBs to be dumped in the Kalamazoo River during the process. As early as June 1998 (at a time before the CSA was entered into and while NCR's misrepresentations were continuing), NCR was aware that the environmental authorities were pursuing paper mills that reprocessed CCP on the Kalamazoo River, and was also fully aware of the likelihood that those mills would in turn pursue NCR on the basis that NCR's knowing and intentional disposal of broke at the Kalamazoo River made it liable as an arranger under CERCLA. Indeed, NCR was already aware that the Kalamazoo River was alleged to have been contaminated with PCBs as a result of the recycling of



\\4152-1941-2807 v3

NCR paper. NCR was sufficiently concerned of these risks that its in-house lobbyist Phil Servidea set them out in a memo dated June 10, 1998 to an executive at National Fiber Supply, a paper broker, for lobbying purposes. None of that information was disclosed to BAT.

Formatted: Font color: Auto

20. BAT had no reason to suspect that NCR had arranged for PCBs to be dumped into the Kalamazoo River, as neither NCR nor the APD ever had any operations on the Kalamazoo River. NCR knew that BAT would not knowingly agree to share liability for NCR's destruction of the Kalamazoo River if NCR disclosed the true facts, so it concealed what it knew and believed about Kalamazoo. NCR exploited its unique knowledge of essential facts to induce BAT to include Future Sites in the CSA. Having done so, NCR cannot recover from BAT for its wrongful behavior.

21. **First,** NCR is barred from recovery under the CSA as a result of its fraudulent misrepresentations and concealment at the time of the negotiation of the CSA. Had BAT known the true facts as to NCR's involvement in polluting Kalamazoo, the true degree of likelihood of NCR being liable as an arranger, ~~and/or~~that the Kalamazoo River already satisfied the terms of the definition of "Future Site" in the draft CSA, and that NCR intended to transfer liability to BAT for NCR's own misconduct, BAT would not have agreed to execute the CSA.

Formatted: Font color: Auto

22. **Second,** the CSA relates solely to potential liabilities arising out of the APD business that was acquired by BAT. The liability NCR faces for the pollution of the Kalamazoo River is a liability which is attributable only to NCR itself, not to the APD business that BAT acquired.

23. **Third,** even if Kalamazoo were a "Future Site" under the CSA (which it is not), NCR cannot transfer liability for its own misconduct to an innocent party such as BAT. Any recovery from BAT would be barred by ~~both~~ public policy~~ and the *in pari delicto* doctrine. ~~.

24. For all of these reasons, NCR is barred from trying to make BAT pay for NCR's Kalamazoo cleanup costs.

## FACTUAL BACKGROUND

### A. NCR MANUFACTURES CCP USING A TOXIC CHEMICAL

Formatted: Font: Times New Roman

25. From 1954 to 1971, NCR manufactured and sold CCP, which enabled users to make multiple copies of a document without the messy side effects of carbon copy paper. CCP eliminated the need for a sheet of copy paper by placing a special coating on the back of one piece of paper that contained a solvent, colorless ink capsules, and other chemicals. A second piece of paper was coated with a different solution, including clay, which, when mixed with the chemical emulsion from the ink microcapsules on the first page, would turn blue. The microcapsules would rupture under pressure from, *e.g.*, the pressure of a pen, creating an exact duplicate.

26. But as the Seventh Circuit found in 2014, "[t]he invention of [CCP] by NCR . . . in the mid-1950s solved a small problem and created a large one."

Formatted: Font: 12 pt

27. That is because until the early 1970s, the substance NCR used to coat CCP contained PCBs, highly toxic pollutants. Since the invention of PCBs, they have been shown to cause serious health problems in humans. Courts have found that PCBs can cause damage to human livers, can burn and irritate human skin, and do not dissolve or dissipate in water, instead attaching to solids in the water and remaining present for decades.

28. NCR used a two-step process to produce CCP. First, the CCP was coated with NCR's emulsion (the chemical treatment that caused CCP to function and which contained the harmful PCBs); second, the coated paper was turned into an end product through a process called "converting" – that is, turned into actual, branded CCP via cutting, printing, and collating the coated paper rolls.

29. NCR prepared the special emulsions used for the first step in the CCP manufacturing process using a product called Aroclor 1242, which was manufactured by Monsanto. NCR provided the emulsion to three mills with which NCR had contracted to coat its paper: ACPC, CPM, and Mead Corporation ("Mead"). ACPC and CPM were both located along the Fox River in Wisconsin. Mead (which was not acquired by BAT) was located in Chillicothe, Ohio.

30. The coaters would coat rolls of paper with emulsion provided by NCR and then sell the coated paper back to NCR. In 1969 and 1970, NCR acquired CPM and ACPC, respectively, eliminating this step as to those two coaters, though NCR still used Mead as a contractor to coat CCP as well.

31. For the second step in the manufacturing process, the coated rolls of CCP would be "converted" into usable paper products. This process occurred in one of two ways. First, NCR sold coated paper rolls to customers who performed their own conversion. Alternatively, NCR converted the rolls itself into NCR branded CCP through NCR's Systemedia subsidiary. Systemedia had conversion facilities at three locations: Portage, Wisconsin; Washington Court House, Ohio; and Dayton, Ohio.

32. Both the coating process and the converting of CCP created broke. Broke is generally used through a recycling process to create pulp for recycled paper.

33. The paper recycling process involves adding a watery slurry to paper scraps and/or broke and extracting fibers for use in recycled paper. The watery slurry, which contains various chemicals, ink, clay, and other byproducts besides paper fibers, is then dumped back into a water source. In the case of CCP, the watery slurry contained PCBs, which were dumped into rivers next to paper recycling mills.

### B. NCR KNOWINGLY POLLUTES AMERICAN RIVERS

Formatted: Font: Times New Roman

34. As a result of the manufacturing and recycling of NCR CCP, PCBs were discharged into rivers by NCR itself, as well as by the "coaters" and the recycling mills. Not all dischargers in the 1950s to 1970s had knowledge of the toxicity of the PCBs used in CCP – or even that PCBs were present in CCP. As a federal district court in Wisconsin found, "the toxic nature of the discharged product was not appreciated by most of the dischargers until almost all of the environmental damage had already occurred." Most dischargers, that is, except NCR.

