# EXHIBIT 5

SIDLEY & AUSTIN
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

DALLAS
LOS ANGELES
NEW YORK

ONE FIRST NATIONAL PLAZA
CHICAGO, ILLINOIS 60603
TELEPHONE 312 853 7000
FACSIMILE 312 853 7036

FOUNDED 1866

WASHINGTON, D.C.
LONDON
SINGAPORE
TOKYO

WRITER'S DIRECT NUMBER

*(312) 853-7692*

***JOINT DEFENSE MATERIAL***
***PRIVILEGED & CONFIDENTIAL***

April 22, 1997

Mr. Lyman F. Wible
Vice-President
RMT, Inc.
744 Heartland Trail
P.O. Box 8923
Madison, WI 53708-8923

Robert A. Bourque, Esq.
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

**Re: Agreement to Provide Consulting Services**

Dear Messrs. Wible and Bourque:

This letter sets forth the terms and conditions ("Agreement") under which RMT, Inc., a Wisconsin corporation ("Consultant"), is engaged by Sidley & Austin, an Illinois General Partnership ("S&A"), as counsel to and on behalf of NCR Corporation, a Maryland corporation ("NCR"), and Simpson Thacher & Bartlett, a New York General Partnership ("ST&B"), as counsel to and on behalf of Appleton Papers Inc., a Delaware corporation, to render the services described below in connection with anticipated and threatened litigation and for the purpose of assisting S&A and ST&B in providing legal advice to their respective clients, NCR and API.

1. Engagement; Scope of Work. S&A and ST&B agree to retain the services of Consultant on behalf of their respective clients and Consultant agrees to provide technical consulting and support services to S&A and ST&B regarding defense of certain claims made against NCR and API by the Wisconsin Department of Natural Resources ("WDNR"), the United States Environmental Protection Agency ("USEPA"), United States Fish & Wildlife Service ("USF&WS"), the Menominee Indian Tribe of Wisconsin ("Menominee Tribe"), and the Oneida


NCRV_02650313

Indian Tribe of Wisconsin ("Oneida Tribe") relating to the Fox River, Wisconsin. Consultant shall provide such services and materials as requested from time to time to meet NCR's and API's objectives as disclosed by S&A, NCR, ST&B, or API to Consultant ("Services"). The Services shall include, generally, (i) consulting with S&A, NCR, ST&B and API to formulate strategy; (ii) consulting with respect to technical issues relevant to allocation of costs and damages among the parties that may have responsibility with respect to the alleged contamination of the Fox River; and (iii) such other and further consulting tasks as are deemed appropriate by S&A and ST&B to prepare for anticipated litigation. Consultant shall provide the Services as set forth herein in strict compliance with the requirements of the Agreement.

2. Other Work Relating to the Fox River. During, and for a period of five years after the termination of this Agreement, Consultant shall not perform any work relating to the alleged contamination of the Fox River or to the allocation of costs and damages among the parties that may have responsibility for such contamination, for any person not a party to this Agreement (including, without limitation, WDNR, USEPA, USF&WS, the Menominee Tribe, the Oneida Tribe, and the parties to the agreement attached as Attachment C), without the written consent of S&A and ST&B; provided, however, that after the termination of this Ageement, Consultant may perform such work for such other parties provided that the general subject matter of the work is disclosed to S&A and ST&B and the work does not relate to any matters adverse to NCR or API. S&A and ST&B shall provide a written response to any request for such consent within seven working days after receipt, and shall attempt to provide an oral response within three days. The above prohibition of Consultant's performing "work relating to the alleged contamination of the Fox River" shall not be construed to prohibit Consultant from undertaking work related to current or future emissions of pollutants in the Fox River basin (e.g., air pollution and wastewater permitting work).

3. Coordination Between S&A and ST&B; Primary Contacts. James Warchall of S&A will be Consultant's primary contact and Consultant will provide Services only as requested by Sidley & Austin or by such employees of NCR and API as Mr. Warchall may designate. Lyman Wible of Consultant will be S&A's primary contact. S&A and ST&B shall coordinate to provide information and direction to Consultant.

4. Relationship to Joint Defense Agreement. NCR and API have entered into a Joint Defense Agreement dated December 19, 1995 ("JDA"), whereby NCR and API have agreed to share certain information relating to the Fox River matter. NCR and API have also been working together on matters in which they have a common interest in defending against anticipated and threatened litigation. This Agreement is entered into in furtherance of the purpose of the JDA and the common interests set forth above.

5. Term and Termination. The term of the Agreement shall be until the Services are performed fully, unless earlier terminated upon 30 days' notice in writing by S&A and ST&B.

6. Consultant's Status; Subcontractors. Consultant shall, for all purposes hereunder, be deemed an independent contractor and not an employee of S&A or ST&B. Consultant acknowledges that the Agreement constitutes a personal service agreement with Consultant, and Consultant shall not assign its rights or delegate its duties under the Agreement without prior written consent of S&A and ST&B, and any such purported assignment or delegation without the prior written permission of S&A and ST&B shall be null, void, and of no effect. S&A and ST&B expressly acknowledge, however, that it may be appropriate and advisable for Consultant to retain from time to time subcontractors and independent contractors to assist Consultant in performing the Services. No such subcontractor or independent contractor shall be engaged by Consultant or on behalf of S&A or ST&B, or their respective clients, without S&A's and ST&B's express written permission and consent. S&A may assign its rights or delegate its duties under the Agreement without prior notice to Consultant.

7. Compensation; Invoicing. Consultant's labor and other direct charges shall be billed according to Attachment "A" to this Agreement. Consultant agrees to submit an invoice for all Services rendered, including travel, disbursements, and miscellaneous expenses incurred. The invoice shall be forwarded on a monthly basis to:

Dr. William S. Brewer
NCR Corporation
101 W. Schantz Avenue (ECD/2)
Dayton, Ohio 45479

Paul Karch, Esq.
Appleton Papers Inc.
P. O. Box 359
Appleton, Wisconsin 54912

With copies to:

James Warchall, Esq.
Sidley & Austin
One First National Plaza
Chicago, Illinois 60603

Robert Bourque, Esq.
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, New York 10017

The invoice shall specify for each timekeeper involved the work performed on a daily basis, recorded in 1/10th hour segments. Reimbursement requests for disbursements shall be adequately documented with copies of original records showing such expenses. Consultant shall submit

duplicate original invoices with copies of all backup documentation to NCR and API at the above addresses, each party to be invoiced for one-half (50%) of the total monthly invoiced amounts.

8. Cost Sharing. Consultant's charges for Services rendered hereunder will be shared by NCR and API on an equal basis, but invoicing shall be in accordance with paragraph 7, above.

9. Confidentiality.

9.1. Definition. "Confidential or Privileged Information" means all documents, information, materials, data, and experience, whether of a legal, technical, business, engineering, operational, or economic nature developed, provided, obtained, generated, or supplied by S&A, NCR, API, ST&B, or Consultant pursuant to this Agreement, whether in writing, in the form of drawings, orally presented, or by observation; provided, however, that Confidential or Privileged Information does not include information that: (a) at the time of execution of this Agreement is, or hereafter becomes, part of the public domain through legal and proper publication; (b) at the time of execution of this Agreement is in Consultant's possession and was not at the time of receipt Confidential or Privileged Information; or (c) is subsequently acquired by Consultant; provided, however, that such subsequently acquired information was not or is not acquired by Consultant directly or indirectly from (1) S&A, NCR; API, or ST&B, or (2) sources under obligation of secrecy or privilege to S&A, NCR, API, or ST&B, including other consultants or sources which require Consultant to hold such information in confidence. Disclosures of Confidential and Privileged Information made under the Agreement that are organized or provided by S&A, NCR, API, or ST&B to Consultant in a deliberate fashion or scheme shall not be deemed to be within the foregoing exceptions merely because individual items are in the public domain or in the possession of Consultant.

