# EXHIBIT 6

EXHIBIT 80
Grering
2/10/26 D.S.

SIDLEY & AUSTIN
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

DALLAS
LOS ANGELES
NEW YORK

ONE FIRST NATIONAL PLAZA
CHICAGO, ILLINOIS 60603
TELEPHONE 312 853 7000
FACSIMILE 312 853 7036

FOUNDED 1866

WASHINGTON, D.C.
LONDON
SINGAPORE
TOKYO

WRITER'S DIRECT NUMBER
312-853-7157

October 27, 1998

**VIA FEDERAL EXPRESS**

Paul M. Samson
c/o Park Hyatt
24th and M Streets NW
Washington, D.C. 20037

Ben Mieliulis
Appleton Papers Inc.
1400 N. Rankin Street
Appleton, WI 54911

Re: Factual Investigation Action Plan

Dear Paul and Ben:

Enclosed for your review and consideration in advance of Friday's meeting, is our proposed Action Plan for the Factual Investigation. As you know, many of these activities are underway; other projects will be conducted pursuant to a phased approach in an effort to maximize efficiency and reduce costs.

Please call me with any questions or comments.

Sincerely,

Pam

Pamela R. Hanebutt

cc: Arthur J. Harrington
J. Andrew Schlickman

bc: Thomas M. McMahon
James F. Warchall
Evan B. Westerfield
John M. Heyde

::ODMA\PCDOCS\CHICAGO4\729115\1 October 27, 1998 (2:57pm)

SIDLEY & AUSTIN CHICAGO

# MEMORANDUM

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

**TO:** Paul M. Samson -- NCR Corp.
Benjamin Mieliulis -- Appleton Papers Inc.

**FROM:** J. Andrew Schlickman
Pamela R. Hanebutt
Evan B. Westerfield

**RE:** Fox River -- Action Plan for Factual Investigation

**DATE:** **DRAFT:** October 27, 1998

---

The following is an "Action Plan" for completion of the factual investigation. The factual investigation is in fact six separate projects:

(A) Estimation of the mass of PCB discharged to the Fox River by NCR/API and each of the FRG5 (collectively, the "FRG6");

(B) Assessment of the fate and transport of PCB within the Fox River system;

(C) Rebuttal of the claim that the sale of NCR paper broke constituted an "arrangement for disposal" under CERCLA;

(D) Rebuttal of the argument that "equitable factors" do not justify an increase in what would otherwise be NCR/API's allocable share;

(E) Identification of Other PRPs; and

(F) Assessment of NCR/API's exposure at other PCB-contaminated sites.

Below is a summary of how and when we propose to complete each of these projects. In addition, attached is a memo identifying specific action items we intend to undertake in furtherance of these projects. (Tab A) We believe that if sufficient resources are committed to this investigation, we can complete the critical projects within one year.

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

## A. MASS BALANCE ANALYSIS

The first component of the factual investigation is to estimate the amount of PCB discharged into the Fox River by the FRG6. At the fact investigation status meeting in November of 1997, RMT presented an analysis of several different possible approaches for estimating PCB discharges to the River, including the mass balance approach, the TSS approach, and the weighted TSS approach. Although NCR/API have not yet committed to utilize a particular allocation methodology, the consensus at the November meeting was that the mass balance analysis should be pursued at this time. Based on information available at the time, RMT posited that it would likely generate the most favorable discharge shares for NCR/API. Accordingly, much of the factual investigation is designed to identify or refine the variables in the mass balance equation. The results of the mass balance analysis will be important for all of the allocation methodologies identified to date: discharge percentages, incremental cost-causation and stand-alone cost-causation. (We will continue to evaluate alternative allocation approaches in conjunction with Exponent's modeling work and our decision analysis work with the Brattle Group.)

In a mass balance approach, each step in the movement of PCB -- first into each facility, then through each facility's processes, and finally out in product, sludge, or to the river -- is identified and quantified. As indicated on Figure 1, utilization of the mass balance approach requires resolution of eight separate questions, as described more fully below.

