# EXHIBIT 12

PHR
ENVIRONMENTAL
CONSULTANTS, INC.
An IT Company

# Review and Summary
# Of
# Civil Docket Case Number 95-CV-838
# Kalamazoo River Study Group v. Rockwell International, et al
# For
# Sidley & Austin

**Submitted: July 12, 1998**

Dft's 45
1/30/26
ARP

Respond To: ☐ 5290 Overpass Road, Suite 220 • Santa Barbara, CA 93111-2051 • 805/683-1954 • FAX 805/683-2772
☐ 4195 Thousand Oaks Blvd., Suite 155 • Westlake Village, CA 91362-3812 • 805/379-9552 • FAX 805/379-3143
☐ 74 New Montgomery Street, Suite 335 • San Francisco, CA 94105 • 415/975-8700 • FAX 415/975-8702
☑ 11821 Parklawn Drive, Suite 130 • Rockville, MD 20852 • 301/770-1134 • FAX 301/770-5981


NCRV_13609046

| | | |
|---|---|---|
| **Kalamazoo River Study Group v. Rockwell International, et al** | **Civil Docket Number:** | **95-CV-838** |
| | **Filing Date:** | **12-01-95** |
| | **Current Status:** | **Active** |
| | **Judge:** | **Robert Holmes Bell** |

Filed in the U.S. District Court for the Western District of Michigan, Grand Rapids. Records currently maintained at the U.S. District Court, Grand Rapids, Michigan. Sandra Layland, Project Manager reviewed and summarized the case. A.J. Gravel, Director of East Coast Operations provided project oversight and edited the written summary. Copies of all of the documents cited in this summary were provided to the client under separate cover. All document copies are labeled and organized by the Docket Number.

| **Plaintiff:** | **Attorneys:** |
|---|---|
| Kalamazoo River Study Group | Allan C. Bennett<br>Law, Weathers & Richardson<br>Suite 800, Bridgewater Place<br>333 Bridge Street, NW<br>Grand Rapids, MI 49504-5360<br>616-932-1171<br><br>Jerome T. Wolf<br>Sonnenschein Nath & Rosenthal<br>4520 Main Street, Suite 1100<br>Kansas City, MO 64111<br>816-932-4400 |

| **Defendants:** | **Attorneys:** |
|---|---|
| Rockwell International Corporation | Joseph C. Basta<br>Dykema Gossett, PLLC<br>400 Renaissance Center<br>Detroit, MI 48243-1668<br>313-568-6800 |
| Eaton Corporation | Joseph C. Basta<br>(see above) |
| Wells Aluminum Corporation | Plaintiff has 30 days to serve Wells after U.S. Bankruptcy Court for the Southern District of NY has resolved adversary proceeding 96-8041A [Docket Item 41]<br>Wells Aluminum was dismissed from the case on 1-20-98. [Docket Item 644] |

| | |
|---|---|
| Hercules, Inc. | Thomas M. Weibel<br>Smith, Haughey, Rice & Roegge, PC<br>200 Calder Plaza Bldg.<br>250 Monroe, NW<br>Grand Rapids, MI 49503-2251<br>616-774-8000<br><br>There is no mention of Hercules Inc. in the case docket after May 2, 1997. This defendant does not appear to be a current party to the lawsuit. |
| Benteler Industries, Inc. | Jon R. Muth<br>Miller, Johnson, Snell & Cummiskey<br>800 Calder Plaza Bldg.<br>250 Monroe Ave., NW<br>Grand Rapids, MI 49503<br>616-831-1700<br>fax 616-841-1701<br><br>Daniel P. Perk<br>Miller, Johnson, Snell & Cummiskey<br>425 W. Michigan Ave.<br>Kalamazoo, MI 49007-3765<br>616-226-2958 |
| Menasha Corporation | Jeffrey L. Woolstrum<br>Honigan, Miller, Schwartz & Cohn<br>2290 First National Bldg.<br>660 Woodward Ave.<br>Detroit, MI 48226-3583<br>313-465-7000<br><br>Dustin P. Ordway and<br>James Gavin O'Connor<br>Dickinson Wright, PLLC<br>200 Ottawa, NW Suite 900<br>Grand Rapids, MI 49503<br>616-458-1300 |

| | |
|---|---|
| Upjohn Company | Douglas E. Wagner<br>Warner, Norcross & Judd, LLP<br>900 Old Kent Bldg.<br>111 Lyon Street, NW<br>Grand Rapids, MI 49503-2489<br>616-752-2000 |
| Rock-Tenn Company, Mill Division Inc. | Arthur H. Siegel<br>Jaffe, Raitt, Heuer & Weiss, PC<br>One Woodward, Ave., Suite 2400<br>Detroit, MI 43226<br>313-961-8380 |
| | Edward A. Kazmarek and<br>John L. Watkins<br>Long, Aldridge & Norman<br>One Peachtree Center, Ste. 5300<br>303 Peachtree Street<br>Atlanta, GA 30308<br>404-527-4160 |

**Mediator:**

| | |
|---|---|
| VFM | Richard Dana, Judge<br>Judicial Arbiter Group<br>1601 Black Street, #400<br>Denver, CO 80202-1328<br>313-572-1919 |

**Counter Defendants:**

| | |
|---|---|
| Kalamazoo River Study Group | Alan C. Bennett<br>(See Above) |
| | Jerome T. Wolf<br>(See Above) |

Georgia-Pacific Corporation
Simpson Plainwell Company
James River Paper Company, Inc.
HM Holdings, Inc./Allied Paper

## Case Background:

This case was filed by the plaintiffs for recovery of response costs incurred at the Allied Paper, Inc/Portage Creek/Kalamazoo River Superfund site (hereinafter referred to as the subject site). The subject site as originally defined in December 1990, included Portage Creek from Cork Street just above the Bryant Mill Pond in Kalamazoo, Michigan, to the confluence of Portage Creek with the Kalamazoo River and the Kalamazoo River from this confluence downstream to the Allegan City Dam. In all, the site originally included about three miles of Portage Creek and about thirty-five miles of the Kalamazoo River. In July 1991 the area of the site was expanded to encompass upstream landfills owned and operated by the PRPs, and downstream areas affected by the migration of PCB contamination. Currently the subject site includes an eighty mile segment of the Kalamazoo River from the Morrow Lake Dam to the river mouth at Lake Michigan, and the three mile segment of Portage Creek described above. The plaintiff is conducting an environmental response at the subject site pursuant to an Administrative Order of Consent (AOC) with the Michigan Department of Natural Resources (MDNR).