35. By 1965, NCR scientists were conducting experiments on the toxicity of the PCBs used in CCP and finding harmful effects on animals exposed to the product as well as caustic effects on human skin.

36. In 1967, Monsanto, the manufacturer of the PCBs used by NCR in NCR's coating, sent NCR a study which validated peer reviewed scientific studies and found that PCBs were "related to and as poisonous as DDT."

37. As found by the Wisconsin federal district court, over the course of 1967 to 1971, Monsanto, NCR, and several other entities discussed the toxicity of the PCBs used in NCR's CCP manufacturing process. NCR realized at that time that it would have to stop using PCBs, but did not want to do so until it developed an alternative.

38. Rather than reducing or halting production while searching for an alternative, NCR, upon learning that the PCBs were toxic and harmful to humans on the level of DDT, ramped up its production of CCP, leading to what the Wisconsin federal court described as a "precipitous increase" in production during the late 1960s and early 1970s.

39. The Wisconsin federal district court found that "the strategy of waiting was a deliberate acceptance of a large amount of risk to the environment and public health."

40. As a result of NCR's egregious conduct the Wisconsin federal district court barred NCR from seeking *any* contribution from recyclers in CERCLA litigation over the cleanup of the Fox River in Wisconsin – even though the recyclers were the parties that had actually dumped the PCBs into the river.

### C. NCR MISLEADS RECYCLERS INTO POLLUTING THE KALAMAZOO RIVER

Formatted: Font: Times New Roman

41. As discussed above, the federal courts have already determined that by March 1969 (at the latest), NCR knew that PCBs disposed of during the manufacturing process were toxic, and that the PCBs in broke were also toxic and would introduce toxins into waterways where the broke was recycled.

42. Indeed, the Michigan federal court found that "[n]one of the evidence . . . suggests that NCR genuinely believed that treating the effluent from recycled CCP broke would keep PCBs from flooding into the environment through the recycling process."

43. Rather, the evidence showed that NCR concluded by 1970 that there was "no effective method for controlling [PCBs from] the disposal of used paper."

44. For instance, "NCR proposed incinerating CCP broke," – clear evidence that NCR knew the broke to be worthless at best – "but the cost of doing so, coupled with the fact that the PCBs in CCP paper underwent little decomposition when burnt, derailed that option."

45. Rather than ordering the cessation of CCP broke sales, NCR instead asked Monsanto to conceal the fact that NCR was a major recipient of Monsanto products containing PCBs.

46. NCR then ***ramped up*** production, which created even more toxic broke, and then "arranged for disposal of CCP broke that it knew to be an environmental and economic liability." NCR intentionally exploited the fact that, normally, broke is considered such an important product for paper recyclers that they compete to acquire it from paper mills. NCR concealed that its broke

was not normal but highly toxic, and moved to "divest itself of a product that it knew to be hazardous and a legal liability," all the while profiting from its deception by selling worthless and toxic scrap to brokers and recycling plants.

47. The Michigan federal court found that "NCR had deliberately attempted to conceal from [recyclers]—and everyone else—the toxic nature of CCP broke." Following a bench trial, the Michigan district court found in 2013 that NCR had caused CCP broke to be sent to recyclers on the Kalamazoo ~~river~~River, which resulted in pollution of the Kalamazoo River with PCBs.

48. Following additional proceedings, the Michigan federal court issued a further ruling in 2018 allocating liability for Kalamazoo cleanup costs among NCR and other polluters. The court held that, despite evidence that NCR had only contributed 1-2% by way of volume of the PCBs in the Kalamazoo River, NCR was liable for 40% of the cleanup costs. The court explained that this high percentage was appropriate because, among other things, "NCR dragged its feet on sharing knowledge about PCBs with the paper mills" and "greatly benefitted from the sale of its CCP broke and trim." Indeed, the Michigan district court found that NCR had made profit margins of 20% and brought in over $2.1 billion in revenue from the production of CCP in 1970 to 1972 alone.

49. In sum, the court found that: "NCR had a hand in all of the carbonless copy paper that was responsible for the PCB contamination and . . . knew that there were environmental and human dangers to releasing the wastewater from recycling CCP, even as it encouraged the de-inking mills to continue to recycle its product."

**D. NCR HIDES ITS INVOLVEMENT AT KALAMAZOO TO FRAUDULENTLY PROCURE A SETTLEMENT WITH BAT**

Formatted: Font: Times New Roman

50. In the 1990s, the EPA targeted the Fox River Site and another site called Marina Cliffs for CERCLA remediation. It issued notices to NCR and API indicating that they were Potentially Responsible Parties for the Fox River and Marina Cliffs sites.

51. In 1995, NCR filed a declaratory judgment action in this District (No. 95-cv-4620) seeking a declaration that API and BAT were required to defend and indemnify NCR against claims arising out of or relating to the Fox River and Marina Cliffs sites pursuant to the SPA. API and BAT filed counterclaims seeking declarations that NCR was required to defend and indemnify them against claims arising out of or relating to the Fox River and Marina Cliffs sites.

Formatted: Font color: Auto

52. API funded the defense of NCR's claim on behalf of itself and BAT. The law firm retained by API, Simpson Thacher & Bartlett LLP ("STB"), represented API and BAT in the conduct of that defense. BAT personnel had no direct involvement in either the defense of NCR's claim or the associated factual investigation except through its representation by STB.