9.2. Proprietary Information. In the course of performing the Agreement, Consultant and its employees, agents, or subcontractors and independent contractors will have access to and come into contact with Confidential or Privileged Information of NCR and API. Unless otherwise specifically declared by NCR or API to Consultant in writing, all Confidential or Privileged Information is deemed to have pecuniary value, even though difficult to assess, and to be confidential, proprietary, and trade secret in nature.

9.3. Duty of Confidentiality. Consultant acknowledges and agrees that any information disclosed to it by S&A, NCR, API, or ST&B, or developed pursuant to the Agreement that is Confidential or Privileged Information, shall be maintained in confidence and not revealed to others. Consultant agrees to (i) protect Confidential or Privileged Information in the same manner as it protects its own proprietary information and afford not less than a reasonable degree of care; (ii) not disclose Confidential or Privileged Information except to its employees, agents, and subcontractors requiring such to perform hereunder, for whose conduct Consultant shall be responsible; (iii) use Confidential or Privileged Information only to provide services to S&A and ST&B under this Agreement; (iv) take all steps necessary to prevent

disclosure or unauthorized use; and (v) forthwith report to S&A and ST&B any conduct coming to its attention that appears to be a violation or, or inconsistent with, the rights that NCR or API claim therein, and afford to S&A, NCR, API, and ST&B reasonable cooperation in inquiring into and pursuing any such matter. Consultant will advise each of its employees, agents, representatives, and subcontractors who have or shall have access to Confidential or Privileged Information of their obligation to keep it confidential, and will not cause or permit other persons or entities to have access to Confidential or Privileged Information without S&A's, NCR's, API's, and ST&B's prior written consent. Consultant further agrees not to make any use whatsoever of Confidential or Privileged Information except for the purposes specified in Paragraph 1 above, and accordingly, without limiting the generality of the foregoing, agrees (a) not to use such information in connection with any other services performed by Consultant either for itself or for any other person or entity; and (b) to cause all written materials relating to or containing such information, including all reports and notes, and all copies, reproductions and reprints, whether received from S&A, NCR, API, or ST&B, or generated by Consultant, to be plainly marked to indicate the privileged, secret, and confidential nature thereof, and to prevent unauthorized use or reproduction. Such marking shall read "PRIVILEGED AND CONFIDENTIAL, ATTORNEY WORK-PRODUCT." Except as otherwise provided in Paragraph 10, Consultant shall return to NCR or API., as appropriate, all documents obtained directly or indirectly from S&A, NCR, API, or ST&B, including duplicates and working copies made by Consultant, in the event S&A, NCR, API, or ST&B so requests. Consultant agrees not to make any statements, whether written or oral, or provide other information to members of the press without the prior written consent of S&A, NCR, API, and ST&B.

9.4. Duties Upon Third-Party Requests For Information. Consultant shall not reveal any Confidential or Privileged Information to third parties, and accordingly, without limiting the generality of the foregoing, not supply any such information to any federal, state, or local governmental agency, unless and until directed by S&A, NCR, API, and ST&B. Consultant agrees that in the event any third party, including a government agency, requests verbal or written information from Consultant, Consultant shall immediately notify S&A, NCR, API, and ST&B by telephone, with written confirmation within three (3) days. Consultant shall oppose any request on such grounds as NCR or API may have, or as directed by S&A, NCR, API, and ST&B, whether by legal process or otherwise. In the event that request is before any tribunal, Consultant shall advise the tribunal of the confidential and privileged nature of the data requested and resist its disclosure.

9.5. Duty To Ensure Non-Disclosure By Others. Consultant will use its best efforts to ensure that each of its employees and any agents, subcontractors or employees thereof, who now or hereinafter are assigned to provide or assist in providing the Services, will comply with the same obligations of confidentiality as Consultant under this provision, unless otherwise agreed to in writing by S&A, NCR, API, and ST&B. In addition, as set forth above, NCR and API have entered into the JDA, which, among other things, provides that certain Defense Materials (as defined therein) will be treated as confidential and sets forth procedures to ensure

the continued confidentiality of such Defense Materials. A copy of the JDA is attached hereto as Attachment B. NCR and API have also separately entered into a confidentiality agreement among seven identified potentially responsible parties ("PRPs") dated March 15, 1996 (Attachment C). and "An Agreement Between the State of Wisconsin and Certain Companies Concerning the Fox River" dated January 31, 1997 which contains confidentiality provisions (Attachment D). These three agreements (collectively, "Confidentiality Agreements") impose certain obligations on experts and consultants engaged by the PRPs who receive confidential information as defined in those agreements to maintain the confidentiality of such information and to follow certain procedures in this regard. Consultant acknowledges that it has received and reviewed the Confidentiality Agreements and agrees to be bound by the applicable provisions thereof. To the extent that any of the confidentiality provisions of the Confidentiality Agreements is inconsistent with any of the confidentiality provisions of this Agreement, the parties hereto shall confer as to the proper course of action.

9.6. Injunctive Relief. In the event of a breach of this Paragraph 9, the parties hereto acknowledge that damages shall not be an adequate remedy and, in addition to any other relief to which they may be entitled, S&A, NCR, API, and ST&B parties shall be entitled to temporary and permanent injunctive relief to restrain any such breach, threatened or actual.

9.7. Survival of Obligations. The obligations stated in this Paragraph 9 shall survive the termination of the Agreement for any reason whatsoever until the earliest of the following occurs:

(a) Such Confidential or Privileged Information has become available to the general public through no fault of Consultant; or

(b) Such Confidential or Privileged Information is received by Consultant from others who are in lawful possession of such and who by such disclosure are not breaching any obligation owing to S&A , NCR, API, or ST&B.

10. Copyrights. All documents, drawings, designs, specifications, notebooks, tracings, photographs, negatives, computer programs and memories, calculations, worksheets, reports, findings, recommendations, data and memoranda of any kind or description discovered, developed, or prepared relating to the Services and Additional Services, whether in draft or in final form, shall be the property of NCR and be delivered to NCR upon request. Except as otherwise set forth in this Paragraph 10, S&A, NCR, API, and ST&B shall have full right of access to such materials relating to Services at all times during the term of the Agreement, and S&A, NCR, API, and ST&B shall have the exclusive right to use such materials relating to Services thereafter in any manner S&A, NCR, API, or ST&B may wish without any claim on the part of Consultant for additional compensation. Consultant warrants that it is the owner of all copyrights on the plans, drawings, blueprints, specification and other documents (1) as the employer for hire of the person(s) in its employ who contributed to the creation of these materials

and (2) as the assignee of any and all subcontractors and independent contractors who contributed to the creation of these materials. Consultant further warrants that it has obtained written copyright assignments from any and all such subcontractors and independent contractors. In consideration of the mutual promises contained in this Agreement, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Consultant hereby assigns to NCR and its successors and assigns, all the Consultant's rights, title, and interest in and to the copyright of the aforementioned plans, drawings, blueprints, specifications, and other documents prepared solely under this Agreement, and in all renewals and extensions of the copyright that may be secured now or hereafter in force and effect in the United States of America or in any another country or countries. Consultant may retain one duplicate copy of final documents and materials, together with the underlying information reasonably relied upon by Consultant in generating such final materials, for record purposes, and, coincident with final payment hereunder, Consultant shall certify that no other copy has been retained for any purpose. Consultant agrees to coordinate with S&A and ST&B regarding review of Consultant's files and records prior to archiving any such materials. Consultant shall implement such procedures as are deemed necessary and appropriate to ensure compliance with the confidentiality provisions contained in paragraph 8 of this Agreement for all such retained materials. Any use by S&A, NCR, API, or ST&B of Consultant-prepared materials for other than their stated purpose, however, shall be the responsibility of S&A, NCR, API, or ST&B, as appropriate, without liability to Consultant. This Paragraph shall be binding on the successors, assigns, administrators, or other legal representatives of the parties hereto.