### 1. How much of the PCB that came into each mill was incorporated into the final product?

This is the so-called "partitioning" issue (i.e. how much PCB "partitions to" product during deinking and recycle operations as opposed to the quantity discharged as part of the mill's effluent). The scant information existing on this issue comes from the mid-1970s Easty studies; the Draft Technical Memorandum 2d (hereafter, "DTM2d"); and the Valley report. Unfortunately, much of this information suggests that PCB tended to partition to product. In RMT's judgment, however, the studies are flawed; among other things, they do not take account of PCB in capsular form. RMT has thus proposed to undertake experiments which it believes will yield data allowing us to argue persuasively that the partitioning rate (i.e., the amount of PCB leaving the mills in product) is much lower than existing studies suggest. The specific experiments RMT proposes to perform are summarized in the attached proposal. (Tab B)

We recommend that this work be given the highest priority for several reasons. First, RMT's spreadsheet analysis shows that this issue has one of the strongest influences on the final allocation percentages. In addition, work on this issue is a precondition for work on some of the other issues, such as the removal efficiency of

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

the recycle mills. Finally, this question will require a significant amount of time to answer, given the type of work involved (e.g., bench and possibly pilot-scale studies). Postponement of this work could jeopardize our ability to respond to an accelerated allocation battle.

Assuming that the bench-scale studies are favorable, and pilot-scale experiments are justified, we anticipate completion of work on this issue by July of 1999. Nine months is necessary in part because the experiments themselves are time-intensive. In addition, much of the work depends on factors outside RMT's control. For instance, based on their past experience, RMT estimates that it could take three months simply to negotiate a contract with the facility to do the pilot-scale work. Finally, in order to minimize the risk of adverse results, we anticipate that each step in the process will be reviewed not only by members of the team, but also by engineers at API. This review process, while essential, will slow progress. For these reasons, a nine-month timetable is actually aggressive.[1]

**2. How much PCB came into each mill on NCR broke and/or post-consumer waste paper?**

This is the "PCB furnish" issue. Existing information on this issue is fragmentary. It consists of a handful of documents suggesting the use of NCR broke by certain mills; studies suggesting the amount of post-consumer NCR paper that was recycled during the relevant time period; and claims by the mills concerning their share of the national recycling capacity.

We propose to improve upon and supplement this existing information through, among other things, continued broker interviews; analyses of consumer recycling patterns during the relevant time period; analyses of contemporary trade journals; analyses of the contribution of converter, Systemedia, and Mead broke; and analyses of the capacity of the FRG5 to recycle NCR broke and/or post-consumer NCR paper. Attached is a memo summarizing different approaches to this issue, and the variables we will need to quantify. (Tab C)

We believe this work should, like the partitioning work, have the highest priority. RMT's spreadsheet analyses show that this issue has an equally significant impact on the overall allocation percentages. In addition, work on this issue is critical to our efforts both to obtain favorable recycling legislation and to develop our argument that the sale of NCR broke was the sale of a useful product. Finally, we believe that we need to move quickly to interview brokers before they are contacted by the mills or otherwise become reluctant to speak with us.

---

[1] RMT originally proposed to complete this work in 12 months.

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

Our plan is to complete this work by April of 1999. Six months is necessary principally because so much depends on broker interviews, which are difficult to schedule (in part due to Mary Cesar's travel constraints) and iterative in nature (one broker gives the name of another broker, who points us to another broker, and so on). In addition, several complicated analyses (e.g. assessment of capacity; deinking capability) need to be performed that require sifting through substantial information.

**3. How much PCB came into Combined Locks on secondary fiber?**

This is the "Combined Locks/Broke" issue. The DTM2d assumes that a certain percentage of the NCR broke generated at Appleton was recycled at Combined Locks. This assumption conflicts with the information we have collected to date on this issue, such as the recollections of Combined Locks employees (who stated that Combined Locks did not recycle NCR broke) and RMT's engineering review of the deinking equipment in place at Combined Locks (which suggests that the equipment could not handle NCR broke). Patterson, however, was not persuaded by this evidence.

Even if Patterson's replacement can be persuaded that Combined Locks did not deink NCR broke, we anticipate that the recycle mills will continue to argue otherwise. Thus, this issue requires further effort on a high priority basis. Among other things, we will interview other Combined Locks employees and attempt to obtain design or as-built drawings of the deinking equipment to demonstrate that it could not handle NCR broke. We believe that this work should require no more than six weeks to complete, depending on the availability of witnesses and the responsiveness of the engineering firms we contact.