The plaintiff, Kalamazoo River Study Group (KRSG), is an unincorporated association having as its members four paper manufacturing companies. All of the members of KRSG, except James River Paper Company, are also respondents to the AOC dated December 28, 1990 under a cooperative agreement between the MDNR and the U.S. EPA. The AOC expressly states that respondents do not admit as a matter of fact or law any issue dealt with in the AOC. The current KRSG members are:

- **HM Holdings, Inc./Allied Paper, Inc.** a Delaware corporation
- **Georgia-Pacific Corporation,** a Georgia corporation
- **Simpson Plainwell Paper Company,** a Michigan corporation
- **James River Paper Company,** a Virginia corporation

It should be noted that James River Paper Company (James River) joined the group only after the group presented a case study in March 1993 containing evidence of substantial contribution to the PCB contamination of the Kalamazoo River. Similar case studies were also prepared by the group and presented to the parties who became the plaintiffs in this case. Only James River elected to join the KRSG as a result of these case studies. Although not a party to the AOC, James River has participated in the work on the subject site since 1993.

The plaintiffs are companies which owned and operated facilities within the subject site during the time period when PCBs were released to the river.

- **Rockwell International**: Rockwell owned riparian land bordering upon and located within the subject site. Rockwell, and its predecessors, owned and operated a manufacturing plant at 1 Glass Street, Allegan, Michigan from 1914 to 1992. This

plant manufactured drive parts for heavy trucks and construction equipment. The plant ceased to operate and was completely closed in July 1992. From about 1914 to until about 1960 the wastewater produced by Rockwell's plant was released directly into the Kalamazoo River. Rockwell's industrial processes at the plant included the use of quench oils, cutting oils, hydraulic fluids, and lubricating oils.

- **Eaton Corporation:** Eaton owned property located at 1101 West Hanover Street, Marshall, Michigan, and 463 North 20th Street, Battle Creek, Michigan. The Marshall property housed Eaton's Fluid Power Division, which manufactured power steering pumps, fan drives, clutches, differentials, and other products. The Marshall Street Facility has been in operation since about 1938. From the 1930s until about 1984 Eaton's Engine Components Facility operated at the Battle Creek property. This facility manufactured engine valves. Eaton's industrial processes included use of hydraulic, cutting, and quenching oils.

- **Pharmacia & Upjohn, Inc. (Upjohn):** Upjohn owned riparian land at 439 Portage Street, Kalamazoo, Michigan, bordering on Portage Creek within the subject site. Upjohn owned and operated a large manufacturing complex known as the Henrietta Street Facility near the confluence of Portage Creek and the Kalamazoo River, as well as a manufacturing complex known as the Portage Facility, near Portage, Michigan. Upjohn's third facility in the subject site was known as the Kilgore Road Facility. Industrial equipment used at all of Upjohn's facilities included dozens of electrical transformers and capacitors which used PCB-containing fluids.

- **Hercules, Inc.:** Hercules owned riparian land at 411 Hercules Ave., Parchment, Michigan. From 1931 until about 1990, Hercules operated a facility on this property. There is no mention of Hercules Inc. in the case docket after May 2, 1997. This defendant does not appear to be a current party to the lawsuit.

- **Benteler Industries, Inc.**: After 1989, Benteler owned an automobile parts manufacturing facility located at 9000 East Michigan Avenue, Galesburg, Michigan. The Benteler facility was connected to the site by a drainage ditch emptying into Morrow Lake, a section of the Kalamazoo River in the subject site. Prior to Benteler, the plant was owned by General Signal Corporation and ICM Acquisitions.

- **Rock-Tenn Company, Mill Division:** Rock-Tenn owned riparian land located at 431 Helen Street, Ostego, Michigan. Rock-Tenn acquired an existing paper mill on the Ostego site in 1987. The paper mill had been in operation since about 1906. Prior owners of the Ostego paper mill included the Mead Corporation. A 1989 MDNR document appears to indicate that the Rock-Tenn Mill was affiliated with the Simpson Plainwell Paper Company (see Docket Item 666 Exhibit 2).

- **Menasha Corporation:** Menasha owned riparian land located at 350 North Farmer Street, Ostego, Michigan. A large paper mill complex was located on this property from about 1939.

## Experts:

**Plaintiff** Docket Item 308 Exhibit C.

Mark P. Brown, Ph.D.

Principal expert for KRSG. Project Manager of the RI/FS for the Kalamazoo River Superfund site.

Vice President of Blasland, Bouck & Lee, Inc., 6723 Towpath Road, P. O. Box 66, Syracuse, NY. Ph.D. in biology from Fordham University, 1979. Experience includes thirteen years research and experience in the fate and transport of water-borne pollutants, including PCBs. Has consulted on the following sites: **Fox River, WI**; Housatonic River, MA and CT; Passaic River, NJ; Sheboygan River, WI; and Hudson River, NY.

Expert Report. Docket Item 571 Exhibit 13.

Expert Report. Docket Item 551 Exhibit 17.

Affidavit on Benteler. Docket Item 182.

Kenneth G. Crumrine Ph.D.

KRSG expert in environmental engineering and chemistry.

Vice President, AECOM Technology Corporation, 1776 Eye Street, NW, Suite 1040, Washington, DC. Ph.D. in Environmental Engineering, University of Maryland, 1979. Dr. Crumrine's experience includes hazardous materials and waste management, and industrial process engineering for the papermaking, automotive, and manufacturing industries.

Has previously served as a consultant for cost allocation studies at various CERLA sites including: Acme Solvents; Hartage Landfill; Dover Gas Light; Peterson-Puritan Blackstone River. Principal author of the TSCA PCB Compliance and Inspection Manual.

Expert Report: Docket Item 571 Exhibit 14.

Expert Report. Docket Item 551 Exhibit 16.