53. Over the course of the summer of 1995, NCR and/or its counsel, Sidley Austin, conducted privileged investigations into its potential CCP liability at the Fox River and sought access to certain of API's employees for that purpose. API agreed to permit such access on condition that the parties enter into a Joint Defense Agreement. Accordingly, on November 17, 1995, API, BAT and NCR entered into a Joint Defense Agreement (the "1995 JDA"), pursuant to which they "wish[ed] to cooperate with each other and exchange Defense Materials from time to time in connection with any allegations of potential liability against any of them relating to the alleged Fox River PCB contamination […] and to assist each other in the defense of such allegations, including any investigation, negotiations, and other activities or proceedings relating to such allegations […]"

54. Following the execution of the 1995 JDA, Sidley Austin and STB engaged in a joint factual investigation of matters relevant to NCR's and API's potential liability for PCB contamination of the Fox River ("the Joint Fox River Investigations"). In the course of that investigation, the parties and their counsel pledged to cooperate closely and share information obtained pursuant to the investigation.

55. At all material times, NCR, acting itself or through its counsel, Sidley Austin, directed and controlled the conduct of the Joint Fox River Investigations. In particular, NCR (1) took the lead in dealings with State and Federal agencies; (2) determined the manner in which the investigation would be conducted; and (3) identified, instructed and liaised with joint consultants in connection with the investigation.

56. Notwithstanding the 1995 JDA, however, NCR undertook separate and/or privileged investigations into its potential CCP liability without the knowledge or participation of BAT or its counsel (the "NCR-Only Investigations"). The subject matter of the NCR-Only Investigations included potential CCP liability at Future Sites, including the Kalamazoo River, as well as the relevance of broke generated by Systemedia's operations to that liability. NCR did not disclose the existence of or findings from those privileged investigations to BAT or its counsel.

57. From as early as July 15, 1997, NCR had been secretly investigating its potential liability in respect of PCB contamination of the Kalamazoo River. Throughout the latter half of 1997, NCR analyzed information concerning PCB contamination of the Kalamazoo River and litigation relating to liability for that contamination, including the *Kalamazoo River Study Group v Rockwell International et al.* litigation. As a result of these investigations, prior to the execution of the CSA, NCR anticipated that it would be sued in respect of PCB contamination of the Kalamazoo River. None of these matters were disclosed to BAT or its counsel.

52.58. In February 1998, NCR and API took part in a mediation in order to resolve their disputes. The mediation was in respect of potential liability for Fox River and Marina Cliffs and focused exclusively on this. There was no discussion of Kalamazoo.

Formatted: Font color: Auto

53.59. As a result of this mediation, the parties agreed in principle to the terms of a settlement. (the "Memorandum of Settlement"). The parties agreed, without accepting liability, that API and BAT would be jointly and severally responsible for 55% of the liability for the Fox River and Marina Cliffs, and NCR would be responsible for 45% of costs, up to a combined total of $75 million. If costs exceeded $75 million, the parties would enter into an arbitration to determine the percentages for which each party was liable beyond $75 million. The parties also agreed to continue to cooperate and jointly coordinate with respect to the underlying environmental litigation surrounding the Fox River Site.

Formatted: Font color: Auto

Formatted: Font color: Auto

54.60. The original terms of the settlement the parties reached at the mediation that led to the CSA did not include any reference to "future sites." BAT was unaware of any sites other than the two listed expressly in the CSA – the Fox River and Marina Cliffs sites in Wisconsin – where NCR had directly or indirectly disposed of NCR broke.

55.61. However, in the first draft of the CSA, which was prepared by NCR's counsel, Sidley Austin, NCR inserted language providing that the CSA would apply to "Future Sites" as well. The Sidley Austin partner representing NCR, J. Andrew Schlickman, stated in an April 23, 1998 cover letter (the "April letter") proposing the change that NCR was proposing to apportion liability for "potential future sites" on the basis that "NCR paper was recycled at mills other than those on the Fox River," and that the new language would apply to "Future Sites, if any." He provided no information about Kalamazoo. Indeed, as in the mediation, there was *no mention* of Kalamazoo.

Formatted: Font color: Auto

Formatted: Font color: Auto

56.62. At the time, BAT was unaware of any future sites (actual or potential) outside the Fox River and Marina Cliffs sites.

57.63. But unbeknownst to BAT, NCR was, in fact, fully aware that it had trucked CCP broke to the Kalamazoo River for recycling knowing that broke was a worthless toxin, knowing of the likelihood that claims would accordingly be made against it and that it would be found liable, and knowing that such liability would arise not from the mere fact of its broke having been recycled, but from the fact that NCR's knowledge and intentions regarding the disposal of its broke rendered it liable as an "arranger" for the purposes of CERCLA liability. As NCR personnel admitted in later depositions, at the time of the CSA negotiations, Kalamazoo River was "lurking out there" as a source of liability for NCR. NCR "knew that there was another potential location, so [it] wanted to include [future sites language] as broadly as geographically as [it] could."

64. When Schlickman drafted the April letter and the draft CSA proposing an indemnity for Future Sites, NCR was fully aware that the Kalamazoo River was already a Future Site. It was on the basis of that awareness that the Future Sites provision was included in the draft CSA in the first place. The facts surrounding NCR's investigations and its proposal of the Future Sites provision demonstrate NCR's intent to deceive BAT into contributing to the cleanup of NCR's own contamination of the Kalamazoo River.

65. On March 6, 1998, District Judge Robert Holmes Bell issued the Rockwell decision in *Kalamazoo River Study Group v Rockwell International et al.*, litigation which NCR had been closely monitoring. In that decision, the court stated expressly that the Kalamazoo River had been contaminated with PCBs as a result of the recycling of NCR paper. On the same day, Sidley Austin prepared a memorandum of advice on NCR's liability as an arranger.

66. Within a week of the Rockwell decision, on March 13, 1998, Sidley Austin drafted the CSA together with a memorandum of advice concerning its terms and sent the memorandum to NCR. On March 25, 1998, Sidley Austin prepared a memorandum of advice specifically concerned with the Rockwell decision. Less than a week thereafter, on April 1, 1998, Sidley Austin prepared a revised draft of the CSA together with a further memorandum of advice on those revisions. Neither memorandum was shared with BAT or its counsel, STB, notwithstanding the close cooperation and information-sharing arrangements that had been agreed by NCR, Sidley Austin, API and STB pursuant to the 1995 JDRA and the Joint Fox River Investigations.