11. Consultant's Representations, Warranties, and Covenants. Consultant hereby represents, warrants, and covenants to S&A, NCR, ST&B, and API that:

11.1. Capabilities. Consultant has the capability, experience, expertise, and means required to perform the Services and Additional Services, and that all Services and Additional Services shall be performed using personnel, equipment, and material qualified and/or suitable to perform the Services.

11.2. No Breach Of Other Agreements. Consultant is not subject to any restrictive obligations imposed by any third-party that would impair Consultant's ability to consult with and give testimony on behalf of NCR and API respecting Consultant's Services or Additional Services hereunder, or which would prevent Consultant from maintaining the confidentiality of Confidential or Privileged Information as provided for in the Agreement.

11.3. No Misappropriation. Consultant will not misappropriate any trade secrets or other proprietary information belonging to any person, firm, corporation, or other business entity, and will comply with all applicable law.

11.4. No Liens. Consultant shall keep the properties of S&A (and its partners, employees, and agents), NCR (and its directors, officers, shareholders, employees, and agents),

ST&B (and its partners, employees, and agents), and API (and its directors, officers, shareholders, employees, and agents), free and clear of all liens, encumbrances, and charges arising out of the Services, including materialman's, laborer's, and mechanic's liens.

11.5. Existence; Authorization. Consultant is a corporation duly organized and existing under the laws of the State of Wisconsin. The execution and delivery of this Agreement and the performance of the Services and Additional Services hereunder are within its powers and authority and have been authorized by all necessary corporate action. This Agreement is a valid and binding obligation of Consultant, enforceable according to its terms.

12. Governing Law. The Agreement is entered into in the State of New York. The Agreement will be governed by and construed in accordance with the laws of New York. The forum to resolve disputes arising under the Agreement shall be in New York.

13. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

If the foregoing terms and conditions meet with your approval, please indicate your acceptance thereof by executing this letter in the space provided below, and returning the same to S&A.

Very truly yours,

James F. Warchall

ABOVE AGREED TO AND ACCEPTED
THIS 23 DAY OF April 1997.

RMT, INC.

By ______________________

Title V.P.

SIMPSON THACHER & BARTLETT

By ______________________

Title Partner

APPROVED AS TO FORM AND CONTENT

NCR CORPORATION

By William S. Brown

Title Director Environmental Mgt

APPLETON PAPERS INC.

By Dennis N. Hultgren

Title Director of Environmental & Public Affairs

**Attachment A** **Compensation Schedule**

## SCHEDULE OF CHARGES - FLAT RATE
**January 1, 1997 - December 31, 1997**

**PERSONNEL CHARGES***

| | |
|---|---|
| Senior Consultant | $ 144/hour |
| Consultant, Project and Technical Management | $ 124/hour |
| Senior Project Technical | $ 115/hour |
| Project Technical II | $ 99/hour |
| Project Technical I | $ 88/hour |
| Staff Technical II | $ 75/hour |
| Staff Technical I | $ 65/hour |
| Senior Technician, Designer | $ 70/hour |
| Technician II | $ 60/hour |
| Technician I | $ 55/hour |
| Field/O&M Technician | $ 45/hour |
| Administration | $ 45/hour |

*Personnel include direct and contract employees.

DISPUTE RESOLUTION SUPPORT: Services in support of disputes (arbitration, litigation, etc.) involving client's information or interests, such as responding to discovery requests and subpoenas, are chargeable at the above rates.

Testimony rates (court, deposition or hearing time) are 1.75 times the above rates, with a minimum of 4 hours per day.

**OTHER CHARGES**

| | |
|---|---|
| Computer: CADD, Modeling Appl. & other computer service charges, per hr | $ 25.00 |
| Equipment Use | Std. Rate Sheet |
| Facsimile Transmissions, per sheet | $ 2.00 |
| Laboratory Analysis | Std. Rate Sheet |
| Prints: Blueline, per sq. foot | $ 0.15 |
| Reproduction, per sheet | $ 0.15 |
| Sample Storage: Geotechnical and Soils Samples | $ 10.00/unit/first mo.<br>$ 1.00/unit/mo. after |
| Vehicles: Car, per mile | $ 0.37 |
| Field Vehicle | $ 50.00/day<br>plus $ 0.35/mile |

Outside services, equipment, and facilities not furnished directly by RMT, Inc., will be billed at cost plus 15%, and may include, but are not limited to, the following:

- Aerial photography & mapping
- Meals and lodging
- Outside laboratory testing
- Printing and photographic reproduction
- Rental of equipment and vehicles
- Sample disposal
- Shipping
- Bonds required by project or client
- Special fees, permits, insurance, etc.
- Subcontractors to RMT, Inc.
- Supplies
- Telephone
- Transportation on public carriers

Payment terms: Net thirty (30) days. Thereafter, one percent (1%) interest per month on the unpaid balance will be charged.

RMT INC.

RMT, INC. — MADISON, WI
744 HEARTLAND TRAIL - 53717-1934
P.O. BOX 8923 - 53708-8923
608/831-4444 - 608/831-3334 FAX

g:\data\susanh\finance\brown\rateschd.doc 1/17/97

**Attachment B** **Joint Defense Agreement**

# JOINT DEFENSE AGREEMENT

AGREEMENT, dated ~~November~~ December 19, 1995, by and between Appleton Papers Inc. ("API"), B.A.T Industries Limited ("BAT"), and AT&T Global Information Solutions Company ("AT&T GIS") (collectively referred to herein as "the parties").

WHEREAS, AT&T GIS received a letter from the State of Wisconsin Department of Justice dated September 9, 1994 notifying AT&T GIS that it "is probably a PRP" with respect to certain contamination of the Fox River with polychlorinated biphenyls ("PCBs") and that AT&T GIS' participation in cooperative cleanup efforts would likely influence the State's decision on whether to initiate legal action;

WHEREAS, the Assistant Attorney General of the State of Wisconsin has notified AT&T GIS that the State intends to commence legal action if the State does not receive a satisfactory response to its September 9, 1994 letter;

WHEREAS, pursuant to the terms of the Agreement of Purchase and Sale of Assets for Appleton Papers Division of NCR Corporation Dated June 30, 1978 ("Asset Purchase Agreement") and the related Assumption Agreement, AT&T GIS requested API and BAT to defend the State's assertion of a claim and indemnify and hold it harmless;

WHEREAS, API and BAT have denied that they are required to defend or indemnify AT&T GIS with regard to actions related to Fox River PCB contamination;

WHEREAS, the United States Environmental Protection Agency ("U.S. EPA") notified AT&T GIS by letter dated August 8, 1995 of potential liability with regard to alleged disposal of hazardous substances by Appleton Coated Paper Company and Appleton Paper, Inc. at the Marina Cliffs Barrel Dump Superfund Site ("Marina Cliffs Site") in Wisconsin, and has informed AT&T GIS that it will assume that AT&T GIS does not wish to

negotiate a resolution of its potential liability if AT&T GIS fails to notify U.S. EPA of its willingness to perform or finance response activities;

WHEREAS, pursuant to the terms of the Asset Purchase Agreement and the Assumption Agreement AT&T GIS requested API and BAT to defend and indemnify and hold it harmless with regard to the Marina Cliffs site;

WHEREAS, API and BAT have denied any obligation to defend or indemnify AT&T GIS with regard to actions related to the Marina Cliffs Site;

WHEREAS, AT&T GIS commenced a lawsuit in the U.S. District Court for the Southern District of New York in June 1995 against API and BAT seeking a declaratory judgment that API and BAT are required to defend and indemnify AT&T GIS for any liability it may incur relating to the alleged Fox River PCB and Marina Cliffs contamination pursuant to the Asset Purchase and Assumption Agreements among NCR Corporation (the former name of AT&T GIS), BAT and Lentheric Inc. (the "Southern District Action");