**4. How much of the PCB lost during unloading and coating operations at ACPC eluded existing treatment processes and went into Fox River?**

This is the "Appleton POTW removal efficiency" issue. Existing information on this issue includes the DTM2d, which focused on the frequency of by-passes of the Appleton POTW; and the AIG report, which found an average removal efficiency of 50-75% before 1964, and 50-90% after 1964. RMT believes that AIG's analysis is rudimentary and that the removal efficiency estimates could be improved if a more systematic analysis is undertaken.

We propose that RMT be authorized to undertake the following tasks: (1) review the AIG report; (2) review the POTW's 104(e) response; (3) interview, if

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

possible, personnel from the POTW[2]; (4) visit the POTW site, if possible; (5) analyze potential overflow events; and (6) analyze the effect of the treatment processes on capsules. A more detailed outline of the work to be performed will be prepared before work on this issue begins.

We believe tasks (1) through (5) can begin immediately and will be concluded within three months. As for task (6), we believe that it is more appropriate to undertake this work once the microcapsule experiments are completed. Those experiments will provide information about the fate of the capsules under a variety of different conditions, information which is critical to this task. Otherwise, we risk having to duplicate our efforts. For these reasons, we recommend that task (6) begin after the microcapsule experiments have been completed; we estimate that it will take three months thereafter to complete this part of the analysis.

**5. How much of the PCB not incorporated into the final product eluded the treatment processes at each mill and went into the Fox River?**

This is the "removal efficiency at the mills" issue. Existing information on this issue includes the DTM2d, which among other things estimated that Fort Howard's removal efficiency was over 90%; the AIG report on the mills treatment processes; and RMT's initial estimates based on block flow diagrams. RMT believes that the information from the microcapsule experiments should provide the information we need to generate more realistic estimates about the mills' treatment efficiencies.

We propose to have RMT prepare a report which synthesizes information from their prior work, the AIG report, the mills' 104(e) responses, and the microcapsule experiments. We believe that it would be more prudent and economical to prepare this report after the microcapsule studies have been completed. This report should take no more than three months to complete.

**6. How much PCB was delivered to ACPC and Combined Locks for coating?**

This is the "encapsulation" issue. The goal is to determine (i) whether any PCB was lost during the encapsulation process and, if so, how much; (ii) how much of the encapsulated PCB was sent to the Fox Valley rather than to Mead or elsewhere; and (iii) how of the PCB sent to the Fox Valley was sent to ACPC rather than Combined Locks. Existing information on this issue includes the TRC report (which estimates that 27 million pounds of PCB came into the valley, none going to Combined Locks); and the DTM2d (which estimates that 30 million pounds of PCB came into the valley, with

[2] Requests for such interviews must be made through the Appleton POTW's counsel.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT
JOINT DEFENSE MATERIAL

2% going to Combined Locks). Neither of these prior analyses evaluates the possibility of encapsulation losses. In addition, the TRC report suffers from a lack of clarity on this point.

We propose to have accurate and defensible estimates developed for each of the three questions above. This would involve, among other things, a review of emulsion shipping records; a review of production records; interviews of individuals involved in the encapsulation process; and site visits of encapsulation facilities.

In our judgment, this is a medium to low priority issue. While to a certain extent the entire mass balance depends on the answer to this question (i.e., how much did we start with), our spreadsheet analyses show that the final allocation percentages are not particularly sensitive to minor swings in this number. We therefore believe that our resources are more appropriately directed at other issues first. Once we turn to this issue, a report can be generated in two-to-three months.

7. **How much of the PCB delivered to ACPC and Combined Locks was lost during unloading and coating operations?**

This is the emulsion loss issue. RMT has already prepared an analysis of this issue for the Appleton facility, which was favorably received by Patterson. No estimates have as yet been made for the Combined Locks facility.

Given RMT's past work, little needs to be done on this issue with respect to the Appleton facility. The remaining action items are to confirm production information and to consider whether to perform a Monte Carlo analysis on the identified loss events. RMT believes that a Monte Carlo analysis will undercut most objections to their estimate. We are in the process of evaluating this proposal and will provide you with a recommendation in two-to-four weeks.