Affidavit . Docket Item 651 Exhibit 1.

| | |
|---|---|
| William A. Duval Jr., Ph.D. | KRSG expert on application of the National Oil and Hazardous Substances Pollution Contingency Plan, 42 CFR Part 300. Specific expertise for this case was the cost and economics of environmental response actions.<br>Vice President of ENSR Consulting and Engineering, 35 Nagog Park, Acton, MA. Ph.D. in Environmental Science from Rutgers University.<br>Expert Report: Docket Item 571 Exhibit 13<br>Expert Report: Docket Item 585 Exhibit 7. |
| Ronald T. Barrows, Esq. | KRSG expert on real estate law, water law, title insurance standards, and riparian rights and obligations.<br>Attorney and real estate broker with Barrows & Associates, P. O. Box 36958, Grosse Pointe, MI.<br>Expert Report. Docket Item 585 Exhibit 10. |

**Defendants**

| | |
|---|---|
| Lawrence A. Austin, Ph.D. | Benteler expert. President of Aqua-Tech Consultants, 1336 Scribner NW, Grand Rapids, MI.<br>Testified about the hydrogeology of the ditch on the Benteler property.<br>Expert Report. Docket Item 182 Exhibit P. |
| Lawrence N. Halfen, Ph.D. | Benteler expert. Environmental Consultations, Inc., 6688 Forest Valley Drive, Grand Rapids, MI.<br>Testified about soil samples collected from the Benteler facility.<br>Expert Report. Docket Item 157 Exhibit 16.. |
| John P. Geisy, Ph.D. | Upjohn expert. Professor of Fisheries and Wildlife, 163 Natural Resources, Michigan State University, East Lansing, MI.<br>Docket Item 575 Exhibit 1.<br>Docket Item 520 Exhibit F.<br>All PCBs detected in the sediments and soils in Portage Creek adjacent to the Upjohn facilities were consistent with, and could be accounted for by water-borne dispersion of PCBs (primarily Aroclor 1242) discharged |

from the de-inking mill at Allied Paper to the Bryant Mill Pond. The co-occurrence of Aroclor 1242, paper fibers, and kaolin in the sediments further supports the contention that the PCBs were the result of downstream migration from the Bryant Mill Pond. Upjohn did not use Aroclor 1242 in any of its operations. Contributions of Aroclor 1248, 1254, or 1260 might have been related to Upjohn's activities. However, documented transformer leaks on the Allied property may also be responsible for detection of Aroclor 1254 downstream from Allied's operations. Wastewater discharges from Upjohn facilities which contained PCBs were treated and diluted at the local POTW, the Kalamazoo Water Reclamation Plant, prior to discharge into the river.

John D. Schell, Ph.D.

Menasha expert. Ph.D. in Toxicology from Rutgers University, 1979. Director of Risk Assessment at ATRA Occupational & Environmental Services.

Docket Item 571 Exhibit 1. Expert Report.

Docket Item 542 Exhibit L. Affidavit.

Stated that Menasha never used NCR paper as part of its secondary fiber sources. Menasha never operated a de-inking plant in connection with its paper mill at Ostego. Kalamazoo River water was the source of non-contact cooling water at Manasha's plant from 1951 to the present. From 1960 on, the Kalamazoo River water used by Menasha contained elevated levels of PCBs as a direct result of the de-inking activities of upstream paper mills. The small quantities of PCBs detected in process waste water was likely to have been river water containing PCBs originating in discharges from upstream sources.

Electrical equipment used by the Menasha mill was contained in rooms with concrete dikes or berms to prevent water from contacting the electrical equipment. Such containment structures would also have contained any leaked or spilled PCB fluids inside the plant. There is no documentation of any PCB leakage from electrical equipment at the Menasha plant reaching the Kalamazoo River.

Because certain paper mills used NCR paper as a source of secondary fiber, PCBs eventually became incorporated into other types of paper, which ultimately entered the wastepaper stream. As a result of the large scale paper recycling efforts beginning in the mid-1970s, PCBs originating in the NCR paper have slowly infiltrated a large portion of the world's paper stock, although in steadily decreasing concentrations. In theory any paper mill using even small quantities of post-consumer paper as furnish could have introduced small quantities of PCBs into its production line.

| | |
|---|---|
| Brian C. Boevers | Rock-Tenn expert. BS and MBA. Principal and Vice President of Conestoga-Rovers & Associates, St. Paul, MN.<br><br>Testified about: the fate and transport of PCBs in the Kalamazoo River; lack of migration of PCBs deposited on the Rock-Tenn site by Mead Corporation; and that upstream PCBs could not have been deposited by the Rock-Tenn plant.<br><br>Expert Report. Docket Item 623 Exhibit 25 |
| Kim E. Anderson, Ph.D. | Rockwell expert. Senior Vice President, Chief Principal Health Scientist of McLaren/Hart Environmental Engineering Corporation, 1000 Town Center, Suite 600, Southfield, MI. Ph.D. in Environmental Health from University of Oklahoma.<br><br>Expert Report. Docket Item 655 Anderson.<br><br>Report on the historic composition and use of hydraulic, cutting, and quench oils. Concludes that PCBs were seldom added to hydraulic, cutting, or quench oils, and only when specific process requirements mandated their use. PCB-containing oils were costly, emitted unpleasant odors, and were irritating to the skin. PCB-containing oils were not commonly used when other oils would meet process requirements.<br><br>References cited for the historic composition of hydraulic, cutting, and quench oils were all published after 1985. No historic sources were cited. No trade literature contemporary with the historic operation of the Rockwell facilities was cited. |
| Lennard Wharton, Ph.D. | Rockwell expert. Ph.D. in Physical Chemistry. President of Evidential Engineering, 10 Park Place, Short Hills, NJ.<br><br>Expert report. Docket Item 655 Wharton<br><br>Report concerning the cutting oils, quench oils, and hydraulic fluids used at the Eaton Transmission Division Plant. Found no evidence that PCB-containing oils were used at the plant. Explained the presence of PCBs in the plant's wood flooring as "limited leakage from electrical equipment over many years." |
| John P. Connolly, Ph.D. | Rockwell expert. Principal Engineer, HydroQual, Inc.<br><br>Qualifications. Docket Item 655 Connelly. |

| | |
|---|---|
| Robert C. Barrick | Rockwell expert. Principal, PTI Environmental Services, 15375 SE 30th Place, Suite 250, Bellevue, WA. A geochemist specializing in the fate and transport of toxic chemicals.<br><br>Expert Report. Docket Item 655 Barrick<br><br>Report addresses the fate and transport of PCBs in the Kalamazoo River. The Aroclors found on the Rockwell site are not consistent with the Aroclors found in the river sediments. The Rockwell facility, therefore, did not contribute Aroclors to the river sediments. |