67. That same day, Schlickman drafted the April letter, which was sent to BAT's counsel on April 23, 1998, together with the draft CSA. The draft CSA that was appended to the April letter defined Future Sites as "any facility alleged to be contaminated with Hazardous Substances as a result, in whole or in part, of the manufacture, recycling, deinking or repulping of NCR carbonless paper that was manufactured with PCB-containing coatings". Given that the Kalamazoo River was alleged in the Rockwell decision to be contaminated with PCBs as a result of the recycling of NCR paper, when the April letter and draft CSA were sent to BAT's counsel, the Kalamazoo River was already a Future Site. NCR knew this, but instead of disclosing this fact to BAT (as it should have done), NCR falsely represented to BAT that it was not aware of any "Future Sites" by, among other things, repeatedly asserting that the proposed indemnity only applied to Future Sites "if any".

68. NCR sought to add an indemnity for "Future Sites" liability due to NCR's knowledge, derived from the Rockwell decision and the legal advice obtained in response to it, that it faced a material risk of liability in respect of PCB contamination of the Kalamazoo River, as evidenced by, among other things, the timing of the Rockwell decision, the contemporaneous legal advice

concerning NCR's liability as an arranger, the drafting of the CSA within a week thereafter, the subsequent advice concerning the Rockwell decision, and the revision of the CSA within a week thereafter.

69. Further, NCR drafted the definition of "Future Sites" in broad terms which were not confined to PCB contamination originating from broke generated by APD because of NCR's knowledge that it faced a material risk of liability in respect of PCB contamination of the Kalamazoo River as a result of the recycling of NCR paper generally, including as a result of broke and trim from NCR's Systemedia and other subsidiaries, which NCR retained in 1978 and which had no connection whatsoever with BAT.

~~58.~~70. Despite this knowledge, NCR never disclosed to BAT or its counsel (1) the fact that it had arranged for the discharge of ~~its broke into the Kalamazoo River, or its expectation that the Kalamazoo River would be~~ broke into the Kalamazoo River, including broke generated by its Systemedia operations, (2) its analysis of the Rockwell decision, (3) its knowledge that the Rockwell case involved allegations that the Kalamazoo River had been polluted with PCBs as a result of the recycling of NCR paper products, (4) its appreciation of the significance of the Rockwell decision as set out above, (5) its knowledge that the Kalamazoo River was already a future site, or (6) that it was fully aware of the facts in April 1998 and prior to the execution of the CSA in July 1999 that gave rise to the likelihood that NCR would have arranger liability in respect of ~~it~~the Kalamazoo River – facts it intentionally concealed from BAT.

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

~~59.~~71. In the executed version of the CSA executed on July 26, 1999, a definition of "Future Sites" was included at NCR's request effectively as a "sweep up" provision in case there was liability at unknown future sites. NCR intentionally drafted the provision to attempt to cover Kalamazoo by including "any facility, property, or location, other than the Fox River sites, alleged

to be contaminated with Hazardous Substances as a result, in whole or in part, of the manufacture, recycling, deinking, or repulping of any amount of PCB-containing NCR Paper brand carbonless paper that was manufactured utilizing the assets that were the subject of the Purchase Agreement." NCR did not disclose to BAT or its counsel that it had introduced the "Future Sites" provision because it knew that it faced potential liability in respect of the Kalamazoo River. Nor did NCR disclose that the Kalamazoo River already met the definition of "Future Site", with the consequence that the provision required BAT to assume the risk of that liability. Nor did NCR disclose that such liability would extend to PCB contamination resulting from broke generated by NCR's Systemedia operations.

Formatted: Font color: Auto

Formatted: Font color: Auto

72. The draft CSA appended to the April letter provided that "NCR and API/BAT agree to continue to cooperate, coordinate, and assist one another in the defense of the Sovereigns' and potential third-party claims relating to the Fox River sites, as well as Future Sites, and further agree to implement a coordinated and efficient joint defense effort among themselves […] The parties agree to share documents, factual material, mental impressions, memoranda, interview reports and other information in any form, whether written, oral, computerized or otherwise, relating to the Fox River sites and Future Sites" (the "Draft Cooperation Clause").

73. Against the background of the close cooperation and information sharing established by the 1995 JDA, which was thereafter expressly extended to Future Sites by the Draft Cooperation Clause, NCR represented, by the 1995 JDA and the Draft Cooperation Clause and its conduct, that it was cooperating and would continue to cooperate with BAT and its counsel and sharing information concerning potential CCP liability in respect of Future Sites.

74. However, NCR did not cooperate with BAT and its counsel nor share information concerning potential CCP liability in respect of Future Sites. Further, in or around July 1998,

NCR, API and Sidley Austin agreed to enter into a Joint Defense and Representation Agreement ("the JDRA") with effect from July 1, 1998, to which neither BAT nor STB was a party. By the JDRA, Sidley Austin, which had previously acted only for NCR, would thereafter jointly represent both NCR and API in relation to the "Joint Defense Matters". Those matters were defined broadly to include "*the defense prosecution, and handling of Claims, Damages, Group Defense Costs, and other matters (excluding Excepted Matters) relating to or arising from the Fox River Sites or Future Sites.*" "Claims" were themselves defined to include all liabilities, claims and demands relating to the release or disposal of Hazardous Substances at those sites, whether existing or future, known or unknown.

75. The JDRA therefore established a joint engagement under which Sidley acted for both NCR and API in respect of, amongst other things, actual or potential claims against NCR and API relating to PCB contamination of the Kalamazoo River. A further consequence of the JDR was that, from July 1, 1998, STB had no involvement in the conduct of API's defense of any of the Joint Defense Matters.

76. Further, the JDRA also imposed obligations of confidentiality in respect of information generated by or shared between NCR, API and Sidley Austin in the course of their investigations into potential CCP liability at Future Sites (the "NCR-API Future Sites Investigations"), with the result that such information could not be disclosed to BAT or STB. Accordingly, neither BAT nor STB knew that the NCR-API Future Sites Investigations were being undertaken or the findings of those investigations.