WHEREAS, API and BAT have filed a counterclaim in the Southern District Action seeking a declaratory judgment that AT&T GIS is required to defend and indemnify API and BAT for any liability it may incur relating to the Fox River PCB and Marina Cliffs contamination;

WHEREAS, the parties have concluded that they have interests in common and may assert common defenses and/or claims in connection with the alleged contamination of the Fox River and the Marina Cliffs Site, and the parties accordingly have concluded that the conduct of each party's respective defense may be best served by, from time to time, sharing documents, factual material, mental impressions, memoranda, interview reports and

other information in any form, whether written, oral, computerized or otherwise, relating to the alleged Fox River PCB contamination and the Marina Cliffs Site ("Defense Materials");

WHEREAS, the parties wish to cooperate with each other and exchange Defense Materials from time to time in connection with any allegations of potential liability against any of them relating to the alleged Fox River PCB contamination and the Marina Cliffs Site, and to assist each other in the defense of such allegations, including any investigation, negotiations, and other activities or proceedings relating to such allegations, without prejudice to their respective positions regarding the Asset Purchase Agreement and the Assumption Agreement and without making any admissions or concessions; and

WHEREAS, it is the intent and desire of the parties that any information exchanged between or among them shall be maintained as confidential and shall be subject to all applicable privileges and protections from disclosure, including without limitation the joint defense privilege and the attorney work product doctrine.

NOW THEREFORE, the parties agree as follows:

1. The parties shall exchange Defense Materials pursuant to the terms of this Agreement. All such Defense Materials that are written shall be designated as such by the producing party and shall contain the following legend on the first page of each document: CONFIDENTIAL JOINT DEFENSE MATERIAL.

2. All Defense Materials shared pursuant to this Agreement shall be maintained as confidential by the receiving party and shall not be disclosed to third parties except in accordance with this Agreement.

3. All Defense Materials that are privileged or otherwise protected from disclosure under any applicable privilege or doctrine shall be maintained as privileged and

protected from disclosure by the receiving party and shall not be disclosed to third parties except in accordance with this Agreement.

4. By exchanging or disclosing Defense Materials pursuant to this Agreement, the parties do not intend to waive or diminish in any way the confidentiality of such materials or any privilege or other protection from disclosure applicable thereto. The parties specifically intend to invoke to the fullest extent possible the protections of all applicable privileges, including without limitation the joint defense privilege. In the event that a party hereto makes available to another party documents or information that could have been, but through inadvertence were not, designated as Defense Materials, the producing party may subsequently designate such documents or information as Defense Materials by promptly providing written notice to all other parties. Upon receiving and reviewing such notice, the receiving parties shall take such actions as are necessary to maintain the designated Defense Materials as confidential and/or privileged in accordance with the Agreement.

5. Defense Materials shall not be disclosed by any receiving party without the written permission of the party providing such Defense Materials, except that Defense Materials may be disclosed (a) to employees of the receiving party and employees of the receiving party's subsidiaries, parent corporations and other affiliates participating in investigation, negotiation, evaluation or other activities relating to the Fox River PCB contamination or the Marina Cliffs Site; (b) to counsel for the receiving party (and employees and support staff of such counsel) participating in investigation, negotiation, evaluation or other activities relating to the Fox River PCB contamination or the Marina Cliffs Site; (c) to experts and consultant retained by any party to participate in investigation,

negotiation, evaluation or other activities relating to the Fox River PCB contamination or the Marina Cliffs Site; (d) in the event that such disclosure is required under applicable law, provided that (i) three days prior written notice is given by the disclosing party to the party that provided such Defense Materials stating (A) the intent to disclose such materials, (B) to whom the disclosure is intended to be made, (C) the legal basis upon which disclosure is required, and (D) the time and place that such disclosure is intended to be made, and (ii) the disclosing party permits all affected parties an opportunity to protect their respective interests by motion or otherwise in an appropriate forum.

6. Counsel for the party receiving Defense Materials shall explicitly instruct all authorized recipients of such Defense Materials listed in Section 5(a)-(c) to maintain them in the strictest confidence and not to disclose them to anyone other than persons listed in Section 5(a)-(c).

7. Defense Materials that are shared pursuant to this Agreement, and the information therein, are to be used by the receiving party solely in the investigation and preparation of defenses regarding the Fox River PCB contamination and the Marina Cliffs Site, and any subsequent legal proceedings.

8. The parties will use their best efforts to ensure that Defense Materials are maintained as confidential and that no action is taken that would result in a waiver or loss of any confidentiality, privilege or other protection from disclosure.

9. Nothing in this Agreement is intended to or shall be deemed to restrict or limit the party producing Defense Materials from any use or disclosure of same (or information contained therein or derived therefrom) or the use of disclosure of any document or information which a party shall have acquired outside the scope of this Agreement.

10. In the event that any party shall no longer have a common interest with the other parties regarding the Fox River PCB contamination or the Marina Cliffs Site, that party shall promptly notify the other parties of that fact and shall withdraw from this Agreement. Such withdrawal shall not terminate the mutual obligation to maintain previously shared Defense Materials and information as confidential and/or privileged. Upon withdrawal, the withdrawing party shall return all documents provided to that party by the other parties hereto, including any copies of those documents subsequently made. The fact that the withdrawing party had been a party to this Agreement, and that Defense Materials had previously been shared pursuant to this Agreement, shall remain confidential and privileged.

11. Neither the existence of this Agreement, any provision hereof, nor any joint defense conducted by the parties shall be used in any fashion other than as set forth in this Agreement, including without limitation, any only by way of example, it shall not be used offensively or defensively to argue a waiver of any privileges or protections from disclosure, nor shall it be used by any party to claim that any counsel shall be disqualified in any litigation or other proceedings arising from the Fox River PCB contamination or the Marina Cliffs Site, or any other or different litigation or proceeding.

12. The parties acknowledge that disclosure by a party of any information in violation of this Agreement will cause the other parties to suffer irreparable harm for which there is not an adequate remedy. The parties acknowledge that immediate injunctive relief is an appropriate and necessary remedy for violation of this Agreement.

13. This Agreement shall remain and continue in force and effect notwithstanding any conclusion or resolution as to any party hereto of liability for the Fox

River PCB contamination or the Marina Cliffs Site, and the parties shall continue to be bound by this Agreement following any such conclusion or resolution.

14. Neither this Agreement, any provision hereof, nor any party's conduct under this Agreement shall be offered as evidence or as an admission against any party in any proceeding before any court or other body, including but not limited to the Southern District Action, and nothing in this Agreement is intended to be, nor shall be deemed to be, an admission of any liability on the part of any party or of the existence of facts upon which liability could be based.

15. Any notice required or permitted under this Agreement shall be sufficient if delivered to the following by confirmed facsimile transmission and/or by overnight delivery by a reputable overnight courier service:

If to Appleton and/or BAT:

Edwin F. Bush, II, Esq.
General Counsel and Secretary
Appleton Papers Inc.
1400 North Rankin Street
Appleton, WI 54911
Fax: (414) 749-8852

with a copy to:

Robert A. Bourque, Esq.
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Fax: (212) 455-2502

If to AT&T GIS:

Susan R. Chema, Esq.
Attorney
AT&T Global Information Solutions Company
101 W. Schantz Avenue, ECD-2
Dayton, Ohio 45479-0001
Fax: (513) 445-0801

with a copy to:

Steven M. Bierman, Esq.
Sidley & Austin
875 Third Avenue
New York, NY 10022
Fax: (212) 906-2021

16. Any waiver in any particular instance of the rights and limitations contained herein shall not be deemed to be, and is not intended to be, a general waiver of any rights or obligations contained herein and shall not operate as a waiver beyond the particular instance.

17. Any assignment, waiver or modification to this Agreement shall not be effective, and shall be void and of no effect, unless it is in writing and is signed by or on behalf of all parties.