Although this issue has not been investigated with respect to Combined Locks, we do not propose to undertake any such work at this time. Based on the interviews to date, we suspect that such work would not be fruitful. Accordingly, we believe it is prudent to delay such work to see what, if anything, the other parties develop on this issue.

8. **How much of the PCB lost during unloading and coating operations at Combined Locks eluded existing treatment processes and went into the Fox River?**

This is the "Combined Locks removal efficiency" issue. While some work has been done to determine the removal efficiency of the deinking facility that was in

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

place until 1966, very little work has been done on the questions of whether there was any treatment of emulsion lost during coating operations and, if so, what the efficiency of that treatment was. For the same reasons as in question 7, above, we recommend against undertaking work on this particular issue at this time.

## B. FATE AND TRANSPORT OF PCB

Exponent is currently conducting modeling work to enhance our understanding of how PCB moved in the Fox River system. Exponent's report is expected to be completed by year-end.

Exponent's proposal is attached (Tab D).

## C. ARRANGER LIABILITY / SALE OF A USEFUL PRODUCT

The third component of the factual investigation is to rebut the claim that the sale of NCR broke constituted an "arrangement for disposal" under CERCLA. Specifically, we need to develop evidence and legal arguments that demonstrate that the sale of NCR broke was in fact the sale of a "useful product." To accomplish this, we need to undertake four tasks:

### 1. Update Arranger Liability White Paper.

In early 1996, we prepared a summary of the law in the Seventh Circuit on the sale of a useful product defense. Since that time, there have been a number of developments in this area, including the Vertac and Pneumo Abex decisions and the legislative initiatives. In light of these developments, we propose to update the "white paper" so that it properly identifies the issues we need to investigate. This update can be completed in three-to-four weeks and will incorporate information developed in our Factual Investigation thus far.

### 2. Prepare an Analysis of Whether NCR Broke Would Constitute a "Solid Waste" Under RCRA.

Recently, several courts have used a RCRA analysis as part of their consideration of the useful product defense. Specifically, these courts have looked at whether the material at issue would have constituted a "solid waste" under RCRA, on the theory that a RCRA "solid waste" is unlikely to have been a "useful product." Whatever one thinks of this approach, it is being advocated elsewhere by Ft. Howard's attorneys and is thus an argument we will likely have to confront. Accordingly, we propose to prepare an analysis of whether NCR broke would constitute a "solid waste"

under RCRA and, if so, arguments we can make against the use of this approach. This analysis will be included as part of the update of the arranger liability white paper.

**3. Synthesize Evidence Showing That Broke Was "Valuable" and Not a "Waste".**

Case law and recent legislative initiatives confirm that the key issue for the useful product defense is to show that the material at issue was, subjectively and objectively, a "valuable" product and not a "waste." Specifically, we will need to show, among other things, that a market existed for the sale of NCR broke; that more than nominal consideration was paid for NCR broke; that the price of NCR broke was set by competitive bidding; that a substantial portion of NCR broke was useable as a replacement for a virgin raw material; that NCR broke met a commercial specification; and that NCR broke was never landfilled nor dumped.

We already have collected significant information on all these issues. Our interviews of NCR/API employees have confirmed, among other things, that broke was never landfilled; that it was carefully managed for resale; that it was priced by competitive bidding; and that brokers, not Appleton, directed the shipments of broke. Our review of documents has confirmed that broke was given a value on accounting records and that it was inventoried and tracked by grade.

We propose to have the appropriate consultant prepare a report that collects in one place the information we have gathered, making a persuasive case that NCR broke was a useful product. We believe that it would be more efficient to prepare this report after the investigation into the issue of PCBs in mill furnish has been completed, thereby enabling the consultant to utilize information developed during broker interviews. We therefore anticipate that this report will be finalized no later than May of 1999.