## Non-Expert Witnesses from the Paper Industry:

| | |
|---|---|
| Simpson-Plainwell | Carl Gren; George Lawton; William Thacker |
| James River | William Zinkus; C.M. Williams; Frank Yankoviak; Victor Ferguson |
| Allied | Wayne Kendrick; U.G. (Les) Stoeffler; Richard Eaton; Thomas Flanagan |
| Georgia-Pacific | Fritz B. Curtenius; Robert W. Polderman; Fred Shelton; Thomas F. Sullivan; Al Campbell; Dan Cummins; Ronald Hanson |
| Menasha | Keith Kling; Jack Rynbrand |
| Krell Iron & Metal Co. | Robert E. Krell, wastepaper supplier |
| Padnos Iron & Metal Co. | Jack Rynbrand, wastepaper supplier |

## Abstracts of Significant Decisions:

1) **February 21, 1997. Docket Item 221. Opinion by Judge Bell granting Benteler's motion for summary judgment.** Benteler was not held liable for KRSG response costs. Benteler's counterclaim against KRSG was dismissed. Judge Bell stated that KRSG had failed to uphold its claim that it had material facts linking Benteler's facility to PCB contamination in the Kalamazoo River. KRSG's evidence was insufficient to form a causal link between the contamination and the response costs incurred.

   The facility in question was connected to the river by a 3200 foot drainage ditch. Benteler acknowledged that in 1989 a PCB-containing transformer at its facility was damaged and leaked PCBs. While cleaning up this spill, Benteler discovered PCBs throughout the plant, in the drainage lines leading to the ditch, and in the ditch. PCB-contaminated soils were removed from the drainage ditch in 1993. The facility was issued a closure letter by the MDNR in 1993.

   Benteler successfully argued that the condition of the ditch and the nature of the surrounding soils are such that PCBs would not have been transported all the way down the ditch for disposal into the section of the river know as Morrow Lake. Approximately 2600 feet of the ditch separated the PCB-

contaminated section of the ditch from the river. No evidence of PCBs emanating from the plant was found in the ditch near the river.

KRSG based its contention that PCBs would have been carried down the ditch to the river on four categories of information: a U.S.G.S. map describing the ditch as a continuously running waterway; a Benteler NPDES permit; soil samples at the ditch outlet to Morrow Lake, and Dr. Brown's expert opinion. The evidence of the map was overturned by witness testimony that the ditch was not a continuously running stream. The evidence of the NPDES permit that Benteler and the MDNR considered Morrow Lake the discharge point for the ditch was outweighed by the fact that KRSG could not prove that any wastewater flows along the ditch had actually reached the lake. The PCBs detected at the outlet of the ditch were held to be the result of deposition of PCB-contaminated sediments from Morrow Lake into the ditch during periodic flooding. Judge Bell stated that "the inadequate factual basis makes Dr. Brown's affidavit scientifically unreliable."

2) **April 30, 1997. Docket Item 319. Discovery hearing.** The plaintiff sought to withhold certain documents from discovery by the defendants under a claim of privilege. Rock-Tenn brought the motion to compel KRSG to produce these documents. U.S. Magistrate Judge Joseph G. Scoville presided at the hearing.

Judge Scoville stated that the KRSG was not a legal entity, but in effect a joint venture of its member corporations. Blasland, Bouck, and Lee (BBL), the consulting firm retained by KRSG, was deemed to be part of the client team for purposes of attorney-client privilege. By divulging a privileged document to BBL, KRSG did not waive attorney-client privilege for that document.

Work product documents prepared in anticipation of litigation may also be immune from discovery, or partially immune. Disclosure of work product documents to a third party does not necessarily waive their immunity from discovery. Work product immunity acquired in one legal proceeding is applied to subsequent cases. Judge Scoville held that administrative proceedings before the MDNR are deemed to be previous litigation due to the adversarial nature of the process. However, after entering into a consent decree with the MDNR, the parties are no longer in an adversarial position with regard to that agency. After signing a consent decree the work product immunity no longer applies, although attorney-client privilege still applies.

Judge Scoville applied the sequential analysis set out by Toledo Edison v. G.A. Technologies to determine which documents were discoverable in this case. The steps are listed below:

1) Are the documents relevant and discoverable? The burden of proof is placed on the party seeking the documents, in this case the defendants. The judge felt that the defendants had proven the documents relevant.

2) Were the documents prepared in anticipation of litigation? The burden of proof in this case is on the plaintiff. The plaintiff had proven that all the documents in question were prepared in anticipation of litigation.

3) Can the defendant show substantial need and/or undue hardship in order to qualify the immune documents for discovery? The defendants had not proved substantial need and undue hardship.

The defendants also argued that by naming Mark Brown of BBL as an expert witness, the KRSG was waiving all privilege and immunity for all documents prepared by BBL for any purpose. The judge did not accept this argument. The documents in question were broken down into several categories. Judge Scoville ruled on the discoverability of each category:

a) **Letters to Counsel.** These were letters prepared by BBL to provide counsel with recommendations and opinions on meetings with MDNR or third parties, or to seek legal

advice for the KRSG members concerning matters at issue. These documents fall under attorney-client privilege and are protected.

b) **Letters to Group Members.** Letters prepared by BBL to provide members of the group with opinions and recommendations regarding matters at issue. Since these were not communications with counsel the attorney-client privilege does not apply. Since these documents were not prepared specifically in anticipation of litigation they are not considered to be immune work products. Judge Scoville classifies these documents as consultant reports and therefore discoverable. The statement "prepared at the request of counsel" is not sufficient to establish work product immunity.

c) **Meeting Notes for Counsel.** If the communication was with counsel, it is privileged. If the communication was with a group member it is not.

d) **Minutes of Meetings.** If the communication was with counsel, it is privileged. If the communication was with a group member it is not.

e) **PRP Documents.** Judge Scoville held that documents prepared by the consultant to identify PRPs were inherently prepared in anticipation of litigation. Documents that have to do with identifying PRPs, whether addressed to counsel or group members, are considered to be protected work products. However, the facts summarized in those documents or underlying those documents are not immune from discovery. Questions can be asked about the identification of PRPs and the information considered during that process, but the summary report does not have to be released in order to answer the questions.