77. The JDRA therefore enabled NCR and API to investigate and assess NCR's and API's potential CCP liability in respect of the Kalamazoo River and to exchange information

pursuant to those investigations without disclosing to BAT or STB either the existence of those investigations or the information thereby obtained. NCR intended the JDRA to have that effect.

78. On or around July 1, 1998, NCR and API, acting by themselves or through their joint counsel, Sidley Austin, commenced the NCR-API Future Sites Investigations. As part of those investigations, NCR and API (1) commissioned expert reports concerning PCB contamination at sites other than the Fox River, including the Kalamazoo River, (2) actively monitored and assessed NCR's and API's exposure at other contaminated sites, including the Kalamazoo River, (3) obtained, reviewed and analyzed expert evidence and other materials generated in the Rockwell litigation, and (4) interviewed, or sought to interview, Systemedia employees about the destination of Systemedia's broke and trim, including broke and trim generated by its Washington Court House, Dayton and Viroqua plants. NCR never disclosed to BAT or STB that it was investigating these matters or the information obtained in the course of those investigations.

79. As a result of both the NCR-Only Investigations and the NCR-API Future Sites Investigations, prior to the execution of the CSA, NCR was aware (1) of facts in April 1998 and prior to the execution of the CSA in July 1999 that gave rise to the likelihood (a) that it would be sued in respect of PCB contamination of the Kalamazoo River, (b) that allegations of liability would be made against it in respect of all PCB-contaminated sites, and (c) that the PCB contamination at the Kalamazoo River resulted in part from the recycling of broke and trim generated by NCR's Systemedia operations. NCR never disclosed these matters to BAT or STB. The JDRA was entered into, and the NCR-API Future Sites Investigations conducted pursuant to it, for the purpose, among other things, of preventing BAT and its counsel from having that awareness.

### E. NCR'S ROLE AT KALAMAZOO IS EXPOSED, LEADING TO LIABILITY FOR CLEAN UP COSTS

Formatted: Font: Times New Roman

~~60.~~80. In April 2003, NCR received an Information Request from the EPA seeking information about NCR's role at the Kalamazoo River site.

~~61.~~81. After conducting a search of its documents, NCR represented to the EPA that it had no documents showing sales to mills in the Kalamazoo River area because it had not made any, and that all of its broke was sold to mills in the Fox River area.

~~62.~~82. In 2009 litigation relating to the Fox River Site, a Kalamazoo-based recycling mill obtained documents from the 1960s which suggested that NCR had arranged for CCP broke to be sent to mills in the Kalamazoo River area.

~~63.~~83. In 2010, the EPA sent a further Information Request to NCR asking it to "revisit" its previous response in 2003. NCR responded that its 2003 response was still accurate.

~~64.~~84. Following this refusal to change positions, the EPA sent NCR a notice that it was a Potentially Responsible Party for the Kalamazoo River site.

~~65.~~85. Also in 2010, recycling mills on the Kalamazoo River sued NCR seeking contribution for the costs of cleanup on the Kalamazoo River, alleging, among other things, that NCR directly and through Mead had caused CCP broke to be sent to mills along the Kalamazoo River.

~~66.~~86. In 2013, the federal district court in Michigan ruled that NCR was an "arranger" that had arranged for its toxic waste to be sent to the Kalamazoo River to be disposed of, making NCR liable for cleanup costs under "arranger" liability provisions of CERCLA.

~~67.~~87. The court found that NCR had concealed the dangers of PCBs from recyclers and brokers so that NCR could keep making profits on the sale of broke while offloading scrap that it viewed as a liability due to the presence of toxic chemicals in the broke.

~~68.~~88. In 2018, the same court apportioned 40% of the past cleanup costs to NCR, despite the fact that NCR claimed that it was responsible for a small fraction of the PCBs in the Kalamazoo River. The court reasoned that a 40% allocation was equitable because "NCR . . . knew that there were environmental and human dangers to releasing the wastewater from recycling CCP, even as it encouraged the de-inking mills to continue to recycle its product."

~~69.~~89. The court based its conclusions in 2013 and 2018 on NCR's knowing and wrongful actions in delivering toxic broke to the Kalamazoo River:

- "NCR knew at least by the late 1960s that its CCP broke was, at best, not a useful product for a fully informed paper mill and, at worst, a serious environmental hazard."
- "Collectively, the evidence paints a clear and unequivocal picture that, at least by the late 1960s, NCR knew the CCP broke it was facilitating was a hazardous substance, the disposal of which created the possibility of substantial legal liability. Under those circumstances, the Court finds that no one with NCR's knowledge of the situation could have believed that CCP broke was a useful product."
- "NCR created the PCB- containing emulsion, held title to the product as it was converted to usable paper, and then sold that finished product. . . . NCR developed a process to enable de-inking mills to use CCP as a feedstock, a process that resulted in most of the PCBs being emitted in waste streams."
- "NCR was not open with the public about its use of PCBs in CCP, but instead tried to keep its use of PCBs out of the press or regulator cross-hairs until a suitable alternative was found."
- "NCR greatly benefitted from the sale of its CCP broke and trim . . . NCR had profit margins of twenty percent and experienced over $2.1 billion in revenues from the production of its CCP in 1970-1972 alone."
- "NCR knew that recycling CCP broke in the paper mills created a hazardous waste stream; that NCR continued to sell CCP broke to brokers and recyclers even though it understood no rational recycler would want the CCP broke anymore if it understood what NCR did; and that CCP broke reached the Kalamazoo River Valley Site."

~~70.~~90. The court also explicitly recognized prior decisions finding that ACPC did not have knowledge sufficient to be liable as an "arranger," and stated that NCR's liability for the Kalamazoo River was not based on any wrongdoing or knowledge of ACPC, but solely *NCR's* wrongful actions:

- "The Court's decision in this case . . . rests not on any findings as to ACPC's culpability or mindset during the production period, but entirely on NCR's knowledge and intent to dispose of what it well understood to be a hazardous, toxic substance."