18. This Agreement shall be governed by the law of the State of New York.

19. This Agreement may be executed in one or more counterparts, each of which shall constitute an original document.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the above date.

APPLETON PAPERS INC.

By ____________________
Robert A. Bourque
Simpson Thacher & Bartlett
Attorneys for Appleton Papers Inc.

and

By ____________________
Edwin F. Bush, II
General Counsel and Secretary
Appleton Papers Inc.

B.A.T INDUSTRIES LIMITED

By ____________________
Robert A. Bourque
Simpson Thacher & Bartlett
Attorneys for B.A.T Industries Limited

AT&T GLOBAL INFORMATION SOLUTIONS COMPANY

By ____________________
Steven M. Bierman
Sidley & Austin
Attorneys for AT&T Global Information Solutions Company

and

By ____________________
Susan R. Chema
Attorney
AT&T Global Information Solutions Company

IN WITNESS WHEREOF, the parties have executed this Agreement as of the above date.

APPLETON PAPERS INC.

By____________________
Robert A. Bourque
Simpson Thacher & Bartlett
Attorneys for Appleton Papers Inc.

and

By____________________
Edwin F. Bush, II
General Counsel and Secretary
Appleton Papers Inc.

B.A.T INDUSTRIES LIMITED

By____________________
Robert A. Bourque
Simpson Thacher & Bartlett
Attorneys for B.A.T Industries Limited

AT&T GLOBAL INFORMATION SOLUTIONS COMPANY

By____________________
Steven M. Bierman
Sidley & Austin
Attorneys for AT&T Global Information Solutions Company

and

By____________________
Susan R. Chema
Attorney
AT&T Global Information Solutions Company

**Attachment C** **Confidentiality Agreement**

# CONFIDENTIALITY AGREEMENT

This confidentiality agreement (the "Agreement") is made this 15th day of March, 1996, by and between Fort Howard Corporation, P.H. Glatfelter Company, Wisconsin Tissue Mills, Inc., U.S. Paper Mills Corporation, Appleton Papers Inc., Riverside Paper Corporation and NCR Corporation (collectively the "PRPs").

1. Purpose. The purpose of this Agreement is to protect the confidentiality of, and the privileges and protections attaching to, communications between and among the PRPs, and to discuss potentially coordinating responses appropriate to the efforts by the United States Fish & Wildlife Service, the Wisconsin Department of Natural Resources, and/or any other entity to assess injury to natural resources in and around the lower Fox River and portions of the Bay of Green Bay.

2. Denial of Liability. This Agreement shall not constitute, be interpreted, construed or used as (a) any admission of liability, law or fact, (b) a waiver of any right or defense; or (c) an estoppel against any PRP or PRPs as among themselves or by any other person not a signatory to this Agreement. However, nothing in this Agreement is intended or shall be construed to limit, bar or otherwise impede the enforcement of any term or condition of the Agreement against any party to this Agreement.

3. Shared Information. From time to time, the PRPs or their representatives may communicate information to each other, either orally or in writing (the "Shared Information"). The PRPs intend to protect from disclosure (including in any litigation) all Shared Information to the greatest extent permitted by law, regardless of whether the sharing occurred before execution of this Agreement and regardless of whether the writing or document is marked "Confidential." The PRPs also intend that the provision or exchange of Shared Information pursuant to this Agreement shall not be deemed a waiver of any privilege, work product doctrine or other legally recognized protection against disclosure. Shared Information does not include any information in the public domain, obtained from public sources, or secured through means other than pursuant to this Agreement (for example, information obtained through discovery).

4. Confidentiality and Use of Shared Information.

a. All Shared Information received by any PRP pursuant to this Agreement shall be held in strict confidence by the receiving PRP, except as otherwise expressly provided herein.

b. Shared Information that is provided in written or in document form and is intended to be kept confidential may, but need not, be marked "Confidential" or with a similar legend.

c. If any Shared Information becomes the subject of a request or demand for the production of documents or the provision of information by a PRP in the course of an administrative or judicial proceeding, including but not limited to document production requests, interrogatories, depositions and/or subpoenas, or if any Shared Information becomes the subject of an administrative or judicial order requiring disclosure of such information by any PRP, that PRP shall, as soon as practicable but in no event later than three (3) business days of receipt of the request, demand or order to provide such Shared Information, notify the PRP(s) that provided the information, in writing, of the required disclosure. Any PRP(s) may seek to quash the request, demand and/or order, or to otherwise protect the confidentiality of the Shared Information to the greatest extent permitted by law. If the PRPs are unable, despite their best efforts, to maintain the confidence of the subject Shared Information, the PRPs shall attempt to

agree upon a course of action that maintains the confidence of the subject Shared Information to the greatest extent possible, notwithstanding the required disclosure.

d. Notwithstanding any other provision of this Agreement, Shared Information may be shown, produced or relayed by the receiving PRP to its counsel and accountants, to experts retained by counsel, to its corporate parent and to any party against whom the PRP has a claim for defense or indemnification provided that any such party other than counsel agrees in writing to preserve the confidentiality of such Shared Information in accordance with this Agreement.

e. The duty to hold Shared Information in strict confidence under this Paragraph shall survive the termination of this Agreement and/or the withdrawal of any PRP.

5. Conflict of Interest. Each PRP agrees that it will not claim or assert at any time that current counsel for any other PRP executing this Agreement has a conflict of interest: (a) in performing legal services for a PRP in connection with any Fox River matter based solely on said counsel's past or present representation of a PRP in another matter; and (b) in connection with any past or present representation of a PRP in another unrelated matter based solely on said counsel's representation of a PRP in connection with any Fox River matter.

6. No Partnership or Agency. This Agreement does not create a partnership or joint venture nor does this Agreement authorize any PRP to act as an agent or representative of any other PRP with respect to matters addressed under this Agreement or any other matters.

7. Successors and Assigns. This Agreement shall be binding upon the successors and assigns of the PRPs. No assignment or delegation of the obligations hereunder will release the assigning PRP without the prior written consent of each PRP.

8. Withdrawal. Any PRP may withdraw from this Agreement upon written notice to all other PRPs. Such withdrawal shall be effective thirty (30) days from the receipt of such notice by the PRPs. Each PRP agrees that in the event the PRP withdraws from this Agreement, it will continue to abide by the Agreement's provisions concerning the confidentiality of all Shared Information.

9. Choice of Law. This Agreement is to be governed by the laws of the State of Wisconsin.

IN WITNESS WHEREOF, the PRPs enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the PRP on whose behalf the person is signing.

U.S. PAPER MILLS CORPORATION

Dated 3/12/96

By [signature]

Title President and CEO



PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

WISCONSIN TISSUE MILLS

Dated ____________________ By ____________________
Title ____________________

P.H. GLATFELTER COMPANY

Dated 3/15/96 By Robert L. Miller
Title Vice Pres - admin.

RIVERSIDE PAPER CORPORATION

Dated ____________________ By ____________________
Title ____________________

FORT HOWARD CORPORATION

Dated ____________________ By ____________________
Title ____________________

APPLETON PAPERS INC.

Dated ____________________ By ____________________
Title ____________________

NCR CORPORATION

Dated ____________________ By ____________________
Title ____________________



PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

CONFIDENTIAL

| | |
|---|---|
| Dated March 15, 1996 | WISCONSIN TISSUE MILLS<br>By [signature]<br>Title Secretary |
| Dated ______ | P.H. GLATFELTER COMPANY<br>By ______<br>Title ______ |
| Dated ______ | RIVERSIDE PAPER CORPORATION<br>By ______<br>Title ______ |
| Dated ______ | FORT HOWARD CORPORATION<br>By ______<br>Title ______ |
| Dated ______ | APPLETON PAPERS INC.<br>By ______<br>Title ______ |
| Dated ______ | NCR CORPORATION<br>By ______<br>Title ______ |



PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

WISCONSIN TISSUE MILLS

Dated ______________________ By ______________________
Title ______________________

P.H. GLATFELTER COMPANY

Dated ______________________ By ______________________
Title ______________________

RIVERSIDE PAPER CORPORATION

Dated March 13, 199[illegible] By [illegible signature] Bergman
Title President and CEO

FORT HOWARD CORPORATION

Dated ______________________ By ______________________
Title ______________________

APPLETON PAPERS INC.