**4. Investigate Whether to Retain an Additional Expert on the Limited Issue of Whether There Was a "Market" for Broke.**

In a different "useful product" case, our firm hired a Yale University economist to prepare a report showing that, according to all relevant indicia customarily relied on by economists, a market existed for the material at issue and therefore the material constituted a "useful product."[3] We believe there may be some value in using this approach here. We propose to investigate this idea further and to then prepare a recommendation. This recommendation will be prepared by the end of this year.

---

[3] The case was settled before the report was tendered and so we do not have any information about how a Court would have reacted to such a report.

## D. EQUITABLE FACTORS

The fourth component of the factual investigation is to develop evidence showing that the "equitable factors" to be considered under CERCLA § 113 do not justify an increase in what would otherwise be NCR/API's allocable share. Following is a brief summary of how and when we intend to address each of the principal Gore factors:

### 1. Degree of Toxicity or Hazard Involved.

A significant amount of work has already been done on this issue in connection with the technical investigation and the health forums. Consequently, we do not propose to undertake any additional work specifically on this issue at this time. However, we will continue to monitor this issue for the purposes of both the technical and the factual investigations.

### 2. Degree of Involvement and Responsibility of the Parties in the Generation and Disposal of the Substances.

This is the "who knew what when" issue. We can expect the mills to claim (i) that NCR/API delayed removing PCB from NCR paper, even after the risk of harm was recognized; and (ii) that the mills were ignorant of the PCB-content of NCR paper. To neutralize this issue, we will need to develop evidence rebutting both of these claims.

We have already looked into these claims extensively. Among other things, we have reviewed NCR/API documents; reviewed Monsanto brochures; reviewed technical literature from the 1950s and 1960s; conducted interviews of NCR/API employees; and conducted patent searches. This work has uncovered substantial evidence that NCR/API did not delay in removing PCB from NCR paper. However, it has not uncovered much information to suggest that the mills knew of the PCB content.

With this work, we have exhausted the principal sources of information currently available to us. However, once we can use the tools available during discovery, we can pursue other (and probably more fruitful) sources of information, including mill employees and the former Institute of Paper Chemistry. Consequently, at the present time we do not propose to undertake any significant work on this issue.

### 3. Degree of Care Exercised by the Parties With Respect to the Substance Involved.

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

This issue largely overlaps with the previous issue, although the nature and effectiveness of the mills' wastewater treatment facilities will also be relevant here. As with "who knew what when," we propose to investigate this issue further when additional sources of information become available to us.

**4. Degree of Cooperation of the Parties With Government Officials.**

At this time, NCR/API and the mills, by virtue of their common efforts with the Fox River Group, are in identical positions with respect to the cooperation issue. Consequently, there is no reason to undertake any work on this issue at this time.

**5. Each Party's Ability to Pay.**

Some mills (U.S. Paper and Glatfelter, in particular) have claimed that they could not afford to pay their anticipated share of response costs and natural resource damages. We can expect these mills to argue that their financial circumstances warrant a reduction in their allocable share. Our response will be that their claims of relative "poverty" are unwarranted, supported with analyses of the claimants' balance sheets. We have already done this on a preliminary basis for Glatfelter and plan to conduct similar analyses for US Paper and Riverside.

**E. OTHER PRPs**

At the August 1998 status meeting, we concluded that, for now, NCR/API should continue to identify other PRPs as part of the collective FRG6 effort, rather than embark on their own independent search. We will, however, continue to monitor this group activity closely, particularly as it relates to the liability of the Corps of Engineers.

**F. OTHER SITES**

Although the focus of our efforts is obviously the Fox River, we are closely monitoring NCR/API's potential exposure at other PCB-contaminated sites. Thus, for example, we recently retained PHR Environmental to review the Kalamazoo River litigation files, the result of which was the discovery of some very useful information (e.g. the Valley report).

Following up on our August status meeting, we have reviewed the EPA's report entitled "The Incidence and Severity of Sediment Contamination in Surface Waters of the United States: National Sediment Quality Survey" (EPA 823-R-97-006) to identify those sites identified as being contaminated with PCB. Using that list, we will

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**
**JOINT DEFENSE MATERIAL**

ask Jaakko Poyry to identify whether there are any paper mills or coaters in the vicinity. This project can be completed by year-end.

::ODMA\PCDOCS\CHICAGO4\729120\1 October 27, 1998 (12:17pm)