One particular document, known as the Valley Report, [Docket Item 542 Exhibit A] was prepared in July 1990 by Richard B. Valley for Georgia-Pacific Corporation. Mr. Valley was an outside academician retained by Georgia-Pacific to assist with an investigation of the claims of threatened litigation made against Georgia-Pacific. This document entitled "Sources of PCB Contamination in the Kalamazoo River," was provided in 1990 to Mark Brown, KRGS's expert witness as background information for his investigations. Three pages of the Valley report were disclosed to James River prior to the date when James River joined the KRSG, while it was still in an adversarial relationship to the group. In view of the uncontested disclosure of a portion of the document to an adversary, Judge Scoville ruled that the document was not immune from discovery.

3) **February 13, 1998. Docket Item 676. Hearing before Judge Bell concerning summary judgment motions.**

Argument concerning the various standards of causation used by the federal courts in CERCLA cases. Argument concerning timing of releases, that is whether current owner-operators should be held liable for releases which occurred prior to their tenancy. Argument concerning scientific validation of historic analytical test results offered as evidence of releases.

4) **March 6, 1998. Docket Item 689. Opinion by Judge Bell on motions for summary judgment.**

**Causation.** Judge Bell noted that there had been much debate about the plaintiffs' burden of proof with respect to causation. The standard case law states that the release must have caused the plaintiff to incur response costs. KRSG contends that CERCLA imposes strict liability, therefore it need not prove causation at all. So long as KRSG proves a release and the PRP group incurred response costs, the defendant(s) should be held liable. Part of the argument concerning the causation issue was KRSG's contention that there is no requirement that a defendant discharge meet some minimum quantity of hazardous substances in order to be held liable.

The court agreed that in a multiple generator case such as this the plaintiff cannot be required to fingerprint the waste from each PRP. The court will not require the plaintiff to prove that a particular defendant caused plaintiff to incur response costs. On the other hand the court does not agree that the release of even the slightest quantity of a hazardous substance is enough to support a judgment against that defendant for an undetermined extent in a contribution action brought by an admittedly responsible party.

There may also be a different standard of proof for an action brought by an innocent party, such as the innocent government, versus one brought by a private party. All suits brought as contribution actions by private parties are bound by the principles of equitable contribution. That is, a "release sufficient to justify response costs." The court found the Cordova case applicable for the standard of causation. The court will use the "threshold of significance" standard in considering summary judgment motions. This is defined as "is the evidence of defendant's release of sufficient significance to justify holding defendant liable for response costs?"

**Riparian Land-owners.** KRSG asserts that Menasha, Pharmacia & Upjohn and Rock-Tenn are liable simply because they own riparian land along the River on which PCBs have been detected. The defendants have all used the third party defense allowed by CERCLA to innocent landowners. To establish this defense the defendants must prove that:

1) A third party was the sole cause of the release.
2) The act or omission of the third party did not occur in the context of a direct or contractual relationship between the defendant and the third party.
3) The defendant took due care and precautions to prevent the foreseeable acts or omissions of the third party causing the release.

KRSG seeks to deny the defendants this defense arguing that they cannot establish that the contamination of the riparian property was caused solely by other parties, and because they cannot establish that they took due precautions against the acts and omissions of third parties. The court holds that the degree of care required for riparian owners to assert the third party defense in passive migration cases is met if the riparian owner has not facilitated or encouraged the migration or spread of the hazardous substance and has not exacerbated the conditions at the site.

**Menasha.** The frequency and quantity of alleged PCB releases by Menasha is purely speculative and involves incidental discharges of miniscule quantities. Menasha's motion for summary judgment is granted. Menasha is dismissed from the case.

**Pharmacia & Upjohn.** Summary judgment on riparian property is granted. Insufficient contribution is found to hold Pharmacia & Upjohn liable. Pharmacia & Upjohn is dismissed from the case.

**Rock-Tenn.** Despite exculpatory evidence presented by Rock-Tenn's experts concerning the current non-contributory status of the plant, the plaintiff presented considerable evidence that a prior owner of the property, Mead Corporation, released PCBs to the river on an almost continuous basis. Subsequent to Mead's ownership, the PCBs in the settling ponds and aeration lagoon were not removed and remain in Rock-Tenn's wastewater treatment system today. Rock-Tenn remains a defendant.

**Admissibility of Public Records.** "In the case of public records, evidence that the purported public record or report is from the public office where items of this nature are kept is sufficient for authentication." Rock-Tenn argued that such records are hearsay and therefore has the burden of proving they are not trustworthy. Rock-Tenn contends that the historic laboratory test results found in

the public records are invalid and the samples taken were not representative, thereby bringing into question the scientific accuracy of the tests. These are issues that go to the weight accorded to the evidence and not to its admissibility. These are questions of fact for trial.

5) **June 5, 1998. Docket Item 716. Order Denying Expedited Motion for Clarification or Amendment of Summary Judgment Orders.**

Rock-Tenn requested that the court clarify or amend its summary judgment orders to find KRSG liable. KRSG had refused to stipulate to the liability of its members. Although no motion for summary judgment was filed on this issue, Rock-Tenn sought to avoid the necessity of establishing the liability of KRSG during the liability phase of the trial scheduled to begin on June 1, 1998. [Docket Item 712]

Judge Bell denied Rock-Tenn's motion for clarification or amendment stating that it was in effect a request for ruling on issues not previously presented to the court.