~~71.~~91. Following this ruling, NCR reached a settlement with the EPA, leading to a consent decree being filed in the action requiring NCR to pay past and future costs to the EPA.

~~72.~~92. NCR then turned to BAT, demanding it pay part of the cost of NCR's bad acts. It also turned to API, but API was in bankruptcy.

~~73.~~93. BAT informed NCR that it is not responsible for payment of Kalamazoo costs under the CSA. BAT and NCR participated in a dispute resolution procedure, including mediation in December 2019, however the parties were unable to resolve their dispute.

**COUNT I**

**DECLARATORY JUDGMENT (FRAUD)**

~~74.~~94. BAT repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

~~75.~~95. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

~~76.~~96. As set forth in detail above, NCR fraudulently induced BAT to enter into the CSA in an attempt to force BAT to pay for the cleanup costs for NCR's pollution of the Kalamazoo River.

~~77.~~97. In order to induce BAT to enter into the CSA, and to agree to the "Future Sites" language proposed by NCR, NCR represented to BAT that it had no reason to think it would face liability at any site other than Fox River and Marina Cliffs, that such liability, "if any," was only "potential" and would arise, if at all, on the basis that "NCR paper was recycled at mills other than those on the Fox River." NCR concealed the fact that it had intentionally arranged for discharges of PCBs into the Kalamazoo River and that it was fully aware of the likelihood of it being found liable as an arranger.

~~78.~~98. NCR's representatives have admitted in sworn testimony that they were aware of the likelihood of Kalamazoo liability *at the time that the CSA was being negotiated*, and these matters are also apparent from NCR's lobbying at the same time, and yet NCR failed to disclose that fact to BAT and instead misrepresented that liability to BAT to induce BAT to enter into the CSA.

99. By describing Future Sites as "potential" and including the qualifier "if any" in relation thereto, NCR, acting through Schlickman of Sidley Austin, represented that it was not aware of any existing Future Sites within the meaning of the CSA at the time of the April letter. That representation was false. NCR knew at the time of the April letter that the Kalamazoo River was alleged in the Rockwell decision to have been contaminated with PCBs as a result of the recycling of NCR paper, such that the Kalamazoo River already constituted a Future Site within the meaning of the draft CSA.

100. By the April letter, NCR represented that the Future Sites provision was intended to address potential and/or hypothetical liability in relation to sites other than the Fox River, but omitted to disclose that (1) the Kalamazoo River already met the definition of "Future Site", (2) NCR had already analyzed the Rockwell decision and obtained legal advice in respect of its implications for NCR's liability for PCB contamination of the Kalamazoo River, (3) NCR already knew that it faced a material risk of liability in respect of PCB contamination of the Kalamazoo River, and (4) NCR had introduced the Future Sites provision precisely because of that analysis, advice and knowledge. Those omissions rendered NCR's representation a partial disclosure and a materially misleading statement, and placed NCR under a continuing affirmative duty to correct or supplement that representation. Despite obtaining further information through the NCR-API Future Sites Investigations that confirmed NCR's understanding of the risk that it would face liability in respect of PCB contamination of the Kalamazoo River, NCR neither disclosed that information to BAT or STB nor corrected its misleading representation in the April letter. Rather, NCR deliberately concealed those facts from BAT and STB and used the confidentiality arrangements established by the JDRA to continue that concealment.

101. By proposing the draft CSA together with the Draft Cooperation Clause, NCR represented that, from no later than February 12, 1998, NCR's and BAT's relationship in relation to the defense of potential claims relating to Future Sites would be governed by the Draft Cooperation Clause. However, NCR omitted to disclose that (1) as of the date of the April letter, NCR had already undertaken privileged investigations concerning its potential CCP liability in respect of PCB contamination of the Kalamazoo River and had not disclosed either the existence of those investigations or the information obtained in the course of them with BAT or STB; and (2) NCR, API and Sidley Austin had undertaken the NCR-API Future Sites Investigations under

a confidential arrangement from which BAT and STB were excluded. Those omissions rendered NCR's representation a partial disclosure and a materially misleading statement, and placed NCR under a continuing affirmative duty to correct or supplement that representation.

79.102. Independently of the duty arising from NCR's partial disclosures, NCR was under an affirmative duty to disclose the likelymaterial facts concerning the likelihood of Kalamazoo River liability to BAT during the CSA negotiations by reason of the special facts doctrine as well as its special relationship with BAT. NCR had unique knowledge of its own role in the discharge of PCBs into the Kalamazoo River – and that NCR had acted with the specific intent to offload a product it knew was toxic and faced liability for having done so – which it failed to disclose to and instead intentionally concealed from BAT. BAT, on the other hand, had no knowledge of NCR's pollution of the Kalamazoo River, nor could it have known as such information was known only to NCR. Yet NCR negotiated the CSA with BAT, knowing that BAT was unaware that NCR also faced Kalamazoo River cleanup liability because the public evidence to date did not indicate that NCR had committed acts that would lead to liability for the Kalamazoo cleanup.

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

80.103. NCR had knowledge of material facts that BAT was unaware of – namely, that (1) it had sold broke to mills in the Kalamazoo River area; (2) it knew that such broke would create toxic waste in the Kalamazoo River; (3) it had intentionally passed off on Kalamazoo recyclers a product it knew to be toxic as useful in order to earn a profit; and (4) the likelihood that NCR would be held liable for environmental cleanup costs at the Kalamazoo River. it was likely that NCR would be held liable for environmental cleanup costs at the Kalamazoo River; (5) investigations had been undertaken into potential CCP liability at the Kalamazoo River by or on behalf of NCR, including the NCR-Only Investigations and the NCR-API Future Sites

Investigations conducted pursuant to the JDRA; (6) NCR had obtained information through the NCR-Only Investigations and the NCR-API Future Sites Investigations that showed that (a) it faced a material risk of liability in respect of the Kalamazoo River and (b) the PCB contamination of the Kalamazoo River resulted in part from the recycling of broke and trim generated by Systemedia's operations; and (7) NCR had obtained legal advice as to the implications of the Rockwell decision for its potential liability in respect of the Kalamazoo River and had implemented the Future Sites provision on the basis of that advice (together, the "material information"). By reason of its possession of the material information, which was peculiarly within its knowledge, NCR was under an affirmative duty to disclose the material information to BAT. NCR breached that duty by failing to disclose that information.