Dated ______________________ By ______________________
Title ______________________

NCR CORPORATION

Dated ______________________ By ______________________
Title ______________________



PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

CONFIDENTIAL

WISCONSIN TISSUE MILLS

Dated ____________________ By ____________________
Title ____________________

P.H. GLATFELTER COMPANY

Dated ____________________ By ____________________
Title ____________________

RIVERSIDE PAPER CORPORATION

Dated ____________________ By ____________________
Title ____________________

FORT HOWARD CORPORATION

Dated ____________________ By ____________________
Title ____________________

APPLETON PAPERS INC.

Dated ____________________ By ____________________
Title ____________________

NCR CORPORATION

Dated 3/15/96 By [signature]
Title Attorney



PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

**Attachment D** — <u>Agreement Between the State of Wisconsin and Certain Companies Concerning the Fox River</u>

# AGREEMENT BETWEEN THE STATE OF WISCONSIN AND CERTAIN COMPANIES CONCERNING THE FOX RIVER

## I. INTRODUCTION

This Agreement, effective as of January 31, 1997, is hereby entered into by and among the following parties: Fort Howard Corporation, NCR Corporation, Appleton Papers Inc., P.H. Glatfelter Company, Riverside Paper Corporation, U.S. Paper Mills Corp., and Wisconsin Tissue Mills Inc. ("Companies"); and the State of Wisconsin ("State"), through the Wisconsin Department of Natural Resources ("WDNR") and the Wisconsin Department of Justice ("Wisconsin DOJ"). The above listed parties shall be referred to as "the Parties."

As set forth more fully below, the subject matter of this Agreement involves claims for damages for injuries to, destruction of, or loss of natural resources and/or services resulting from releases of polychlorinated biphenyls ("PCBs") and other hazardous substances to the Lower Fox River for which the Companies are alleged to be responsible, and plans, studies or activities concerning the restoration or replacement of such injured resources and/or services or the acquisition of the equivalent.

The Parties have executed this Agreement in order to investigate claims that the United States and the State have asserted against the Companies for natural resource damages and to pursue a negotiated settlement of all claims of any kind whatsoever under either federal or state statute or common law among the State, the United States, and the Companies relating to the release of PCBs and other hazardous substances to the Lower Fox River ("Claims"). The Parties are entering into the negotiations in good faith and agree to consider and to discuss all issues that any party deems necessary or appropriate to a final resolution.

Except as otherwise specifically provided, this Agreement shall not constitute, be interpreted, be construed or be used as: evidence of any admission of liability, law or fact; a waiver of any right or defense; or an estoppel against any party to this Agreement.

## II. AGREEMENT OBJECTIVES

The Parties agree that the objectives of this Agreement are as follows: (1) to begin certain plans, studies or activities in the Lower Fox River/Green Bay area that will improve natural resources and will serve as a basis for evaluating certain sediment management techniques; (2) to establish a one-year "time out" from

litigation, including tolling of limitations periods and forbearance from litigation; (3) to establish a mechanism for collaborative natural resource damage ("NRD") assessment planning or activities in the Lower Fox River/Green Bay area; and (4) to establish a framework for negotiations, leading to settlement of the Claims.

## III. STATE AUTHORITY OVER NATURAL RESOURCES

### A. Legal Framework

Under its Constitution and laws, the State is trustee for, and has administrative jurisdiction over, all natural resources within its borders ("State Natural Resources"). Federal trustees under various federal statutes may have co-trusteeship authority over certain resources.

Federal regulations provide that the state and federal trustees may arrange to divide responsibility for implementing the natural resources damages assessment if a lead authorized official is designated by mutual agreement of all the trustees. 43 C.F.R. § 11.32(a)(1). If the trustees cannot reach consensus on the designation of the lead authorized official, the state shall act as lead authorized official for the natural resources delineated in 43 C.F.R. § 11.32(a)(1)(ii)(D). Id.

Federal regulations further provide that if there is a reasonable basis for dividing the assessment, natural resource trustees may act independently and pursue separate assessments, actions or claims so long as the claims do not overlap with those of other trustees. 43 C.F.R. § 11.32 (a)(1)(iii).

### B. Attempts to Delineate Trusteeship Authority

In compliance with the letter and the spirit of the regulations, the representatives of the State of Wisconsin, the U.S. Department of the Interior, the U.S. Department of Justice, the National Oceanographic and Atmospheric Administration, the Oneida Tribe of Indians of Wisconsin, and the Menominee Indian Tribe of Wisconsin have met several times to attempt to delineate the respective roles of the State and the asserted federal trustees in NRD assessment planning or activities in the Lower Fox River/Green Bay area. However, despite these multiple attempts, the State and the federal trustees to date have been unable to reach agreement about whether the assessment should be divided or who should be designated the lead authorized official.

C. Assertion of Authority by the State of Wisconsin over Natural Resources in the Fox River/Green Bay Area

Because the State and the asserted federal trustees to date have been unable to reach agreement on their respective roles, the State, in compliance with 43 C.F.R. § 11.32(a)(1), has asserted and will continue to assert trusteeship authority over all State Natural Resources.

1. For the purposes of NRD assessment and claims under any federal or state statute, including restoration and compensation issues, the State will act as lead authorized official pursuant to 43 C.F.R. § 11.32(a)(1)(ii)(A) for all State Natural Resources, except for resources located on lands or waters subject to the administrative jurisdiction of a federal agency.

2. The resources described in paragraph III.C.1 are hereinafter collectively called "State-Lead Resources."

3. Coordination. The State will coordinate with other trustees as required by law.

4. Authority to Assess, Compromise, and Litigate. The State has the authority independently to assess, to compromise and to litigate its claims against the Companies regarding the State Natural Resources over which no other trustee has overlapping authority. Regarding other State-Lead Resources, the State's responsibility as lead authorized official includes, pursuant to 43 C.F.R. § 11.32(a)(1)(ii)(A), the authority to act as final arbitrator of disputes if consensus among the authorized officials cannot be reached regarding the assessment of natural resource damage claims.

IV. WORK WITH RESPECT TO STATE-LEAD RESOURCES

A. Actions of the Companies

The Companies will make available a total of $10 million, consisting of a combination of work by the Companies and funding of State activities, for the Interim Phase of the resource assessment and restoration projects for the Fox River and Green Bay. Work on this Interim Phase shall proceed as fast as reasonably possible. The State and the Companies have the goal of finishing work on the Interim Phase by December 1, 1998. The Interim Phase will include the work described in paragraphs 1-4 below:

1. Field-Scale Demonstration of Restoration Projects. The Companies will make available a total of $8 million, consisting of a combination of work by the Companies and funding of State activities, for the following work:

a. A portion of the design, implementation, and/or monitoring of the Deposit N sediment restoration project. At a minimum, the Companies will perform monitoring of the Deposit N project. The Companies understand that the State contemplates that a portion of the costs of the Deposit N project will be paid by funds held by the Fox River Coalition, which funds include monies previously contributed by some of the Companies. The Companies will not be obligated for any additional contribution through the Fox River Coalition for the Deposit N project.

b. The design, implementation, and monitoring of a sediment restoration project below DePere Dam that is designed to provide important information regarding large-scale sediment restoration projects in the Lower Fox River, the specific parameters of which are to be worked out by separate technical discussions of the Technical Committee. The Companies' aggregate commitment for this work shall be in an amount not less than $7.0 million.

c. The following two resource restoration projects. The Companies' aggregate commitment for these projects shall be in an amount to be agreed upon by the parties:

i. Preserve Point Au Sable Wetlands. The Companies will attempt to purchase and transfer to public ownership as much of Point Au Sable as possible and construct the following: public access and a small parking area for vehicular traffic (in a location that limits human interference with the interior wetland habitat), along with a hiking trail, observation decks, a fishing pier, and educational facilities such as interpretive signage.

ii. Enhance 1,000 Islands Environmental Center (City of Kaukauna). The Companies will seek to implement the 1,000 Islands Environmental Center's long-range plan of acquiring key land parcels on the eastern perimeter of the conservancy zone; upgrading a trail to a paved, wheelchair-accessible surface; and building a canoe launch and an observation deck with a view of the pair of bald

eagles that have successfully nested in that location for the last six years.

d. The plans submitted under Section IV.A.4 for work to be done under Section IV.A.1 will call for adequate monitoring to allow for appropriate evaluation of these field-scale demonstration projects for selection of restoration methods. The Companies will not be required to implement monitoring plans until the State and the Companies jointly approve those plans.