## Significant Issues in Motions for Summary Judgment:

The defendants and plaintiff in this case submitted motions for summary judgment. The defendants motions were all based on similar arguments and were supported by virtually the same case law citations. The motions and orders are listed below:

| Date | Docket Item | Description |
|---|---|---|
| 12-10-96 | 156 (Client has) | Benteler motion for summary judgment. |
| 2-21-97 | 221 | Opinion of Judge Bell on summary judgment for Benteler. Benteler not held liable for response costs. |
| 8-8-97 | 483 | Rock-Tenn motion for partial summary judgment. |
| 9-5-97 | 509 | Menasha motion for partial summary judgment. |
| 9-15-97 | 520 | Pharmacia & Upjohn motion for summary judgment. |
| 10-10-97 | 542 | Menasha motion for summary judgment. |
| 10-27-97 | 565 | Plaintiff motion for summary judgment against Pharmacia & Upjohn. |
| 11-13-97 | 584 | Plaintiff motion for summary judgment against Menasha. |
| 12-12-97 | 622 | Rock-Tenn motion for summary judgment. |
| 1-16-98 | 642 | Opinion of Judge Bell granting in part, and denying in part, motions by Rock-Tenn and Menasha for summary judgment. |
| 2-2-98 | 650 | Plaintiff motion for partial summary judgment against Rockwell International. |
| 2-2-98 | 654 | Rockwell International motion for summary judgment. |
| 2-2-98 | 656 | Eaton Corporation motion for summary judgment. |
| 2-4-98 | 662 | Plaintiff motion for partial summary judgment against Eaton Corporation. |

| Date | Docket Item | Description |
|---|---|---|
| | | |
| 3-6-98 | 689 | Opinion by Judge Bell granting motions for summary judgment in favor of Menasha and Pharmacia & Upjohn; denying motions for summary judgment in favor of Rock-Tenn; denying all plaintiff motions for summary judgment against Menasha, Pharmacia & Upjohn; and Rock-Tenn. |

No ruling has yet been rendered by the court on the motions for summary judgment concerning Rockwell International and Eaton Corporation. The following discussion summarizes the main issues common to all the summary judgment motions.

## Issues with Court Rulings

### CERCLA Section 107(a) claims

The plaintiff brought action against the defendants under CERCLA Section 107(a) as joint and severally liable persons chargeable for response costs. This argument was based on the following points:

a) Each defendant is a current owner of the subject site, that is the riparian lands extending to the center line of the Kalamazoo River.

b) During the time when PCBs entered the river, each of the defendants owned and operated facilities at which PCBs were used, stored, or disposed. Such PCBs were subsequently released directly or indirectly into the river.

c) Each defendant arranged for disposal or treatment of PCBs which were released directly or indirectly into the river.

This action was not successful. The judge has ruled that KRSG cannot name additional liable parties under CERCLA Section 107(a). That prerogative is limited to innocent parties. The court did not agree that mere ownership of riparian lands inside the subject site was sufficient grounds for liability under 107(a).

Docket Item 642 Opinion by Judge Bell.

### CERCLA Section 113 claims

The plaintiff brought liability claims for contribution against the defendants under CERCLA Section 113 (f )and (g)(2). To prove a prima facie case of CERCLA liability, the court required the plaintiff to:

a) Show that there was a release or threatened release of a hazardous substance, in this instance PCBs.

b) Show that the area of the release is a facility as defined in 42 USC 9601 (9).

c) Show that the release or threatened release caused the plaintiff to incur response costs. This must include evidence of the pathway connecting the releases at a facility with the Kalamazoo River or its tributaries.

d) Show that the defendant is an owner or operator of the facility from which there was a release; or is an arranger or transporter under CERCLA 107(a).

e) Show that the quantity of the release was above the "threshold of significance standard" used in United States v. Cordova Chemical Company of Michigan, 113 F.3d 572 (6th Cir. 1997), that is: "is the evidence of defendant's release of sufficient significance to justify holding defendant liable for response costs?"

KRSG argued that Cordova was not applicable to the facts of this case because it did not set a minimum quantity of hazardous substances which must be released to incur liability. According to KRSG's counsel, Cordova found a generator of hazardous wastes liable when it "by some realistic measure, helped to create the harmful conditions." [Docket Item 628]

KRSG's claims for contribution were upheld in the instance of Rock-Tenn as stated in Judge Bell's opinion on Rock-Tenn's motion for summary judgment. KRSG failed to support its claims for contribution in the instances of:

**Benteler:** KRSG failed to show that releases at the facility reached the river via the surface drainage ditch.

**Menasha:** KRSG failed to show that the quantity of the release was significant.

**Upjohn:** KRSG failed to show evidence of significant releases to the river.

Docket item 689, Opinion by Judge Bell.

**Admissibility of Public Records and Technical Documents**

Historical analytical results of effluent testing at the Rock-Tenn mill site dating from the period of Mead Corporation ownership could not be authenticated or scientifically validated. [Docket Item 622]

Judge Bell has ruled that "In the case of public records, evidence that the purported public record or report is from the public office where items of this nature are kept is sufficient for authentication." The issues raised by Rock-Tenn concerning scientific validation of the analytical findings are issues that go to the weight accorded to the evidence and not to its admissibility. These are questions of fact for trial.

Docket item 689, Opinion by Judge Bell.

**Generation of PCB Wastes by Prior Owners**

KRSG argued that PCBs were accumulated in the Rock-Tenn paper plant's wastewater treatment lagoons by Mead Corporation, a prior property owner and plant operator. The historic sludge in the lagoons were allegedly discharged to the river by the activities of both Mead Corporation and Rock-Tenn. However, KRSG produced no documentation of PCBs in the Rock-Tenn discharges which were also regulated by its NPDES permit. [Docket Item 622]

KRSG documented that from 1972 to 1978 PCBs were consistently detected in sludge, process water, and effluent generated by Mead Corporation at the Rock-Tenn facility. KRSG obtained witness testimony that the treatment lagoons had never been dredged or cleaned by either Mead Corporation or Rock-Tenn, and were therefore likely to contain residual PCBs from Mead's tenure on the property. [Docket Item 649]

Judge Bell did not grant Rock-Tenn's motion for summary judgment.

Docket item 689, Opinion by Judge Bell.