Formatted: Font color: Auto

104. Separately, and independently of the foregoing, NCR was in a special relationship with BAT, by reason of, among other things, (1) the 1995 JDA and the regime of close cooperation and information sharing that developed between its parties in relation to the defense of claims concerning the Fox River Site; (2) NCR's role in directing and controlling the Joint Fox River Investigations; and (3) the Draft Cooperation Clause which represented that substantially the same regime of close cooperation and information sharing which applied to the Joint Fox River Investigations would apply to Future Sites. By reason of that special relationship, NCR was under an affirmative duty to disclose the material information to BAT. In breach of that duty, NCR failed to disclose that information.

~~81.~~105. Based on NCR's ~~failure~~representations, partial disclosures and failures to disclose these material facts, BAT was unaware of them, and was thus fraudulently induced to enter into the CSA. In particular, NCR knew that the representations were false or materially misleading because of the material information that NCR omitted to disclose. NCR knew that such

Formatted: Font color: Auto

Formatted: Font color: Auto

information was material and deliberately withheld it from BAT, knowing that BAT was unaware of it and was acting under a false impression. NCR made the representations, provided the partial disclosures, and omitted the material information with the intention of inducing BAT to execute the CSA, which BAT did in reliance on those representations, partial disclosures and misleading omissions.

Formatted: Font color: Auto

82.106. BAT has been and will be damaged in an amount to be determined at trial, but likely in the hundreds of millions of dollars by NCR's fraudulent inducement.

83.107. An actual controversy has arisen between NCR and BAT because NCR is seeking to recover from BAT under the CSA.

84.108. Accordingly, BAT is entitled to a declaration that NCR fraudulently induced BAT to enter into the CSA and that, as a result, the CSA is null and void.

85.109. NCR's fraudulent procurement of BAT's agreement to enter into the CSA arises out of the same transaction – the CSA – upon which it seeks to recover money from BAT. Accordingly, BAT is entitled to equitably recoup any alleged damages NCR seeks to recover from BAT under the CSA.

**COUNT II**

**DECLARATORY JUDGMENT (NEGLIGENT MISREPRESENTATION)**

86.110. BAT repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

87.111. In order to induce BAT to enter into the CSA, and to agree to the "Future Sites" language proposed by NCR, NCR misrepresented and concealed the fact that it had engaged in discharges of PCBs into the Kalamazoo River and that such discharges had caused significant

environmental damage for which it was facing liability exposure. Those misrepresentations and concealments are set forth at paragraphs 99 to 101 above.

~~88.~~112. NCR's representatives have admitted in sworn testimony that they were aware of the likelihood of Kalamazoo liability *at the time that the CSA was being negotiated*, and yet they failed to disclose that fact to BAT.

~~89.~~113. NCR was under an affirmative duty to disclose the likely Kalamazoo River liability to BAT during the CSA negotiations and not to misrepresent NCR's liability exposure. NCR had unique knowledge of its own role in the discharge of PCBs into the Kalamazoo River and of the likelihood of consequent liability, which it misrepresented and failed to disclose to BAT. BAT, on the other hand, had no knowledge of NCR's pollution of the Kalamazoo River, nor could it have known as such information was known only to NCR. Yet NCR negotiated the CSA with BAT, knowing that BAT was acting on the basis of an erroneous belief since the public evidence to date did not indicate that NCR had committed acts that would lead to liability for the Kalamazoo cleanup.

~~90.~~114. NCR had knowledge of material facts that BAT was unaware of – namely, that (1) it had sold broke to mills in the Kalamazoo River area; (2) it knew that such broke would create toxic waste in the Kalamazoo River; (3) it had intentionally passed off on Kalamazoo recyclers a product it knew to be toxic as useful in order to earn a profit; and (4) the likelihood that NCR would be held liable for environmental cleanup costs at the Kalamazoo River; (5) investigations had been undertaken into potential CCP liability at the Kalamazoo River by or on behalf of NCR, including the NCR-Only Investigations and the NCR-API Future Sites Investigations conducted pursuant to the JDRA; (6) NCR had obtained information through the NCR-Only Investigations and the NCR-API Future Sites Investigations that showed that (a) it

faced a material risk of liability in respect of the Kalamazoo River and (b) the PCB contamination of the Kalamazoo River resulted in part from the recycling of broke and trim generated by Systemedia's operations; and (7) NCR had obtained legal advice as to the implications of the Rockwell decision for its potential liability in respect of the Kalamazoo River and had implemented the Future Sites provision on the basis of that advice (together, the "material information"). By reason of its possession of the material information, which was peculiarly within its knowledge, NCR was under an affirmative duty to disclose the material information to BAT. NCR breached that duty by failing to disclose that information.

~~91.~~115. Based on NCR's failure to disclose these material facts, BAT was unaware of them~~,~~ and was thus induced to enter into the CSA.

116. NCR also had a duty to disclose the material facts to BAT due to its partial disclosures as set forth above at paragraphs 100 to 101, which placed NCR under a continuing affirmative duty to correct or supplement those partial disclosures.

117. Separately, and independently of the foregoing, NCR was in a special relationship with BAT, by reason of, among other things, (1) the 1995 JDA and the regime of close cooperation and information sharing that developed between its parties in relation to the defense of claims concerning the Fox River Site; (2) NCR's role in directing and controlling the Joint Fox River Investigations; and (3) the Draft Cooperation Clause which represented that substantially the same regime of close cooperation and information sharing which applied to the Joint Fox River Investigations would apply to Future Sites. By reason of that special relationship, NCR was under an affirmative duty to disclose the material information to BAT. In breach of that duty, NCR failed to disclose that information.

118. Based on NCR's representations, partial disclosures, and failures to disclose these material facts, BAT was unaware of them and was thus induced to enter into the CSA.