2. The Companies will conduct a collaborative assessment of natural resource damages concerning State-Lead Resources, including injury identification and quantification and damages estimation or scaling of compensatory restoration. The State will direct, in consultation with the Companies, the assessment work. This work shall be coordinated with the Technical Committee established under this Agreement. The Companies' commitment under this paragraph will not exceed in the aggregate $1 million in costs to the Companies.

3. The Companies will perform technical work, consistent with the activities and the oversight described in Section IV.A.2., above, designed (a) to evaluate existing models for PCB fate and transport in the Fox River and Green Bay; (b) to enhance the human and ecological risk assessment information available to the trustees; and (c) to support the identification and analysis of further sediment management alternatives, all to promote future decision making and claims resolution by the trustees. The Companies' commitment under this paragraph will not exceed in the aggregate $1 million in costs to the Companies.

4. The Companies will submit draft plans for the performance of work under this Section IV.A on the schedule set out below. The State will consider those draft plans as called for by Section IV.B of this Agreement, and may call for consideration of any appropriate issues by the Technical Committee established by Section IV.D of this Agreement. The draft plan may be modified by agreement of the Parties following discussions with the Technical Committee prior to its approval by the State. Upon approval of any plan by the State, the Companies and State will implement that plan according to its terms and schedule.

a. The Companies will submit a plan for the provision of funds and for the development of a monitoring plan for the Deposit N project within 60 days of receipt of notice from the State that the State has completed conceptual design of the rest of the Deposit N

project, and provision of that conceptual design to the Companies.

b. The Companies will submit a plan for the work and/or funding described in Section IV.A.1.b, including, but not limited to, implementation of monitoring by the Companies within 60 days of receipt of notice from the State that the Technical Committee has completed discussions concerning a technical framework for that project, and provision to the Companies of that technical framework.

c. The Companies will submit a plan for the design and implementation of the work called for by Section IV.A.1.c within 75 days of the effective date of this Agreement.

d. The Companies will submit a plan for the work called for by Sections IV.A.2 and IV.A.3 within 120 days of the effective date of this Agreement, unless the State extends that date to allow further discussion by the Technical Committee of the technical framework for that work pursuant to Section IV.B.

5. The undertaking of all of the foregoing work is subject to the receipt of any necessary permits and approvals.

B. Actions of the State of Wisconsin

The State, as lead authorized official for State-Lead Resources, and the Companies will together cooperatively define the above sediment management and restoration projects. They will attempt to agree as expeditiously as possible on a technical framework for the projects, studies, and analyses outlined above. The technical framework will serve as a basis for developing scopes of work, work plans, budgets, and schedules.

C. Cost Recovery and Contribution

All of the work under this section shall be implemented in a manner that will not prejudice the Companies' potential cost recovery and contribution claims. The Parties intend that the Companies shall receive the maximum protection available under the law against claims regarding matters addressed by this Agreement. Expenditures by the Companies pursuant to this Agreement will be credited against any final judgment or settlement obtained by the trustee(s) relating to claims for response actions or costs or natural resource damages arising from releases to the Fox River.

D. Technical Committee

The State and the Companies will form a Technical Committee to serve as a forum for the exchange of data, information and views concerning the projects, studies and analyses to be undertaken and the technical issues relating to State-Lead Resources or the State's Claims.

E. Terms of Payment

The Companies will pay funds committed in this Agreement in the form of payment of invoices for goods and services purchased under work plans approved according to the terms of this Agreement.

F. Monitoring and Assessment Activities by the Companies

All work performed by the Companies: (a) to monitor the Deposit N project pursuant to Section IV.A.1.a, (b) to monitor the sediment restoration project pursuant to Section IV.A.1.b, (c) to assess natural resource damages pursuant to Section IV.A.2, and (d) to implement technical work pursuant to Section IV.A.3 shall be subject to this Section IV.F.

1. All work shall be performed subject to the oversight of the WDNR.

2. The Companies shall provide WDNR access to all data and analyses developed by the Companies as they become available.

3. WDNR may conduct any additional data collection or analyses it may deem appropriate. WDNR shall provide all such data or analyses to the Companies as they become available.

4. The Parties shall endeavor to plan and to implement their effort cooperatively to satisfy each Party's need for data or analyses.

5. The State shall expedite the issuance of any permits needed by the Companies to perform work under this Agreement.

6. The plans for such work shall provide a budget for the reasonable expenses of the WDNR in overseeing and participating in that work. The budgeted amount shall be included within the Companies' financial commitment for that work.

V. PUBLIC INFORMATION

Subject to Section VIII (Settlement Discussions/Confidentiality), the Parties will undertake measures to inform and obtain input from the Fox River Coalition and the public regarding activities conducted and results obtained pursuant to the Agreement, as appropriate. Such activities may include periodic public meetings.

VI. TOLLING/STANDSTILL PROVISIONS

The State contends that it presently has claims for relief or causes of action (hereinafter "claims") against the Companies, and it has initiated these proceedings and asserted these claims, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§9601 et seq. ("CERCLA"), and the Clean Water Act, 33 U.S.C. §§ 1251 et seq., to seek damages, including assessment costs, for injury to natural resources under its trusteeship in the Lower Fox River/Green Bay area. The State also contends that it presently has claims against the Companies under secs. 283.87 and 292.11, Wis. Stats., and the common law of nuisance.

The Parties agree that the time from January 31, 1997, through the date of termination of this Agreement will not be included in computing the time limited by any statute of limitations or other limitation that applies or may apply to claims referred to above, or to claims derivative of or arising out of those referred to above ("Tolled Claims"), which the Parties may have against each other, nor will that time period be considered on a defense of laches or similar defense concerning timeliness of commencing a civil action, for the recovery of damages or other relief on account of the Tolled Claims. Tolled Claims shall not include claims to enforce, or claims related to the implementation of, this Agreement. With respect to the Tolled Claims, any statute of limitations shall be tolled during and for that period. Except as specifically set forth in this paragraph, no other defense to any claim by the State or by the Companies or any other person is waived or otherwise foregone hereby, including, but not limited to, any statute of limitations defense or similar defenses to claims that may be asserted by persons not a party to this Agreement. Notwithstanding anything to the contrary in this Agreement, all defenses and limitations of the Companies to the claims existing on the effective date of this Agreement based on the expiration of any limitations period or the passage of time shall be preserved, and neither this Agreement nor work performed pursuant to this Agreement shall be construed to revive any claim barred by a statute of limitations or the passage of time, or give rise to any claim other than one to enforce performance in accordance with its terms. The State reserves the right to assert that no statute of limitations, limitation, defense of laches, or similar defense concerning timeliness of commencing a civil action applies to the Tolled Claims.