## Issues with Rulings Pending

### Divisibility of Liability

In its request for partial summary judgment [Docket Item 483], Rock-Tenn argued that it should not be held liable for response costs concerning contaminants detected upstream from its paper mill in Ostego, MI. This mill was the furthest downstream paper mill in the subject site. Menasha's paper mill was also located in Ostego, just upstream from the Rock-Tenn mill. Menasha used the same arguments as Rock-Tenn concerning apportionment of liability based on its facility's location within the subject site. [Docket Item 509]

KRSG held that Rock-Tenn and Menasha's argument of apportionment of liability based on geographic location was not applicable to the first phase of the trial, namely the liability phase. KRSG requested that the court deal with this issue in the second, or allocation phase of the trial. [Docket Item 535]

Rock-Tenn rebutted the KRSG response by citing In re: Bell Petroleum Services 3 F.3d 889 (5th Cir. 1993), where the court held that the nature of the harm is the key factor in determining whether apportionment is appropriate. Rock-Tenn argued that the harm to the subject site was divisible geographically entitling it to a partial summary judgment. [Docket Item 563]

### Federally Permitted Releases

Upjohn argued that any "theoretical, undetectable releases" of PCBs by its facilities were federally permitted releases under the NPDES permit held by the local POTW, the Kalamazoo Water Reclamation Plant. Since all wastewater produced by Upjohn's plants reached the river after treatment at the local POTW, if the POTW was in compliance with its NPDES permit, then Upjohn was in compliance. [Docket Item 575]



CONFIDENTIAL NCRV_13609063
NCRV_13609046

Rock-Tenn also argued that since it acquired ownership of its Ostego mill in January 1988 all of its wastewater discharges had been federally permitted discharges under its NPDES permit. [Docket Item 622]

## Document Index:

The following table lists documents found in the case file which appear to be relevant to the following topics:

- Detection and "fingerprinting" of PCBs in the river
- NCR carbonless paper
- Paper recycling processes
- Pathways for migration of PCBs from facilities to the river
- Quantities of PCBs present in feed stock
- Quantities of PCBs present in finished products
- Quantities of PCBs present in waste products
- Secondary fiber brokers or suppliers
- Secondary fibers as feed stock for paper mills
- Types and volumes of PCB-containing products produced by Monsanto
- Waste handling methods of paper mills

| Docket Item | Description |
|---|---|
| **335 Exhibit F** | Excerpt from Menasha's responses to interrogatories. "Cabonless paper or other PCB-containing material has never been used as secondary fiber stock at the Ostego Mill. Because Menasha does not use PCBs in its papermaking process, its final product consistently complies with the PCB limits established by the Federal Food and Drug Administration for food packaging material." |
| **335 Exhibit H** | Condensed transcript of Keith Kling, Menasha Corporation, Environmental Group. Menasha produced corrugated media for manufacture of double-lined-kraft (DLK) corrugated paper boxes. "Liner is not typically made with a lot of recycled paper ... certainly not made with any white paper, NCR papers." Describes paper recycling processes. |
| **386** | Status Conference. Menasha's counsel repeats that it sought no PCB-containing feed stock for its plant. Judge Scoville orders Menasha to produce names and addresses of its feed stock suppliers or feed stock brokers. |
| **441** | Notice of Deposition. Metro Fibers was one of the suppliers of feed stock to the Menasha paper mill. |
| **442** | Notice of Deposition. Padnos Iron & Metal was one of the suppliers of feed stock to the Menasha paper mill. |
| **443** | Notice of Deposition. Krell Paper Stock Company was one of the suppliers of feed stock to the Menasha paper mill. |

| Docket Item | Description |
|---|---|
| **480** | Response by Eaton Corporation to KRSG's evidentiary showing regarding groundwater as a PCB pathway to the river. |
| **491** | Status Conference on Discovery. Discussion of the relevance of soil and groundwater reports from the Eaton facility. KRSG argued that solvents and residues from the degreasers at the plant could have contained PCBs. Witness testimony had indicated that these residues were dumped on the ground or into an unlined pit on the Eaton plant grounds. KRSG wanted to review the groundwater studies for any evidence that surface contamination had migrated to the groundwater, and thence to the river. |
| **520 Exhibit B** | KRSG Report Excerpt. History of the papermaking industry in Kalamazoo. References to carbonless paper as a source of Aroclor 1242 in the paper recycled by Kalamazoo-area paper manufacturer. |
| **520 Exhibit E** | Mark Brown deposition excerpt. Details of laboratory analysis of PCB-containing sediments to determine the type or group of Aroclors that best matches the sample. The effect of berms, dams, and containments on the migration of PCB-containing sediments in a river system. |
| **520 Exhibit J** | Background on Upjohn's activities to eliminate PCBs from its wastewater discharges. |
| **542 Exhibit A** | Valley Report. "Sources of PCB Contamination in the Kalamazoo River" prepared for Georgia Pacific Company, July 1990.<br>States that various Aroclors were designed by Monsanto for particular end uses. Carbonless paper used Aroclor 1242, certain inks contained Aroclor 1254. Source for background information on use of Aroclors in the paper industry was an article by Zambrano and Walter of the NY Dept of Environmental Conservation (no exact citiation).<br>Only 6.3% of Monsanto's production of Aroclor 1242 was sold for manufacture of carbonless papers during the period 1957-71.<br>Appendix A provides estimates of PCBs from de-inking plant waste, based on various assumptions.<br>Appendix B provides estimates of PCBs from box board plant waste, based on various assumptions.<br>Appendix C estimates PCBs as a percentage of production for de-inking mills and paperboard mills.<br>Appendix D provides an abbreviated corporate history for each of the paper mills in the Kalamazoo area.<br>Appendix E lists the paper mill locations in the Kalamazoo area. |
| **542 Exhibit C** | Condensed transcript. Deposition of Ronald Hanson, Georgia Pacific employee. Recalled that NCR paper was part of the "wood free furnish" used in de-inking mill No. 1. NCR paper was approximately 10 percent of the furnish for that mill. |
| **542 Exhibit G** | Selected discharges of PCBs to the Kalamazoo River 1971-1981. |
| **542 Exhibit H** | PCB sampling results for point sources along the Kalamazoo River, August-September 1985. Lists PCBs detected in waste water from various paper mills. |