~~92.~~119. BAT has been and will be damaged in an amount to be determined at trial, but likely in the hundreds of millions of dollars, by NCR's negligent inducement.

~~93.~~120. An actual controversy has arisen between NCR and BAT because NCR is seeking to recover from BAT under the CSA.

~~94.~~121. Accordingly, BAT is entitled to a declaration that NCR negligently induced BAT to enter into the CSA and that, as a result, the CSA is null and void.

~~95.~~122. NCR's negligence arises out of the same transaction – the CSA – upon which it seeks to recover money from BAT. Accordingly, BAT is entitled to equitably recoup any alleged damages NCR seeks to recover from BAT under the CSA.

~~**COUNT III**~~

~~**DECLARATORY JUDGMENT (CONTRACT)**~~

~~96. BAT repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.~~

~~97. NCR and BAT are parties to the CSA.~~

~~98. NCR has asserted that BAT has liability under the CSA for damages relating to the Kalamazoo River.~~

~~99. BAT has denied any liability for costs relating to the Kalamazoo River on the ground that the cleanup costs for the Kalamazoo River do not fall within the scope of the CSA because, among other things, the liability is not attributable to the assets that were the subject of the SPA. In addition, the acts that have caused NCR to be liable for the cleanup of the Kalamazoo River were its own wrongful acts, which did not arise in any way from the assets acquired by BAT.~~

100. An actual controversy has arisen between NCR and BAT because NCR is seeking to recover from BAT under the CSA.

101. Accordingly, if the CSA is found to be binding upon BAT, BAT is entitled to a declaration that it has no liability to NCR for any cleanup costs relating to the Kalamazoo River.

**COUNT IV**

**DECLARATORY JUDGMENT (IN PARI DELICTO)**

102. BAT repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

103. NCR has a long history of fraudulent activity in its manufacturing and marketing of dangerous PCB-laden products, and in concealing its responsibility for the liabilities arising from its wrongful acts. NCR has already been found to have engaged in wrongful and deceptive conduct by several courts and is collaterally estopped from arguing otherwise.

104. NCR has been found to have known the PCBs were toxic since at least the mid-1960s, yet rather than stopping production, it ramped up production exponentially.

105. NCR has been found to have concealed the toxic nature of CCP broke from recyclers, while attempting to persuade recyclers to buy more broke.

106. NCR's misconduct bars it from now seeking to enforce a contract term against BAT under the doctrine of *in pari delicto*.

107. An actual controversy has arisen between NCR and BAT because NCR is seeking to recover from BAT under the CSA.

108. Accordingly, BAT is entitled to a declaration that it has no liability to NCR for any cleanup costs relating to the Kalamazoo River under the doctrine of *in pari delicto*.

**COUNT V**

**DECLARATORY JUDGMENT (PUBLIC POLICY)**

109. BAT repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

110. NCR has demanded that BAT pay costs associated with the Kalamazoo Consent Decree it reached with the EPA.

111. The Kalamazoo Consent Decree is based on a federal district court in Michigan apportioning 40% of the costs for cleanup at the Kalamazoo River to NCR.

112. In that lawsuit, NCR presented calculations of its actual responsibility of around 1-2%.

113. The court rejected NCR's proposed apportioning due to NCR's misconduct – namely, concealing the dangerous nature of CCP broke from recyclers while at the same time attempting to convince them to buy more CCP broke.

114. In the Fox River litigation, a Wisconsin federal court denied NCR's attempt to gain contribution from other alleged polluters on the Fox River, again because the court found that NCR must shoulder a share of the cleanup costs far in excess of the actual share of PCBs it deposited in the Kalamazoo River. The Wisconsin district court reached this conclusion because NCR knew about the dangers of toxic PCBs in its CCP, but concealed that information from the public, the government, and recyclers for years while ramping up production of CCP exponentially.

115. These awards of damages against NCR were explicitly found to be in excess of the actual proportionate share of PCBs for which NCR was responsible for discharging. The excess amounts were found to be justified as equitable due to NCR's bad behavior.

~~116. Such apportionment is a form of punitive damages intended to punish NCR for its bad behavior.~~

~~117. It is against the public policy of New York to enforce contracts that purport to indemnify a defendant for punitive damages.~~

~~118. Accordingly, NCR is barred from seeking compensation from BAT for such punitive assessments of damages.~~

~~119. An actual controversy has arisen between NCR and BAT because NCR is seeking to recover from BAT under the CSA.~~

~~120. Accordingly, BAT is entitled to a declaration that it has no liability to NCR for any cleanup costs relating to the Kalamazoo River, as any requirement to reimburse such damages would violate public policy.~~

**PRAYER FOR RELIEF**

WHEREFORE, ~~Plaintiff~~BAT requests that the Court grant the following relief:

1. Judgment in favor of BAT on all of its claims;

2. A declaration that the CSA is unenforceable, null and void;

3. A declaration that NCR is not entitled to any payments from BAT under the CSA relating to the Kalamazoo River CERCLA action;

4. An award of all attorneys' fees, costs, and expenses incurred by BAT in connection with this action; and

5. Such additional relief as the Court deems fair and just.

Dated: ~~June 23, 2023~~ August , 2026

Respectfully Submitted,

~~By:~~ ~~/~~ /s/ ~~DRAFT~~ *Dennis H. Tracey, III*

Dennis H. Tracey, III
David R. Michaeli
~~Peter Bautz~~
~~Ian Lewis-Slammon~~
HOGAN LOVELLS CADWALADER US LLP
~~390 Madison Avenue~~200 Liberty Street
New York, NY ~~10017~~10281
Telephone: (212) 918-3000
~~dennis.tracey@hoganlovells.com~~
~~david.michaeli@hoganlovells.com~~
~~peter.bautz@hoganlovells.com~~
~~ian.lewisslammon@hoganlovells.com~~
dennis.tracey@hlc.com
david.michaeli@hlc.com

Formatted: Indent: Left: 3", First line: 0.5"



~~\\4152-1941-2807 v3~~