Except as otherwise agreed by the Parties or compelled by court rule or judicial order to avoid loss of claims, no Party will initiate or prosecute litigation against any other Party on any Tolled Claims during the term of the Agreement.

It is the Parties' intent that all natural resource damages assessment and planning activities conducted during the term of this Agreement will be conducted collaboratively.

## VII. MODIFICATION

This Agreement may be modified (including without limitation the addition of new parties to the Agreement) by agreement of the Parties. All modifications shall be in writing and signed by authorized representatives of the Parties.

The Parties presently intend to modify this Agreement to address natural resource damages assessment activities and claims of the federal trustees, if the federal trustees will agree to enter into such a modified agreement on mutually acceptable terms.

## VIII. SETTLEMENT DISCUSSIONS/CONFIDENTIALITY

Using the analyses and studies to be conducted hereunder, the Parties will attempt to negotiate a settlement of the Claims. Any Party may attempt to negotiate a settlement of the Claims at any time during the term of the Agreement. To encourage full and frank discussions, the Parties agree that the substance of all settlement negotiations are confidential and that all documents and information related to the negotiations shall not be released or communicated to anyone except the attorneys, consultants and administrative personnel involved in the negotiations and principals and their insurers and indemnitors. The subsequent use of all communications or statements made in connection with settlement negotiations will be subject to the Federal Rules of Evidence, including Rule 408, and similar provisions under State evidentiary law.

## IX. NON-WAIVER OF CLAIMS, DEFENSES AND PRIVILEGE

Each party to this Agreement reserves the right to assert any claim, defense, or matter of avoidance in any subsequent litigation among or between any or all of the Parties hereto, and a party's execution of this Agreement or participation in settlement negotiations will not in any way affect such rights. By entering into this Agreement or participating in settlement negotiations, no party waives any right, privilege, defense or claim that could otherwise be asserted or raised with respect to the Claims or the subject matter of this Agreement.

X. TERMINATION OF AGREEMENT

This Agreement shall not be terminated prior to January 31, 1998, without agreement of all of the Parties. On or after that date, the Agreement shall be terminated upon the occurrence of either of the following events: (1) the Parties agree that the work set forth in Section IV of this Agreement has been completed; or (2) 30 days after the State or the Companies as a group provide written notice of intent to terminate this Agreement to the other Parties. Termination of the Agreement will terminate all of each Party's obligations under this Agreement, except for obligations under Section VIII; *provided,* however, that if the Companies as a group terminate this Agreement pursuant to clause (2) of the previous sentence, obligations under Section IV will not terminate; *provided further* that the State will continue to exercise its sovereign rights over State Natural Resources and to assert trusteeship authority in accordance with Section III during the term of this Agreement and otherwise during the course of good faith settlement negotiations regarding the Claims.

XI. EFFECT ON SUCCESSORS, ASSIGNS, AND CORPORATE AFFILIATES

This Agreement will be binding on and shall inure to the benefit of each Party and its successors, assigns, and corporate affiliates.

XII. COUNTERPARTS; CONSIDERATION; AUTHORITY

This Agreement may be signed in counterparts, which together shall constitute one and the same instrument. The Parties acknowledge that the covenants and forbearances under this Agreement constitute adequate and sufficient consideration. The undersigned representative of each party to this Agreement certifies that he or she is fully authorized to enter into the terms and conditions of this Agreement, and to execute for and bind such party to this Agreement.

XIII. STEERING COMMITTEE.

For purposes of implementing this Agreement, the Parties agree to form a Steering Committee to address problems, to assess progress of the Technical Committee, and to provide quarterly reports to the Parties and the public on the implementation of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: George E Meyer
WDNR

By: ______________________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: ______________________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: ______________________________

Print Name: ______________________

FOR NCR CORPORATION:

By: ______________________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: ______________________________

Print Name: ______________________

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: ______________________________
WDNR

By: ______________________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: ______________________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: ______________________________

Print Name: ______________________

FOR NCR CORPORATION:

By: ______________________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: ______________________________

Print Name: ______________________

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: ______________________
WDNR

By: ______________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: [signature]

Print Name: Paul J. Karch
Secretary and General Counsel

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: ______________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: ______________________

Print Name: ______________________

FOR NCR CORPORATION:

By: ______________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: ______________________

Print Name: ______________________



01/29/97 WED 18:45 [TX/RX NO 5130]

CONFIDENTIAL

NCR-FOX-0542375
NCRV_02650356
NCRV_02650313

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: ______________________
WDNR

By: ______________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: [signature]

Print Name: JAMES L. MELLEN II
VICE PRESIDENT

FOR U.S. PAPER MILLS CORP.:

By: ______________________

Print Name: ______________________

FOR NCR CORPORATION:

By: ______________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: ______________________

Print Name: ______________________

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: ______________________
WDNR

By: ______________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: ______________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: ______________________

Print Name: ______________________

FOR NCR CORPORATION:

By: John L. Giering

Print Name: John L. Giering

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: ______________________

Print Name: ______________________

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: ______________________________
WDNR

By: ______________________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: ______________________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: ______________________________

Print Name: ______________________

FOR NCR CORPORATION:

By: ______________________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: R.P. Newcomer

Print Name: Robert P. Newcomer

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCCNSIN:

By: ______________________
WDNR

By: ______________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: Harold J. Bergman

Print Name: HAROLD J. BERGMAN

FOR FORT HOWARD CORPORATION:

By: ______________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: ______________________

Print Name: ______________________

FOR NCR CORPORATION:

By: ______________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: ______________________

Print Name: ______________________

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: ______________________________
WDNR

By: ______________________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: ______________________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: [signature] Pres. & CEO

Print Name: Thomas L. Olson

FOR NCR CORPORATION:

By: ______________________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: ______________________________

Print Name: ______________________

FOR P.H. GLATFELTER COMPANY:

By: ______________________________

Print Name: ______________________

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement on the day and year appearing above.

FOR THE STATE OF WISCONSIN:

By: ______________________________
WDNR

By: ______________________________
Wisconsin DOJ

FOR APPLETON PAPERS INC.:

By: ______________________________

Print Name: ______________________

FOR RIVERSIDE PAPER CORPORATION:

By: ______________________________

Print Name: ______________________

FOR FORT HOWARD CORPORATION:

By: ______________________________

Print Name: ______________________

FOR U.S. PAPER MILLS CORP.:

By: ______________________________

Print Name: ______________________

FOR NCR CORPORATION:

By: ______________________________

Print Name: ______________________

FOR WISCONSIN TISSUE MILLS INC.:

By: [signature] Secretary

Print Name: J.P. Causey Jr., Secretary

FOR P.H. GLATFELTER COMPANY:

By: ______________________________

Print Name: ______________________

WISCONSIN TISSUE MILLS

Dated ______________ By ______________
Title ______________

P.H. GLATFELTER COMPANY

Dated ______________ By ______________
Title ______________

RIVERSIDE PAPER CORPORATION

Dated ______________ By ______________
Title ______________

FORT HOWARD CORPORATION

Dated March 13, 1996 By [signature]
Title VICE PRESIDENT

APPLETON PAPERS INC.

Dated ______________ By ______________
Title ______________

NCR CORPORATION

Dated ______________ By ______________
Title ______________



PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

CONFIDENTIAL

WISCONSIN TISSUE MILLS

Dated ____________________ By ____________________
Title ____________________

P.H. GLATFELTER COMPANY

Dated ____________________ By ____________________
Title ____________________

RIVERSIDE PAPER CORPORATION

Dated ____________________ By ____________________
Title ____________________

FORT HOWARD CORPORATION

Dated ____________________ By ____________________
Title ____________________

APPLETON PAPERS INC.

Dated ____________________ By Paul J. Karch
Title Senior Legal Counsel and Assistant Secretary

NCR CORPORATION

Dated ____________________ By ____________________
Title ____________________



PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

CONFIDENTIAL