| Docket Item | Description |
|---|---|
| **542 Exhibit M** | PCB sampling results reported by Allied after lowering the Bryant Mill Pond in March and April 1976. |
| **542 Exhibit O** | Condensed Transcript. Deposition of Keith Kling, Menasha. Describes processes at the plant for handling process wastes and secondary fiber sources. |
| **542 Exhibit Q** | Excerpt from Volume III, Deposition of Mark Brown. Stated that he was unable to characterize the proportion of PCB residue in various categories of wastepaper, such as office waste or cardboard. |
| **542 Exhibit S** | MDNR wastewater survey results for Menasha Mill. |
| **542 Exhibit V** | MDNR February 1993 Interoffice Memorandum on Analytical Detection Levels for Environmental Response Activities. Notes changes to detection levels for a number of chlorinated compounds including pesticides and PCBs. |
| **542 Exhibit X** | Paper sample test results for the Menasha Mill. Tests performed by the Institute for Paper Chemistry, Appleton, WI. Results are listed for other Menasha plants including "North Bend." |
| **542 Exhibit Y** | Excerpt from the Deposition of Robert E. Krell, Lipsner & Krell Iron and Metal Company. This was a wastepaper supplier to all the paper and box mills in the area. Described the process of selling waste paper to Menasha. Basically the supplier contacted Menasha about a "load" of waste paper of a specific grade from a location, such as Grand Rapids. Some loads were baled at their source, some by the supplier at its place of business. Suppliers such as Krell made every effort to keep grades of waste paper separated to insure the highest price possible. Mixed paper was cheap, corrugated paper board was worth more. Mr. Krell recalled that at one time there was a specific category of wastepaper called "NCR paper" which contained nothing but carbonless paper. |
| **542 Exhibit Z** | Excerpt from the deposition of Jack Rynbrand, Menasha employee, former employee of Padnos Iron & Metal, a supplier of secondary fiber to Menasha. Mr. Rynbrand first became aware of the presence of PCBs in NCR paper in the late 1960s. Waste paper sold to Menasha was sorted by type and sold by the bale. |
| **551 Exhibit 19** | 1995 U.S. EPA letter to City of Kalamazoo Wastewater superintendent re: PCB discharges from POTWs.<br>U.S. EPA methods of calculating PCB discharges from POTWs. U.S. EPA did not maintain lists of facilities with records of PCB usage in 1995. |
| **570** | KRSG memorandum in opposition to Menasha's motion for summary judgment. Footnote 3, Page 4 states that Georgia Pacific purchased bales of NCR paper for recycling from "companies making NCR paper," and not as post-consumer waste. Source: Hanson Deposition at 15-16 and 61-64. |
| **571 Exhibit 1** | Expert Report by John Schell, Expert Witness for Menasha.<br>Dr. Schell reviews the U.S. EPA's reports citing NCR paper as a source of PCBs in the secondary fiber sources used as furnish by certain paper plants. According to Dr. Schell, levels of PCBs in secondary fiber sources would be relatively low in the early 1960s. As more NCR paper entered the wastepaper stream the level of PCBs would increase. Since use of Aroclor 1242 in NCR paper ceased in 1971, the levels of |

| Docket Item | Description |
|---|---|
| | PCBs entering the wastepaper stream would tend to decrease after that date.<br>Laboratories in the early and mid-1970s had problems detecting and quantifying low levels of PCBs. Laboratory problems included: difficulties in identifying all the components of a mixture; interference by organochlorine pesticides which can produce false positive readings; and biodegradation of sampled materials causing difficulty in matching the detected material with standard profiles for PCB products. |
| **623 Exhibit 2** | Extract from: "PCBs: Involvement in the Pulp and Paper Industry," Versar Inc., Springfield, VA, (February 25, 1977) EPA 560/6-77-005. Also published as NTIS PB-271-017. Reviews history of Aroclor 1242 use in NCR paper. |
| **655 Exhibit 4** | MDNR February 28, 1973 letter to Brown Company (now James River) indicating that a "significant amount (.96 ppb) of PCBs" were detected in its wastewater discharge to the Kalamazoo Industrial Sewer. Letter provides some background information concerning PCBs and gives instructions for safe disposal of PCB-containing wastes. |
| **655 Exhibit 5** | Brown Company (now James River) 1976 reports on samples of NCR paper tested for PCBs. Describes type of form, date of form contents, and amount of PCBs detected. Attached memoranda indicate that paper samples dating to 1960s contain fewer PCBs than paper samples from the 1970s. |
| **655 Huisman** | Extract from the deposition of Howard Huisman, employee of James River (formerly Brown Company). Testified that carbonless paper was a source of PCBs detected in the products of the plant. |
| **665 Exhibit 36** | List of Monsanto PCB Sales (1970-1972) to District 3. Michigan purchasers of PCB products. Shows Eaton Corporation purchased Pydraul, and PCB hydraulic fluid. This document was found in the files of MDNR and appears to have been produced for another legal case. The Bates stamp KB20102750 relates to the current case. The Bates stamp 0012808 relates to another, unidentified case. |
| **666 Exhibit 2** | MDNR memorandum, January 1989. Records decision not to impose water quality-based effluent standards for PCBs on the Rock-Tenn Mill. The memorandum also indicates that Simpson Plainwell Paper Company was somehow connected to the Rock-Tenn Mill at this time. |
| **679 Exhibit 3** | Monsanto Technical Bulletin No. P-137, "Aroclor, a nonflamable hydraulic fluid for die-casting systems," May 1, 1950. |
| **679 Exhibit 4** | Excerpt from Monsanto Technical Bulletin No. O-P-115, "Aroclors, physical properties and suggested applications," n.d. |
| **679 Exhibit 37** | Apparently a list of Monsanto's products with percentages of PCBs by weight. Appears to be a document produced in a prior lawsuit. Probably found in the MDNR files. |

**NCR CORPORATION V. B.A.T INDUSTRIES P.L.C.**[1]

**Hard Copy Document Review Issue Tag Cover Sheet**

Issues:

✓ 1
2
3
4
5
6

✓ 8
9
10
11
12

Attorney Comments:

discusses pcb in k.river.
MENTIONS NCR carbonless paper
on pg 18

[1] Docket Number 23-cv-1172-JPC-SDA (S.D.N.Y.)